UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| RAO MANDALAPU         )<br>                       )<br>    Plaintiff,       )<br>                       )<br>v.                     )   Case No. 3:25-cv-1320<br>                       )<br>UNITED STATES DEPARTMENT )<br>OF VETERANS AFFAIRS,   )<br>and DOUGLAS A. COLLINS, )<br>U.S. SECRETARY of VETERANS )<br>AFFAIRS                )<br>                       )<br>    Defendants         )   Jury Trial Demanded | |

## COMPLAINT

The Plaintiff, Dr. Rao Mandalapu, M.D., by and through his attorneys, Tully Rinckey PLLC, as and for his Complaint against the Defendants, alleges the following:

## INTRODUCTION

1. The plaintiff, Dr. Rao Mandalapu, is a physician and surgeon formerly employed by the Department of Veterans Affairs ("VA"). Dr. Mandalapu lost first his clinical privileges, then his employment, then his ability to practice his profession by the actions of the Defendants.

2. The Defendants' actions began after Dr. Mandalapu complained about workplace decisions apparently based on his race, age, or national origin. Their actions were taken for an unlawful, retaliatory purpose. These actions initially followed procedures set by regulation, but they extended the timing of these procedures past all reason until Dr. Mandalapu resigned his position. After he resigned, the Defendants filed invalid reports

1

against Dr. Mandalapu in the National Practitioner Data Bank and the State Medical Board. The final report claims that Dr. Mandalapu voluntarily failed to renew his clinical privileges while under investigation, but this claim is false.

3. These reports have prevented Dr. Mandalapu from being hired as a physician ever since. They have also damaged his professional reputation in connection with adverse employment actions and a constructive discharge.

4. Dr. Mandalapu brought the Title VII portion of this case before the Equal Employment Opportunity Commission ("EEOC"), which made a final decision denying relief on February 25, 2025. A related case is on appeal to the EEOC's Office of Federal Operations; however, for *this* case, Dr. Mandalapu has elected to bring an action in federal court under 42 U.S.C. § 2000e-5(f)(3).

## JURISDICTION AND VENUE

5. This action arises under the Fifth Amendment to the United States Constitution, the Administrative Procedure Act, and Title VII of the Civil Rights Act of 1964. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

6. Most of the events noted below took place in or near Dallas, Texas. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## FACTS

**Background**

7. Dr. Mandalapu (Plaintiff) is a board-certified Urologist and surgeon. He joined the VA in 2021 and practiced without noteworthy incident until 2022. In 2022 he worked at the Dallas VA Medical Center as a urological surgeon.

8. Plaintiff's immediate supervisor was Dr. Karen Crotty, Chief of Urology and Assistant Chief of Surgical Services for the VA North Texas Health Care System (VANTHCS).

9. Dr. Crotty's immediate supervisor was Dr. John Modrall, Chief of Surgical Services at VANTHCS.

10. Dr. Modrall's immediate supervisor was Dr. Jeffrey Hastings, Chief of Staff at VANTHCS.  However, during some of the events described below, Dr. Raul Rivera, who normally serves as deputy chief of staff, was acting chief of staff.

11. Mr. Kendrick Brown, Certified Healthcare Facility Manager, served as Medical Center Director for VANTHCS in 2022-23.

12. In March 2023, Mr. Brown was replaced by Mr. Jason Cave.

**Clinical Privileges and Adverse Clinical Actions.**

13. In order to practice as a surgeon in a VA hospital (or any other hospital), a doctor must have "privileges" to perform various specific functions, such as fluoroscopic imaging or robotic-assisted surgery.  Plaintiff received these privileges for the VANTHCS in 2021.

14. Within the VA system, a physician's privileges may be suspended or reduced under the procedures set out in VHA Directive 1100.21(1) (2023).  However, this directive did not go into effect until March 2, 2023.

15. Before March 2, 2023, privileging procedures were still governed by VHA Handbook 1100.19 (2012).  In particular, before a physician's privileges could actually be reduced, he had to be allowed to review "all evidence not restricted by regulation or statute" upon which the proposed changes were based.  He also had to be notified of his right to a Review Panel, at which he had the right to be present, to examine the evidence against him, to be represented, and to cross-examine witnesses.

16. The Medical Center Director may also impose a Summary Suspension of Privileges under VA Privileging Directive 1100.21—Standard Operating Procedure P9 ("SOP P9"). A summary suspension is designed to temporarily stop the physician's practice in areas where the Director has some concern about patient safety, while an appropriate investigation is conducted. Per SOP P9, "it is critical that the investigation be completed, and appropriate action be taken *as expeditiously as possible*." As will be shown below, this did not occur in Dr. Mandalapu's case.

17. Also as noted by the SOP P9, the "appropriate investigation" is generally a Focused Clinical Care Review (FCCR) conducted under the authority of the Executive Committee of Medical Staff (ECMS) in accordance with VHA Directive 1100.21. VHA Handbook 1100.19, which governed privileges in 2022, required the FCCR to be completed within 30 days of the summary suspension, with the circumstances surrounding any deviations to be documented.

18. According to the VHA Office of Quality, Safety, and Value, *Focused Clinical Care Review and FPPE For Cause Guidance* (January 2018), "if it is determined that action should be taken on a provider's privileges, detailed evidence of substandard care must be gathered." As will be shown below, after the summary suspension of Dr. Mandalapu's privileges, he requested but did not receive such evidence; yet the language of this publication suggests that the evidence should already have been gathered before the summary suspension.

19. Once the FCCR is conducted, its results are sent to the ECMS, which makes a recommendation to the Medical Facility Director, who chooses between the following options: (1) no further action, (2) Focused Professional Practice Evaluation measures (a

kind of probation for the physician), or (3) further steps to reduce the physician's privileges (which ultimately include the physician's right to a Review Panel). VHA Directive 1100.21, para. 7g. Under VHA Handbook 1100.19, the director had five business days from receipt of the recommendations to make this decision.

20. Thus, the procedures for reducing a physician's privileges in the VA move from collecting evidence → summary suspension → FCCR investigation → ECMS recommendation → Action by the Director → Physician's right to a hearing before a Review Panel.

21. Of all the steps noted above, only the hearing before a Review Panel guarantees the physician procedural due process, in the sense of notice and a right to be heard; and the constructive denial of these rights by means of interminable delay lies at the heart of this lawsuit.

22. Adverse employment actions within the VA are governed by VA Handbook 5021/22, *Employee/Management Relations*. For adverse actions, the manual requires:

    (1) An employee shall be informed in writing honestly and specifically why the action is being brought against him or her.
    (2) An employee shall be given a reasonable opportunity to present his or her side of the case.
    (3) The employee and representative shall have assurance of freedom from restraint, interference, coercion, discrimination, or reprisal in discussing, preparing, and presenting a defense.

**Reports to the National Practitioner Data Bank**

23. Under the Health Care Quality Improvement Act of 1986, the Department of Health and Human Services maintains the National Practitioner Data Bank (NPDB), to which reporting authorities (such as hospitals and the VANTHCS) must report certain significant actions in the career of a physician who receives his privileges from them.

5

    Reportable actions include healthcare related criminal convictions, malpractice payments based on a physician's conduct, *final* actions reducing a physician's privileges, and (of interest to this case) a failure to renew clinical privileges by a physician who is under investigation.

24. As noted in Chapter E of the *NPDB Guidebook*, whether a given action is reportable often depends on whether the practitioner was afforded due process rights, or at least whether such rights were made available to him.

25. Also as noted in Chapter E of the *NPDB Guidebook*, a reporting entity may "void" its report at any time, if the report was submitted in error, the action did not meet NPDB reporting requirements, or the action was overturned on appeal.

**Dr. Mandalapu Makes His Original EEO Complaints**

26. Dr. Mandalapu is an Asian man of East Indian origin.

27. Plaintiff engaged in EEOC-protected activity by complaining to his supervisors that he felt discriminated against based on age, race, accent, and national origin in February and April 2022.

28. VHA Directive 1039(3), *Ensuring Correct Surgery and Invasive Procedures In and Out of the Operating Room* (2018), forbids "concurrent" or "simultaneous' surgeries, in which a surgeon leaves uncredentialed providers to perform a critical part of a scheduled surgery while he attends to a different surgery at the same time.

29. Dr. Mandalapu's complaint was that his supervisors were assigning such surgeries to him, but were not doing so to Caucasian staff physicians in the same supervisory line.

6

30. This action is not based on whether the original actions were in fact discriminatory; but it is partly based on whether the VA took its subsequent actions in retaliation for Dr. Mandalapu's complaints of discrimination.

**The Summary Suspension**

31. On Saturday, May 14, 2022, Dr. Crotty emailed Dr. Modrall recommending the summary suspension of Plaintiff's operative privileges. For further details as to Dr. Crotty's accusations, and why the bases given for the summary suspension were invalid, see **Exhibit A** to this complaint.

32. On May 18, 2022, Mr. Brown issued a summary suspension of clinical privileges against Dr. Mandalapu. This summary suspension prevented him from practicing surgery, and Dr. Mandalapu was reassigned to non-surgical duties.

33. Dr. Mandalapu asked Dr. Crotty for documented evidence, to explain why he was being summarily suspended. Dr. Crotty responded that she did not have to give him such evidence.

34. The appropriate investigation did not take place within 30 days, as required by VHA Handbook 1100.19 and SOP P9.

**The Focused Clinical Care Review (FCCR)**

35. On September 23, 2022, Dr. Mandalapu finally received a report from the FCCR. The cover letter noted that this report, together with any response from him, would be considered by the Executive Council of the Medical Staff (ECMS) in recommending a final action by the Executive Medical Center Director. It gave him 14 days to submit his response.

7

36. On September 30, 2022, Dr. Mandalapu did his best to answer the accusations against him, and provided some helpful detail.  For details of why this FCCR report was invalid see **Exhibit A** to this complaint.

### The Executive Committee of Medical Staff (ECMS) Takes Action

37. On November 16, 2022, the Executive Committee of Medical Staff (EMCS), the body that authorized the FCCS, issued a report, recommending that Dr. Mandalapu's privileges not be reinstated.  However, Dr. Mandalapu was not allowed to see this report until April 3, 2023, and the Medical Center Director did not take action within 5 business days as required by VHA Handbook 1100.19.  For further details of why the ECMS report was invalid, see **Exhibit A** to this complaint.

38. The plaintiff wrote to Mr. Jason Cave, the new Medical Center Director, in March-April 2023, stating that he was humiliated, tortured, and intimidated without being informed of the reasons for the suspension of his privileges.  At this point, the "summary suspension" had remained in place for over 10 months, far more the 30 days contemplated by VHA Handbook 1100.19 and SOP P9, and the Director still had not issued his decision.

39. The plaintiff's skills, particularly his robotic assisted surgical skills and cancer surgical skills, are highly specialized skills.  They require regular practice for the provider to maintain his proficiency.  The protracted "summary suspension" led Dr. Mandalapu to fear that his skills would atrophy, and that he would never be able to practice these skills at all as long as he worked at the VA.

### Dr. Mandalapu Requests Renewal of His Privileges, and Resigns

40. On April 27, 2023, Dr. Mandalapu wrote to Mr. Cave, explaining that he had submitted appropriate documents to rebut the claims against him, and that no veteran had ever

8

suffered harm from his clinical practice. He asked Mr. Cave to restore his privileges, pointing out that the lengthy suspension had done irreparable damage to his career, not to mention imposing deep humiliation on him. He asked Mr. Cave to relieve him of further duties "as soon as [Mr. Cave] reinstate[d] operative privileges without a condition"; in other words, Dr. Mandalapu wanted to first have his privileges restored, and then resign from the VA.

41. On May 29, 2023, the Medical Staff Office at VANTHCS wrote to Dr. Mandalapu, telling him it was time for him to renew his privileges.

42. On May 30, 2023, Dr. Mandalapu applied for renewal of his privileges. Applying for renewal is not an action reportable to the NPDB.

43. On June 5, 2023, Plaintiff felt no choice but to resign, and he submitted his resignation.

44. When Dr. Mandalapu resigned, he was not under investigation; the "investigation," the FCCR, had taken place the prior year.

**VANTHCS Issues Its NPDB Reports**

45. In the aftermath of Dr. Mandalapu's resignation, VANTHCS has issued three successive reports against him to the NPDB.

46. The first report, issued on August 3, 2023, states that Plaintiff suffered a "suspension of clinical privileges" and undertook a "voluntary surrender of clinical privilege(s) while under, or to avoid, investigation relating to professional competence or conduct."

47. Both halves of this claim were untrue. Dr. Mandalapu had suffered only a non-reportable "summary suspension" of privileges. He had not voluntarily surrendered his clinical privileges by resigning after asking to renew them, and he was not under, or pending, any investigation when he resigned.

48. The second report, issued on August 31, 2023, supersedes the first, but it still states that Dr. Mandalapu voluntary surrendered his clinical privileges "while under, or to avoid, investigation relating to professional competence or conduct." This claim was still untrue.

49. The final report, issued on February 20, 2024, still contains the false claim that he surrendered his privileges "while under, or to avoid, investigation."

**Dr. Mandalapu Exhausts His Administrative Remedies**

50. With respect to his NPDB reports, Dr. Mandalapu has contested the reports against him using the NPDB dispute resolution process, but to no avail: the false claim remains.

51. With respect to his Title VII claim, Dr. Mandalapu filed his formal complaint on April 2, 2024. He received his Notice of Advisement of Rights and his Right to Sue Letter in October 2024. His hearing before an Equal Employment Opportunity Commission (EEOC) Administrative Judge took place in January 2025. The Administrative Judge denied relief on February 21, 2025, and the agency issued its final order on February 25, 2025.

52. In its final order, the EEOC gave Dr. Mandalapu the option of appealing to the EEOC's Office of Federal Operations (OFO) or of bringing a federal action.

53. Over Dr. Mandalapu's objection, the Administrative Judge had consolidated two different cases into a single hearing. Dr. Mandalapu has appealed one of them to the OFO, but he has elected to bring the second, which is based on the final NPDB report, in this court, together with his other federal causes of action.

**Aftermath**

54. Since leaving the VA and since the NPDB reports started coming out, Dr. Mandalapu has made repeated efforts to obtain employment as a physician and surgeon.

55. Dr. Mandalapu has not been able to do so, because of the lingering effects of the defendants' actions.

## LEGAL CLAIMS

## COUNT ONE

### JUDICIAL REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT
### 5 U.S.C. § 702

56. The VA is an "agency" within the meaning of the Administrative Procedure Act.

57. The long delays in the credentialing actions against Dr. Mandalapu violated the VA's own regulatory guidance.

58. The VA's filing of the NPDB report, containing the false claim that Dr. Mandalapu resigned while under investigation (when he was not), was arbitrary, capricious, and unsupported by substantial evidence.

59. The VA's filing also violated VA Handbook 1100.17, *National Practitioner Data Bank Reports*, para. 9a(2) (2009), which requires that "[t]he physician must be offered due process (as outlined in VHA Handbook 1100.19)" before an NPDB report may be filed based on a surrender of privileges while under investigation.

60. Dr. Mandalapu has suffered harm from the defendants' actions, to include damage to his skills, being pressured into resigning from his job, and being unable to obtain a new one as a urological surgeon.

## COUNT TWO

### VIOLATION OF DR. MANDALAPU'S DUE PROCESS RIGHTS
### FIFTH AMENDMENT, UNITED STATES CONSTITUTION

61. The VA's decisions damaged Dr. Mandalapu's professional reputation, and did so in connection with serious adverse actions: the *de facto* permanent suspension of his privileges, and his constructive discharge from the VA. They also prevented him from practicing his profession either in the VA or out of it. They thus damaged his liberty interests in his reputation, in government employment, and in practicing his profession as a surgeon.

62. The VA also denied Dr. Mandalapu procedural due process, in that he never received full notice of the evidence against him, nor a hearing at which he could properly rebut that evidence and defend himself.

63. Accordingly, the VA deprived Dr. Mandalapu of recognized liberty interests, and did so without due process of law.

## COUNT THREE

### RETALIATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### 42 U.S.C. § 2000e-3

64. Dr. Mandalapu raised claims in February-March 2022 related to apparent discrimination based on his age, race, or national origin. He thus opposed an employment practice made unlawful by the Civil Rights Act of 1964.

65. Shortly after raising these claims, Dr. Mandalapu received a summary suspension, based in part on a surgical proceeding where Caucasian surgeons had the same kind of problems he did, yet they were not suspended.

66. The extreme and unconscionable extension of the proceedings against Dr. Mandalapu drastically affected his terms and conditions of employment, as it prevented him from practicing his surgical specialty, and from keeping his skills current. It led ultimately to

his constructive discharge and to the false NPDB reports noted above. He continues to suffer harm from these actions by not being able to practice his profession.

67. Dr. Mandalapu's repeated requests for evidence and for news on the unending process, which always fell on deaf ears, provide evidence that these actions were intentional.

68. The defendants intentionally subjected Dr. Mandalapu to these adverse actions because of his opposition to discriminatory employment practices, so that they result directly from his engagement in a protected equal employment activity.

## PRAYER FOR RELIEF

Wherefore, Dr. Mandalapu respectfully requests that this court award

1. Declaratory relief, finding that the issuance of the third NDPB report against Dr. Mandalapu was arbitrary, capricious, the result of improper retaliation, and in violation of his Fifth Amendment due process rights.

2. Injunctive relief requiring VANTHCS to void that report, with a strict time limit for doing so.

3. Appropriate damages, to include compensatory, emotional distress, and punitive damages;

4. Reasonable attorneys' fees;

5. Costs of this action; and

6. Such other and further relief as this Court deems just and proper.

May 27, 2025.

Respectfully Submitted,

*Sean C Timmons*

Sean C. Timmons, Esq., LL.M.
Managing Partner, Tully Rinckey PLLC

13

Texas Bar No.: 24067908
New York State Bar No.: 5470190
Admitted to Practice in all
Texas Federal Courts
18722 University Blvd., Ste. 235
Sugar Land, TX 77479
(832) 240-3273 Phone
(281) 387-3411 Cell
(832) 241-5998 FAX
Stimmons@tullylegal.com

Attorney for Plaintiff