# EXHIBIT A

## DETAILS OF THE INVALID BASES FOR THE PLAINTIFF'S SUMMARY SUSPENSION, DEFECTS IN THE FCCR, AND DEFECTS IN THE ECMS REPORT

### A. Invalid Bases for the Plaintiff's Summary Suspension

1. In February-April 2022, the plaintiff engaged in EO protected activity, by complaining about discrimination.

2. On May 13, 2022, Dr. Crotty, Dr. Modrall, and Dr. Rivera talked and decided to take action against Dr. Mandalapu. Dr. Rivera advised Dr. Crotty to put her request in writing.

3. On Saturday, May 14, 2022, Dr. Crotty emailed Dr. Modrall and Dr. Hastings, expressing concerns about two cystoscopy surgical procedures and recommending the suspension of Plaintiff's operative privileges.

    a. The first surgical procedure in Dr. Crotty's complaint, Plaintiff asserts, was a concurrent surgery per the VHA Directive 1039(3).

    b. According to the American College of Surgeons (ACS) principles, the primary attending surgeon should be present in the operating suite or immediately available for the entire surgical procedure. The primary attending surgeon determines the critical components of an operation. It is inappropriate for a primary attending surgeon to be involved in concurrent or simultaneous surgeries on two different patients in two different rooms. See https://www.facs.org/about-acs/statements/statements-on-principles/

    c. The plaintiff sought help from Dr. Crotty to attend the concurrent surgery while he was engaged in Robotic surgery in another operating suite. Dr. Crotty later alleged intraoperative complications attributed to the Plaintiff in his absence.

    d. Dr. Crotty's testimony deviates from the operative report, and no documentation has been produced that demonstrates that the alleged cone-tip catheter caused a hole (perforation) in the ureter.

    e. Dr. Crotty returned the patient to the operating room to confirm the alleged left ureteral perforation. However, the operative findings revealed no evidence of ureteral perforation and indicated that there were no complications. The patient was discharged home on the day of the surgery. Although Dr. Crotty documented

       no evidence of ureteral perforation and no complications, she reported unusual significant complications attributed to the Plaintiff in her complaint.

4. Dr. Crotty and Dr. Gahan (who also took part in the surgery) later testified that the cone-tip catheter caused a hole (perforation) in the ureter. No documentation was provided that states that the Plaintiff's actions caused the ureteral injury to the patient.

5. Plaintiff argues that he explained what was documented in the surgical operative report. An independent, impartial, board-certified expert team should review Plaintiff's surgeries to determine whether Plaintiff's surgical competency error or misconduct resulted in significant surgical complications

6. The plaintiff's supervisors, including Dr. Karen Crotty, Dr. Jeffrey Gahan, Dr. John Modrall, Dr. Raul Rivera, Dr. Jeffrey Hastings, and Mr. Kendrick Brown, accused Plaintiff of using a cone tip catheter 1 to 2 mm in the left ureteral orifice within the bladder wall, allegedly attributing to a perforation in the ureter. The medical records do not reflect the Defendant's assertions.

7. Dr. Crotty and Dr. Gahan were involved in the surgery reviewed and patient care; therefore, according to VHA 1190, they should not have participated in the Plaintiff's peer review later

8. The second surgical procedure mentioned in Dr. Crotty's complaint was post-operative urinary retention.

9. According to the standard Clavien-Dindo system, surgical complications are graded from 1 to 5. Minor complications under grade 1-2, moderate in grade 3, and significant complications or life-threatening complications in grade 4 and 5. Post-operative urinary retention that requires a catheter or extra time in the hospital to manage is considered a Grade II complication (minor complication).

10. Dr. Crotty attributed non-existent significant surgical complications, or life-threatening surgical complications, to the Plaintiff in the second surgical procedure in her complaint, despite documented medical records and surgical operative reports showing otherwise. The NSO issued a VASQIP report documenting that it was not a reportable complication.

11. In her complaint, Dr. Crotty stated that both patients were doing fine and that she had no concerns about the Plaintiff's clinical care.

12. Plaintiff's documented evidence demonstrates that there were no significant or life-threatening surgical complications associated with the Plaintiff's surgeries. The patient's medical records should reflect life-threatening complications, if they exist.

13. The plaintiff's supervisors testified that the summary suspension of privileges dated May 18, 2022, was based on Dr. Crotty's articulated concerns. However, the summary suspension did not reflect Dr. Crotty's concerns about two cystoscopy procedures. They failed to produce documented evidence of surgical competency errors or misconduct as a proximate cause of unusual significant surgical complications to support their testimony per the legal standards.

14. The standard of surgical care is defined as follows:

    *The applicable standard of surgical care refers to the level of care that a qualified and prudent surgeon with similar education and training should provide to a patient in comparable circumstances. An expert surgeon should outline the standard surgical steps according to established guidelines or textbooks to determine whether the surgeon deviated from these standard procedures in a manner that led to life-threatening complications. Furthermore, the proximate cause indicates that the surgeon's deviation from the standard of care resulted in the patient's injury, leading to unusual and life-threatening surgical complications.*

15. The Plaintiff contends that any patient who suffered from significant or life-threatening surgical complications during the hospital course should have been documented in the

    hospital patient medical records in the CPRS (Computerized Patient Record System), if they exist, and the NSO-issued VASQIP surgical complications report.

16. Dr. Modrall later testified that all surgeons, including the Plaintiff's urology colleagues, perform operations that result in complications. Several elements of the Plaintiff's case were different. Dr. Modrall failed to provide documented evidence in the patient's medical records supporting his statement under oath.

17. Dr. Crotty later stated under oath that three surgeons--Dr. Gahan, Dr. Uhlenhuth, and the Plaintiff—all experienced perioperative and post-operative complications during the entire time the Plaintiff performed surgeries at the Dallas VA Medical Center. Yet the Plaintiff was the only one suspended.

### B. Defects in the FCCR

18. Plaintiff asserts that the suspension of privileges necessitates a comprehensive legal review by independent, impartial, Board-certified surgical experts with qualifications similar to the Plaintiff's. The expert team must evaluate surgical competency errors in relation to the surgical standards of care, as defined by legal standards.

19. Persons involved in the accusations against Dr. Mandalapu, including Dr. Gahan and Dr. Crotty, conducted, reviewed, and reported a Focused Clinical Care Review (FCCR) without an evidence file determined by peer review and a comprehensive review of the reasons for the summary suspension within 30 calendar days per the suspension notice. The FCCR was conducted to determine whether Dr. Crotty's concerns about two surgical procedures were substantiated. If not substantiated, no further action would be taken.

20. Dr. Crotty and Dr. Gahan were involved in the surgery and patient care, and they should not have been included in the peer review FCCR due to conflicts of interest. Furthermore,

Dr. Crotty and Dr. Hastings were aware that they had been named as responsible management officials (RMOs) in the Plaintiff's EEO case at the time of the review. Following the EEOC notice of investigation, Dr. Crotty identified ten surgeries for review rather than the two surgeries mentioned in her complaint in the FCCR assessment. She testified that she coordinated, reviewed, and reported the FCCR report.

21. On September 23, 2022, Plaintiff received a report from Dr. Hastings, the FCCR report. The cover letter noted that three reviewers independently reviewed charts in the CPRS. This report, together with any response from him, would be considered by the Executive Council of the Medical Staff (ECMS) in recommending a final action by the Executive Medical Center Director. It gave him 14 days to submit his response.

22. On September 30, 2022, Plaintiff submitted documented evidence to Dr. Hastings, the chief of staff, and Mr. Kendrick Brown, Acting Executive Director, in response to the FCCR report. The Plaintiff's documented evidence contradicted the FCCR review, which included operative reports, hospital medical records, and nursing staff reports, demonstrating that the FCCR report was based on their perceptions rather than on documented facts.

23. The FCCR may result in one of three options based on whether or not substantial evidence supports Dr. Crotty's articulated concerns. The RMOs violated VHA bylaws by refusing to resolve the Plaintiff's documented evidence contradicting the FCCR report, and not conducting a fair hearing. The RMOs never notified the Plaintiff whether there was substantial evidence supporting Dr. Crotty's allegations that required fair hearing procedures.

24. Dr. Crotty testified that based on her FCCR report, there was a unanimous vote to continue the suspension of his operative privileges. The Plaintiff was unaware of who the reviewers were and what they voted for.

**Defects in the ECMS**

25. On November 16, 2022, Defendants supervised and conducted the Executive Committee of Medical Staff (EMCS), the body that authorized the FCCR, issued a report, recommending that Plaintiff's privileges not be reinstated.  Plaintiff unaware of who the reviewers were and what they reviewed. However, the Plaintiff was not allowed to see this report until April 3, 2023, and the Medical Center Director did not take action within the required five business days, as specified in VHA Handbook 1100.19.

> *The comprehensive review of the reasons for the summary suspension must be accomplished within 30 calendar days of the suspension unless there are extenuating circumstances, with recommendations to proceed with formal procedures for reduction or revocation of clinical privileges forwarded to me for consideration and action. Within 5 working days of receipt of the recommendations, I will make a decision either to restore your operating room settings to an active status or that the evidence warrants proceeding with a reduction or revocation process.*

26. Despite the Plaintiff's written objection to Defendants' participation in the ECMS review due to conflicts of interest regulations, they conducted the ECMS review without the Plaintiff's participation.

27. On April 12, 2023, Plaintiff responded to Mr. Cave, the Executive Director, stating:

> *ECMS discussion had 'no content'; the discussion was not about the surgical complications or surgical technique but some strange, non-existent, imaginary, intentional, baseless, and irrelevant content. However, the ECMS decision was not to reinstate operative privileges.*