# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| RAO MANDALAPU, M.D. | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 3:25-cv-1320** |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF VETERANS AFFAIRS, | ) | |
| and DOUGLAS A. COLLINS, | ) | |
| U.S. SECRETARY of VETERANS | ) | |
| AFFAIRS | ) | |
| | ) | |
| **Defendants** | ) | |

## MEMORANDUM IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF

Plaintiff respectfully prays that this Honorable Court to protect Plaintiff's status with the U.S. Department of Health and Human Services National Practitioner Data Bank ("NPDB"). Defendants report on Dr. Mandalapu to the NPDB is unwarranted and improper under the NPDB Guidelines, and such action will damage Plaintiff's reputation, subjecting him to unreasonable and unfounded scrutiny and likely investigation by the Texas Medical Board and cause irreparable injury to Plaintiff. Unless the Court immediately intervenes and preserves Plaintiff's status by ordering Defendants to immediately withdraw and void its recently filed report, Plaintiff has no meaningful remedy.

Plaintiff's request for a temporary restraining order is warranted because: (1) Plaintiff has a substantial likelihood of success on the merits, (2) there is a substantial threat Plaintiff will suffer irreparable injury if the injunction is denied, (3) the threatened injuries outweigh any

1

damage that the injunction might cause Defendants, and (4) the restraining order will not disserve the public interest.

## I.    FACTUAL BACKGROUND

### A.  Summarized Background

The factual background for this dispute is discussed more fully in Plaintiff's Original Complaint filed on May 28, 2025 *[ECF Docket No.1]* herewith, which is incorporated by reference. In short, Defendants has imposed certain actions against Dr. Mandalapu following his complaints of workplace discrimination and retaliation. Despite the absence of any finding of clinical incompetence, the Defendants summarily suspended Dr. Mandalapu's privileges. Dr. Mandalapu remained under summary suspension for over a year. After nearly a year of suspension, on May 29, 2023, the VA North Texas Health Care System, requested Dr. Mandalapu to process his credentialing packet providing a June 9, 2023, deadline to do so *[See Exhibit A]*. As such, on May 30, 2023, Dr. Mandalapu submitted the credentialing packet to the medical staff office for renewal of operative privileges. On June 5, 2023, Dr. Mandalapu submitted his resignation to the Defendants. On August 3, 2023, Defendants submitted a report to NPDB for a "summary suspension and pending investigation.". On August 31, 2023, Defendants filed a second report, alleging a "voluntary surrender of privileges while under investigation." [See Exhibit B].

On January 22, 2024, the VA voided the NPDB report, acknowledging that its prior submission had been erroneous *[See Exhibit C]*. Yet on February 20, 2024, the same officials resubmitted the same erroneous report, reinstating inaccurate and damaging information that the agency had already admitted was improper. As a result, the false and damaging report remains active and publicly disclosable to all credentialing entities.

As of November 2025, the NPDB reports remain on file and visible to every querying hospital, medical board, and insurance carrier *[See Exhibit EE]*. Each NPDB query automatically transmits the report branding Dr. Mandapalu as "substandard." These ongoing publications continue to cause irreparable harm to his professional reputation, career prospects, and economic livelihood, harm which cannot be undone or adequately compensated by money damages.

### B. Detailed Statement of Facts

1. Plaintiff, Dr. Rao Mandalapu, is a highly trained, board-certified VA physician who, between February and April 2022, reported serious concerns of workplace harassment, discrimination, and retaliation to his supervisory chain. *[See Exhibit D]*

2. Dr. Karen Crotty admitted under sworn testimony that she received multiple EEO complaints filed by Plaintiff and were operating under an affidavit at the time *[See Exhibit E]* Defendants admissions establishes that she was under formal EEO scrutiny when she later initiated and directed adverse actions against Plaintiff, placing her in a documented conflict of interest under VHA bylaws from the very beginning thus, her continued involvement in subsequent actions directly violated neutrality requirements under VHA 1100.19 and 5021.

3. Plaintiff's supervisors, including Drs. Crotty, Modrall, Hastings, and Rivera, were explicitly informed of Plaintiff's EEO activity *[See Exhibit E]* Their acknowledgment of his complaints is shown through testimony, including that of Dr. Modrall, who confirmed during an EEOC hearing that he was aware of Plaintiff's protected activity and later participated in discussions regarding adverse actions therefore creating causal link between Plaintiff's EEO disclosures, and the adverse decisions subsequently taken by these same officials. Under Title VII, supervisors who become aware of protected activity

must avoid any involvement in adverse personnel or privileging decisions. Instead, the evidence shows they moved in the opposite direction.

4.  Plaintiff reports that his supervisors subjected him to differential treatment in surgical scheduling, including being assigned concurrent surgeries in violation of VA Directive 1039(3), which mandates safe supervision ratios and prohibits overlapping surgical responsibilities without appropriate staffing *[See Exhibit F],* demonstrate that these concurrent schedules were imposed on Plaintiff by RMOs, not initiated by the Plaintiff, and that they created a hazardous and procedurally improper clinical environment.

5.  The VA National Surgery Office (NSO), through its VA Surgical Quality Improvement Program (VASQIP), reviewed Plaintiff's surgical cases and confirmed no reportable complications. Plaintiff testified consistently *[See Exhibit G]* that all surgical complications are documented contemporaneously in electronic medical records by qualified staff, and the absence of such documentation means none occurred. "No reportable complications" signifies not only the lack of any adverse clinical outcomes but also a clean record with respect to competency, patient safety, and adherence to surgical standards which essentially undermines later claims that Plaintiff was suspended due to "clinical incompetence," "complications," or "immediate danger."

6.  On Friday, May 13, 2022, Defendants management; Drs. Crotty, Modrall, and Rivera met privately to discuss terminating Plaintiff's privileges and employment in retaliation for his protected EEO activity. This meeting occurred before any clinical incidents, before any reported concerns, and immediately after Plaintiff had engaged in protected conduct. The retaliatory intent behind this meeting is confirmed by Dr. Modrall's sworn testimony

*[See Exhibit H],* which reveals that discussions regarding adverse actions were already taking place even though there were no documented concerns at the time.

7. Following Defendants May 13 meeting, Drs. Crotty and Rivera exchanged draft adverse-action correspondence, including drafts recommending summary suspension, despite having no clinical evidence to support such actions. *[See Exhibit H]* and these drafts were exchanged before any allegation of clinical incompetence or patient harm existed.

8. On Saturday, May 14, 2022, as part of the premeditated plan conceived the day before, Dr. Crotty wrote an email to Drs. Modrall and Hastings alleging "concerns" about two cystoscopy procedures and recommending summary suspension. However, See Exhibit-I shows that the concerns were unsupported by the medical records, contradicted by operative reports, and factually untrue. Significantly, this action occurred on a weekend, outside regular business hours, and outside standard review procedures, further suggesting the urgency was fabricated rather than clinically driven.

9. The first case referenced in Dr. Crotty's complaint involved a concurrent surgery improperly scheduled by RMOs, not by the Plaintiff, in violation of VA Directive 1039(3). Later, Dr. Crotty confirmed no complications. See Exhibit-I. The second case issue did not exist at the time the suspension was decided, as confirmed by medical records and testimony issued the VASQIP report, which was documented as not a reportable complication *[See Exhibit G].* Plaintiff asserts that Dr. Crotty's allegations constituted false, misrepresentations, malicious, made-up complaints in violation of VHA bylaws and professional ethics.

10. On May 14, 2022—the same day she sent her initial email—Dr. Crotty repeated her allegations of "significant complications due to surgical incompetence" and recommended immediate suspension. Medical records, VASQIP data, and testimony demonstrate that these claims were entirely unsubstantiated and directly contradicted by objective evidence. Plaintiff asserts these allegations were made to create a false narrative of urgency and danger and thus justify the preplanned retaliatory suspension. Exhibit-I.

11. The VASQIP report *[See Exhibit ]* and operative medical records definitively show no reportable complications. The phrase "no reportable complications" holds legal weight because it reflects the VA's own national quality-assurance determination. Dr. Crotty admitted that the summary suspension was based solely on her information *[See Exhibit J],* but her testimony changed multiple times regarding the basis for the suspension.

12. Dr. Crotty's testimony in ROI directly contradicted hospital medical records and VASQIP findings. She produced no documented evidence to substantiate her claims. Furthermore, ROI-2, *[See Exhibit J],* confirms that no independent, impartial, or conflict-free expert review occurred, thereby violating the requirements of both VHA 1100.19 and HCQIA standards for professional review actions.

13. Plaintiff asserts that Dr. Crotty misrepresented the medical records, and the RMOs accepted her claims blindly, without verifying records, consulting conflict-free specialists, or reviewing operative notes, combined with Dr. Crotty's testimony *[See Exhibit I and Exhibit-J]* shows a repeated failure to verify facts. Such conduct violates the basic tenets of medical oversight, peer review integrity, and federal due process requirements. Dr. Crotty asserted that Plaintiff caused "significant complications," posed a danger to

patients, and required immediate suspension. Yet contemporaneous operative reports, NSO VASQIP data, and medical documentation *[See Exhibit G]* prove these allegations were factually untrue and, the alleged complications did not even exist at the time of the suspension decision. "No reportable complications" means no immediate danger, no patient safety concerns, and no justification for emergency suspension.

14. Despite the absence of any documented surgical complications, the RMOs relied exclusively on Dr. Crotty's unverified accusations *[See Exhibits I and J]*. Under VHA policy, reliance on unverified allegations violates standards of clinical due process, impartial review, and basic principles of fairness.

15. On May 18, 2022, RMOs imposed a summary suspension without fact-finding evidence file, without conflict-free expert peer review, without notice, without a fair hearing, and in violation of every procedural safeguard mandated by the Health Care Quality Improvement Act (42 U.S.C. § 11112(a)(1)–(4)), VHA 1100.19, and VA Handbook 5021. [Exhibit-K]

16. The summary suspension of Plaintiff's operative privileges violated multiple binding regulatory and statutory frameworks, including VA Handbook 5021/21, which governs adverse actions against employees, and explicitly sets forth procedural safeguards in Part I, Chapter 1, ¶3(a)(1–3). These provisions mandate written notice of proposed action, a clear statement of the charges, and an opportunity to respond before the effective date of an adverse action. None of these procedures were followed. The suspension also violated ¶6b(5) and ¶6c, which require the involvement of impartial officials outside the supervisory chain—requirements ignored when RMOs who were subjects of Plaintiff's EEO complaint executed the suspension. See Exhibit-K

17. Plaintiff sought repeatedly to learn the factual basis for the sudden suspension, including requesting the underlying documentation, the specific clinical incidents at issue, and the identity of the reviewers. Supervisory officials refused to disclose any information whatsoever, leaving Plaintiff without notice of the charges or an opportunity to respond. This violated the mandated fair hearing procedures under VHA Handbook 1100.19, pp. 43–44, § 6(i)(4)(a)–(h), which clearly outline the requirement that any physician subject to an adverse privileging action must be provided with: 1. written notice, 2. a statement of the reasons for the action, 3. access to the evidence, 4. the right to representation, and 5. a fair hearing before an impartial panel. *[See Exhibit K]* show repeated refusals to answer Plaintiff's inquiries. Their disregard created a situation in which the Plaintiff was suspended "in the dark," without notice, which is incompatible with both constitutional due-process standards and internal VHA policy.

18. The same RMOs who were implicated in Plaintiff's EEO complaint—Drs. Crotty, Modrall, Hastings, and Rivera—continued to serve as decision-makers in all subsequent professional review actions: summary suspension, FCCR, ECMS, PSB, and ultimately the NPDB reporting. *[See Exhibit D, p. 3]* demonstrate that each of these individuals was directly involved in Plaintiff's protected activity and therefore legally disqualified from performing review functions. VHA 5021 § 6(b)(5) explicitly prohibits involvement by officials who may have conflicts of interest or who are within the supervisory chain. VHA 1100.19 and VHA 1190 contain similar impartiality mandates requiring neutral reviewers. Their persistent involvement invalidates the entirety of the administrative process as unlawfully conflicted, retaliatory, and contrary to mandatory VHA rules.

19. Under VHA Handbook 1100.19, pp. 52, §14(l)(3)(a), once a summary suspension is imposed, the Medical Center must complete a comprehensive review within 30 calendar days, including review by impartial experts qualified in the same specialty. After the comprehensive review, the Director must issue a determination within five business days. None of these timelines were met. The VA failed to conduct a proper review, failed to appoint conflict-free subject-matter experts, and failed to produce findings within either mandated deadline. This failure alone renders the suspension procedurally void.Exhibit-K

20. Regardless of whether the physician is a full-time employee, part-time employee, or contractor, due process is required for any reduction, revocation, or nonrenewal of clinical privileges. This is mandated by VHA 1100.19, §14, and by statute under 38 U.S.C. § 7462, which creates procedural rights for Title 38 physicians. Such protections include a fair hearing before an impartial panel, the right to present evidence, and the right to challenge the decision. Plaintiff received none of these protections, making the adverse action unlawful.

21. In August 2022, the EEOC formally served notice of investigation upon all supervisory officials involved in the actions taken against Plaintiff *[See Exhibit E]* The formal notice placed the supervisors under active investigation for discrimination and retaliation. Under VHA policies, individuals under EEO scrutiny are categorically prohibited from conducting reviews or participating in any decision-making regarding the complainant. Despite this explicit conflict, the same RMOs continued leading all review processes against Plaintiff, revealing a retaliatory pattern and structural bias.

22. After the summary suspension, the RMOs initiated a sequence of internal reviews— specifically the FCCR (September 2022), the ECMS review (November 2022), and the

PSB proceeding (April 2023). These were conducted without Plaintiff's participation, without notice, and without independent reviewers, violating every procedural safeguard. Plaintiff asserts these reviews were "sham peer reviews" designed not to assess competence.

23. Mandatory VHA procedures require completion of the comprehensive summary suspension review within 30 calendar days. Instead, the RMOs waited 644 days before reporting to the NPDB that a "pending investigation" supposedly remained open from May 18, 2022, to February 20, 2024 *[See Exhibit K]*. The notion of a "644-day pending investigation" contradicts all VHA procedures and federal reporting rules.

24. On September 23, 2022, the Chief of Staff claimed that "a team of impartial urologists" had completed the FCCR *[See Exhibit L]*. However, the actual reviewers were Drs. Crotty and Gahan, both of whom had participated in the surgeries under review and were named in Plaintiff's EEO complaint as above mentioned.

25. On September 30, 2022, Plaintiff submitted a comprehensive written rebuttal to the FCCR, meticulously addressing each allegation and referencing medical records, operative notes, and VHA policies, materially contradicting the FCCR. [Exhibit-M] Plaintiff asserted that had RMOs complied with mandatory VHA procedures and their scope of authority, the summary suspension would have been lifted within 30 days, further demonstrating that the suspension was improperly maintained.

26. Dr. Crotty testified that she prepared, coordinated, and reported the FCCR findings and that the committee unanimously voted to continue suspension *[Se Exhibit L, p. 407-425]*.

27. Plaintiff asserts RMOs deliberately concealed reviewer identities, the basis of the suspension, and conflicts of interest. ROI, confirms that requests for disclosure went

unanswered. Plaintiff contends RMOs knowingly sustained a suspension based on false allegations without conflict-free review, making all subsequent actions—including FCCR, ECMS, and PSB—unlawful, retaliatory, and undertaken in bad faith.

28. On October 22, 2022, the Office of Medical Inspector (OMI) conducted a site visit, confirming multiple VHA violations—including unlawful concurrent surgeries, conflicting patient schedules, overbooking, and improper supervision—that directly targeted Plaintiff following his EEO activit..

29. Plaintiff submitted written objections to the FCCR and provided supporting medical documentation contradicting the FCCR's conclusions. RMOs ignored these objections and did not issue a written determination as required which obligates peer review bodies to act in an evidence-based, conflict free, fair manner.[Exhibit-M]

30. On November 16, 2022, the ECMS convened without notifying Plaintiff and accepted Dr. Crotty's FCCR's unsupported conclusions and voted to continue the suspension. The Director then failed to issue a decision within five business days, violating mandatory deadlines *[See Exhibit N]*.  Months later, the same officials falsely informed the NPDB that a "pending investigation" existed, contradicting the earlier failure to act.

31. Plaintiff filed detailed, evidence-supported objections citing procedural violations and conflicts of interest; RMOs ignored them *[See Exhibit M].The ECMS review did not operate as a proper endpoint for the summary suspension with a timely Director's decision, and the mandated due process hearing rights were never afforded.*

32. On March 30, 2023, while under active EEOC investigation, Dr. Crotty submitted new allegations seeking a probationary review before the PSB. The PSB convened without due process.

33. After Plaintiff filed a formal EEOC complaint, RMOs escalated retaliation by filing multiple summary-suspension extensions between May 18, 2022, and June 2023, and multiple NPDB reports *[See Exhibit B]*.

34. Plaintiff disputed each NPDB report on grounds that the VA had failed to meet mandatory prerequisites—including final agency action, due process completion, and substantiated findings. *[See Exhibit B]*.

35. The first National Practitioner Data Bank (NPDB) report, dated August 3, 2023, falsely stated that Plaintiff's clinical privileges had been suspended. This report was erroneous and void because, by that time, Plaintiff's privileges had already been reinstated and renewed. *[See Exhibit O]*. A voluntary surrender of privileges is only valid when a physician affirmatively elects to relinquish privileges in writing, without coercion, and with knowledge of its consequences. Plaintiff denies voluntary surrender of privileges.

36. Plaintiff alleges that the VA reported a "suspension" and a "voluntary surrender while under investigation" even though his privileges had already been renewed and reinstated, and no valid "pending investigation" existed under the governing bylaws. A report that falsely characterizes those facts as a reportable professional review action is both premature and outside the scope of 42 U.S.C. § 11133 and 45 C.F.R. Part 60, and violates the VA's regulatory duty to ensure accuracy and proper reportability before submitting NPDB entries.

37. NPDB reporting entities bear full legal responsibility for ensuring accuracy, timeliness, and completeness. NPDB reporting is proper only for actual adverse licensure or clinical-privileges actions taken as a result of formal professional review proceedings; reporting a non-existent, rescinded, or purely tentative action is premature and outside the scope of

the regulations and reporting entities are responsible for ensuring that NPDB submissions are factually accurate, properly characterized, and within the NPDB's reporting authority, and must correct or void reports that are premature, inaccurate, or not reportable.

38. On April 27, 2023, Plaintiff submitted a written letter to Executive Director, stating that no veteran had suffered harm due to his surgeries, that the review process had been prejudiced because the defendants themselves acted as judges, and that he requested relief from VA service once his privileges were reinstated *[See Exhibit P]* hostile environment and the untenable conditions created by retaliatory actions.

39. On May 29, 2023, the VA renewed and re-credentialed Plaintiff's privileges. Renewal and re-credentialing confirm that no evidence of surgical competency error and that there were no pending performance-related issues involving Plaintiff's surgeries.  [Exhibit-A]

40. Plaintiff separated from VA service on June 5, 2023, after his privileges were reinstated. The Medical Center Director accepted Plaintiff's resignation after the renewal of privileges. Acceptance of the resignation relieved Plaintiff from further VA service, consistent with the terms of his notice of resignation. Under VHA 1100.19, ROI pp. 222, if a "pending investigation" exists at the time of resignation, the Medical Center Director must notify the provider and offer due process. No such notice was provided. [Exhibit-T]

41. On August 31, 2023, RMOs filed a second NPDB report alleging voluntary surrender of privileges and substandard care *[See Exhibit B]* collectively show that the VA produced no documentation of a voluntary surrender while pending investigation and failed to support its allegations with evidence. Plaintiff disputed the report as false, premature, and retaliatory.

42. Plaintiff notified the EEOC Administrative Judge that the NPDB reports were retaliatory and Plaintiff alleges that the AJ failed to intervene or correct the unlawful reports, leaving Plaintiff vulnerable to continued professional harm and demonstrating administrative malfunction within the EEOC process itself. [Exhibit-Q]

13

43. Defendants continued to submit NPDB reports during active EEOC litigation, despite knowing that such reports were disputed and unsupported.  Every report constitutes a final agency action because it carries independent legal and professional consequences for Plaintiff, including damage to his reputation, licensure, credentialing, and employment prospects. The repeated filing and re-filing of erroneous NPDB reports, therefore, caused separate and ongoing harm.

44. On January 22, 2024, the VA filed a "void" action with the NPDB, acknowledging that the prior NPDB action was erroneous *[See Exhibit C]* confirming that Defendants itself recognized the earlier reports were improper. Subsequent correction does not erase the illegality after violation deemed complete at the time of the action taken.

45. On February 20, 2024, the Defendants resubmitted the same erroneous voided NPDB report, giving it enduring damage. *[See Exhibit R]. This final agency action has legal implications, including damage to reputation, licensure, credentialing, and jobs.*

46. To date, the report remains in the NPDB database *[See Exhibit EE]* and consequently, Plaintiff has not been able to secure employment despite multiple efforts thus, remaining unemployed *[See Exhibit S].*

## II. LAW AND ARGUMENT

An applicant is entitled to a preliminary injunction if she can show: (1) a substantial likelihood of success on the merits of its claim; (2) a substantial threat of irreparable injury or harm for which there is no adequate remedy at law; (3) that the threatened injury to the applicant outweighs any harm that the injunction might cause to Defendant; and (4) that the injunction will not disserve the public interest. *See*, *e.g.*, *DSC Communications Corp. v. DGI Techs., Inc.*, 81 F.3d 597, 600 (5th Cir. 1996); *Cherokee Pump & Equip., Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994); *Canal Auth. of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). The decision over whether to grant or deny a preliminary injunction is within the discretion of the district court and may be reversed on appeal only for an abuse of discretion. *Allied Mktg. Group,*

*Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989). Courts in this Circuit routinely grant injunctive relief to maintain the status quo and prevent the dissemination or continued effect of an erroneous National Practitioner Data Bank ("NPDB") report where the report is not authorized by the governing statutes, regulations, or controlling agency rules. *See, e.g., Poliner v. Texas Health Sys., 537 F.3d 368, 381 (5th Cir. 2008) (injunctive and declaratory relief available notwithstanding HCQIA damages immunity); Walker v. Memorial Health Sys. of E. Tex., No. 2:17-cv-00066 (E.D. Tex. Feb. 2017) (granting preliminary injunction, ordering a void report, and enjoining further NPDB filings during litigation).* Issuance of a preliminary injunction is within the discretion of the Court. *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015). Findings of fact are subject to a clearly-erroneous standard of review, while conclusions of law are subject to a broad review. *Janvey v. Alquire*, 647 F.3d 585, 591-92 (5th. Cir. 2011).

In general, the Data Bank is a federal program that contains various negative information on health care practitioners including medical malpractice payments, adverse licensure actions, exclusions from Federal or State healthcare programs, and negative actions or reports made against practitioners by hospitals. Though not accessible by the general public, the Data Bank is accessible by Federal and State licensing authorities (including the Texas Medical Board), hospitals and other healthcare entities, and healthcare insurance providers. The Data Bank was established in conjunction with the Health Care Quality Improvement Act ("HCQIA") in an effort to advance the quality of medical care by encouraging physicians to participate in peer review and by restricting the ability of incompetent physicians to move from state to state without disclosing their previous incompetent performance. *See 42 U.S.C. § 11101.* Ostensibly, practitioners with one or more adverse reports in the Databank may find it difficult to build or maintain their practices, as healthcare entities, including hospitals and health insurance

companies, are likely reluctant to associate with practitioners who have been deemed incompetent through peer review.

### A. Defendants reporting to the NPDB based on Dr. Mandalapu's resignation is not proper nor substantiated by regulation, and even if it were, Defendant's actions violated due process.

Within the VA system, a physician's privileges may be suspended or reduced under the procedures set out in VHA Directive 1100.21(1) (2023). However, this directive did not go into effect until March 2, 2023. Before March 2, 2023, privileging procedures were still governed by VHA Handbook 1100.19 (2012). In particular, before a physician's privileges could actually be reduced, he had to be allowed to review "all evidence not restricted by regulation or statute" upon which the proposed changes were based. He also had to be notified of his right to a Review Panel, at which he had the right to be present, to examine the evidence against him, to be represented, and to cross-examine witnesses. Per Defendants SOP P9, "it is critical that the investigation be completed, and appropriate action be taken *as expeditiously as possible*." As will be shown below, this did not occur in Dr. Mandalapu's case. Also as noted by the SOP P9, the "appropriate investigation" is generally a Focused Clinical Care Review (FCCR) conducted under the authority of the Executive Committee of Medical Staff (ECMS) in accordance with VHA Directive 1100.21. VHA Handbook 1100.19, which governed privileges in 2022, required the FCCR to be completed within 30 days of the summary suspension, with the circumstances surrounding any deviations to be documented.

Nonrenewal of medical staff appointments or clinical privileges generally should not be reported to the NPDB. However, if the practitioner does not apply for renewal of medical staff appointment or clinical privileges while under investigation by the health care entity for possible

16

professional incompetence or improper professional conduct, or in return for not conducting such an investigation or not taking a professional review action, the event is considered a surrender while under investigation and must be reported to the NPDB. *See* National Practitioner Data Bank Guidebook, at E-37 (April 2015) ("NPDB Guidebook"). An action must be reported to the NPDB based on whether it satisfies NPDB reporting requirements and not based on the name affixed to the action. For example, administrative fines may or may not be reportable, depending upon whether they meet NPDB reporting criteria, not on what they are called. A suspension or restriction of clinical privileges is reportable if it meets reporting criteria, whether the suspension or restriction is called summary, immediate, emergency, precautionary, or any other term. *See Id. NPDB Guidebook.*

VHA Handbook 1100.17 provides that a report is permitted only when the Medical Center Director renders a final determination—"based on a clinical professional review"—that adversely affects clinical privileges for a period longer than 30 days. Summary suspensions are not reportable. They become reportable only if, after review, the Director takes a final action adversely affecting privileges >30 days, in which case both the summary suspension and the final action are reported. A resignation or "surrender of privileges" is reportable only if the practitioner resigns while under investigation for possible incompetence or improper professional conduct (or in lieu of investigation). Due process under VHA Handbook 1100.19 must be offered before reporting and, where a report is erroneous, it must be voided, removed from the credentialing file, and prior recipients notified.

Here, the Defendants' three NPDB submissions (Aug. 3, 2023; Aug. 31, 2023; Feb. 20, 2024) cannot be squared with these prerequisites *[See Exhibits O, B, R].* First, there is no Medical Center Director final determination reducing or revoking Dr. Mandalapu's privileges for >30

days following the review process. To the contrary, his operative privileges were submitted for renewal as prescribed before the deadline provided. Renewal is the opposite of a final adverse action. Second, a summary suspension is non-reportable and as such, the May 18, 2022, summary suspension was an interim step. § 9(b)(2) declares such summary suspensions "not reportable" unless followed by a final Director action adversely affecting privileges >30 days.

Thus, reporting premised on a non-final summary suspension is *ultra vires*. Third, a "surrender while under investigation" requires an active investigation <u>at the time of resignation</u>. And by the time of Dr. Mandalapu's resignation tendered to Defendants on June 5, 2023, the FCCR/ECMS/PSB cycle had concluded, and Dr. Mandalapu's privileges submitted within the time specified by Defendants for processing and renewal on May 30, 2023. There is no notice of an ongoing investigation at resignation and none after request for credential renewal. Therefore, labeling the resignation as a "surrender while under investigation" is factually false and legally impermissible. Fourth, the reporting "surrender while under investigation" is conditioned on offering due process as outlined in VHA Handbook 1100.19 (2012) and SOP P9. To say the least, the record lacks impartial hearing, no timely disclosure of evidence, and pervasive conflicts in the FCCR/ECMS processes—all contrary to 1100.19 and due process requirements. Dr. Mandalapu's May 18, 2022, summary suspension was temporary, never confirmed by the Medical Center Director, and ultimately rescinded *[ See Exhibit A].* A summary suspension pending review "is not reportable" unless it results in a Director's final determination lasting longer than thirty days. No such determination exists in the record. The VA's reports dated August 3, 2023, August 31, 2023, and February 20, 2024, all claim that Dr. Mandalapu "voluntary surrendered privileges while under investigation" or that privileges were "restricted." By the time of the alleged "voluntary surrender," all internal reviews (FCCR, ECMS, PSB) had concluded, and the

Defendants had requested Dr. Mandalapu to submit his credentialing request, restoring his privileges *[See Exhibit A].* There was no active investigation, and no factual predicate for such a report and certainly, no legal basis that supports Defendants action(s).

**B. Dr. Mandalapu has a substantial likelihood of success on the merits.**

The sequence of events in this case leaves little room for dispute. Plaintiff engaged in protected EEO activity between February and April 2022. On May 13, 2022—barely days after Plaintiff's protected communications intensified—his supervisors met and discussed taking adverse action "because of" Plaintiff's EEO conduct. That is not inference; it is evidence of retaliatory animus. The following day, May 14, a false complaint appeared. The National Surgery Office and Plaintiff's medical documentation confirm it was unfounded. Four days after that, on May 18, Plaintiff was summarily suspended with no notice, no evidence, and no due-process opportunity. No Fifth Circuit authority requires a court to ignore timing this tight. The proximity between the protected activity, the retaliatory planning meeting, the unsupported fabricated complaint, and the immediate suspension (spanning only a few days) satisfies the causation element under the retaliation statute by any measure. Furthermore, the Defendants cannot credibly argue legitimate justification because Plaintiff's privileges were later fully renewed in May 2023, confirming that no clinical competency issue ever existed. And when Plaintiff resigned on April 27, 2023 (after his privileges were reinstated without any conditions) the agency accepted his resignation without identifying any pending investigation or hearing rights. Under VHA bylaws, if any investigation had been active at the time of resignation, Plaintiff was entitled to notice and a fair hearing. No notice was issued because no legitimate investigation existed. The absence of such notice destroys any assertion that Plaintiff's suspension or subsequent reviews were rooted in valid clinical concerns. Also, the same supervisors who met

on May 13 to discuss retaliating against Plaintiff also conducted the September 2022 Focused

Clinical Care Review (FCCR), the November 2022 Executive Committee of the Medical Staff

(ECMS) proceeding, and the April 2023 Professional Standards Board (PSB) review, even after

being formally notified in August 2022 that they were under EEOC investigation for retaliating

against Plaintiff. Under VHA bylaws, conflicted reviewers are strictly prohibited from

participating in any evaluation of the employee. Yet these same conflicted supervisors authored

every adverse document in Plaintiff's file. A review conducted by individuals under active EEO

investigation is not a peer-review process; it is retaliation *"dressed"* in procedure.

  The May 18, 2022 summary suspension was issued without notice, without evidence, and

without a meaningful opportunity to respond. Here, VHA bylaws require that the reasons

supporting such a suspension be "clearly established." They also impose strict timelines for

conducting and completing an FCCR, require a Director's decision within five days of that

review, and mandate due-process hearing rights if privileges are reduced or revoked. The facility

followed none of these requirements. Instead, it proceeded with an FCCR conducted by

supervisors who were legally prohibited from participating, followed by an ECMS review held

without notifying Plaintiff, and then by an unrelated PSB review with no procedural basis. The

Office of Medical Inspector's October 2022 site visit confirmed that the facility repeatedly

violated VHA bylaws in its handling of Plaintiff's case. The Fifth Circuit has recognized that

violations of mandatory agency procedures, especially those affecting property rights in

professional privileges, may amount to deprivation of due process. Here, every procedural

safeguard designed to protect fairness was ignored. On August 3, 2023, the agency filed an

NPDB report stating that Plaintiff's privileges had been suspended. On August 31, 2023, it filed

a second report stating that Plaintiff had voluntarily surrendered his privileges while an

investigation was pending. Both statements were untrue. By that time, Plaintiff had been reinstated, had resigned, and had no pending investigation under VHA bylaws. The agency later admitted its error because on January 22, 2024, it voided the report. Yet, incredibly, the same officials resubmitted the same erroneous NPDB report on February 20, 2024, after acknowledging it was false. In the context of Plaintiff's established retaliation history, the motive is unmistakable. The individuals who certified the NPDB submissions were the same supervisors who had retaliated against Plaintiff since May 2022 and who had been the subjects of Plaintiff's EEOC complaints. Each NPDB filing constitutes a discrete "final agency action" because it determines Plaintiff's legal rights and professional status, carries immediate and concrete consequences, and is not subject to further agency review. Courts consistently hold that NPDB reports create cognizable reputational and professional harm sufficient to satisfy finality and reviewability under the APA. Plaintiff therefore possesses a strong likelihood of success on both his APA and Title VII retaliation claims.

**C. Defendants' actions threaten Dr. Mandalapu with immediate and real irreparable harm.**

Defendants arbitrary, capricious and unlawful decision to report Plaintiff to the NPDB will irreparably harm Plaintiff if a Void Report is not immediately submitted by Defendants. Plaintiff will suffer significant harm including but not limited to: a report to the Texas Medical Board, which will likely result in its own investigation; the permanent stigma of a report diminishing his reputation as a surgeon which will be obtained by every hospital, managed care organization, potential physician employer or other entity mandated to query the NPDB, and which will have to be disclosed by Dr. Mandalapu for the remainder of his professional career, which may result in an increase in insurance premiums, a limitation or denial of professional liability coverage, and exclusions from preferred provider networks; and the

potential denial of his application for privileges in other hospitals, with new insurance providers, managed care organizations, locum tenens groups or other potential physician employers; all of which will cause further irreparable damage to Dr. Mandalapu. As noted by the Supreme Court of Montana in a similar proceeding, the fact is that filing a negative report with the NPDB at this juncture is akin to a ringing bell cannot be unrung. *See Doe v. Cmty. Med. Ctr., Inc.*, 2009 MT 395, P37 (Mont. 2009). An erroneous report announcing to all interested parties that a physician is being investigated or suspended for an activity or impairment has the potential for immediate harm as well as permanent harm. *See id*. The harm to Plaintiff's professional standing and reputation that will be caused by the report to the NPDB is enormous and could affect his reputation and his current and future prospective business relations, and Plaintiff ultimately may face financial ruin and the end of his career as a medical doctor. *See Winter v. Natural Res. Def. Council, Inc*., 129 S.Ct. 365, 375 (2008); *see also Doe v. Cmty. Med. Ctr., Inc.*, 2009 MT 395, P37 (Mont. 2009).

In fact, since the first report (Aug. 3, 2023) and its successor entries (Aug. 31, 2023; Feb. 20, 2024), he has experienced repeated credentialing denials, "does not meet credentialing/licensing requirements" outcomes, and lost opportunities, including: (a) Medical Center Hospital (Odessa) ultimately declining for lack of recent verified case logs despite interest and an offer framework; (b) Houston Methodist's termination of a credentials file for "incomplete employment verification"; and (c) multiple VA and private placements where letters of intent/commitment did not mature because of credentialing impediments. More recently, in October–November 2025, he signed letters of intent with VA vendors (Fresno, Martinsburg, Columbia) and received a bid decline from Aspirus citing verification requirements. *[See Exhibit-S]*. And, these are precisely the cascading, no compensable harms such as exclusions from staff

privileges, payer networks, and practice opportunities; reputational damage; and the erosion of recent-practice currency.

An irreparable injury is one that cannot be adequately compensated in money damages or cannot be measured by pecuniary standards. Plaintiff here will suffer irreparable injury as no other legal remedy exists if Defendants are not required to void the report. There is no adequate remedy at law available to Plaintiff because Plaintiff will suffer injury before trial on the merits can be completed. Furthermore, an award of money damages will not address Plaintiff's immediate concerns related to the immediately triggered Texas Medical Board report and subsequent investigation, nor the third-party ramifications as set forth above, potentially causing restrictions and damages to his surgery practice that will be difficult if not impossible to quantify. Plaintiff will likely suffer irreparable injury if Defendants are not required to immediately submit a Void Report and is not enjoined while this suit is pending from filing any subsequent report with the NPDB or any other entity or agency. Plaintiff has a substantial chance of succeeding on the merits of this case, including with respect to the threshold issues discussed above as to what constitutes a requirement under the plain language of the NPDB Guidebook. In addition to those threshold issues, Plaintiff will be able to show that the actions taken by Defendants were unsupported by the facts, contrary to the overwhelming evidence, and contrary to law.  Here, on 18 May 2022, Defendants suspended Dr. Mandalapu's operating room privileges citing that a "comprehensive review" had to be conducted within 30 days, and that within 5 days after that, Defendants would determine whether to restore privileges or continue with reduction or revocation process (none of these happened).  Defendants violated the deadlines and instead, they conducted the required investigation (a Focused Clinical Care Review) and gave Dr. Mandalapu the results on 23 September 2022 with 14 days to respond,

after which the investigation and Dr. Mandalapu's response were supposed to be considered by the Executive Committee of the Medical Staff (ECMS).  After the ECMS made its recommendation (reduce his privileges or not), the hospital director was supposed to act on it. And after that Dr. Mandalapu was supposed to be afforded the right to a review panel which is a full-on due process procedure where witnesses would be called and cross-examined.  According to VHA Handbook 1100.19, which governed at the time, the Review Panel had to be appointed by the director within 5 days of receiving Dr. Mandalapu's response to his decision. Instead, Dr. Mandalapu received the FCCR results on 23 September 2022.   Furthermore, Defendants extended the summary suspension (had been extended on 15 June, 17 July, 10 August, 2 September, 30 September, 5 October, 4 November, 2 December, 27 December, and 2 February) (all the way until his resignation). Essentially, indicating Dr. Mandalapu that *someday* the ECMS will make its recommendation to the director, and whenever that happens, the director will decide.  But VA Handbook 1100.19 clearly states that under no circumstances should there be more than three automatic suspensions of privileges in 1 calendar year, and no more than 20 days per calendar year. If there are more than

three automatic suspensions of privileges in 1 calendar year, or more than 20 days of automatic suspension in a calendar year, a thorough assessment of the need for the practitioner's services needs to be performed and documented and appropriate action taken. Any action is to be reviewed against all reporting requirements unless a special circumstance applies such as circumstances where *a practitioner who is accused of a crime unrelated to clinical practice or is being investigated for fraudulent use of a Government Credit Card, both of which could take well over 20 days to resolution* (which is not the case here).

NPDB reports are available to a broad group of members in the medical community.

Among other individuals and entities, insurance companies, hospitals, licensing and credentialing organizations, dividend paying surgery centers, physician groups and professional societies must query the NPDB for adverse reports filed about physicians seeking or reapplying for staff privileges at a hospital and/or surgical group and centers and/or applying to be a preferred provider for an insurance carrier, all of which are necessary for a doctor's practice of medicine. At this time, Defendants knows and understands or should know and understand that filing a report with the NPDB will damage Dr. Mandalapu's professional reputation and practice, particularly if the report states or claims that Dr. Mandalapu voluntarily resigned on June 5, 2023, while under investigation for professional incompetence and misconduct, prior to the Medical Center Director taking a final privileging action or closing the investigation based on the findings and recommendation of the Professional Standards Board action, implying that he was found by the Hearing Committee to be a danger to patients, which is fa*lse.* The same reasoning compelled the court in Walker v. Memorial Health System of East Texas, No. 2:17-CV-00066 (E.D. Tex. 2017), to issue a preliminary injunction voiding the NPDB report. Although not binding, there, as here, the hospital's report mischaracterized a non-reportable event under the NPDB Guidebook. If a state hospital's procedural error warranted immediate equitable relief, a federal agency's open violation of its own binding regulations demands the same outcome.

**D. The restraining order would not disserve the public interest.**

The issuance of a preliminary injunction would not adversely affect the public interest. Requiring Defendants to file a Void Report and to refrain from filing a subsequent report will not affect the public interest because the report is improper under the guidelines and further it is based on a discriminatory self serving anti- due process, and the action reported was not

supported by the overwhelming evidence nor classified accordingly as above discussed.

Moreover, the public has no access to the NPDB. Few actions by a federal agency carry

consequences as severe, lasting, and difficult to reverse as a National Practitioner Data Bank

report. An NPDB entry operates as a permanent marker on a physician's professional record.

Hospitals, credentialing committees, insurers, licensing boards, and employers rely on the NPDB

as an authoritative source of truth. Once a report is filed—even erroneously—it is presumed

accurate unless corrected by the reporting entity itself. Courts have repeatedly recognized that

reputational harm coupled with professional impairment constitutes irreparable injury,

particularly where the damage results from an official government record with national

circulation.

　　　　Here, the VA filed not one but two wrongful NPDB reports: a false suspension report on

August 3, 2023, and a false "voluntary surrender during a pending investigation" report on

August 31, 2023. Both were factually baseless. Plaintiff's privileges had been reinstated in full,

with no conditions, in May 2023; Plaintiff then submitted a notice of resignation on April 27,

2023, to relive him after reinstating privileges, which the facility accepted in June, 2023, without

issuing any notice of a pending investigation—a requirement explicitly imposed by VHA

bylaws. The agency later conceded its wrongdoing by voiding the NPDB report on January 22,

2024. But in a move that underscores the retaliatory nature of the entire course of conduct, the

same officials resubmitted the same erroneous NPDB report to the NPDB on February 20, 2024.

The report now sits in the national database again, signaling to every credentialing body in the

country that Plaintiff engaged in conduct warranting adverse action—even though the agency

already determined the report to be erroneous.

This alone satisfies irreparable harm. A physician cannot work, secure privileges, obtain

insurance coverage, or maintain licensure without passing NPDB review. No monetary damages

can unwind the reputational and career-ending consequences of a false federal disciplinary report. The VA cannot identify any public interest harmed by correcting or halting false NPDB reports, by complying with VHA bylaws, or by refraining from retaliatory action. The agency's interest in administrative convenience cannot outweigh the public's interest in lawful conduct. The requested injunction does not impede patient care, restrict the VA's ability to supervise clinical staff, or limit the agency's ability to perform legitimate peer review. It merely requires the agency to refrain from continuing actions already proven erroneous or retaliatory.

Thus, requiring Defendants to file a Void Report and preventing Defendants from submitting a subsequent report during the pendency of this suit will not put the public at risk or adversely affect it in any way.

### E. The balancing of the equities weighs in Dr. Mandalapu's favor.

The harm faced by Dr. Mandalapu outweighs the harm that would be sustained by Defendants if the preliminary injunction were granted. Defendants will suffer no impairment whatsoever if this Honorable Court orders the Defendants to submit a Void Report and refrain from filing a subsequent report with the NPDB, as a court injunction/Order would protect it in the highly unlikely event the NPDB were to question or challenge the action. As outlined above, Dr. Mandalapu faces substantial risk and damage if the report is kept in the NPDB. The continued presence of false NPDB information threatens his ability to practice his profession, maintain licensure, obtain hospital privileges, and pursue employment in any clinical setting. The VA has already acknowledged that at least one NPDB submission was erroneous by voiding it on January 22, 2024. Yet the re-filing of that same erroneous report on February 20, 2024 means Plaintiff must now continue explaining, defending against, and suffering the consequences of an entry the agency itself previously deemed inaccurate. No physician can function freely with a

tainted NPDB record, and no amount of retrospective compensation can restore the professional opportunities and reputation already lost. By contrast, the relief Plaintiff seeks imposes virtually no burden on the VA. Correcting an NPDB entry or refraining from further dissemination of false or retaliatory information requires nothing more than administrative compliance with existing federal regulations and VHA bylaws. The agency does not lose any substantive authority, operational capacity, or statutory prerogative by obeying the law and ensuring that its disciplinary processes are fair, accurate, and non-retaliatory. The VA has no legitimate interest in maintaining an erroneous NPDB report—particularly one it previously voided.

Thus, Dr. Mandalapu has far greater stakes in this matter than the Defendants, and faces far greater harm if the preliminary injunction is denied than the Defendants would face if the Court grants this application. Additionally, absent an injunction, Dr. Mandalapu remains unable to clear an erroneous record that substantially impairs his ability to practice and earn a livelihood. By contrast, the Defendants suffers no legally cognizable harm from complying with its own rules and federal regulations. In Walker, the court rejected the same contention the VA is likely to raise—that an injunction would "force" noncompliance with reporting law—because it is the court's role to determine what the law requires. Here, the law requires no report absent a final adverse action or an actual "under investigation" resignation, and it requires voiding when the report is erroneous.

**F. Security in this Matter should be minimal if required at all as Defendants will not be harmed by the issuance of the Requested Injunctive Relief.**

District courts have wide discretion in the decision of whether to require a party to post security relating to a temporary restraining order or a preliminary injunction. *Kaepa, Inc v. Achilles Corporation,* 76 F.3d 624, 628 (5th Cir. 1996); *Corrigan Dispatch Company v. Casa*

*Guzmas, S.A.,* 569 F.2d 300, 303 (5th Cir. 1978). Furthermore, the court does not have to grant security at all. *See id*. This is true particularly when there is no harm to the party opposing the injunction. *Steward v. West*, 449 F.2d 324 (5th Cir. 1971); *Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1202 (10th Cir. 2003). The security requirement of FRCP Rule 65(c) is intended to cover the costs and damages suffered by the party wrongfully enjoined. Here there is no harm to Defendants, Dr. Mandalapu is requesting this Court to exercise its discretion and issue no more than a nominal security bond requirement of $500 or less.

**G. HCQIA does not provide immunity from injunctive relief.**

To the extent the Defendants may intend to assert immunity under HCQIA as a reason to deny injunctive relief, such immunity does not apply to claims for injunctive or declaratory Relief. *See Poliner v. Tex. Health Sys.*, 537 F.3d 368, 381 (5th Cir. 2008) ("The doors to the courts remain open to doctors who are subjected to unjustified or malicious peer review(s), and they may seek appropriate injunctive and declaratory relief in response to such treatment.").

**H. Exhaustion of Administrative Remedies Is Not Required or Should Be Excused**

Even assuming the VA contends that Dr. Mandalapu must exhaust the NPDB's administrative review process, that requirement is not jurisdictional and should be waived in this case. As the Fifth Circuit and Supreme Court have recognized, exhaustion is unnecessary where (1) the agency lacks authority to grant effective relief, or (2) delay would cause undue prejudice or irreparable harm. *McCarthy v. Madigan, 503 U.S. 140, 146–47 (1992); Dawson Farms, LLC v. Farm Serv. Agency, 504 F.3d 592, 602 (5th Cir. 2007).* Here, the NPDB's administrative process provides no mechanism to compel the VA to void an erroneous report during litigation, and any administrative review would extend months or longer while Dr. Mandalapu's career remains paralyzed.

### III. CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's Application for Temporary Restraining Order and require Defendants to immediately submit a Void Report to the NPDB and enjoin Defendants from submitting any subsequent report about Plaintiff to the National Practitioners Data Bank and any other agency or entity while this suit is pending. The report is not required under the NPDB Guidebook, or at least is not required at this time, it is highly likely that Plaintiff will prevail on the merits of his claims, Plaintiff is likely to suffer irreparable injury in the absence of injunctive relief, an injunction is not against the public interest, and the balance of equities tips in Plaintiffs favor.

### IV. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff Dr. Rao Mandalapu, M.D., by and through undersigned counsel, respectfully prays that this Honorable Court issue the following relief pursuant to Rule 65 of the Federal Rules of Civil Procedure, and all inherent equitable powers of this Court to issue a Temporary Restraining Order directing and enjoining Defendants, the United States Department of Veterans Affairs, Douglas A. Collins, in his official capacity as Secretary of Veterans Affairs, and all officers, agents, employees, and persons acting in concert with them from maintaining or disseminating the February 20, 2024 NPDB report, or any prior iteration thereof, which falsely states that Plaintiff "voluntarily failed to renew or surrendered clinical privileges while under, or to avoid, investigation;" Filing, refiling, supplementing, or transmitting any additional or related NPDB report, statement, or comment regarding Plaintiff's clinical privileges or the actions taken by VANTHCS, pending this Honorable Court's determination of the merits; and using, relying upon, or transmitting the false NPDB report in any credentialing, privileging, or employment decision while this action is pending. Plaintiff

further requests that the Court set this matter for an expedited evidentiary hearing on the Motion

for Preliminary Injunction at the Court's earliest convenience, to ensure full consideration before

the continued dissemination of the challenged NPDB report inflicts further irreparable harm and

any remedy this Honorable Court deems necessary.

Respectfully submitted,

*/s/Sean C. Timmons*
Sean C. Timmons, Esq., LL.M.
Managing Partner, Tully Rinckey PLLC
Texas Bar No.: 24067908
New York State Bar No.: 5470190
Admitted to Practice in all
Texas Federal Courts
18722 University Blvd., Ste. 235
Sugar Land, TX 77479
(832) 240-3273 Phone
(281) 387-3411 Cell
(832) 241-5998 FAX
Stimmons@tullylegal.com
*Attorney for Plaintiff, Dr. Rao Mandalapu*

*/s/ Michelle Alvarado Salermo*
Michelle Alvarado Salermo, Esq.
Associate, Tully Rinckey PLLC
MN Bar No. 0505805
5488 Sheridan Drive Suite 500
Buffalo NY 14221
Tel: (716) 272-3015
Fax: (716) 462-4455
msalermo@tullylegal.com
*Pro Hac Vice*