# Exhibit-A

May 29, 2023, Recredentialing
Packet for VA North Texas Health
Care System

 Gmail

MS <urodoc7@gmail.com>

## FW: Recredentialing Packet for VA North Texas Health Care System
1 message

**Mandalapu, Rao S.** <Rao.Mandalapu@va.gov>                    Wed, May 31, 2023 at 11:06 AM
To: "urodoc7@gmail.com" <urodoc7@gmail.com>

**From:** Mandalapu, Rao S.
**Sent:** Tuesday, May 30, 2023 1:51 PM
**To:** Crotty, Karen L. <Karen.Crotty@va.gov>
**Cc:** Luna-McGimsey, Michelle E. <Michelle.Luna-McGimsey@va.gov>
**Subject:** RE: Recredentialing Packet for VA North Texas Health Care System

Hi Dr. Crotty,

Please find the attached recredentialing packet for your approval.

Thank you,

Rao

**From:** Luna-McGimsey, Michelle E. <Michelle.Luna-McGimsey@va.gov>
**Sent:** Monday, May 29, 2023 6:35 PM
**To:** Mandalapu, Rao S. <Rao.Mandalapu@va.gov>
**Cc:** Malone, Martin T. <Martin.Malone@va.gov>
**Subject:** Recredentialing Packet for VA North Texas Health Care System
**Importance:** High

Good Afternoon Mandalapu Rao

It is time to renew your credentials here at VA North Texas Health Care System.  In order to process your credentials timely, please complete all steps below.

**This must be completed no later than <u>06/09/2023</u>**

**<u>Step 1: VetPro</u>**

VetPro Internet Address:                    http://fcp.vetpro.org

Log-on ID:                   MANDALAPUR1307

Temporary Password:            **@04181965**

Update the following information (Do not skip any of these – You are required to put a new entry for these each recredentialing cycle, EVEN IF THE LICENSE/ CERTIFICATION IS NOT EXPIRED. NEW ENTRY IS NEEDED EACH TIME VETPRO IS OPEN FOR RECREDENTIALING

- o **Personal Profile** - Update any personal information as needed, Save.

- o **Supp/Attest** – Click "Add new record", answer all questions, any affirmative answers require an explanation, Save. (VetPro takes several seconds to save your entries.)

- o **License** - Highlight your last entry for your current license(s), change expiration date as needed; Save as New Record.

- o **Federal DEA -** Highlight your last DEA entry; change expiration date as needed; Save as New Record.

- o **State CDS (non-Texas only) -** Highlight your last state CDS entry; change expiration date as needed; Save as New Record.

- o **Certification (BLS) -** NO ENTRY NEEDED.  PLEASE INCLUDE COPY OF BLS WITH SIGNED PACKET

- o **Certification (Board Certification) -** Highlight your last entry for your board certification(s), indicate if MOC participating, enter Agency and Certifying Board (choose "Other" if not applicable); Save as New Record.

- o **Certification (ACLS, if applicable) -** NO ENTRY NEEDED.  PLEASE INCLUDE COPY OF BLS WITH SIGNED PACKET

- o **References/Peer Review** - Enter 2 peer references (same occupation as you), include phone numbers and email addresses, save after each entry (VetPro takes a few seconds to save each entry).

- o **Personal History** – Add a new entry for all <u>current</u> work histories, including here at VA North Texas; click the current box below the to and from dates; Save as New Record.

- o **Sign & Submit** - Check the box to attest to the Bylaws for VA North Texas Health Care System (copy attached for your reference), then sign using the VetPro password you created for this session.

<u>**Step 2:**</u>  **Send the digitally signed and completed copy of your completed packet <u>AND</u> requested privileges to the appropriate section and service chief for their signature, <u>and copy me</u>.**

When completing your new privilege form, it may be helpful to review your current privilege listing found on the VA intranet (by service):

https://dvagov.sharepoint.com/sites/NTX/services/mso/privileges/default.aspx

**Step 5:  If you are not able to able to digitally sign the packet and privilege form, email us a copy of both so we can get started while you are getting signatures.  You must then return the original hand-signed privilege form to me after obtaining all service-level signatures.**  Only original hand-written initials/signatures or digitally signatures are acceptable.  Faxed copies will not be accepted.


Please feel free to contact me at if you have any questions about the credentialing process.  We know this can be a complicated process and we are here to assist you.


Thank you!


Respectfully,

## Michelle Luna-McGimsey

Credentialing Specialist / Medical Staff Office

📞 Phone: (214) 857-0497

📠 Fax: (214) 462-4843

✉ Michelle.Luna-McGimsey@va.gov │ www.va.gov


*"Changing lives. One Veteran at a time*



VA North Texas Health Care System 4500 South Lancaster Road │11-G│ Dallas, TX 75216

**MISSION**
*Honor America's Veterans by providing exceptional health care that improves their health and well-being.*

**VISION**
*To be the health care provider of choice for our Veteran patients by ensuring a continuous focus on Quality, Safety and Value, Patient centered Care and Servant Leadership.*


---

**4 attachments**

📄 **Urology Privileges - Approved 4.16.20.pdf**
445K

**ACLS_eCard.pdf**
87K

**BLS_eCard.pdf**
88K

**Recredentialing Packet.pdf**
762K

# Exhibit-B

Contents:

1. August 31, 2023, second NPDB report, disputed for factual inaccuracies and violation of VHA bylaws.
2. Request to withdraw NPDB/SLB (State Licensing Board) report. (p.4)
3. Request for dispute resolution. (p. 5-10)
4. Documented evidence for Recredentialing. (p. 11-13)
5. Standard Form-50- Notification of Personal Action. No disciplinary actions. (p. 15)



National Practitioner Data Bank
Health Resources and Services Administration
U.S. Department of Health and Human Services
P.O. Box 10832
Chantilly, VA 20153-0832
https://www.npdb.hrsa.gov

DCN: 5500000216574829
Process Date: 08/31/2023
Page: 1    of    3
MANDALAPU, RAO S
For authorized use by:
MANDALAPU, RAO S

# MANDALAPU, RAO S

## *VA NORTH TEXAS HEALTH CARE SYSTEM*

### CORRECTION TO TITLE IV CLINICAL PRIVILEGES ACTION

**Date of Action:** 06/05/2023

| Initial Action | Basis for Initial Action |
|---|---|
| - VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE(S), WHILE UNDER, OR TO AVOID, INVESTIGATION RELATING TO PROFESSIONAL COMPETENCE OR CONDUCT | - SUBSTANDARD CARE OR INADEQUATE SKILL LEVEL |

**A. REPORTING ENTITY**

| | |
|---|---|
| Entity Name: | VA NORTH TEXAS HEALTH CARE SYSTEM |
| Address: | 4500 S LANCASTER RD OFC 11G |
| | CHIEF OF STAFF |
| City, State, Zip: | DALLAS, TX 75216-7167 |
| Country: | |
| Name or Office: | MEDICAL STAFF OFFICE |
| Title or Department: | CHIEF OF STAFF OFFICE |
| Telephone: | (214) 857-4195 |
| Entity Internal Report Reference: | |
| Type of Report: | CORRECTION |
| Previous Report Number: | 5500000214857488 (Please destroy all copies of the previous report) |

**B. SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL)**

| | |
|---|---|
| Subject Name: | MANDALAPU, RAO S |
| Other Name(s) Used: | |
| Gender: | MALE |
| Date of Birth: | 0▮/18/1965 |
| Organization Name: | |
| Work Address: | |
| City, State, ZIP: | |
| Home Address: | ▮710 N BRAESWOOD BLVD |
| City, State, ZIP: | HOUSTON, TX 77025-3104 |
| Deceased: | NO |
| Social Security Numbers (SSN): | ***-**-▮30▮ |
| National Provider Identifiers (NPI): | 1356510007 |
| Professional School(s) & Year(s) of Graduation: | SRI VENKATESVARA MEDICAL COLLEGE (1988) |
| Occupation/Field of Licensure: | PHYSICIAN (MD) |
| State License Number, State of Licensure: | ▮6042, T▮ |
| Specialty: | UROLOGICAL SURGERY |
| Drug Enforcement Administration (DEA) Numbers: | ▮M735857▮ |
| Name(s) of Health Care Entity (Entities) With Which Subject Is Affiliated or Associated (Inclusion Does Not Imply Complicity in the Reported Action): | |
| Business Address of Affiliate: | |
| City, State, ZIP: | |
| Nature of Relationship(s): | |

National Practitioner Data Bank
Health Resources and Services Administration
U.S. Department of Health and Human Services
P.O. Box 10832
Chantilly, VA 20153-0832
https://www.npdb.hrsa.gov

DCN: 5500000216574829
Process Date: 08/31/2023
Page: 2    of    3
MANDALAPU, RAO S
For authorized use by:
MANDALAPU, RAO S

| C. INFORMATION REPORTED | |
|---|---|

**NOTE: Information marked with an asterisk (*) was added, corrected, or removed.**

Type of Adverse Action: TITLE IV CLINICAL PRIVILEGES

Basis for Action: SUBSTANDARD CARE OR INADEQUATE SKILL LEVEL (F6)

* Adverse Action
Classification Code(s): VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE(S), WHILE UNDER, OR TO AVOID, INVESTIGATION RELATING TO PROFESSIONAL COMPETENCE OR CONDUCT (1635)

* Date Action Was Taken: 06/05/2023

* Date Action Became Effective: 06/05/2023

Length of Action: PERMANENT

* Description of Subject's Act(s) or Omission(s) or Other Reasons for Action(s) Taken and Description of Action(s) Taken by Reporting Entity:
Physician voluntarily resigned on June 5, 2023, while under investigation for professional incompetence and misconduct, prior to the Medical Center Director taking a final privileging action or closing the investigation based on the findings and recommendation of the Professional Standards Board.

| D. SUBJECT STATEMENT | |
|---|---|

If the subject identified in Section B of this report has submitted a statement, it appears in this section.

Date Submitted: 09/01/2023
Nonrenewal of medical staff appointments or clinical privileges generally should not be reported to the NPDB. However, if the practitioner does not apply for renewal of medical staff appointment or clinical privileges while under investigation by the health care entity for possible professional incompetence or improper professional conduct, or in return for not conducting such an investigation or not taking a professional review action, the event is considered a surrender while under investigation and must be reported to the NPDB. [URL DELETED (UD)] The practitioner (Dr. Mandalapu) applied/submitted a renewal of privileges packet in May 2023 (Copy attached) Dr. Mandalapu applied for renewal of privileges, the event is NOT considered a voluntary surrender of privileges while under investigation per the NPDB. Therefore, the NPDB report has to be withdrawn immediately. Time Frame for Reporting: (NPDB Handbook) Eligible entities must report medical malpractice payments and other required actions to the NPDB within 30 calendar days of the date the action was taken or the payment was made. Date Action Was Taken: 06/05/2023 DCN: 5500000216574829 Process Date: 08/31/2023 The NPDB report was not submitted in accordance with the NPDB reporting requirements. VHA bylaws violation: 1. The NPDB report was not submitted in accordance with the NPDB reporting requirements per VHA Handbook 1100.17 and VHA 1100.19. a. When privileges are summarily suspended, a comprehensive review of the reason for summary suspension should be accomplished within 30 calendar days of the suspension. (VHA 1100.19, p52) The NPDB report was submitted 471 days after the summary suspension of operative privileges violating VHA policy. b. The Director of the VA medical center must file an adverse action report within 15 calendar days of the date of the action (VHA 1100.17) This report was not submitted within 15 calendar days after my separation from the VA service on 06/05/2023. c. Prior to approving the NPDB report, the Medical Center Director must notify the practitioner to be reported and provide the practitioner an opportunity for discussion with appropriate facility officials, including the Medical Center Director, before the report is submitted. (VHA 1100.17) The practitioner was never notified and never provided an opportunity to respond prior to approving the NPDB report violating VHA policy and civil rights. d. The VA reports only final actions sustained for physicians and dentists to the NPDB, but due process procedures are required for all privileged practitioners for whom revocation occurs. (VHA 1100.19, p56). Dr. Mandalapu was never offered due process violating

National Practitioner Data Bank
Health Resources and Services Administration
U.S. Department of Health and Human Services
P.O. Box 10832
Chantilly, VA 20153-0832
https://www.npdb.hrsa.gov

DCN: 5500000216574829
Process Date: 08/31/2023
Page: 3    of    3
MANDALAPU, RAO S
For authorized use by:
MANDALAPU, RAO S

civil rights and VHA policy. 2. Dr. Mandalapu submitted documented evidence in all his prior communications showing the director of the VA North Texas Health Care System (VANTHCS) summary suspension of operative privileges and the review process was based on 'false' allegations and prejudiced and violating VHA policies and violating civil rights. 3. Dr. Mandalapu submitted documented evidence showing that he never had any reportable surgical complications (Clavien II or above), never had any patient care issues, and never had any Tort claims or malpractice claims in all his prior communications. 4. In August 2022, The EEOC initiated an investigation against the section chief, chief of surgery, chief of staff, and the Director of the VANTHCS on charges of Racial discrimination, Retaliation after the fact, workplace harassment, VHA policy violations, and abuse of power of authority. 5. Dr. Mandalapu submitted innumerable written requests to the Director of the VANTHCS and the chief of staff to refrain from the review process due to EEOC investigation to avoid legal conflicts of interest. 6. The NPDB report violated NPDB reporting requirements, VHA policies, and civil rights. 7. The NPDB/SLB report was in retaliation to the EEOC proceedings.

## E. REPORT STATUS

Unless a box below is checked, the subject of this report identified in Section B has not contested this report.

[ ] This report has been disputed by the subject identified in Section B.

[X] At the request of the subject identified in Section B, this report is being reviewed by the Secretary of the U.S. Department of Health and Human Services to determine its accuracy and/or whether it complies with reporting requirements. No decision has been reached.

[ ] At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services and a decision was reached. The subject has requested that the Secretary reconsider the original decision.

[ ] At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services. The Secretary's decision is shown below:

Date of Original Submission:        08/03/2023
Date of Most Recent Change:         08/31/2023

## F. SUPPLEMENTAL SUBJECT INFORMATION ON FILE WITH DATA BANK

The following information was not provided by the reporting entity identified in Section A of this report. The information was submitted to the Data Bank from other sources and is intended to supplement the information contained in this report.

Occupation/Field of Licensure:    Physician (MD)
State License Number, State of Licensure:    659264, NY
Occupation/Field of Licensure:    Physician (MD)
State License Number, State of Licensure:    MD446156, PA

**This report is maintained under the provisions of:** Title IV

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the provisions of Title IV of Public Law 99-660, as amended, and 45 CFR Part 60. All information is confidential and may be used only for the purpose for which it was disclosed. Disclosure or use of confidential information for other purposes is a violation of federal law. For additional information or clarification, contact the reporting entity identified in Section A.

**END OF REPORT**

CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY    AJ



**rao ms <msrao17@gmail.com>**

---

## Request to withdraw NPDB/SLB report dated 08/31/2023

---

**rao ms** <msrao17@gmail.com>                                                          Fri, Sep 1, 2023 at 12:15 PM
To: Jason.Cave2@va.gov, xavier.becerra@hhs.gov, Mark.Wilson5@va.gov, Rima.Nelson@va.gov,
Wendell.Jones@va.gov
Cc: rao ms <msrao17@gmail.com>

Hi Mr. Jason Cave,

I am Rao Mandalapu, a staff physician at the VA North Texas Health Care System from 10/12/2021 to 06/05/2023.
I request you to withdraw the NPDB report DCN: 5500000216574829 Process Date: 08/31/2023 immediately.
The NPDB report disputed the factual accuracy of the report and the report was not submitted in accordance with the
NPDB reporting requirement violating VHA policies.
As per the NPDB guidebook, the practitioner (Dr. Mandalapu) applied/submitted renewal of privileges packet in May 2023.
(Copy attached) Dr. Mandalapu applied for renewal of privileges, the event is **NOT** considered a voluntary surrender of privileges
while under investigation per the NPDB.
Therefore, I request you the NPDB report be withdrawn immediately.
Please find the attached documented report explaining the disputed reasons.
I request you withdraw the NPDB/SLB report immediately as it affects my professional career.
You have summarily suspended operative privileges without notice or 'reason' or opportunity to respond violating VHA
policies and civil rights for 471 days and now reported to the NPDB to kill my surgical career permanently.
I wonder if you have a name to describe this kind of intentional humiliation.
This mail is also copied to the Honorable United States Secretary of Health and Human Services, Dr. Xavier Becerra,
Director of the VISN 17, VHA Executive Director, National Surgery Office, and Assistant Deputy Under Secretary for
Health.
Please advise as soon as possible.
Thank you,
Respectfully

Rao Mandalapu, MD

---

**3 attachments**

  **NPDB report_dispute09012023..pdf**
193K

  **FW_JC_Request to reinstate privileges.pdf**
346K

  **FW_ Recredentialing Packet for VA North Texas Health Care System.pdf**
395K

**AJ**



DCN: **5500000217240936**



P.O. Box 10832
Chantilly, VA 20153-0832
https://www.npdb.hrsa.gov

# REQUEST FOR DISPUTE RESOLUTION

Report summary for DCN: 5500000216574829
Federal governing statute(s):
- Title IV

Reported Action(s):
- Voluntary Surrender of Clinical Privilege(s), While Under, or to Avoid, Investigation Relating to Professional Competence or Conduct

## Dispute Points

| | |
|---|---|
| **1** | 1. I did not voluntarily surrender clinical privileges. I did submit a re-credentialing packet in May 2023 2. Suspension privileges without disclosing reasons violating VHA policies, civil rights, abusing the power of authority 3. The review process was intentionally delayed more than a year violating VHA policies and civil rights 4. I made innumerable written requests to the director of the medical center and the chief of staff to refrain from the review process due to legal conflicts of interest |

## Documentation

- Disputeresolutionrequest09092023.pdf
- NPDBreport_dispute09012023.pdf
- NPDBrequiresadditionaldocuments.pdf
- Complainantfirstsetofinterrogatories_NPDB_09092023.pdf
- Complainttosuspendoperativeprivilegesanddocumentedresponse.pdf

To expedite your request and avoid processing delays, please upload documents electronically. If you are unable to upload documents, contact the Customer Service Center.

If you need to submit additional documentation that you did not upload on the previous screen, print this page and mail it with the documentation to the following address:

Express Mail:
4094 Majestic Lane,
PMB-332, Fairfax, VA 22033

US Mail:
NPDB
P.O. Box 10832
Chantilly, VA 20153-0832

**To process your request we must have the following:**

1. Proof of an unsuccessful attempt to resolve the disagreement with the reporting organization (e.g., a copy of email correspondence with the reporting organization's response).

**AJ**

Case 3:25-cv-01320-L    Document 17-2    Filed 11/26/25    Page 12 of 295    PageID 140

2. Documentation supporting your position that the information reported is not correct. The documents must be directly related to the facts in dispute and substantially contribute to a determination of the accuracy of the facts in the report. **Do not include any personally identifiable information other than your own.**

**Is an attorney assisting you?**

Due to confidentiality restrictions, we cannot accept documents from or provide information to your attorney until we receive an authorization letter. Your attorney can provide this to you. You or a designated employee who is representing your organization must sign the letter and upload or mail it to us.

## Certification

I certify that I am authorized to submit this information. I am the subject of this report, the duly authorized attorney for the subject of this report or the designated employee representing the organization that is the subject of this report.

I certify that I have submitted or will submit documentation to support my position and proof that I attempted to resolve the disagreement with the reporting entity but was unsuccessful. I understand that my dispute resolution request will not be processed until all required documents are received.

| | |
|---|---|
| **Authorized Submitter's Name:** | RAO MANDALAPU |
| **Authorized Submitter's Title:** | SELF |
| **Authorized Submitter's Telephone:** | (214) 422-1113 |
| **Certification Date:** | 09/10/2023 |

**END OF DOCUMENT**

**AJ**

<u>**Ref: Request for Dispute Resolution - DCN: 5500000216574829**</u>
**(p107-119)**

NPDB report:
*Adverse Action Classification Code(s):*
*VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE(S), WHILE UNDER, OR TO AVOID,*
*INVESTIGATION RELATING TO PROFESSIONAL COMPETENCE OR CONDUCT (1635)*
*Date Action Was Taken: 06/05/2023*
*Date Action Became Effective: 06/05/2023*
*DCN: 5500000216574829 Process Date: 08/31/2023*

## C. INFORMATION REPORTED

Type of Adverse Action: TITLE IV CLINICAL PRIVILEGES

\* Adverse Action Classification Code(s): VOLUNTARY SURRENDER OF CLINICAL
PRIVILEGE(S), WHILE UNDER, OR TO AVOID, INVESTIGATION RELATING
TO PROFESSIONAL COMPETENCE OR CONDUCT (1635)

Basis for Action: SUBSTANDARD CARE OR INADEQUATE SKILL LEVEL (F6)

The Description of Subject's Act(s) or Omission(s) field in Section C of the Report specifically
states:

***Physician voluntarily resigned on June 5, 2023, while under investigation for professional
incompetence and misconduct, prior to the Medical Center Director taking a final privileging
action or closing the investigation based on the findings and recommendation of the
Professional Standards Board.***

<u>**Response:**</u>

<u>**Timeline events:**</u>
*Copied from the Reporting agency document submitted to the NPDB dated 11/17/2023*
*EntityDocumentation-MandalapuRao.pdf (Agency p1)*

**4/3/2023:** Dr. M acknowledge receipt of the Summary Probationary Review and convening of
Professional Standards Board. The agency made new false allegations that were not disclosed.

**4/12/2023:** (p38-85)

Dr. Mandalapu (Dr. M) submitted response to the director of the VA North Texas and the PSB
with all the documented evidence including operative reports, anesthesia records, operative room
records, post operative care records, and hospital records on 04/12/2023. (p38-85)

1

**AJ**

Dr. M made a written objection to the chief of staff and the director of the medical center involving the chief of urology, chief of surgery, chief of staff and the director of the medical center in the Professional Standards Board (PSB) review process due to legal conflicts of interest.

Despite written objections and legal conflicts of interest, the chief of urology, Jeffrey Gahan, chief of surgery, and the chief of staff were involved in the PSB review.

**4/26/2023:** Professional Standards Board submitted final report.

**5/22/2023:** Medical Center Director approved Professional Standards Board Action. (Agency p1)

***The Medical Center Director signed a final privileging action based on the findings and recommendation of the Professional Standards Board on 05/22/2023.***

**5/29/2023:** VA North Texas Medical staff office/director of the medical center sent a recredentialing packet to Dr. Mandalapu. (p114)

**Subject:** Recredentialing Packet for VA North Texas Health Care System
Importance: High

*Good afternoon Mandalapu Rao*
*It is time to renew your credentials here at VA North Texas Health Care System. In order to process your credentials timely, please complete all steps below.*

**5/30/2023:** Dr. Mandalapu signed and submitted completed recredentialing packet for approval. (p114)

Dr. Mandalapu applied for renewal of clinical privileges on 5/30/2023, after the ***Medical Center Director signed a final privileging action based on the findings and recommendation of the Professional Standards Board on 05/22/2023.***

***As per the NPDB guidebook,*** the event of applying for the recredentialing is **not reportable and is not** considered a 'VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE(S), WHILE UNDER, OR TO AVOID, INVESTIGATION RELATING TO PROFESSIONAL COMPETENCE OR CONDUCT (1635)'.

**Ref: NPDB Guidebook:**

**Nonrenewal:**

Nonrenewal of medical staff appointment or clinical privileges generally should not be reported to the NPDB. However, if the practitioner **does not apply** for renewal of medical staff appointment or clinical privileges while under investigation by the health care entity for possible professional incompetence or improper professional conduct, or in return for not conducting such an investigation or not taking a professional review action, the event is

2

AJ

considered a surrender while under investigation and must be reported to the NPDB.
https://www.npdb.hrsa.gov/guidebook/EClinicalPrivileges.jsp

**6/5/2023**: Dr. M resigned from the VA service after submitting recredentialing packet in May 2023 and communicated the same with the Director of the Medical Center.

As of 6/5/2023, no pending investigations against Dr. Mandalapu.

**6/5/2023:** The SF-50 is the Notification of Personnel Action.

It contains certain employment information including personal actions, current or pending malpractice cases, misconduct or patient care issues.

It is used by current and former federal employees. The copy of the SF -50 requested from the National Personal Records Center (NPRC).

I never had any complaints against me from the staff physicians, nursing staff, residents, students, operative room staff, anesthesia staff physicians, patient care issues, malpractice or tort claims.

**The SF-50 – Notification of Personal Action report attached for your review.**

**No adverse actions reported in the SF-50.**

## C. INFORMATION REPORTED

**Basis for Action**: SUBSTANDARD CARE OR INADEQUATE SKILL LEVEL (F6)

**Response:**

The standard of care for surgery is the quality of care that a reasonably prudent health care professional who has the same training and experience, would offer under similar circumstances.

The VHA directive 1190, states that three independent, impartial board-certified urologists should review all surgeries to determine adverse surgical outcomes if the surgeon met the standard of surgical care or not.

The review process of summary suspension of operative privileges was never assigned to an independent, impartial team of experts despite Dr. M's innumerable written requests to the Chief of Staff and the Director of the medical center violating VHA directives.

Dr. M submitted the following documented evidence to the chief of staff and the Director of the Medical center on 9/30/2022. (p32-37)

The reporting agency/VA medical center admits the documented evidence as submitted. The VA medical center never provided any documented evidence showing substandard care or inadequate skill level (F6).

AJ

*a. Microsoft XL sheet showing all 728 patient encounters, including procedures from January 2022 to June 2022.*
*b. Microsoft XL sheet showing all surgeries from January 2022 to 5/18/2022 (privileges were suspended on 5/18/2022)*
*c. I have submitted the VASQIP (VA Surgical Quality Improvement Program) report, which independently reviews all the surgeries quarterly and reports surgical complications.*
*c. The VASQIP report showed NO surgical complications in my name (Mandalapu). (Copy attached)*
*d. Based on the VASQIP report, the summary suspension of privileges was based on non-reportable minor complications in two minor surgical procedures out of one hundred and thirty surgeries.*
*e. The copies of All operative reports of concurrent surgeries show start and end times, violating VHA policy.*
*f. Copies of operative reports on four procedures that the FCR or clinical care committee alleged reported issues. The operative reports documented in real-time during surgery showed documented evidence contrary to the FCR report. (#5)*
*g. I have requested the names, qualifications, and designation of the committee members who reviewed my surgeries independently on CPRS. The leadership/administration refused to disclose the requested details. No documented evidence of the review disclosed.*

The reporting agency/ VA medical center never provided any documented evidence reviewed by the independent, impartial board-certified urologists per the VHA directive showing substandard care or inadequate skill level **(F6).**

**Time Frame for Reporting to the NPDB:**

(NPDB Handbook)

Eligible entities must report medical malpractice payments and other required actions to the NPDB within 30 calendar days of the date the action was taken or the payment was made.

*Date Action Was Taken: 06/05/2023*
*DCN: 5500000216574829 Process Date: 08/31/2023*

The NPDB report was not submitted in accordance with the NPDB reporting requirements.

**VHA bylaws violation:**

1. The VA reports only final actions sustained for physicians and dentists to the NPDB, but due process procedures are required for all privileged practitioners for whom revocation occurs. (VHA 1100.19, p56).

2. Dr. Mandalapu was never offered mandated due process prior to reporting to the NPDB violating the VHA policy.

3. The Director of the VA medical center must file an adverse action report within 15 calendar days of the action (VHA 1100.17) This report was not submitted within 15 calendar days after my separation from the VA service on 06/05/2023.

4. The VA leadership made false allegations, false reviews, manipulations, violation of policies.

4

**AJ**

                                                    **MS <urodoc7@gmail.com>**

---

## FW: Recredentialing Packet for VA North Texas Health Care System
1 message

---

**Mandalapu, Rao S.** <Rao.Mandalapu@va.gov>                    Wed, May 31, 2023 at 11:06 AM
To: "urodoc7@gmail.com" <urodoc7@gmail.com>

---

**From:** Mandalapu, Rao S.
**Sent:** Tuesday, May 30, 2023 1:51 PM
**To:** Crotty, Karen L. <Karen.Crotty@va.gov>
**Cc:** Luna-McGimsey, Michelle E. <Michelle.Luna-McGimsey@va.gov>
**Subject:** RE: Recredentialing Packet for VA North Texas Health Care System


Hi Dr. Crotty,

Please find the attached recredentialing packet for your approval.

Thank you,

Rao

---

**From:** Luna-McGimsey, Michelle E. <Michelle.Luna-McGimsey@va.gov>
**Sent:** Monday, May 29, 2023 6:35 PM
**To:** Mandalapu, Rao S. <Rao.Mandalapu@va.gov>
**Cc:** Malone, Martin T. <Martin.Malone@va.gov>
**Subject:** Recredentialing Packet for VA North Texas Health Care System
**Importance:** High


Good Afternoon Mandalapu Rao


It is time to renew your credentials here at VA North Texas Health Care System.  In order to process your credentials timely, please complete all steps below.

### This must be completed no later than <u>06/09/2023</u>

**<u>Step 1: VetPro</u>**


VetPro Internet Address:                    http://fcp.vetpro.org

---

Log-on ID:                          MANDALAPUR1307

Temporary Password:            **@04181965**

Update the following information (Do not skip any of these – You are required to put a new entry for these each recredentialing cycle, EVEN IF THE LICENSE/ CERTIFICATION IS NOT EXPIRED. NEW ENTRY IS NEEDED EACH TIME VETPRO IS OPEN FOR RECREDENTIALING

- o **Personal Profile** - Update any personal information as needed, Save.

- o **Supp/Attest** – Click "Add new record", answer all questions, any affirmative answers require an explanation, Save. (VetPro takes several seconds to save your entries.)

- o **License** - Highlight your last entry for your current license(s), change expiration date as needed; Save as New Record.

- o **Federal DEA -** Highlight your last DEA entry; change expiration date as needed; Save as New Record.

- o **State CDS (non-Texas only) -** Highlight your last state CDS entry; change expiration date as needed; Save as New Record.

- o **Certification (BLS) -** NO ENTRY NEEDED.  PLEASE INCLUDE COPY OF BLS WITH SIGNED PACKET

- o **Certification (Board Certification) -** Highlight your last entry for your board certification(s), indicate if MOC participating, enter Agency and Certifying Board (choose "Other" if not applicable); Save as New Record.

- o **Certification (ACLS, if applicable) -** NO ENTRY NEEDED.  PLEASE INCLUDE COPY OF BLS WITH SIGNED PACKET

- o **References/Peer Review -** Enter 2 peer references (same occupation as you), include phone numbers and email addresses, save after each entry (VetPro takes a few seconds to save each entry).

- o **Personal History** – Add a new entry for all current work histories, including here at VA North Texas; click the current box before the to and from dates; Save as New Record.

- o **Sign & Submit** - Check the box to attest to the Bylaws for VA North Texas Health Care System (copy attached for your reference), then sign using the VetPro password you created for this session.

**Step 2:  Send the digitally signed and completed copy of your completed packet AND requested privileges to the appropriate section and service chief for their signature, and copy me.**

When completing your new privilege form, it may be helpful to review your current privilege listing found on the VA intranet (by service):

https://dvagov.sharepoint.com/sites/NTX/services/mso/privileges/default.aspx

Case 3:25-cv-01320-L    Document 17-2    Filed 11/26/25    Page 19 of 295    PageID 147

**Step 3:** **If you are not able to able to digitally sign the packet and privilege form, email us a copy of both so we can get started while you are getting signatures. You must then return the original hand-signed privilege form to me** **after obtaining all service-level signatures.**  Only original hand-written initials/signatures or digitally signatures are acceptable.  Faxed copies <u>will not</u> be accepted.

Please feel free to contact me at if you have any questions about the credentialing process.  We know this can be a complicated process and we are here to assist you.

Thank you!

Respectfully,

# Michelle Luna-McGimsey

Credentialing Specialist / Medical Staff Office

📞 Phone: (214) 857-0497

📠 Fax: (214) 462-4843

✉️ Michelle.Luna-McGimsey@va.gov  | www.va.gov

*"Changing lives. One Veteran at a time*



VA North Texas Health Care System 4500 South Lancaster Road | 11-G | Dallas, TX 75216

MISSION
Honor America's Veterans by providing exceptional health care that improves their health and well-being.

VISION
To be the health care provider of choice for our Veteran patients by ensuring a continuous focus on Quality, Safety and Value, Patient centered Care and Servant Leadership.

---

**4 attachments**

📄 **Urology Privileges - Approved 4.16.20.pdf**
445K

**AJ**

 **ACLS_eCard.pdf**
87K

 **BLS_eCard.pdf**
88K

 **Recredentialing Packet.pdf**
762K

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296–33, Subch. 4

**NOTIFICATION OF PERSONNEL ACTION**

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| MANDALAPU, RAO S | 0█████1 | 0██████ | 06/05/2023 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5–A. Code **317** | 5–B. Nature of Action **RESIGNATION** | 6–A. Code | 6–B. Nature of Action |
| 5–C. Code **V8V** | 5–D. Legal Authority **38 USC CHAP 74** | 6–C. Code | 6–D. Legal Authority |
| 5–E. Code | 5–F. Legal Authority | 6–E. Code | 6–F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| PHYSICIAN (REGULAR FT)<br>PD: 000000<br>POSITION: 91569097 | |

| 8. Pay Plan **VM** | 9. Occ. Code **0602** | 10. Grade or Level **PHYS** | 11. Step or Rate **01** | 12. Total Salary **$███,███** | 13. Pay Basis **PA** | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19.Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12A. Basic Pay ██████ | 12B. Locality Adj. ██████ | 12C. Adj. Basic Pay ██████ | 12D. Other Pay $0 | | | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| VETERANS HEALTH ADMINISTRATION<br>SURGICAL CARE<br><br><br>DALLAS TX USA | |

**EMPLOYEE DATA**

| 23. Veterans Preference **1** | 24. Tenure **1** | 25. Agency Use | 26. Veterans Preference for RIF YES **X** NO |
|---|---|---|---|
| 1 – None   3 – 10–Point/Disability   5 – 10–Point/Other<br>2 – 5–Point   4 – 10–Point/Compensable   6 – 10–Point/Compensable/30% | 0 – None   2 – Conditional<br>1 – Permanent   3 – Indefinite | | |

| 27. FEGLI **D0** BASIC + OPTION A | 28. Annuitant Indicator **9** NOT APPLICABLE | 29. Pay Rate Determinant **0** |
|---|---|---|

| 30. Retirement Plan **KF** FERS FRAE AND FICA (FULL) | 31. Service Comp. Date (Leave) **10/12/2021** | 32. Work Schedule **F** FULL TIME | 33. Part–Time Hours Per Biweekly Pay Period |
|---|---|---|---|

**POSITION DATA**

| 34. Position Occupied **2** | 35. FLSA Category **E** | 36. Appropriation Code **8202-2280** | 37. Bargaining Unit Status **1276** |
|---|---|---|---|
| 1 – Competitive Service   3 – SES General<br>2 – Excepted Service   4 – SES Career Reserved | E – Exempt<br>N – Nonexempt | | |

| 38. Duty Station Code **48-1730-113** | 39. Duty Station (City – County – State or Overseas Location) **DALLAS   TX** |
|---|---|

| 40. Agency Data **549** | 41. | 42. | 43. | 44. |
|---|---|---|---|---|

**45. Remarks**

FORWARDING ADDRESS:13204 LAGUNA SHORES DR PEARLAND, TX 77584
LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE.
OPF RETAINED BY * NATIONAL PERSONNEL RECORDS CENTER (NPRC) 1411 BOULDER BOULEVARD, VALMEYER, IL 62295.
EMPLOYEE GAVE NO REASON FOR RESIGNATION.

| 46. Employing Department or Agency<br>VETERANS HEALTH ADMINISTRATION | 50. Signature/Authentication and Title of Approving Official<br>ELECTRONICALLY SIGNED BY: |
|---|---|
| 47. Agency Code **VATA** | 48. Personnel Office ID **1367** | 49. Approval Date **06/05/2023** | VIVIAN PETERS<br><br>CHIEF HUMAN RESOURCES OFFICER |

5–Part 50–316

2 - OPF Copy - Long-Term Record - DO NOT DESTROY

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540–01–333–6238

# <u>Exhibit-C</u>

## <u>Contents:</u>

1. January 22, 2024, Report #5500-0002-1657-4829 is voided. It is no longer available.

VA NORTH TEXAS HEALTH CARE SYSTEM (DALLAS, TX), the reporting entity that submitted report #5500-0002-1657-4829, voided it for the following reason: **The report was submitted in error.**

Case 3:25-cv-01320-L    Document 17-2    Filed 11/26/25    Page 23 of 295    PageID 151



P.O. Box 10832
Chantilly, VA 20153-0832
https://www.npdb.hrsa.gov

## Void Notice 5500-0002-2592-8376

## Report #5500-0002-1657-4829 is voided. It is no longer available.

VA NORTH TEXAS HEALTH CARE SYSTEM (DALLAS, TX), the reporting entity that submitted report #5500-0002-1657-4829, voided it for the following reason: The report was submitted in error (e.g., wrong practitioner named; duplicate report; payment not delivered; action never finalized).

The report was removed from the National Practitioner Data Bank on January 22, 2024.

We sent a notification to all entities that received this report in an NPDB query disclosure within three years from the date the report was removed. The notification advised the entity that this report is voided and directed them to destroy all copies of it.

## Confidentiality

All information in the NPDB is confidential, disclosed only to registered organizations for specified uses, and is not available to the public. Disclosure or use of confidential information for other purposes is a violation of federal law. Federal regulations governing the NPDB are codified at 45 CFR Part 60.

# Exhibit-D

Contents:

1. EEOC Report of Investigation (ROI)
2. Affidavit of Complainant, and RMOs (p.2)
3. Protected activity (p. 3-5)



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**Continental District**
**Houston, TX 77030**

| | | |
|---|---|---|
| Rao Mandalapu | ) | |
| | ) | |
| | ) | |
| Complainant | ) | |
| | ) | |
| | ) | |
| and | ) | Case No. 2003-549A4-2024-157842 |
| | ) | |
| Secretary | ) | |
| Department of Veterans Affairs | ) | |
| | ) | |
| 810 Vermont Avenue, NW | ) | |
| Washington, DC  20420 | ) | |
| | ) | |
| | ) | |
| Agency | ) | |
| | ) | |
| North Texas Healthcare System | ) | |
| 4500 South Lancaster Road | ) | |
| Dallas, TX 75216 | ) | |



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**William Moorhead Federal Building**
**1000 Liberty Avenue, Suite 1801**
**Pittsburgh, PA 15222**

**This equal employment opportunity investigative document contains identifiable personal data that is subject to the Privacy Act of 1974, 5 U.S.C. Sec. 552a. Release of such data must be in accordance with the provisions of the Act, as amended. The unauthorized release of this information could subject the releaser to formal disciplinary action and/or criminal penalties, including a fine of up to $5,000.00.**

**Investigative Report`**
**In the Matter of the EEO Complaint of Discrimination of Rao Mandalapu**

| | | |
|---|---|---|
| Rao Mandalapu | ) | |
| Complainant | ) | |
| | ) | |
| | ) | |
| v. | ) | ORM No. 2003-549A4-2022-147508 |
| | ) | |
| Secretary | ) | |
| Department of Veterans Affairs | ) | |
| 810 Vermont Avenue NW | ) | |
| Washington, DC 20420 | ) | |
| Respondent | ) | |

Facility:
Veterans Affairs Medical Center, Dallas TX

Theresa D. Brunson, JD
EEO Investigator
David Jones CPA PC
827 Fairways Court, Suite 304
Stockbridge, GA 30281

**DEPARTMENT OF VETERANS AFFAIRS**
**Office of Resolution Management, Diversity & Inclusion**
**William S. Moorhead Federal Building**
**1000 Liberty Avenue, Suite 1801**
**Pittsburgh, PA 15222**

Table of Contents
Case No. 2003-549A4-2022-147508

**1. Formal Complaint**
Formal Complaint                                                    1-1
Investigator Assignment Letters                                    1-2

**2. EEO Counselor's Report**
Counselor's Report                                                 2-1
Notice of Right to File                                            2-2
Notice of Rights and Responsibilities                              2-3

**3. Procedural Review**
Notice of Acceptance                                               3-1

**4. Settlement Agreements**                                       4-1
Reserved

**5. Prior Appellate Activity**                                    5-1
Reserved

**6. Report of Investigation Summary**                             6-1

**7. Exhibits, Evidence**
Affidavit & Supp Docs of Complainant                               7-1
Affidavit & Supp Docs of Karen Crotty (RMO)                        7-2
Affidavit & Supp Docs of John Modrall (RMO)                        7-3
Affidavit of Kathy Rodgers (Witness)                               7-4
Affidavit & Supp Docs of Kendrick Brown (Witness)                  7-5
Affidavit & Supp Docs of Raul Rivera (RMO)                         7-6
Dept VA HR Memo 8.10.2022                                          7-7
Dept of VA Request for Info. HWE Questionnaire                     7-8
RMO EEO Training Report                                            7-9
Current Practitioner Privilege Procedure Listing                   7-10
Text Messages re Use of Annual Leave Time                          7-11
Leave Use Summary 9.26.2021 – 8.3.2022                             7-12
CP Request for Use of Annual Leave                                 7-13
Pretext Document by Complainant - Karen Crotty                     7-14
Pretext Document by Complainant - John Modrall                     7-15
Pretext Document by Complainant – Raul Rivera                      7-16

1

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**Continental District**
**Houston, TX  77030**

**Rao Mandalapu**
**Table of Contents**
**2003-549A4-2024-157842**

**1. Formal Complaint**
Formal Complaint                                                    1-1
Investigator Assignment Letters                                    1-2

**2. EEO Counselor's Report**
Counselor's Report                                                 2-1
Notice of Right to File                                            2-2
Notice of Rights and Responsibilities                              2-3

**3. Procedural Review**
Notice of Acceptance                                               3-1
Notice of Receipt                                                  3-2

**4. Settlement Agreements**
 Reserved Sheet                                                    4-1

**5. Prior Appellate Activity**
Reserved Sheet                                                      5-1

**6. Report of Investigation Summary**
ROI                                                                6-1

**7. Exhibits, Evidence**
Affidavit of Complainant, Rao Mandalapu                            7-1
Affidavit of RMO Raul Rivera                                       7-2
Affidavit of RMO Jason Cave                                        7-3
Affidavit of RMO John Modrall                                      7-4
Affidavit of RMO Kendrick Brown                                    7-5
Affidavit of RMO Karen Crotty                                      7-6
SF50 RMO Karen Crotty                                              7-7
Medical Release Form                                               7-8
Agency EEO Office Email Regarding RMO Hastings                     7-9

The protected activity includes complaints of the violation of VHA policies related to assigning concurrent surgeries (scheduling two surgeries at the same time on the same day), concurrent patients in the clinic (two patients at the same time on the same day), assigning more patients outside the clinic schedule (overbookings) and previously unassigned duties, and civil rights violations, such as harassment, differential treatment, and retaliation on February 25, 2022, March 15, 2022, and April 15, 2022.

The chief of urology, the chief of surgery, and the chief of staff are responsible for scheduling concurrent surgeries in the operating room, violating Federal healthcare policies. (Exhibit D)

**The complainant stated under oath:** (ROI; p00063, (7-14, 7-15, 7-16), ROI; p000071-72; ROI; p000078-79)

The complainant stated that he complained to the VA leadership (Dr. Crotty, Dr. Modrall, and Dr. Jeffrey Hastings) about VHA policy violations, including scheduling concurrent surgeries and patient appointments, and overbooking clinic patients, and differential treatment compared to Caucasian colleagues. After his complaint, the leadership summarily suspended his operative privileges without any notice, warning, due process, or documented evidence supporting the adverse employment action. Numerous requests to leadership to disclose documented evidence were ignored. He believes the leadership fabricated false allegations without any documented evidence supporting the stated allegations to justify the adverse employment action. (ROI; p000063)

1. I complained to the supervisor, Karen Crotty, that she has been discriminating racially by treating me unfavorably/differentially compared to other Caucasian staff members because of my race, personal characteristics of color, and native accent.
2. I complained to Dr. Karen Crotty that the unfavorable/differential treatment, compared to my Caucasian staff counterparts, was discriminatory. This will be reported to the EEO in February 2022 and March 2022, as it is crucial to address this issue promptly to prevent further discrimination.
3. The leadership/administration's differential treatment, such as assigning concurrent surgeries have had a significant impact on my work compared to my Caucasian counterpart staff physicians.
4. Despite my complaints of differential treatment and racial discrimination, the supervisor has continued to assign concurrent surgeries, schedule concurrent patient encounters, assign previously unassigned responsibilities and the leadership summarily suspended the operative privileges as recently as 5/18/2022.
5. Despite my repeated requests, Dr. Crotty has failed to provide any documented evidence supporting the summary suspension of privileges on 5/18/2022.
    (ROI:000063, (7-14, 7-15, 7-16), ROI: p000071-72; ROI: p000078-79)

– When did the EEO activity occur (e.g. when did you file the EEO complaint)?
  **Respond:**
  EEO Protected activity was reported on February 25, 2022, March 15, 2022, and April 15,

Affiant's Initials: _RM_____    Date:_08/14/2024_

2022.

On May 18, 2022, The VA leadership suspended the Complainant's operative privileges.

EEO-compliant: On August 2nd, 2022, the complainant filed an EEO complaint alleging discrimination, workplace harassment, and retaliation after the fact.

– What is the status of the activity/action (what is the status of the case)?

**Respond:**

In response to the Complainant's EEO complaint, the EEOC issued a notice of investigation to the VA leadership in August 2022. The investigation found evidence of discrimination, harassment, and retaliation against the Chief of Urology, Chief of Surgery, Chief of Staff, and Director of the VA North Texas Healthcare System. As a result, the EEOC issued a Right-to-Sue letter.

The disputed summary suspension of operative privileges is pending a decision with the EEOC-Administrative Judge. Ref. EEOC No. 450-2023-00222X, Agency No. 2003-549A4-2022-1475.

On 02/20/2024, the VA leadership retaliated against the complainant's EEOC-protected activity by submitting the Title IV clinical privileges action report to the NPDB and state medical boards, even though the summary suspension of privileges was deemed unlawful. The case is still pending judgment with the EEOC administrative judge.

This action of Title IV clinical privileges action report to the NPDB and the state medical boards while pending judgment violates the EEOC's laws. It is illegal for an employer to retaliate against someone who files a charge or takes part in an EEOC investigation or lawsuit.

The VA leadership predetermined to report to the NPDB, and the State Medical Boards, as Dr. Crotty threatened the Complainant to report to the NPDB, as the Complainant reported to the EEOC on 07/11/2022.

37. If you were involved in EEO activity prior to this (current) EEO complaint (i.e. If you filed an EEO complaint prior to the current case being investigated), identify the management official(s) involved and describe their involvement:

**Respond:**

Please see the attached Timeline of events.

The RMOs harassed, discriminated, and retaliated against the complainant by suspending his privileges based on fabricated false allegations without disclosing documented evidence per legal standards and VHA directives after the complainant engaged in protective activity.

The RMOs predetermined to report to the NPDB and the State Medical Boards to cause permanent damage to the Complainant's constitutional right to earn a livelihood.

1. Karen Crotty, MD, Chief of the division of urology

Affiant's Initials: _RM_____    Date:_08/14/2024_

Dr. Modrall denied receiving notification of a hostile work environment allegation until the first notification of an EEO complaint on August 10, 2022. He investigated and responded to the EEO complaint accordingly. The EEO office later informed Dr. Crotty and him that the Complainant opted for mediation. However, per the local EEO office, the Complainant failed to respond to multiple attempts by the EEO office to schedule mediation. (7-2, pp.16-17)

He spoke to Dr. Crotty to investigate Claims 3 and 6 because he had no knowledge of the events surrounding time and leave for the Complainant. Claim 3 was proven to be factually incorrect. Regarding Claim 6, he concluded that Dr. Crotty acted in a responsible and non-hostile manner by attempting to find a compromise to the Complainant's request. He concluded that Dr. Crotty made a good faith effort to facilitate the Complainant's Annual Leave request to the extent possible, while minimizing the impact on patient care. She was collaborative and supportive of the Complainant. Claims 1, 2, 4, and 5 pertain to the Summary Suspension. The Summary Suspension process is not a form of disciplinary action. It is a Credentialing action aimed solely at protecting patient safety while an investigation is conducted. The Summary Suspension was requested by the Chief of Staff and conducted in accordance with the VA's prescribed processes. (7-2, pp.16-17)

**Dr. Rivera, RMO,** stated he did not intend to subject Complainant to a hostile work environment harassment. Any actions taken were solely driven by the concern that failure to act in the manner he did would have resulted in an imminent threat to patient welfare. No investigation was conducted or warranted because the summary suspension of clinical privileges was done per VHA guidance while a Clinical Review was conducted. (7-6, pp. 12.)

**Rebuttal Statement**

Complainant stated he complained to leadership (Dr. Crotty, Dr. Modrall, and Dr. Jeffrey Hastings) about VHA policy violations, including scheduling concurrent surgeries and patient appointments, overbooking of clinic patients and differential treatment when compared to Caucasian colleagues. After his complaint, the leadership summarily suspended his operative privileges without any notice, warning, or documented evidence supporting the adverse employment action. Numerous requests to leadership to disclose documented evidence were ignored. He believes the leadership fabricated false allegations without any documented evidence supporting the stated allegations to justify the adverse employment action. The false allegations were not qualified enough to suspend operative privileges because the intra-operative complications he was accused of were known to occur with those procedures. Moreover, he was not involved in the post-operative care when the catheter migrated, yet it was attributed to him, though he was not on duty at the time. The leadership intentionally retaliated against complaints of civil rights violations. Dr. Crotty was also involved in the same operation as a surgeon due to concurrent surgery scheduled for him on that same day and time. The leadership could have also suspended Dr. Crotty's privileges. (7-14, 7-15, 7-16)

16

**000063**

The information in this report was obtained from witness testimonies, affidavits, and documentation provided by the Complainant and /or the Agency.

*Theresa D. Brunson*                                March 31, 2023

Theresa Brunson                                    Date
EEO Investigator

# Exhibit-E

## Contents:

1. EEOC Report of Investigation (ROI)
2. Affidavit of Complainant, and RMOs (p.2)
3. Protected activity (p. 3-5)
4. Dr. Crotty's testimony (P.20); (p. 419)



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**Continental District**
**Houston, TX 77030**

| | | |
|---|---|---|
| Rao Mandalapu | ) | |
| | ) | |
| | ) | |
| Complainant | ) | |
| | ) | |
| | ) | |
| and | ) | Case No. 2003-549A4-2024-157842 |
| | ) | |
| Secretary | ) | |
| Department of Veterans Affairs | ) | |
| | ) | |
| 810 Vermont Avenue, NW | ) | |
| Washington, DC  20420 | ) | |
| | ) | |
| | ) | |
| Agency | ) | |
| | ) | |
| North Texas Healthcare System | ) | |
| 4500 South Lancaster Road | ) | |
| Dallas, TX 75216 | ) | |
| _____ | ) | |



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**William Moorhead Federal Building**
**1000 Liberty Avenue, Suite 1801**
**Pittsburgh, PA 15222**

**This equal employment opportunity investigative document contains identifiable personal data that is subject to the Privacy Act of 1974, 5 U.S.C. Sec. 552a. Release of such data must be in accordance with the provisions of the Act, as amended. The unauthorized release of this information could subject the releaser to formal disciplinary action and/or criminal penalties, including a fine of up to $5,000.00.**

**Investigative Report`**
**In the Matter of the EEO Complaint of Discrimination of Rao Mandalapu**

| | | |
|---|---|---|
| Rao Mandalapu | ) | |
| Complainant | ) | |
| | ) | |
| | ) | |
| v. | ) | ORM No. 2003-549A4-2022-147508 |
| | ) | |
| Secretary | ) | |
| Department of Veterans Affairs | ) | |
| 810 Vermont Avenue NW | ) | |
| Washington, DC 20420 | ) | |
| Respondent | ) | |

Facility:
Veterans Affairs Medical Center, Dallas TX

Theresa D. Brunson, JD
EEO Investigator
David Jones CPA PC
827 Fairways Court, Suite 304
Stockbridge, GA 30281



**DEPARTMENT OF VETERANS AFFAIRS**
**Office of Resolution Management, Diversity & Inclusion**
**William S. Moorhead Federal Building**
**1000 Liberty Avenue, Suite 1801**
**Pittsburgh, PA 15222**

Table of Contents
Case No. 2003-549A4-2022-147508

**1. Formal Complaint**
Formal Complaint                                          1-1
Investigator Assignment Letters                           1-2

**2. EEO Counselor's Report**
Counselor's Report                                        2-1
Notice of Right to File                                   2-2
Notice of Rights and Responsibilities                     2-3

**3. Procedural Review**
Notice of Acceptance                                      3-1

**4. Settlement Agreements**                              4-1
Reserved

**5. Prior Appellate Activity**                           5-1
Reserved

**6. Report of Investigation Summary**                    6-1

**7. Exhibits, Evidence**
Affidavit & Supp Docs of Complainant                      7-1
Affidavit & Supp Docs of Karen Crotty (RMO)               7-2
Affidavit & Supp Docs of John Modrall (RMO)               7-3
Affidavit of Kathy Rodgers (Witness)                      7-4
Affidavit & Supp Docs of Kendrick Brown (Witness)         7-5
Affidavit & Supp Docs of Raul Rivera (RMO)                7-6
Dept VA HR Memo 8.10.2022                                 7-7
Dept of VA Request for Info. HWE Questionnaire            7-8
RMO EEO Training Report                                   7-9
Current Practitioner Privilege Procedure Listing          7-10
Text Messages re Use of Annual Leave Time                 7-11
Leave Use Summary 9.26.2021 – 8.3.2022                    7-12
CP Request for Use of Annual Leave                        7-13
Pretext Document by Complainant - Karen Crotty            7-14
Pretext Document by Complainant - John Modrall            7-15
Pretext Document by Complainant – Raul Rivera             7-16

1

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**Continental District**
**Houston, TX  77030**

**Rao Mandalapu**
**Table of Contents**
**2003-549A4-2024-157842**

**1. Formal Complaint**
Formal Complaint                                                     1-1
Investigator Assignment Letters                                     1-2

**2. EEO Counselor's Report**
Counselor's Report                                                  2-1
Notice of Right to File                                             2-2
Notice of Rights and Responsibilities                              2-3

**3. Procedural Review**
Notice of Acceptance                                               3-1
Notice of Receipt                                                  3-2

**4. Settlement Agreements**
 Reserved Sheet                                                    4-1

**5. Prior Appellate Activity**
Reserved Sheet                                                     5-1

**6. Report of Investigation Summary**
ROI                                                               6-1

**7. Exhibits, Evidence**
Affidavit of Complainant, Rao Mandalapu                           7-1
Affidavit of RMO Raul Rivera                                      7-2
Affidavit of RMO Jason Cave                                       7-3
Affidavit of RMO John Modrall                                     7-4
Affidavit of RMO Kendrick Brown                                   7-5
Affidavit of RMO Karen Crotty                                     7-6
SF50 RMO Karen Crotty                                            7-7
Medical Release Form                                             7-8
Agency EEO Office Email Regarding RMO Hastings                    7-9

The protected activity includes complaints of the violation of VHA policies related to assigning concurrent surgeries (scheduling two surgeries at the same time on the same day), concurrent patients in the clinic (two patients at the same time on the same day), assigning more patients outside the clinic schedule (overbookings) and previously unassigned duties, and civil rights violations, such as harassment, differential treatment, and retaliation on February 25, 2022, March 15, 2022, and April 15, 2022.

The chief of urology, the chief of surgery, and the chief of staff are responsible for scheduling concurrent surgeries in the operating room, violating Federal healthcare policies. (Exhibit D)

**The complainant stated under oath:** (ROI; p00063, (7-14, 7-15, 7-16), ROI; p000071-72; ROI; p000078-79)

The complainant stated that he complained to the VA leadership (Dr. Crotty, Dr. Modrall, and Dr. Jeffrey Hastings) about VHA policy violations, including scheduling concurrent surgeries and patient appointments, overbooking clinic patients, and differential treatment compared to Caucasian colleagues. After his complaint, the leadership summarily suspended his operative privileges without any notice, warning, due process, or documented evidence supporting the adverse employment action. Numerous requests to leadership to disclose documented evidence were ignored. He believes the leadership fabricated false allegations without any documented evidence supporting the stated allegations to justify the adverse employment action. (ROI; p000063)

1. I complained to the supervisor, Karen Crotty, that she has been discriminating racially by treating me unfavorably/differentially compared to other Caucasian staff members because of my race, personal characteristics of color, and native accent.

2. I complained to Dr. Karen Crotty that the unfavorable/differential treatment, compared to my Caucasian staff counterparts, was discriminatory. This will be reported to the EEO in February 2022 and March 2022, as it is crucial to address this issue promptly to prevent further discrimination.

3. The leadership/administration's differential treatment, such as assigning concurrent surgeries have had a significant impact on my work compared to my Caucasian counterpart staff physicians.

4. Despite my complaints of differential treatment and racial discrimination, the supervisor has continued to assign concurrent surgeries, schedule concurrent patient encounters, assign previously unassigned responsibilities and the leadership summarily suspended the operative privileges as recently as 5/18/2022.

5. Despite my repeated requests, Dr. Crotty has failed to provide any documented evidence supporting the summary suspension of privileges on 5/18/2022.

   (ROI:000063, (7-14, 7-15, 7-16), ROI: p000071-72; ROI: p000078-79)

   – When did the EEO activity occur (e.g. when did you file the EEO complaint)?
   **Respond:**
   EEO Protected activity was reported on February 25, 2022, March 15, 2022, and April 15,

Affiant's Initials: _RM_____     Date:_08/14/2024____

2022.
On May 18, 2022, The VA leadership suspended the Complainant's operative privileges.
EEO-compliant: On August 2nd, 2022, the complainant filed an EEO complaint alleging discrimination, workplace harassment, and retaliation after the fact.

– What is the status of the activity/action (what is the status of the case)?
**Respond:**
In response to the Complainant's EEO complaint, the EEOC issued a notice of investigation to the VA leadership in August 2022. The investigation found evidence of discrimination, harassment, and retaliation against the Chief of Urology, Chief of Surgery, Chief of Staff, and Director of the VA North Texas Healthcare System. As a result, the EEOC issued a Right-to-Sue letter.

The disputed summary suspension of operative privileges is pending a decision with the EEOC-Administrative Judge. Ref. EEOC No. 450-2023-00222X, Agency No. 2003-549A4-2022-1475.

On 02/20/2024, the VA leadership retaliated against the complainant's EEOC-protected activity by submitting the Title IV clinical privileges action report to the NPDB and state medical boards, even though the summary suspension of privileges was deemed unlawful. The case is still pending judgment with the EEOC administrative judge.

This action of Title IV clinical privileges action report to the NPDB and the state medical boards while pending judgment violates the EEOC's laws. It is illegal for an employer to retaliate against someone who files a charge or takes part in an EEOC investigation or lawsuit.

The VA leadership predetermined to report to the NPDB, and the State Medical Boards, as Dr. Crotty threatened the Complainant to report to the NPDB, as the Complainant reported to the EEOC on 07/11/2022.

37. If you were involved in EEO activity prior to this (current) EEO complaint (i.e. If you filed an EEO complaint prior to the current case being investigated), identify the management official(s) involved and describe their involvement:
**Respond:**
        Please see the attached Timeline of events.

The RMOs harassed, discriminated, and retaliated against the complainant by suspending his privileges based on fabricated false allegations without disclosing documented evidence per legal standards and VHA directives after the complainant engaged in protective activity.

The RMOs predetermined to report to the NPDB and the State Medical Boards to cause permanent damage to the Complainant's constitutional right to earn a livelihood.
    1.  Karen Crotty, MD, Chief of the division of urology

Affiant's Initials: _RM_____    Date: _08/14/2024_

Dr. Modrall denied receiving notification of a hostile work environment allegation until the first notification of an EEO complaint on August 10, 2022. He investigated and responded to the EEO complaint accordingly. The EEO office later informed Dr. Crotty and him that the Complainant opted for mediation. However, per the local EEO office, the Complainant failed to respond to multiple attempts by the EEO office to schedule mediation. (7-2, pp.16-17)

He spoke to Dr. Crotty to investigate Claims 3 and 6 because he had no knowledge of the events surrounding time and leave for the Complainant. Claim 3 was proven to be factually incorrect. Regarding Claim 6, he concluded that Dr. Crotty acted in a responsible and non-hostile manner by attempting to find a compromise to the Complainant's request. He concluded that Dr. Crotty made a good faith effort to facilitate the Complainant's Annual Leave request to the extent possible, while minimizing the impact on patient care. She was collaborative and supportive of the Complainant. Claims 1, 2, 4, and 5 pertain to the Summary Suspension. The Summary Suspension process is not a form of disciplinary action. It is a Credentialing action aimed solely at protecting patient safety while an investigation is conducted. The Summary Suspension was requested by the Chief of Staff and conducted in accordance with the VA's prescribed processes. (7-2, pp.16-17)

**Dr. Rivera, RMO,** stated he did not intend to subject Complainant to a hostile work environment harassment. Any actions taken were solely driven by the concern that failure to act in the manner he did would have resulted in an imminent threat to patient welfare. No investigation was conducted or warranted because the summary suspension of clinical privileges was done per VHA guidance while a Clinical Review was conducted. (7-6, pp. 12.)

## Rebuttal Statement

Complainant stated he complained to leadership (Dr. Crotty, Dr. Modrall, and Dr. Jeffrey Hastings) about VHA policy violations, including scheduling concurrent surgeries and patient appointments, overbooking of clinic patients and differential treatment when compared to Caucasian colleagues. After his complaint, the leadership summarily suspended his operative privileges without any notice, warning, or documented evidence supporting the adverse employment action. Numerous requests to leadership to disclose documented evidence were ignored. He believes the leadership fabricated false allegations without any documented evidence supporting the stated allegations to justify the adverse employment action. The false allegations were not qualified enough to suspend operative privileges because the intra-operative complications he was accused of were known to occur with those procedures. Moreover, he was not involved in the post-operative care when the catheter migrated, yet it was attributed to him, though he was not on duty at the time. The leadership intentionally retaliated against complaints of civil rights violations. Dr. Crotty was also involved in the same operation as a surgeon due to concurrent surgery scheduled for him on that same day and time. The leadership could have also suspended Dr. Crotty's privileges. (7-14, 7-15, 7-16)

The information in this report was obtained from witness testimonies, affidavits, and documentation provided by the Complainant and /or the Agency.

*Theresa D. Brunson*                              March 31, 2023
_____
Theresa Brunson                                   Date
EEO Investigator

```
 1  them to -- you don't want them to -- to teach them how

 2  to stick the wrong catheters in ureters or to put a

 3  Foley catheter in the space behind the bladder and not

 4  do an x-ray to confirm the location of the catheter

 5  before you leave the OR.

 6      Q.   (By Mr. Robertson)  So going back to where

 7  these boxes, then, with direction to trainees --

 8      A.   It's not there.

 9      Q.   But you didn't indicate these concerns --

10      A.   It's not there.

11      Q.   Dr. Crotty, you did not indicate these

12  concerns in your narrative; correct?

13      A.   The concern was that he stuck the wrong

14  catheter in a ureter.

15      Q.   All right.  And following the issuance -- the

16  issuance -- the suspension, a comprehensive review is

17  supposed to be conducted; right?

18      A.   Yes.

19      Q.   And you were ultimately responsible for

20  coordinating the panel members?

21      A.   No.  That's not true.

22      Q.   No?

23      A.   Huh-uh.  That was Dr. Rivera.

24      Q.   Okay.  I'm going to pull up -- this is Agency

25  Prehearing Report, Exhibit 5.  Apologies, your Honor.
```

1    It's the Prehearing Report for case 1, Exhibit 5.  Is

2    that -- is this your e-mail right here?

3        A.   Yes.

4        Q.   And it's an e-mail to Dr. Jordan indicating

5    that it's an invite for three doctors?

6        A.   Yes, but I didn't create the panel.

7    Dr. Rivera did.

8        Q.   Okay.  But you coordinated the panel members

9    meeting?

10       A.   The first meeting.

11       Q.   Is that a "yes"?  You did?

12       A.   Yes.  I did not make the panel.  So precision

13   is important.  I did not create or pick the members of

14   the panel.  I did coordinate the first meeting of them.

15       Q.   And you previously mentioned that Dr. --

16   Dr. Gahan, he was involved in that March surgery in the

17   same capacity as you; correct?

18       A.   Yes.

19       Q.   So he was personally involved in one of the

20   surgeries that they were reviewing?

21       A.   Not the surgery, but trying to undo it.

22       Q.   So he was -- he was basing his opinion on

23   different information, though, than the other two panel

24   members?

25       A.   He had more, but the other panel members had

1   access to all the op notes and progress notes that were

2   done after that problem.

3       Q.   But you mentioned the op reports indicate

4   that -- the May 2022 op report stated no complications;

5   correct?

6           MR. WALKER:  Objection.

7   Mischaracterization, your Honor.

8           THE COURT:  She also stated just now

9   that they also had access to progress notes, which I

10  don't think were part of the operative reports by the

11  resident.  So I'm sustaining the objection.

12      Q.   (By Mr. Robertson) So in your experience,

13  it's not abnormal that Dr. Gahan was part of this

14  panel?

15      A.   I've never been involved in a panel before;

16  so I don't know what's regular or not.

17      Q.   Did the other panel members know that

18  Dr. Gahan was involved in some capacity in one of the

19  surgeries that they were reviewing?

20          MR. WALKER:  Objection.  Calls for

21  speculation.

22          MR. ROBERTSON:  Your Honor, I asked if

23  -- if she knew --

24          THE COURT:  If she knows, she can

25  answer it.  Go ahead if you know the answer,

1  Dr. Crotty.

2                    THE WITNESS:  I don't know.  I was on

3  the phone to introduce the topic, and then I got off so

4  they could talk among themselves without me influencing

5  them.  I don't know what they talked about.

6      Q.   (By Mr. Robertson)  Why were you concerned

7  about influencing them?

8      A.   I didn't want there to be any impropriety or

9  appearance of impropriety.

10     Q.   And having one of the -- a doctor with

11 personal involvement in one of the reviews wouldn't

12 give the appearance of impropriety?

13                   MR. WALKER:  Objection.  Calls for

14 speculation.

15                   THE COURT:  I'm going to overrule it.

16 Answer if you are able, Dr. Crotty.

17                   THE WITNESS:  As I recall, the panel

18 required one of the urologists on the panel to be from

19 the facility.  That would mean Dr. Gahan or Dr. Kim, in

20 which case, one of the persons on the panel had to be

21 involved in one of his complications.

22                   THE COURT:  Let me interrupt.  I do

23 have a question right now.  Why would it have been only

24 Dr. Gahan or Dr. Kim?  Weren't there other urology

25 surgeons available at that time?

1                      THE WITNESS:  Not at that time.  It

2    was Rao, me, Kim, and -- me, Dr. Mandalapu, Kim, and

3    Gahan.  I think Dr. Uhlenhuth had retired by then.

4                      THE COURT:  Thank you.

5                      MR. ROBERTSON:  I didn't catch the

6    start of your response.  Why would it have to have been

7    Dr. Gahan on there?  Why couldn't all three have been

8    from a different hospital?

9                      THE WITNESS:  You'll have to ask

10   Dr. Rivera that.  I was told that one of the members of

11   the panel is usually from the facility.  I did not have

12   anything to do with the construction of the panel.

13        Q.   (By Mr. Robertson)  Okay.  During the

14   comprehensive review period, Dr. Mandalapu was supposed

15   to be provided certain due process rights; is that

16   correct?

17        A.   Yes.

18        Q.   And you -- shortly after the issuing of the

19   suspension letter, did Dr. Mandalapu reach out to you

20   and ask for specifics about why he was suspended?

21        A.   Yes.

22        Q.   And you didn't bring up the two concerns that

23   were mentioned in your e-mail when he asked, did you?

24        A.   I don't remember our conversation exactly,

25   but it would have been, "There have been some

1  complications that would be unexpected for somebody who

2  has finished residency.  They were complications in

3  basic cases that were concerning."

4      Q.   So you did not tell him the two surgeries

5  that resulted in the suspension letter?

6      A.   Yes, I did.

7      Q.   You told him when he asked you -- when did

8  you provide that information to him?

9      A.   I do not know.  I don't remember the exact

10  date.

11      Q.   Still on the Prehearing Report, Case 1, going

12  to PDF page 12.  Do you recall sending this e-mail on

13  May 29th to Dr. Modrall and Dr. Rivera?

14      A.   Can you go to the one above?  Okay.  You're

15  going too fast.  Go back.  Okay.

16      Q.   So this is your e-mail; correct?

17      A.   It appears.

18      Q.   Do you not recall sending this e-mail?

19      A.   Specifically, no.

20      Q.   In this e-mail, this is where you're sending

21  information to Dr. Mandalapu about his FPPE and focused

22  clinical reviews; is that correct?

23      A.   Well, it appears to me that it's an e-mail

24  asking Greg and Rao if it was okay to send it by e-mail

25  since he had been -- he was sick, not in office, and I

1  wanted to make sure that he got his information.

2      Q.   And did you end up sending this e-mail or

3  this information?

4      A.   I do not remember.

5              THE COURT:  Just to make sure that I

6  have not misheard, did you -- Mr. Robertson, did you

7  use the acronym FPPE?

8              MR. ROBERTSON:  Yes.

9              THE COURT:  Where is that in this?

10  I'm sorry.  Okay.  Thank you very much.  Okay.

11      Q.   (By Mr. Robertson)  What was your

12  understanding of the amount of information that an

13  employee's entitled to following a summary suspension?

14      A.   It appears to me, based on that, I was

15  sending him the part of the handbook regarding the

16  process that gave him all of his rights and privileges.

17              THE COURT:  Let me interrupt.  I want

18  to ask -- this line of questioning -- are you going to

19  continue this?  I'm sorry, Mr. Robertson, but I'm going

20  to have to ask you --

21              MR. ROBERTSON:  It's -- it's my -- I'm

22  done with -- I'm leading into my next line right now.

23              THE COURT:  Okay.

24      Q.   (By Mr. Robertson)  Do you recall sending an

25  e-mail in July of 2022 discussing your conversations

1  with Dr. Mandalapu about the reasons for his summary

2  suspension?

3      A.   Do I -- no, I don't recall.  There were a lot

4  of e-mails sent during this process.  If you have one

5  you would like me to look at, I would be happy to.

6      Q.   Yes.  I'm going to pull up Agency -- still in

7  the same prehearing report -- Agency Exhibit 10.  This

8  is an e-mail from you to Dr. Modrall on July 11th; is

9  that right?

10     A.   Say it again?

11     Q.   This is an e-mail that -- from you --

12     A.   Okay.  Yeah.

13     Q.   And you state in there, "I'm glad I was so

14  circumspect about what I told him because I wasn't

15  aware I had to do the intro to the reviewers or

16  anything."  Can you please explain what you meant by

17  that?

18     A.   I don't remember.

19     Q.   In what context -- when you say you were

20  being circumspect, what do you mean by that?

21     A.   I don't remember.

22     Q.   Circumspect -- and correct me if you have a

23  different understanding -- is that unwillingness to

24  take a risk?  When would you use that word?

25     A.   When you're being careful about word choice.

```
 1        Q.   So you --

 2        A.   But it was made clear to him that --

 3        Q.   I'm -- excuse me.

 4        A.   Sorry.  Go ahead.

 5        Q.   So you tailored the information that you

 6   provided him in order to, I guess, avoid risk of some

 7   kind?

 8        A.   No.

 9                   THE COURT:  I'm going to ask the

10   attorney -- can you explain to me the relevance of --

11   of this line of questioning?

12                   MR. ROBERTSON:  Sure.  It seems -- it

13   appears, on the face of this e-mail, that Dr. Crotty

14   was aware that Dr. Mandalapu was requesting specifics

15   about the reason all this was going on, and that she

16   was actively withholding information, and she was glad

17   that she did it because she was afraid, it seems, to

18   provide inconsistent information or there was a risk

19   with regards to what she could have told him versus

20   what she was going to tell the reviewers.

21                   It didn't seem like there would be a

22   reason to tell Dr. Mandalapu something different than

23   the reviewers.

24                   MR. WALKER:  Your Honor, the Agency

25   would object.  That testimony is not being consistent
```

1  at all with what the e-mail says.  The e-mail speaks

2  for itself.

3                    THE COURT:  So this is what I'm trying

4  to figure out.  If the process involves Dr. Mandalapu

5  responding to a report generated by the focused

6  clinical care review panel, then I don't understand the

7  relevancy of what he did or did not know before that

8  time through someone who was not part of that panel.

9                    MR. ROBERTSON:  More so, your Honor,

10 it goes toward why -- why the information would be

11 different when provided to Dr. Mandalapu than when

12 presented to the reviewers.

13                    THE COURT:  Okay.  Where are you

14 reading that?  Where are you coming up with the

15 information being different?

16                    MR. ROBERTSON:  I understand -- she

17 said she was circumspect, cautious with what she told

18 Dr. Mandalapu because she didn't know that she was

19 going to have to talk to the reviewers.

20                    And I was just trying to ascertain

21 whether there was inconsistencies that she was worried

22 about, and that's why -- like, why would she not tell

23 Dr. Mandalapu all the same things that she was going to

24 tell the reviewers if they're all reviewing the same

25 information, the same allegations?

1                    Why be cautious about the information
2    that you provide to the person being investigated?
3                    THE COURT:  So let me ask you this.
4    Dr. Crotty, if you can recall, what do you mean here
5    when you said "do the intro to the reviewers"?  Do you
6    recall?  It's been a long time.
7                    THE WITNESS:  It's been a long time,
8    and I don't remember.
9                    THE COURT:  Okay.
10                   THE WITNESS:  I told him that we were
11   doing it because of concerns, adverse outcomes on
12   relatively basic cases.  That was told to him
13   frequently.  I told him the process, that we'll be
14   sending cases to outside reviewers.
15                   He would ask me, frequently, questions
16   that either I couldn't answer, I didn't know the answer
17   to, and that's why I kept saying, you know, "Look.
18   Here.  Here.  Here's the handbook.  Here's your rights.
19   Go."
20                   When it came to the intro, I got on.
21   I said, "We have concerns regarding a urologist and his
22   ability to do basic procedures," and then, as I said, I
23   excused myself and got off so they could do their work
24   without me there.
25                   THE COURT:  Next question,

1  Mr. Robertson.

2      Q.   (By Mr. Robertson)  What questions did he ask

3  you that you didn't know the answer to?

4      A.   I don't remember.  He asked the same ones

5  frequently, though.

6      Q.   But you don't remember those, but they were

7  asked frequently?

8      A.   Those -- I don't remember what I didn't know

9  the answers to, but he asked, "Why is this happening?"

10          "Because there were complications in basic

11  surgeries that we were concerned about."

12      Q.   And you also -- did you also issue the

13  summary suspension extension letters following --

14      A.   I didn't issue any letters.

15      Q.   You handed them to Dr. Mandalapu?

16      A.   That was -- it was assigned to me, tasked to

17  me to do that, so, yes.

18      Q.   And you were tasked with handing

19  Dr. Mandalapu the extension letters as well?

20      A.   Yes, and having him sign them.

21      Q.   Okay.  And you provided those, all of the

22  extension letters that you handed to Dr. Mandalapu,

23  with your affidavit?

24      A.   Sorry.  Sorry.  I didn't hear the start of

25  your question.

1        Q.    No problem.  So did you provide a copy of all

2   the extension letters that you were tasked with handing

3   to Dr. Mandalapu with your affidavit for the

4   investigation in this case?

5        A.    I didn't turn over anything.  Are you asking

6   did I -- are you asking did I give copies to him?  Or

7   did I give copies to y'all?  Or what?  I don't

8   understand the question.

9        Q.    I'll rephrase.  Do you recall providing an

10  affidavit of testimony during the investigation into

11  this matter?

12       A.    It's been a while.  So if you say I did, I

13  did.

14       Q.    So you don't know if you filled out an

15  affidavit?

16       A.    I filled out -- he -- we -- I received

17  numerous things from EEO over my time there, and once

18  since I left, regarding questions regarding

19  discrimination based on age, and something else, and

20  then finally on -- no.  The last one was disability.

21  So I received a lot of -- is that -- was that an

22  affidavit?

23       Q.    I --

24       A.    Is that the affidavit you're talking about?

25       Q.    Strike that.  I'm going to move on.  You

1   retired in July 2023; correct?

2       A.   Yes.

3       Q.   And that was one month after Dr. Mandalapu

4   resigned?

5       A.   Yes.

6       Q.   All right.  And -- but the panel that you

7   conducted, that occurred back in --

8       A.   I didn't conduct the panel.

9       Q.   The panel members met --

10      A.   Yes.

11      Q.   -- in July/September 2022?

12      A.   I -- I -- I was on there first.  After that,

13  they did their work.

14      Q.   And after you were done with that, did you

15  have any involvement in any aspect of the summary

16  suspension going forward?

17      A.   When they finished their review, the only

18  thing that I had to do with the panel after that was to

19  put their responses on an Excel spreadsheet that would

20  go to the executive medical staff committee meeting.

21           I summarized -- I took their three Excel

22  sheets and put them into one, and then I sent it to the

23  executive medical committee.

24      Q.   At that point, the executive medical

25  committee was -- they reviewed that and then provided

 1   recommendations to the medical director; is that

 2   correct?

 3       A.   I wasn't in the meeting.  The only

 4   information -- I didn't hear about it, so -- except

 5   that -- about the unanimous vote to continue the

 6   suspension of his OR privileges.  I wasn't in the

 7   meeting.

 8       Q.   When was that?  Do you recall when the

 9   unanimous decision was made?

10       A.   I think it was September 2023.  But, like I

11   said, I wasn't in on it.

12       Q.   And -- so -- and you said the decision was to

13   remain suspended indefinitely?

14       A.   The only reason I know what happened there

15   was because I had to do the packet for -- that was for

16   his termination.  So I read the minutes.  And I think

17   the end of the minutes said that it was because they're

18   moving for a termination.

19       Q.   Okay.

20       A.   From -- so continued suspension while doing

21   the termination work.  That's my paraphrasing.

22       Q.   Your Honor, Ms. Velasquez -- it's time for a

23   comfort break.  And I'm pretty sure I'm done, but I'll

24   look through my notes, and I figure now might be a good

25   time for that.

1                    THE COURT:  Off the record, please.

2                    (Whereupon, a break was taken from

3    2:10 p.m. - 2:45 p.m. Central Time.)

4                    THE COURT:  I think the way we left it

5    was Mr. Robertson was going to look over his notes and

6    finish with his direct of Dr. Crotty.  Go ahead,

7    please.

8                    MR. ROBERTSON:  Just a few more

9    questions.  Dr. Crotty, you testified that you learned

10   about the decision made by ECMS after the panel review

11   at some point; is that correct?

12                   THE WITNESS:  I learned about the

13   decision to continue the suspension of OR privileges

14   almost immediately because that affects scheduling.

15   But the discussion and all that, I did not know

16   anything about that until the -- until I had to start

17   preparing the packet.

18       Q.   (By Mr. Robertson)  Who informed you of that?

19       A.   I don't remember, but it was probably

20   Dr. Modrall, who was in the meeting.

21       Q.   Okay.  And after they notified you of that,

22   when was the next update that you received about

23   Dr. Mandalapu's privileges?

24       A.   Well, there wasn't an update.  It was an

25   ongoing suspension.

```
 1       Q.   So then, I guess, after you received that

 2  information, did they come every month and tell you

 3  that it was still suspended?

 4       A.   I would -- I would phrase it as it was never

 5  lifted.

 6       Q.   Do you recall, after learning of that

 7  decision, did you hand Dr. Mandalapu any more extension

 8  letters?

 9       A.   I don't remember.  If I'm -- if I had a

10  letter, I presented it.

11       Q.   But you don't specifically recall handing him

12  --

13       A.   After September, no, I don't remember if I

14  did or if I didn't.

15       Q.   Do you recall if Dr. Mandalapu was made aware

16  of the outcome of the ECMS in the same way that you

17  were?

18       A.   I don't recall if I'm the one who told him or

19  not.  I don't recall.

20       Q.   Did you ever receive any phone calls from any

21  potential employers regarding Dr. Mandalapu?

22       A.   Yes.

23       Q.   And when was that?

24       A.   Sometime after he left.

25       Q.   And --
```

```
 1        A.   I think -- before I -- after he left and

 2   before I left.

 3        Q.   And what did you tell them?

 4                    MR. WALKER:  Objection.  Relevance,

 5   your Honor.

 6                    MR. ROBERTSON:  Your Honor, it goes

 7   toward damages.

 8                    MR. WALKER:  How would her phone call

 9   be a damage from something else?

10                    MR. ROBERTSON:  Your Honor, would you

11   like me to address his question?

12                    THE COURT:  Yes.  Go ahead.

13                    MR. ROBERTSON:  There's been a lot of

14   testimony, specifically yesterday, about the subsequent

15   effect of the retaliation and harassment and

16   discrimination that occurred prior to Dr. Mandalapu

17   seeking employment elsewhere; and so the information

18   provided by Dr. Crotty would be relevant to that.

19                    THE COURT:  Your Honor, our position

20   would be that's a new claim.

21                    THE COURT:  You know, I think it

22   probably would be a separate claim, but, however, I

23   also think that it would have to do with evidence

24   toward whether or not Dr. Mandalapu sought to mitigate

25   his damages.
```

```
 1                    So I wouldn't consider it as --

 2   obviously, I'm not going to add it as a brand-new

 3   claim, but I will consider it with respect to

 4   mitigation of damages.  Dr. Crotty, you can answer.

 5                    THE WITNESS:  I said that I wouldn't

 6   be comfortable discussing Dr. Mandalapu.

 7        Q.   (By Mr. Robertson)  And that was the extent

 8   of the conversation?

 9        A.   Yep.

10        Q.   Okay.  Did you -- what did they ask you

11   initially?

12        A.   "This is Somebody Somebody from Somebody

13   Hospital.  We're calling you about Dr. Mandalapu, who's

14   joining.  Could we put you down for a reference?"  And

15   I said that I wasn't comfortable discussing

16   Dr. Mandalapu.

17        Q.   Did they ask to confirm that he was employed

18   under you at some point?

19        A.   I don't remember.

20        Q.   No further questions.  Thank you.

21        Q.   (By Mr. Walker)  Thank you.  Dr. Crotty, I'm

22   Johnston Walker with the Agency.  Good to see you.

23   We've spoken before, but I don't know if we've ever

24   spoken where I had my camera on.

25                    I wanted to ask you about the -- the May
```

# Exhibit-EE

## Contents:

1. November 11, 2025, National Practitioner Data Bank (NPDB) self-query report.

National Practitioner Data Bank
Health Resources and Services Administration
U.S. Department of Health and Human Services
P.O. Box 10832
Chantilly, VA 20153-0832

Case 2:25-cv-01320   Document 17-2   Filed 11/26/25   Page 62 of 295   PageID 190

5E0000009585838
Process Date: 11/11/2025
Page: 1    of    1

MANDALAPU, RAO S

3710 N BRAESWOOD BLVD

HOUSTON, TX 77025-3104

**From:**   National Practitioner Data Bank
**Re:**   Response to Your Self-Query

---

This self-query response is released by the National Practitioner Data Bank (NPDB) for restricted use under the provisions of Title IV of Public Law 99-660, the Health Care Quality Improvement Act of 1986, as amended; Section 1921 of the Social Security Act; and Section 1128E of the Social Security Act.

Title IV established the NPDB as an information clearinghouse to collect and release certain information related to malpractice payment history and professional competence or conduct of physicians, dentists, and other licensed health care practitioners.

Section 1921 of the Social Security Act expanded the scope of the NPDB.  Section 1921 was enacted to protect program beneficiaries from unfit health care practitioners, and to improve the anti-fraud provisions of federal and state health care programs. Section 1921 authorizes the NPDB to collect certain adverse actions taken by state licensing and certification authorities, peer review organizations, and private accreditation organizations, as well as final adverse actions taken by state law or fraud enforcement agencies (including, but not limited to, state law enforcement agencies, state Medicaid Fraud Control Units, and state agencies administering or supervising the administration of a state health care program), against health care practitioners, health care entities, providers and suppliers.

Section 1128E of the Social Security Act was added by Section 221(a) of Public Law 104-191, the Health Insurance Portability and Accountability Act of 1996. The statute established a national data collection program (formerly known as the Healthcare Integrity and Protection Data Bank) to combat fraud and abuse in health care delivery and to improve the quality of patient care. Section 1128E information is now collected and disclosed by the NPDB as a result of amendments made by Section 6403 of the Affordable Care Act of 2010, Public Law 111-148.  Section 1128E information includes certain final adverse actions taken by federal agencies and health plans against health care practitioners, providers, and suppliers.

Regulations governing the NPDB are codified at 45 CFR part 60. Responsibility for operating the NPDB resides with the Secretary of the U.S. Department of Health and Human Services (HHS), and HRSA, Division of Practitioner Data Banks.

Reports from the NPDB contain limited summary information and should be used in conjunction with information from other sources in granting privileges, or in making employment, affiliation, contracting or licensure decisions.  NPDB responses may contain more than one report on a particular incident, if two or more actions were taken as a result of a single incident (e.g., an exclusion from a federal or state health care program and an adverse licensure action).  The NPDB is a flagging system, and a report may be included for a variety of reasons that do not necessarily reflect adversely on the professional competence or conduct of the subject named in the report.

The response received from a self-query belongs to the subject of the self-query. Subjects may share the information contained in their own self-query responses with whomever they choose.

If you require additional assistance, visit the NPDB web site (https://www.npdb.hrsa.gov) or contact the NPDB Customer Service Center at 1-800-767-6732 (TDD: 1-703-802-9395).  Information Specialists are available to speak with you weekdays from 8:30 a.m. to 6:00 p.m. (5:30 p.m. on Fridays) Eastern Time.  The NPDB Customer Service Center is closed on all Federal holidays.

National Practitioner Data Bank
Case 3:25-cv-01320-L Document 17-2    Filed 11/26/25    Page 63 of 295    PageID 191
Health Resources and Services Administration
U.S. Department of Health and Human Services
P.O. Box 10832
Chantilly, VA 20153-0832
https://www.npdb.hrsa.gov

5500000309585839
Process Date: 11/11/2025
Page: 1 of 1

# MANDALAPU, RAO S - SELF-QUERY RESPONSE FOR AN INDIVIDUAL

## A. SUBJECT IDENTIFICATION INFORMATION  (Recipients should verify that subject identified is, in fact, the subject of interest.)

| | | | |
|---|---|---|---|
| Practitioner Name: | MANDALAPU, RAO S | | |
| Date of Birth: | 0██████5 | **Sex:** | MALE |
| Shipping Address: | 3██ N ████████ HOUSTON, TX 77025-3104 | | |
| Social Security Number: | ***-**-3011 | **NPI:** | 1████████ |
| License: | PHYSICIAN (MD), ████, TX | | |
| Professional School(s): | ████████████████ (2018) | | |

## B. SUMMARY OF REPORTS ON FILE WITH THE NPDB AS OF 11/11/2025

The following report types have been searched:

| | | | |
|---|---|---|---|
| Medical Malpractice Payment Report | No Reports | Health Plan Action(s): | No Reports |
| State Licensure or Certification Action | No Reports | Professional Society Action(s): | No Reports |
| Exclusion or Debarment Action(s): | No Reports | DEA/Federal Licensure Action(s): | No Reports |
| Government Administrative Action(s): | No Reports | Judgment or Conviction Report(s): | No Reports |
| Clinical Privileges Action(s): | **Yes, See Below** | Peer Review Organization Action(s): | No Reports |

Copies of these reports are provided for restricted/limited use as prescribed by statutes listed on the preceding cover page.

### VA NORTH TEXAS HEALTH CARE SYSTEM

**TITLE IV CLINICAL PRIVILEGES**
**Basis for Action:**  - SUBSTANDARD CARE OR INADEQUATE SKILL LEVEL

| | | | |
|---|---|---|---|
| **Initial Action:** | - VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE(S), WHILE UNDER, OR TO AVOID, INVESTIGATION RELATING TO PROFESSIONAL COMPETENCE OR CONDUCT | **Date of Action:** | 06/05/2023 |
| **DCN:** | 5500000228160003 | | |

--------------------------  Unabridged Report(s) Follow  --------------------------



National Practitioner Data Bank
Health Resources and Services Administration
U.S. Department of Health and Human Services
P.O. Box 10832
Chantilly, VA 20153-0832
https://www.npdb.hrsa.gov

DCN: 5500000228160005
Process Date: 02/20/2024
Page: 1    of    3
MANDALAPU, RAO S

# MANDALAPU, RAO S

## VA NORTH TEXAS HEALTH CARE SYSTEM

| TITLE IV CLINICAL PRIVILEGES ACTION | Date of Action: 06/05/2023 |
|---|---|
| **Initial Action** | **Basis for Initial Action** |
| - VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE (S), WHILE UNDER, OR TO AVOID, INVESTIGATION RELATING TO PROFESSIONAL COMPETENCE OR CONDUCT | - SUBSTANDARD CARE OR INADEQUATE SKILL LEVEL |

**A. REPORTING ENTITY**

| | |
|---|---|
| Entity Name: | VA NORTH TEXAS HEALTH CARE SYSTEM |
| Address: | 4500 S LANCASTER RD OFC 11G |
| | CHIEF OF STAFF |
| City, State, Zip: | DALLAS, TX 75216-7167 |
| Country: | |
| Name or Office: | MEDICAL STAFF OFFICE |
| Title or Department: | CHIEF OF STAFF OFFICE |
| Telephone: | (214) 857-4904 |
| Entity Internal Report Reference: | |
| Type of Report: | INITIAL |

**B. SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL)**

| | |
|---|---|
| Subject Name: | MANDALAPU, RAO S |
| Other Name(s) Used: | |
| Sex: | MALE |
| Date of Birth: | 0███ |
| Organization Name: | |
| Work Address: | |
| City, State, ZIP: | |
| Home Address: | 3710 N BRAESWOOD BLVD |
| City, State, ZIP: | HOUSTON, TX 77025-3104 |
| Deceased: | NO |
| Social Security Numbers (SSN): | ***-**-3█ |
| National Provider Identifiers (NPI): | ███ |
| Professional School(s) & Year(s) of Graduation: | ███ |
| Occupation/Field of Licensure: | PHYSICIAN (MD) |
| State License Number, State of Licensure: | ███ TX |
| Specialty: | UROLOGICAL SURGERY |
| Drug Enforcement Administration (DEA) Numbers: | ███ |
| Name(s) of Health Care Entity (Entities) With Which Subject Is Affiliated or Associated (Inclusion Does Not Imply Complicity in the Reported Action): | |
| Business Address of Affiliate: | |
| City, State, ZIP: | |
| Nature of Relationship(s): | |

**C. INFORMATION REPORTED**

| | |
|---|---|
| Type of Adverse Action: | TITLE IV CLINICAL PRIVILEGES |
| Basis for Action: | SUBSTANDARD CARE OR INADEQUATE SKILL LEVEL (F6) |
| Adverse Action Classification Code(s): | VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE(S), WHILE UNDER, OR TO AVOID, INVESTIGATION RELATING TO PROFESSIONAL COMPETENCE OR CONDUCT (1635) |

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

National Practitioner Data Bank
Health Resources and Services Administration
U.S. Department of Health and Human Services
P.O. Box 10832
Chantilly, VA 20153-0832
https://www.npdb.hrsa.gov

DCN: 5500000228160003
Process Date: 02/20/2024
Page: 2 of 3
MANDALAPU, RAO S

| | |
|---|---|
| Date Action Was Taken: | 06/05/2023 |
| Date Action Became Effective: | 06/05/2023 |
| Length of Action: | PERMANENT |
| Description of Subject's Act(s) or Omission(s) or Other Reasons for Action(s) Taken and Description of Action(s) Taken by Reporting Entity: | Physician voluntarily resigned on June 5, 2023, while under investigation for professional incompetence and misconduct, prior to the Medical Center Director taking a final privileging action or closing the investigation based on the findings and recommendation of the Professional Standards Board. |

**D. SUBJECT STATEMENT**

If the subject identified in Section B of this report has submitted a statement, it appears in this section.

Date Submitted: 03/01/2024

The reporting agency submitted three similar NPDB Title IV privileges action reports. 1. The NPDB report DCN: 550000214857488 dated 08/03/2023. This report was disputed for factual inaccuracy and voided. 2. The NPDB report DCN: 550000021657482 dated 08/31/2023. This report was disputed for factual inaccuracy and false reporting. The NPDB dispute resolution review committee has already reviewed the timeline events and the rebuttal response to the reporting agency timeline events with documented evidence dated 12/21/2023. This report was voided on 01/22/2024. The NPDB report was voided on 01/22/2024, and the reporting agency resubmitted the same report on 02/20/2024. 3. The NPDB report DCN: 5500000228164003 dated 02/20/2024. NPDB guidebook: Table 1 Actions reportable to the NPDB under Legislation Title IV: Voluntary surrender or restriction of clinical privileges while under or to avoid an investigation. (1635) The reporting agency suspended operative privileges only, but not the clinical privileges. I continued to have clinical privileges and have been staffing patients until the last minute of my employment. The suspension of operative privileges was based on a false allegation subject to review. I submitted all the timeline events with documented evidence, including operative reports, operating room records, anesthesia records, hospital records, and surgical floor nurses' reports from the suspension of operative privileges to the re-credentialing of operative privileges dated 05/29/2023, with the confirmed receipt. The reporting agency never contradicted the documented evidence submitted. I did apply for re-credentialing of operative privileges in May 2023 and resigned from the VA service in June 2023. The reporting agency did not notify me of any pending investigation regarding clinical privileges during the resignation notice period. NPDB guidebook: Nonrenewal: Nonrenewal of medical staff appointments or clinical privileges generally should not be reported to the NPDB. However, if the practitioner does not apply for renewal of medical staff appointment or clinical privileges while under investigation by the healthcare entity for possible professional incompetence or improper professional conduct, or in return for not conducting such an investigation or not taking a professional review action, the event is considered a surrender while under investigation and must be reported to the NPDB. I did apply for re-credentialing in May 2023 and resigned from the VA service in June 2023. Therefore, I did not voluntarily surrender clinical privileges while under or to avoid an investigation per the NPDB guidebook. Therefore, I request that the NPDB report be void.

**E. REPORT STATUS**

Unless a box below is checked, the subject of this report identified in Section B has not contested this report.

☐ This report has been disputed by the subject identified in Section B.

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

National Practitioner Data Bank
Health Resources and Services Administration
U.S. Department of Health and Human Services
P.O. Box 10832
Chantilly, VA 20153-0832
https://www.npdb.hrsa.gov

DCN: 5500000228160003
Process Date: 02/20/2024
Page: 3   of   3
MANDALAPU, RAO S

☐ At the request of the subject identified in Section B, this report is being reviewed by the Secretary of the U.S. Department of Health and Human Services to determine its accuracy and/or whether it complies with reporting requirements.  No decision has been reached.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services and a decision was reached. The subject has requested that the Secretary reconsider the original decision.

☒ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services. The Secretary's decision is shown below:

Date Submitted:                    07/16/2024

The practitioner requested Dispute Resolution Review of this report. The reporting requirements of the Department of Veterans Affairs (VA) are governed by the Memorandum of Understanding referenced at 42 U.S.C. 11152(b) which grants the VA the sole authority to determine which actions and individuals are reportable. The Secretary can only review whether the report accurately describes the reporter's action and reasons for action as stated in the reporter's decision documents. After review of the available information, the Secretary determined that some of the issues raised by the practitioner are beyond the scope of the Secretary's authority to review. After review of the remaining issues, the Secretary determined that there is no basis to conclude that the report should not have been filed or that for agency purposes it is not accurate, complete, timely or relevant. Accordingly, the report shall be maintained as submitted by the VA.

Date of Original Submission:      02/20/2024

Date of Most Recent Change:       02/20/2024

**F. SUPPLEMENTAL SUBJECT INFORMATION ON FILE WITH DATA BANK**

The following information was not provided by the reporting entity identified in Section A of this report. The information was submitted to the Data Bank from other sources and is intended to supplement the information contained in this report.

| | |
|---|---|
| Subject Name(s): | MANDALAPU, SUBBARAO |
| | MANDALAPU, RAO S |
| Date of Birth(s): | ▉▉▉▉▉ |
| Social Security Numbers (SSN): | ***-**-▉ |
| Occupation/Field of Licensure: | Physician (MD) |
| State License Number, State of Licensure: | ▉▉▉▉ PA |
| Occupation/Field of Licensure: | Physician (MD) |
| State License Number, State of Licensure: | ▉▉▉ NY |
| Occupation/Field of Licensure: | Physician (MD) |
| State License Number, State of Licensure: | ▉▉▉▉ PA |
| Occupation/Field of Licensure: | Physician (MD) |
| State License Number, State of Licensure: | ▉▉▉▉ OH |

**This report is maintained under the provisions of:** Title IV

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the provisions of Title IV of Public Law 99-660, as amended, and 45 CFR Part 60. All information is confidential and may be used only for the purpose for which it was disclosed. Disclosure or use of confidential information for other purposes is a violation of federal law. For additional information or clarification, contact the reporting entity identified in Section A.

───── **END OF REPORT** ─────

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

# Exhibit-F

Contents:

1. VA Directive 1039(3)-Concurrent surgery is strictly forbidden. (p.2, #2)
2. Forbidden concurrent surgeries scheduled by RMOs. (p.4-5; p. 10)
3. On April 28, 2022, Dr. Crotty confirmed 'no complications.' (p. 14-16)
4. On May 14, 2022, Dr. Crotty filed a complaint against Plaintiff, alleging that Plaintiff caused significant complications, recommending summary suspension.



**U.S. Department of Veterans Affairs**

Veterans Health Administration
*VA North Texas Health Care System*

In Reply Refer To: 549/112

## <u>Letter of Expectations for Surgeons Who Perform Surgery or Invasive Procedures</u>

Version 1, October 30, 2022

By affixing my signature below, I affirm that I understand and will fully comply with the following:

1) **I have read and will comply with all elements of VA Directive 1039(3), entitled "Ensuring Correct Surgery and Invasive Procedures In and Out of the Operating Room" (attached).**

2) **I understand that "Simultaneous Surgery" by one surgeon (also known as "Concurrent Surgery" in publications from the American College of Surgery) is strictly forbidden.** I have read and understand the definition of "Simultaneous Surgery" below.

   **Simultaneous surgery** occurs when the attending surgeon utilizes providers not credentialed and privileged to perform all or a critical portion of the surgical procedure (examples include, but are not limited to, physician residents, physician assistants, physician and non-physician surgical assistants) in order to leave the OR and actively participate (including resident supervision) in a surgical or invasive procedure in another OR or procedure room, inside or outside of the OR, at a time when there is any reasonable chance for the attending surgeon to be called to actively participate in the procedure. *NOTE: Simultaneous surgery is never permitted.*

3) **I understand that "staggered surgery" (as defined below) is acceptable but must be carefully scheduled and executed to avoid any overlap of the critical portions of two operations.** I understand that the surgeon is solely responsible for ensuring that there is never overlap between the critical portions of two operations <u>and</u> there is no reasonable chance of being called back to the first operating room. If both cannot be guaranteed, no matter the intraoperative events, then the surgeon has two options:  a) schedule the two operations

*Corporate Office*:  Dallas VA Medical Center, 4500 South Lancaster Road, Dallas, TX 75216
Sam Rayburn Memorial Veterans Center, 1201 East Ninth Street, Bonham, TX 75418
Fort Worth Outpatient Clinic, 2201 Southeast Loop 820, Fort Worth, TX 76119
Tyler VA Primary Care Clinic, 428 Centennial Parkway, Tyler, TX 75703
Polk Street Annex Primary Care Clinic, 4243 South Polk Street, Dallas, TX 75224
Plano VA Outpatient Clinic, 3804 West 15th Street, Plano, TX 75075
Grand Prairie VA Outpatient Clinic, 2737 Sherman Street, Grand Prairie, TX  75051
Garland VA Medical Center, 2300 Marie Curie Boulevard, Garland, TX  75042

sequentially with no overlap of the operations; or b) obtain assistance from another surgeon in your specialty. When scheduling "staggered surgery" the two operations cannot be scheduled to have the same start time. They must be staggered.

**Staggered Surgery.** Staggered surgery occurs when the attending surgeon utilizes providers not credentialed and privileged to perform all or a portion of the surgical procedure; for example, physician residents, physician assistants, physician and non-physician surgical assistants, in order to leave the OR and actively participate, including resident supervision, in a surgical or invasive procedure in another OR or procedure room, in or out of the OR, at a time when there is no reasonable chance for the attending surgeon to be called to actively participate in the procedure. ***NOTE: Staggered surgery is permissible.***

4) **I will document my involvement in the critical portions of each operation in a Brief Operative Note or the final dictated Operative Note for all operations for which I am the attending of record.**


Signature of Attending Surgeon (with date)


_____


John G. Modrall
1020714

Digitally signed by John G.
Modrall 1020714
Date: 2023.02.07 16:46:42 -06'00'

John Gregory Modrall, MD
Chief, Surgical Service
VA North Texas Health Care System

Printout

Tuesday, September 27, 2022      3:22 PM

First case in the chief of urology complaint:
Operative report: V_Stents.pdf @ 03/15/2022 @07.53

(Chief of urology involved in the surgery and she is well
aware of concurrent scheduling surgeries despite written
requests stating such concurrent scheduling is illegal)

This surgery was scheduled concurrent with Robotic
Radical Prostatectomy and Pelvic Lymph node dissection

Operative report: RALP_3152022 @ 03/15/2022 @07.45.

Follow up: V_Follow up.pdf: There was no evidence of
left ureter injury.

Management was as per the AUA guidelines.

```
                                                                    Page:  1
--------------------------------------------------------------------------------
MEDICAL RECORD                                                 OPERATION REPORT
--------------------------------------------------------------------------------
NOTE DATED: 03/15/2022 07:53  OPERATION REPORT
VISIT: 03/15/2022 07:53 OR11
SUBJECT: Case #: 283943

PREOPERATIVE DIAGNOSIS
Need for intraoperative identification of the ureters bilaterally


POSTOPERATIVE DIAGNOSIS
Need for intraoperative identification of the ureters bilaterally

PROCEDURE
Cystoscopy, bilateral ureteral stent placement


SURGEON

Rao Mandalapu MD


FIRST ASSISTANT

Gianpaolo Carpinito MD


ATTENDING SURGEON
Dr. Mandalapu, MD


STATEMENT OF STAFF SUPERVISION

Dr. Mandalapu was present and scrubbed for the entire case.


ANESTHESIA
General endotracheal.


ESTIMATED BLOOD LOSS
0 cc


IV FLUIDS
Normal saline.


COUNTS
Instrument and sponge counts were correct.


COMPLICATIONS
Perforation of the left ureter

                  ** THIS NOTE CONTINUED ON NEXT PAGE **
--------------------------------------------------------------------------------
                    DALLAS VA MEDICAL CENTER    Printed:09/27/2022 15:22
                         Pt Loc: OUTPATIENT                 Vice SF 516
--------------------------------------------------------------------------------
```

```
-----------------------------------------------------------------------------
MEDICAL RECORD                                              OPERATION REPORT
-----------------------------------------------------------------------------
03/15/2022 07:53    ** CONTINUED FROM PREVIOUS PAGE **
```

FINDINGS
Intraoperative advancement of 5 French Pollock catheters through the ureteral
orifices bilaterally.  See full op note

SPECIMENS
None

DRAINS
LEFT 5 French Pollock catheter
RIGHT 5 French Pollock catheter
16Fr foley catheter

CONDITION
Good.

STATEMENT OF MEDICAL NECESSITY
 59-year-old male who is proceeding to the OR with general surgery for robotic
sigmoidectomy as definitive treatment for recurrent
diverticulitis refractory to conservative medical management.  Urology requested
to place bilateral ureteral stents to aid in intraoperative identification of
the bilateral ureters.

DESCRIPTION OF OPERATION

The patient was brought to the operating room and placed on the
operating table in the dorsal lithotomy position. All pressure points were
padded appropriately. Sequential compression garments were
applied to lower extremities. Preoperative antibiotics were
administered. General endotracheal anesthesia was obtained
without complication. The patient was prepped and draped in the
usual sterile manner. A timeout was performed.

A 22- french rigid cystoscopy was inserted into the urethral
meatus. This was adavanced to the bladder which was then emptied. We reinserted
the pan-endoscope lens and conducted a full cystoscopy noting no abnormalities
of the bladder mucosa. The bilateralureteral orifices were identified in the
normal orthotopic positions.

We attached the double bridge to the cystoscope.  In each working channel, we
had a small lumen catheter: A 5 French Pollock and a 6 French cone-tipped
catheter.  The cone-tip catheter was employed, as it has a different color,
which would allow us to distinguish the affected side should any injury occur.
The Right ureteral was identified.  The 5 French Pollock catheter with ease
until the 25 cm marking was seen at the ureteral orifice.

** THIS NOTE CONTINUED ON NEXT PAGE **

```
-----------------------------------------------------------------------------
███████████████          DALLAS VA MEDICAL CENTER    Printed:09/27/2022 15:22
                          Pt Loc: OUTPATIENT                    Vice SF 516
-----------------------------------------------------------------------------
```

-------------------------------------------------------------------------------
MEDICAL RECORD                                                OPERATION REPORT
-------------------------------------------------------------------------------
03/15/2022 07:53    ** CONTINUED FROM PREVIOUS PAGE **

Attention was then turned to the left ureteral orifice.  The cone-tip catheter
was advanced 1 to 2 mm into the ureteral orifice, but it was felt that it would
be unlikely to advance more proximally, so this was withdrawn.  This was then
exchanged through the working channel for a 5 French Pollock catheter.

Cannulation of the left ureteral orifice was attempted several times with a 5
French Pollack catheter, but this was unable to be advanced.  A Bentson wire was
advanced through the lumen of the 5 French, and we attempted to direct this into
the ureteral orifice.  We were only able to advance it about a centimeter,
however, before it buckled and self displaced from the ureteral orifice.   We
attempted the same maneuver with an angled Glidewire, but the wire buckled upon
advancement by 1 cm, and ejected itself from the ureteral orifice.  At this
time, it was also difficult to direct the 5 French catheter out of the scope in
the correct orientation. This second pollock catheter and the Glidewire were
removed from the working channel of the scope and our cystoscope was backed off
our already placed right ureteral catheter.  The double bridge was then
exchanged for single bridge.

The second 5 French Pollock catheter was reloaded through the single bridge, and
the rigid cystoscope was readvanced into the bladder.  The left ureteral orifice
was reidentified.  At this time the right ureteral catheter had slightly
migrated into the cystoscope's direct line of site of the left ureteral orifice.
The cystoscope was removed. The Bentson wire was advanced through the lumen of
the right ureteral catheter and the right ureteral 5 French pollock was
exchanged out in order to unobscure the left ureteral orifice. This wire was
clipped to the drape by a snap.

The cystoscope was then readvanced into the bladder. The 5 french pollock in the
working channel was directed toward the left ureteral orifice. We attempted to
advanced a straight sensor wire, again meeting resistance in the distal ureteral
orifice. Cannulation with the 5Fr pollock catheter was again attempted, and it
was advanced about 2-3 cm into the ureteral orifice.  A straight sensor wire was
advanced through the catheter, initially with little resistance, but then did
meet some resistance and could not be advanced farther.  The Pollock catheter
was able to be advanced over the wire up to the 25 cm mark. The sensor wire was
removed.  The cystoscope was then backed off the left ureteral 5 French Pollock
using Seldinger technique and removed from the bladder.

Our right ureteral wire was unclear from the drape.  The other 5 French Pollock
catheter was advanced over the wire until the residual length exiting the penis
was identical identical to that of the left-sided catheter.  Karlyn adapters
were attached.  5 cc of ICG were instilled through each catheter.  A 16 French
Foley was placed.  The Foley was attached to a bag.  The Pollock catheters were
attached each to bile bags via the Karlin adapters.  2 silk ties were used to
secure the Pollick catheters to the Foley catheter.


The patient tolerated the procedure well.  The case was then turned over to the
general surgery team.
                     ** THIS NOTE CONTINUED ON NEXT PAGE **
-------------------------------------------------------------------------------
                         DALLAS VA MEDICAL CENTER    Printed:09/27/2022 15:22
                         Pt Loc: OUTPATIENT                     Vice SF 516
-------------------------------------------------------------------------------

```
                                                               Page:  4
-----------------------------------------------------------------------
MEDICAL RECORD                                        OPERATION REPORT
-----------------------------------------------------------------------
03/15/2022 07:53    ** CONTINUED FROM PREVIOUS PAGE **



DISPOSITION
Per general surgery


                    Signed by: /es/ GIANPAOLO CARPINITO, MD
                               SURGICAL RESIDENT 03/15/2022 15:31
                   Cosigned by: /es/ RAO S MANDALAPU, MD
                               UROLOGY PHYSICIAN 03/15/2022 15:49


03/15/2022 15:49    ADDENDUM            STATUS: COMPLETED
I am the staff on this case performed the procedure, attempted to place intra op
left ureteral stent and found left ureteral perforation close to the bladder.
Attempted retrograde stent placement without success. The plan is to place
antegrade stent by Interventional radiology.

I did speak with Mr. ████████'s wife Ms. ██████ at ██████████ and explained
the intra op complication and management plan. She verbalized that she
understands and they will follow up with urology.
                    Signed by: /es/ RAO S MANDALAPU, MD
                               UROLOGY PHYSICIAN 03/15/2022 15:50


03/18/2022 10:20    ADDENDUM            STATUS: COMPLETED
Right/Left/bilateral 5 french, 70 cm Cook open ended ureteral catheters were
placed and discussed with General surgery attending, Dr Valerie-Sue Emuakhagbon.
```

Left ureteral stent placement c/b possible perforation at the disatal ureter.

```
Please see the addendum note.
                    Signed by: /es/ RAO S MANDALAPU, MD
                               UROLOGY PHYSICIAN 03/18/2022 10:23
```

```
-----------------------------------------------------------------------
██████████████████          DALLAS VA MEDICAL CENTER    Printed:09/27/2022 15:22
                            Pt Loc: OUTPATIENT                   Vice SF 516
-----------------------------------------------------------------------
```

# Printout

Friday, September 30, 2022      1:09 PM

```
                                                                  Page:  1
-------------------------------------------------------------------------------
MEDICAL RECORD                                               OPERATION REPORT
-------------------------------------------------------------------------------
NOTE DATED: 03/15/2022 07:45  OPERATION REPORT
VISIT: 03/15/2022 07:45 OR10
SUBJECT: Case #: 284456

PREOPERATIVE DIAGNOSIS
Prostate cancer

POSTOPERATIVE DIAGNOSIS
Prostate cancer

PROCEDURES
Robotic assisted radical prostatectomy with bilateral pelvic lymph node
dissection

SURGEON
Vishnu Ganesan MD

FIRST ASSISTANT
Rashann J. Coleman, R.N.

ATTENDING SURGEON
Rao Mandalapu, MD

STATEMENT OF STAFF SUPERVISION
Dr. Rao Mandalapu was present and scrubbed for the entire case.

ANESTHESIA
General

ANESTHETIST
See anesthesia record.

ATTENDING ANESTHESIOLOGIST
See anesthesia record.

ESTIMATED BLOOD LOSS
50 mL

IV FLUIDS
See anesthesia record.

COUNTS
Prior to closing, the area was inspected and palpated for the
presence of sponges and instruments and none were identified.
Instrument and sponge counts were correct.

COMPLICATIONS
None.

FINDINGS
Prostate seminal vesicles removed grossly negative margins watertight
anastomosis bilateral pelvic lymph node dissection performed.  Nonnerve sparing

                      ** THIS NOTE CONTINUED ON NEXT PAGE **
-------------------------------------------------------------------------------
```

```
                         DALLAS VA MEDICAL CENTER    Printed:09/30/2022 13:09
                            Pt Loc: OUTPATIENT                   Vice SF 516
-------------------------------------------------------------------------------
```

---

MEDICAL RECORD                                        OPERATION REPORT

---

03/15/2022 07:45    ** CONTINUED FROM PREVIOUS PAGE **

SPECIMENS
#1 peri prostatic fat
#2 prostate and seminal vesicles
#3 apical margin
#4 right pelvic lymph node
#5 left pelvic lymph node
#6 median lobe

DRAINS
None.

STATEMENT OF MEDICAL NECESSITY
Mr. ▨▨▨▨▨ is a 61-year-old African-American male with a PMHx
hypertension, prediabetes who was recently diagnosed with prostate cancer.
He had TRUS prostate biopsy on 11/2/2021 for an elevated PSA of 145.5 ng/mL
path-Gleason grade group 2, 10 of 12 cores positive, 100% core involved.  His
metastatic work-up was negative.  We discussed treatment options for him of
surgery versus radiation.  He was interested in proceeding with surgery.  We did
discuss that given the extent of disease noted on the MRI there is a possibility
for positive margins and his high risk disease portends him at a higher risk of
biochemical recurrence and need for additional treatment such as radiation.  He
understood all this and was agreeable with proceeding.


DETAILS OF PROCEDURE
Patient brought to the operating room, anesthetized with GETA, positioned
supine, prepped and draped in sterile fashion. He was given ancef for
prophylaxis. A foley catheter was placed. Procedure was started with veress
needle insufflation to establish pneuomoperitoneum. After this, the robotic and
assistant trocars were placed under direct vision. The procedure was started
with posterior peritoneotomy and identification and dissection of the vasa and
SVs. We then dissected posterior to the prostate above the level of
Denonviller's  to the apex. This plane of dissection was extended laterally to
the level of the neurovascular bundles. The bladder was then dropped to
establish the retropubic space of Retzius.  The prostate was defatted. The
endopelvic fascia was opened to delineate the apical anatomy. The anterior
bladder neck was incised.  Small median lobe was noted this was separately
removed. posterior bladder neck incised to find the plane that was previously
created with our posterior dissection. The SVs were grasped and pedicles were
taken down in non-nerve sparing plane bilaterally. A V-lock suture was placed
around the DVC and the DVC was ligated. The urethra was divided and apex of
prostate dissected. The specimen was passed off. Hemostasis was achieved.

We then performed left sided pelvic lymph nodes with the lateral boundary being
the external iliac vein, proximal boundary being the bifurcation of the common
iliac vessels. Care was taken to skeletonize and avoid injury to the obturator
nerve. We repeated the same on the right side.

We performed a bladder neck reconstruction with v-loc in a tennis racket
                  ** THIS NOTE CONTINUED ON NEXT PAGE **

---

---

```
                                                                  Page:  3
--------------------------------------------------------------------------------
MEDICAL RECORD                                               OPERATION REPORT
--------------------------------------------------------------------------------
03/15/2022 07:45    ** CONTINUED FROM PREVIOUS PAGE **

fashion. The vesico-urethral anastomosis was then performed in standard running
fashion with interlocking v lock suture. A final catheter was placed and 10cc of
sterile water was placed in the balloon. The anastomosis appeared water tight
after check with 180cc.  A JP drain was placed through the right lower quadrant
port site. The specimens were extracted, extraction site closed with #1PDS, skin
was closed with monocryl and glue and patient was extubated and transported to
PACU in stable condition.

DISPOSITION
PACU

POSTOPERATIVE PLAN
PACU labs.  P.m. labs.  A.m. labs.  Advance diet as tolerated.  Check JP
creatinine in the morning.

                      Signed by: /es/ VISHNUVARDHAN GANESAN, MD
                                 SURGICAL RESIDENT 03/15/2022 18:47
                    Cosigned by: /es/ RAO S MANDALAPU, MD
                                 UROLOGY PHYSICIAN 03/16/2022 07:52
```

```
--------------------------------------------------------------------------------
██████████████████         DALLAS VA MEDICAL CENTER    Printed:09/30/2022 13:09
                             Pt Loc: OUTPATIENT                   Vice SF 516
--------------------------------------------------------------------------------
```

Quick Notes Page 4

Printout

Wednesday, September 28, 2022     3:35 PM

```
                                                                Page:  1
--------------------------------------------------------------------------------
MEDICAL RECORD                                           OPERATION REPORT
--------------------------------------------------------------------------------
NOTE DATED: 04/28/2022 13:06  OPERATION REPORT
VISIT: 04/28/2022 13:06 CYSTO
SUBJECT: Case #: 285238


VANTHCS OPERATION NOTE

PREOPERATIVE DIAGNOSIS
History of Left ureteral injury

POSTOPERATIVE DIAGNOSIS

Same
PROCEDURES

Cystoscopy, left retrograde pyelogram, left ureteral stent exchange
SURGEON
CALEB ASHBROOK, MD

1ST ASSISTANT
NONE.

2ND ASSISTANT
NONE.

ATTENDING SURGEON.
Karen Crotty

STATEMENT OF STAFF SUPERVISION
DR. Crotty was present and scrubbed for the entire case.

ANESTHESIA
SEE DOCUMENTATION

ANESTHETIST
SEE DOCUMENTATION

ATTENDING ANESTHESIOLOGY
SEE DOCUMENTATION

ESTIMATED BLOOD LOSS
0 cc

IV FLUIDS
SEE DOCUMENTATION

COUNTS
REPORTED BY RN TO BE CORRECT AT CASE TERMINATION.

COMPLICATIONS
None

FINDINGS
There was no evidence of persistent left ureteral injury.  The distal left
                    ** THIS NOTE CONTINUED ON NEXT PAGE **
--------------------------------------------------------------------------------
                          DALLAS VA MEDICAL CENTER    Printed:09/28/2022 15:35
              DOB:                Pt Loc: OUTPATIENT              Vice SF 516
--------------------------------------------------------------------------------
```

---

MEDICAL RECORD                                              OPERATION REPORT

---

04/28/2022 13:06    ** CONTINUED FROM PREVIOUS PAGE **

ureter was patent and contrast drained readily.  There was note of slightly
purulent appearing urine after removal of his stent.  Given this we elected
to replace a ureteral stent on a string to facilitate drainage until removal
next week

SPECIMENS
None

DRAINS
6 French X JJ stent

STATEMENT OF MEDICAL NECESSITY
Mr. ▓▓▓▓▓▓ is a 59-year-old male who underwent a colorectal surgery with
bilateral finder stent placement.  This was complicated by left ureteral
perforation during placement of the left stent.  A retrograde stent was not
able to be placed, therefore the patient underwent a left percutaneous
nephrostomy tube with an antegrade stent placement.  The left nephrostomy
tube was eventually dislodged and removed, but the stent remained in place.
He presents to the operating room today to evaluate whether there is
persistent injury.

DESCRIPTION OF PROCEDURE
The patient was taken to the operating room after informed consent was
obtained and preoperative antibiotics were administered.  The patient was
placed in the dorsal lithotomy position and all pressure points were padded.
We first began the case by introducing a 21 French rigid cystoscope at which
point we identified the left ureteral stent.  The bladder was drained, and a
sensor wire was placed alongside the stent.  We confirmed appropriate
position fluoroscopically in the kidney.  At this point we then introduced a
cystoscopic stent grasper, and carefully removed the stent while ensuring the
wire remained in place.  We then placed a second wire into the kidney and
advanced a 5 French open-ended catheter into the mid ureter.  We then
performed a retrograde pyelogram, which revealed a normal collecting system.
We then pulled the 5 French open-ended catheter into the distal ureter and
shot another retrograde pyelogram, which again showed a normal ureter.  We
then removed the 5 French open-ended catheter and took persistent
fluoroscopic images of the ureter draining.  There was no evidence of a
persistent ureteral injury or tapering of the distal ureter.  We performed 15
degree oblique shots of fluoroscopy in both directions which revealed good
patency of the ureter.  After confirming appropriate ureteral patency, the
decision was made to place a 6 French X 26 cm JJ stent on a string due to
findings of slightly purulent urine on removal of the stent.  It was felt
that the larger stent that was placed may have been causing some degree of
obstruction.  We then placed the stent under fluoroscopic guidance.  We
reintroduced the rigid cystoscope into the bladder to pull the stent further
into the bladder to allow for appropriate positioning in the renal pelvis.
The case was then terminated, the strings for the ureteral stent were secured
to the patient's penis using Mastisol and Tegaderm and lidocaine jelly was
introduced into the urethra
                    ** THIS NOTE CONTINUED ON NEXT PAGE **

---

▓▓▓▓▓▓,▓▓▓▓▓▓        DALLAS VA MEDICAL CENTER    Printed:09/28/2022 15:35
▓▓▓▓▓▓ DOB:▓▓▓▓▓▓        Pt Loc: OUTPATIENT                Vice SF 516

---

```
                                                                    Page:  3
--------------------------------------------------------------------------------
MEDICAL RECORD                                                OPERATION REPORT
--------------------------------------------------------------------------------
04/28/2022 13:06     ** CONTINUED FROM PREVIOUS PAGE **


DISPOSITION
PACU then home

POSTOPERATIVE PLAN
The patient will present for a postoperative visit with the urology resident
clinic on Monday or Tuesday for stent removal on a string.  The patient will
then see Dr. Crotty in 6 weeks with a renal ultrasound prior to ensure no
residual hydronephrosis is present

                Signed by: /es/ CALEB Q ASHBROOK, MD
                                SURGICAL RESIDENT 04/28/2022 19:24
              Cosigned by: /es/ KAREN L CROTTY, MD
                                PHYSICIAN 04/29/2022 10:05
```

```
--------------------------------------------------------------------------------
                              DALLAS VA MEDICAL CENTER    Printed:09/28/2022 15:35
              DOB:                Pt Loc: OUTPATIENT                  Vice SF 516
--------------------------------------------------------------------------------
```

Quick Notes Page 4

# Exhibit-G

## Contents:

1. Plaintiff's testimony regarding summary suspension and surgical complications.

2. Protected activity. (p.24-25)

3. Summary suspension. (p. 26-31)

4. Surgical complications. (p. 31-36)

5. National Surgery Office (NSO) issued VA Surgical Quality Improvement Program (VASQIP)- No reportable complications. (p. 16)

1  surgery?  Why -- why you do this?  Also, it's illegal

2  to do."

3          So her answer is the same.  "Just you do what

4  you were asked to do."  And so I -- I -- I also brought

5  to her attention that, "You are doing this only to me,

6  not my colleagues.  That is a differential treatment.

7  I feel like I am discriminated here."

8          So, no response.  So I did this in February.

9  I -- I think I put it on paper in February, and again,

10  March, and also in April.  All those, I have scheduled

11  concurrent surgeries.

12      Q.   You mentioned February, March, and April.

13  Can you clarify what year?

14      A.   February 15th, 2022; March 15th, 2022 -- and

15  March 15th, 2022, surgery was -- also, Dr. Crotty

16  joined the surgery; so she can't deny that it was a

17  concurrent surgery.  So April 15th -- some time in

18  April 2022, also concurrent surgeries.  So these are

19  the dates.

20      Q.   And if I can turn your attention, the first

21  ROI here, page 89, I want to share my screen, if that's

22  okay with you, your Honor.  Can you see the document in

23  front of you?

24      A.   Yes.

25      Q.   Would that have been an example of you

1    informing Dr. Crotty of the issues with the concurrent

2    surgeries?

3        A.    Yes.

4        Q.    Okay.

5        A.    Yeah.  I clearly mentioned that there's been

6    a pattern going on.  So the more I asked -- "There are

7    four bookings in my clinic today.  I understand that,

8    you know -- so you said that this would take one

9    patient.  I agreed, but you put in a fourth patient.

10   Also, this has been a pattern from the beginning."

11            So how many times -- you know, I told her --

12   because -- the attitude is just, "You do what you are

13   asked to do."  That's the response.

14            So my concerns were -- "I expressed my

15   concerns that you were asking me to do illegal things.

16   I'm not -- I'm an independent surgeon; so I'm forced to

17   do illegal, prohibited procedures, and so that -- that

18   leaves me a tremendous pressure on me.  And so why am I

19   doing this?  Why I am forced to do this?"

20            So -- yeah.  So that -- they didn't care.

21   They just kept on doing it.

22       Q.    Are you aware if Dr. Crotty was aware that

23   you filed an EEO complaint?

24       A.    She has (informed me that she) received a

25   copy in August of 2022.

1      Q.    And are you aware whether or not Dr. Modrall

2  would have been aware of your EEO activity?

3      A.    The EEO was notified to all my supervisors in

4  the line of command from Dr. Crotty, Dr. Modrall, and

5  Dr. Hastings, Dr. Rivera, and the acting Director,

6  Mr. Kendrick Brown.

7      Q.    Perfect.  Are you aware of whether or not

8  Jason Cave would have been aware of your EEO activity?

9      A.    Mr. Jason Cave was not there when my

10  privileges were suspended.  He started in the end of

11  February, early March 2023.  My privileges were

12  suspended in May 2022.

13          But I did debrief him as soon as he took over

14  in March 2023.  I briefed him that this was what was

15  going on with me.  At least -- "I've been requesting --

16  I've made numerous requests, written requests.  No

17  response.  Please, at least you can look into this?"

18          And every communication, every single

19  communication, I requested why my privileges were

20  suspended.  Today, I -- today, I'm repeating the same

21  question to Honorable Justice:  Why my privileges were

22  suspended?  I have no answer as of now.  I don't know

23  why my privileges were suspended, my operative

24  privileges.

25              Again, let me clarify this.  Only my

1  operative -- surgical operative privileges were

2  suspended, but I do have clinical privileges.  That

3  means I am allowed to see the patients, but I can't

4  operate.  That was a limitation that they put me on,

5  but they didn't give me any reasons.

6       Q.   So I want to turn to the accepted claims

7  here.  Before we get into the nuts and bolts here of

8  the first claim, can you explain -- what does it mean

9  to be issued a summary suspension of privileges?

10      A.   Summary suspension of privileges.  If a

11 legally validated expert team of surgeons with similar

12 qualifications and education determines that there was

13 a surgical competency error or misconduct happened that

14 resulted in unusual, life threatening surgical

15 complications, and the experts were blinded to the

16 surgeon and the location -- so the experts who reviewed

17 my surgeries should not be known who the surgeon is.

18 So when they review it, it has to be blinded.

19           Once they report it, at the time, they're

20 going to bring the report to me and ask me, "This is

21 what you did.  You did wrong."

22           There is clinical legal standards for the

23 surgical errors because it's a malpractice case.  The

24 courts give -- a number of times, courts give -- what

25 is the standard of care?  Clearly.

 1              So the -- the standard of care is a legal

 2   term, but it's clearly saying that a surgeon who has a

 3   similarly qualified educational training in a similar

 4   situation and who can -- who would have done the

 5   surgery differently, and pointed out where the surgeon

 6   deviated from the regular operative steps -- because of

 7   their deviation, patient got injured, resulting in the

 8   unusual surgical complication -- so to make it easier,

 9   can I explain this a little bit in a different, easier

10   format with your permission, your Honor?

11              THE COURT:  Dr. Mandalapu, if you

12   could just answer the questions by your attorney.

13              THE WITNESS:  I'm trying to explain

14   what is the standard of care and what is reportable to

15   the NPDB.  So it has to be a legal --

16              THE COURT:  I understand that, but

17   your attorney may have questions in a particular order;

18   so let her guide you.

19              And certainly, let me say this.  If

20   you need time to go off the record and talk to her

21   about questions that may not be asked, then we can do

22   so.  But at this point, she may have her questions in

23   order of how she wants to address it.  Okay?

24              THE WITNESS:  I think she asked me

25   what is -- when they do the summary suspension.  So

1  summary suspension has to be a legally validated

2  process, and after that, they should conduct a fair

3  hearing.  The hearing has clinical guidelines.  The

4  Health Care Quality Improvement Act of 1986 clearly

5  defines there are four steps that are to be followed.

6              I clearly notified.  I gave them:

7  Here is the law.  The law was violated.  I was not

8  given this; and so the summary suspension was unlawful.

9  I did submit it many times, and it has to be a legal

10  process.

11             And so there was -- first of all, I

12  don't know which surgery had a surgical error.  I don't

13  know whether the experts were reviewed.  I don't know.

14  They never notified me, and I was -- I was not given a

15  fair hearing process before the suspension of

16  privileges.

17             All these things have to be done

18  before they do the summary suspension.  That's what I'm

19  trying to explain.  And they did, abruptly, summary

20  suspension without going through the legal process.

21  That is illegal.

22     Q.   (By Ms. Velasquez)  So based on your

23  understanding, what kind of situations are required to

24  issue a summary suspension?

25     A.   Like a, for example, it is, like, an --

```
 1  operating on the wrong patient.  Operating on the wrong

 2  organ.  The surgeon is under the influence of drugs or

 3  alcohol, resulting in a major injury and resulting in

 4  life-threatening surgical complications.  There should

 5  be a life-threatening surgical complications as the

 6  proximate reason for the surgeon's deviation.

 7          So a life-threatening surgical complication,

 8  that complication is because of the surgical error.  So

 9  it has to be connected to these, and that determination

10  has to come from an independent, impartial,

11  board-certified, similarly qualified surgeon expert.

12          So this is in the VHA directives by-laws.  It

13  is in the legal system, and it is a practice.  So it is

14  not for me; it is a legal system.  If they follow the

15  legal system, these are the steps they are supposed to

16  do.  And I brought it up to their attention innumerable

17  times.  Every single communication, I asked them why my

18  privileges were suspended.  I was never given notice.

19  I was not told what it is.

20          And also, I told Dr. Crotty, "If you don't

21  disclose the reasons, you can't use that reason to

22  suspend my privileges.  It is the law."  So there's a

23  clear-cut violation.

24          After suspension -- I mean, I know what the

25  process is as a surgeon.  And after suspension, I went
```

1   and I reviewed all the VHA -- what the by-laws are.  So

2   the Veterans Health Administration By-Laws clearly say

3   that anything cannot be disclosed to the employee, that

4   cannot be used to take an adverse action or any action.

5           So I still remember that because I read it a

6   number of times.  This is in the VHA Directive 5021,

7   page 23.  It says Employment Entitlement.  In that,

8   number 5 says, if you can't disclose the reason to the

9   employee, those cannot be used to take action.

10          And as of now, I do not know what was the

11  reasons.  They did not disclose specific reasons.

12      Q.   How were you informed that you were going to

13  be issued the summary suspension of privileges in May?

14      A.   On May 18th, 2022, I was diagnosed to have

15  COVID.  So I was about to leave.  I was asked to leave

16  -- to stay in self isolation.  I was intercepted by

17  Dr. Crotty handing over this summary suspension notice,

18  and she insisted that I should sign it.  I just signed

19  and walked away.

20          And I asked her at the time, "So what is

21  this?  Why my privileges are suspended?"

22          She took them back after my signing and said,

23  "I don't have to answer this to you."  Walked away.  No

24  notice.  No warning.  No due process.  No explanation.

25  I was suspended one fine evening.  That's it.  I was

1  suspended, period.  I don't know why it is.  I don't

2  know why they did it.

3      Q.  So were you ever given any explanation as to

4  why your privileges were suspended here?

5      A.  Never.  I repeat:  Never.  I don't know as of

6  now, today.  What surgeries?  I gave 758 surgeries,

7  patients I encountered; 130 surgeries, I performed in

8  the last five months before my suspension.  I gave all

9  the list.  Which surgeries has life-threatening

10  surgical complications?

11          I gave documented evidence issued by National

12  Surgery Office.  They reported, in the VA Surgical

13  Quality Improvement Program, all the surgeries

14  documented, all the complications documented in that.

15  I gave that report.  This is official, authenticated

16  report issued by National Surgery Center.  They did not

17  report any surgical complications in my name.

18          How you're saying life-threatening

19  complications?  Can you show me where there is one?

20  There is a standard for that.

21          I gave this -- I gave the classification, how

22  the grades are for life-threatening surgical

23  complications.  For the record, life-threatening

24  surgical complications are graded grade 5 and grade 4.

25          This means, like, a stroke, brain injury,

 1   that kind of thing.  And organ failures, system

 2   failures like liver failure, kidney failure because of

 3   the surgery, and patients required an intensive care

 4   treatment, that patient condition is considered as

 5   life-threatening.

 6            These are the requirements.  These have

 7   happened because of the surgical error.  That is called

 8   a surgical error.  That is reported.  That is

 9   reportable to the medical boards.  That is reportable

10   to the NPDB.

11       Q.   So you mentioned a number of reports there.

12   I want to ask -- you mentioned -- what is it -- the

13   VASQIP.  What is that report, again?

14                 MR. WALKER:  Objection.  Lacks

15   foundation, your Honor.

16                 THE WITNESS:  That's a --

17                 THE COURT:  Wait.  Mr. Walker, can you

18   explain that?

19                 MR. WALKER:  I think the testimony

20   that we heard a little while ago, I think, was very

21   relevant to his state of mind, but he also demonstrated

22   that he doesn't know the VA processes.

23                 So she's now going to ask him about a

24   report that there's no evidence to suggest that he has

25   any idea what is in that report, how that report is

1  collated, what the purpose of the report is.  So for

2  him to testify about a report without any foundation

3  that he even knows what's in it is -- could only

4  mislead you.

5                    THE WITNESS:  I'm sorry --

6                    THE COURT:  I understand that.  I'm

7  going to let you address it on cross-examination.

8                    MR. WALKER:  Yes, Your Honor.

9                    THE COURT:  Thank you.

10                    THE WITNESS:  I'm sorry, your Honor.

11 Let me rephrase.  This is Surgical Quality Improvement

12 Program.  This is a repository in the National Surgery

13 Office.  They issued, every three months, on all the

14 surgeries performed across the country in the VA

15 system, the (inaudible) and the complications.

16                    Complications are documented in the VA

17 Surgical Quality Improvement Program through National

18 Surgery Office.  This is an official report.  I

19 submitted this so-and-so day, this surgery that you

20 mentioned.  So they pointed out, it is not reportable.

21                    So all the surgeons -- not only me --

22 all the surgeons in my division, I gave the entire

23 report.  So all my colleagues, urology colleagues who

24 had complications or do not have complications -- so

25 when was the surgery, the date of surgery, who is the

1  surgeon, what has been done, the surgical procedure,

2  and the complications.

3            This is the report, the VA Surgical

4  Quality Improvement Program.  We all go by that, and so

5  that is the standard across the country, not in the

6  Dallas VA Medical Center.  And it's managed by National

7  Surgery Office.

8      Q.   (By Ms. Velasquez)  So if I can turn your

9  attention to -- this the Complainant's Exhibit G here.

10  Do you see the document in front of you here?

11      A.   Yes.  This is what I was talking about.  So

12  the date, and the procedure, and who the attending

13  surgeon is, and the (CTP) codes, and the (inaudible)

14  course, and the morbidity, and the complications.  "No

15  complications."  "No complications."

16            This is how they report it.  Yes.  This is

17  the one.  This is an official complications report.

18      Q.   So with this report here, is this limited to

19  the Dallas VA here?  What areas does it cover?

20                 MR. WALKER:  Objection.  Lack of

21  foundation.  Sorry.

22                 THE WITNESS:  This report --

23                 THE COURT:  Dr. Mandalapu, when you

24  hear an objection, just let me address it before you go

25  on, please.

```
 1                      THE WITNESS:  Sorry.

 2                      THE COURT:  Yes.  If you could, I will

 3  go ahead and sustain that objection.  So Ms. Velasquez,

 4  if you could please lay a foundation regarding this

 5  witness's knowledge of this document.

 6                      THE COURT REPORTER:  Excuse me.

 7  Sorry.  I picked a bad time to interrupt.  Please,

 8  Doctor, in the future, try to slow down a bit and keep

 9  your voice up.  I'm having a bit of trouble hearing

10  you.  Nothing particular, just try to be a bit more

11  slow, please.

12                      THE WITNESS:  Sorry.

13                      THE COURT REPORTER:  That's okay.

14  Thank you.

15      Q.   (By Ms. Velasquez)  Have you seen this report

16  before?

17      A.   Is this question to me?

18      Q.   Yes.

19      A.   This is the report that we follow.  This is

20  the report that we present in our morbidity and

21  mortality conferences.  We go by this.  We -- all the

22  surgeons -- so the surgeons named here, all of them

23  will see this surgery -- this list, who has the

24  complications, who doesn't have complications.

25                      All the people -- all the people in the
```

1   supervisory line knew.  This report is a copy to all of

2   them.  So if there is a complication, it should be

3   reported here.  So it is clearly -- some complications

4   are not reportable because they're minor.  The one

5   showing 10-6-21, that's (inaudible), so not reported.

6   Not tracked.

7           That's a minor procedure, minor thing.  They

8   don't document everything.  So in the hospital,

9   surgical course, in the event, that deviation will be

10  reported.  So -- and that is the documentation all

11  across the country in the VA system.

12      Q.   So where does this report come from?

13      A.   National Surgery Office.  They send out every

14  three months to the other surgeons.

15      Q.   And who compiled this report?

16      A.   I think the National Surgery Office

17  organization.  So all the surgeons, they receive the

18  schedules and what were the surgeries.

19          So they track this, because it's -- the VA

20  Hospital is a national network.  They document which

21  hospital has what surgeries are performing, and who's

22  performing, and what their outcome is.  It is a quality

23  control system.  It is a -- the National Surgery Office

24  organizes this.  We go by this.  It's the gold

25  standard.

**<u>Exhibit G</u>**

National Surgery Office (NSO) issued
VASQIP surgical complications Report

**VASQIP Report_UROLOGY MORBIDITY FY - 2022**

| DATE OF OR | PROCEDURE | ATTENDING | CPT CODES | MORBIDITY |
|---|---|---|---|---|
| | CASES REVIEWED 11/8/2021 - 11/21/2021 | | | |
| 10/1/21 | CYSTOSCOPY / LEFT RETROGRADE PYELOGRAM / BLADDER BX / BLADDER FULGURATION | KIM | 52234/74420 | NO COMPLICATIONS |
| 10/4/21 | TRANSURETHRAL RESECTION OF BLADDER TUMOR | UHLENHUTH | 52235 | NO COMPLICATIONS |
| 10/5/21 | RIGHT ROBOTIC-ASSISTED RADICAL PROSTATECTOMY / BILATERAL PELVIC LYMPH NODE DISSECTION | GAHAN | 55866/S2900 | NO COMPLICATIONS |
| 10/6/21 | LEFT ROBOTIC-ASSISTED PARTIAL NEPHRECTOMY | GAHAN | 50543/76998/S2900 | NOT REPORTED NOR TRACKED BY VASQIP: POST-OP ILEUS |
| 10/7/21 | TRANSURETHRAL RESECTION OF BLADDER TUMOR | KIM | 52240 | NO COMPLICATIONS |
| 10/13/21 | HOLIUM LASER ENUCLEATION OF PROSTATE / TRANSURETHRAL RESECTION OF PROSTATE | GAHAN | 52649 | NO COMPLICATIONS |
| 10/13/21 | TRANSURETHRAL RESECTION OF BLADDER TUMOR | KIM | 52234 | NO COMPLICATIONS |
| 10/13/21 | HOLMIUM LASER ENUCLEATION OF PROSTATE / TRANSURETHRAL RESECTION OF PROSTATE | GAHAN | 52649 | 10/22/2021 SEEN IN ED- UTI: *** FINAL CULTURE REPORT *** 10/25/2021 MJR >100,000 |

| | | | | |
|---|---|---|---|---|
| | | | | CFU/ML ESCHERICHIA COLI   >100,000 CFU/ML KLEBSIELLA PNEUMONIAE  - ANTIBIOTICS GIVEN |
| 10/13/21 | RIGHT SPERMATOCELECTOMY | KIM | 54840 | NO COMPLICATIONS |
| 10/13/21 | HOLEP LEFT TO RIGHT LATERAL LOBE / TURP TO LEFT LATERAL LOBE | GAHAN | 52649 | NO COMPLICATIONS |
| | CASES REVIEWED 11/22/2021 - 12/5/2021 | | | |
| 10/18/21 | TRANSURETHRAL RESECTION OF PROSTATE | UHLENHUTH | 52601 | NO COMPLICATIONS |
| 10/18/21 | TRANSURETHRAL RESECTION OF PROSTATE | UHLENHUTH | 52601 | NO COMPLICATIONS |
| 10/18/21 | TRANSURETHRAL RESECTION / INCISION OF PROSTATE | UHLENHUTH | 52601 | NO COMPLICATIONS |
| 10/19/21 | ROBOTIC-ASSISTED SIMPLE PROSTATECTOMY | GAHAN | 55866/52310/S2900 | NO COMPLICATIONS |
| 10/20/21 | LEFT RADICAL NEPHRECTOMY ROBOTIC-ASSISTED | GAHAN | 50545/S2900 | NO COMPLICATIONS |
| 10/20/21 | LEFT ROBOTIC-ASSISTED PARTIAL NEPHRECTOMY | GAHAN | 50543/S2900 | NO COMPLICATIONS |
| 10/20/21 | TRANSURETHRAL RESECTION OF PROSTATE | KIM | 52601 | NO COMPLICATIONS |
| | CASES REVIEWED 12/6/2021 - 12-19/2021 | | | |

| 10/25/21 | TRANSURETHRAL RESECTION OF BLADDER TUMOR/CYSTOSCOPY/FULGURATION | UHLENHUTH | 52240 | NO COMPLICATIONS |
|---|---|---|---|---|
| 10/26/21 | ROBOTIC-ASSISTED LAPAROSCOPIC RADICAL PROSTATECTOMY, BPLND | GAHAN | 55866/S2900/38571 | NO COMPLICATIONS |
| 10/26/21 | ROBOTIC-ASSISTED SIMPLE PROSTATECTOMY | GAHAN | 55866/S2900 | NO COMPLICATIONS |
| 10/27/21 | ROBOTIC-ASSISTED LAPAROSCOPIC RADICAL PROSTATECTOMY & BPLND | GAHAN | 55866/38571/S2900 | NO COMPLICATIONS |
| 10/27/21 | TRANSURETHRAL RESECTION OF PROSTATE/BLADDER TUMOR | KIM | 52601 | NO COMPLICATIONS |
| 10/27/21 | TRANSURETHRAL RESECTION OF PROSTATE / LEFT RETROGRADE PYELOGRAM | KIM | 52601/52005/74420 | NO COMPLICATIONS |
| 10/27/21 | TRANSURTHERAL RESECTION OF PROSTATE / CYSTOSCOPY | KIM | 52601 | NO COMPLICATIONS |
| 10/28/21 | CYSTOSCOPY / TURBT/TRANSURETHRAL RESECTION OF PROSTATIC LESION / LEFT RETROGRADE PYELOGRAM / LEFT URETERAL STENT PLACEMENT / RESECTION OF LEFT URETERAL ORIFICE | CROTTY | 52354/52235/74420 | NO COMPLICATIONS |
| 11/3/21 | TRANSURETHRAL RESECTION OF BLADDER TUMOR | KIM | 52240 | NO COMPLICATIONS |
| 11/3/21 | ROBOTIC-ASSISTED SIMPLE PROSTATECTOMY | GAHAN | 55866/S2900 | NO COMPLICATIONS |

| 11/3/21 | TRANSURETHRAL RESECTION OF BLADDER TUMOR | KIM | 27685/27704 | NO COMPLICATIONS |
|---|---|---|---|---|
| 11/3/21 | ROBOTIC-ASSISTED LEFT RADICAL NEPHRECTOMY | GAHAN | 50545/S2900 | NO COMPLICATIONS |
| 11/8/21 | TRANSURETHRAL RESECTION OF PROSTATE | UHLENHUTH | 52601 | NO COMPLICATIONS |
| 11/8/21 | TRANSURETHRAL RESECTION OF PROSTATE | UHLENHUTH | 52601 | NOT REPORTED TO VASQIP NOR TRACKED BY VASQIP: 12/12/2021 READMITTED FOR HEMATURIA TO OR FOR CYSTO CLOT EVACUATION |
| 11/8/21 | TRANSURETHRAL RESECTION OF BLADDER TUMOR | UHLENHUTH | 52235 | NO COMPLICATIONS |
| 11/8/21 | TRANSURETHRAL RESECTION OF BLADDER TUMOR | UHLENHUTH | 52235 | NO COMPLICATIONS |
| 11/9/21 | ROBOTIC-ASSISTED RADICAL PROSTETECOMY | GAHAN | 55866/S2900 | NO COMPLICATIONS |
| 11/9/21 | ROBOTIC-ASSISTED RADICAL PROSTETECOMY | GAHAN | 55866/S2900 | NO COMPLICATIONS |
|  |  |  |  |  |
|  | CASES REVIEWED 12/27/2021 - 1/9/2022 |  |  |  |
| 11/10/21 | RIGHT ROBOTIC-ASSISTED PARTIAL NEPHRECTOMY | GAHAN | 50543/S2900 | NO COMPLICATIONS |

| 11/10/21 | LEFT ROBOTIC-ASSISTED PARTIAL NEPHRECTOMY | GAHAN | 50543/S2900 | NO COMPLICATIONS |
|---|---|---|---|---|
| 11/15/21 | TURBT | UHLENHUTH | 52234 | NO COMPLICATIONS |
| 11/15/21 | TRANSURETHRAL RESECTION OF PROSTATE | UHLENHUTH | 52601 | NO COMPLICATIONS |
| | | | | |
| | CASES REVIEWED 1/10/2022 - 1/23/2022 | | | |
| 11/16/21 | LEFT ROBOTIC-ASSISTED PARTIAL NEPHRECTOMY | GAHAN | 50543/S2900 | NO COMPLICATIONS |
| 11/18/21 | BIPOLAR TRANSURETHRAL RESECTION OF PROSTATE | KIM | 52601 | NO COMPLICATIONS |
| 11/19/21 | CYSTO/IRRIGATION & EVACUATION OF CLOTS / TURBT LARGE (GREATER THAN 5.0 CM) | UHLENHUTH | 52240 | NO COMPLICATIONS |
| 11/24/21 | ROBOTIC-ASSISTED RADICAL PROSTATECTOMY WITH BILATERAL LYMPH NODE DISSECTION | GAHAN | 55866/38571/S2900 | NO COMPLICATIONS |
| 11/29/21 | CYSTOSCOPY / TURBT | MANDALAPU | 52234 | NO COMPLICATIONS |
| 11/29/21 | CYSTOSCOPY / TURBT | MANDALAPU | 52234 | NO COMPLICATIONS |
| 11/30/21 | HOLIUM LASER ENUCLEATION OF PROSTATE & TURP | GAHAN | 52649 | NO COMPLICATIONS |
| 11/30/21 | HOLMIUM LASER ENUCLEATION OF PROSTATE & TURP | GAHAN | 52649 | NO COMPLICATIONS |
| 11/30/21 | HOLIUM LASER ENUCLEATION OF PROSTATE & TURP | GAHAN | 52649 | NOT REPORTED NOR TRACKED BY VASQIP: |

| | | | | |
|---|---|---|---|---|
| | | | | ACUTE LIMB ISCHEMIA- TO OR WITH VASCULAR SURGERY |
| 12/1/21 | ROBOTIC-ASSISTED LAPAROSCOPIC PROSTATECTOMY & BLND | GAHAN | 55866/38571/S2900 | SSI: ORGAN/SPA CE INFECTION PER DR. GAHAN |
| 12/1/21 | LEFT HYDROCELECTOMY | KIM | 55040 | NO COMPLICATI ONS |
| 12/1/21 | LEFT ROBOTIC-ASSISTED PARTIAL NEPHRECTOMY | GAHAN | 50543/S2900 | NO COMPLICATI ONS |
| | CASES REVIEWED 1/24/2022 - 2/6/2022 | | | |
| 12/6/21 | TRANSURETHRAL RESECTION OF PROSTATE / CIRCUMCISION | UHLENHU TH | 52601/54161 | NO COMPLICATI ONS |
| 12/6/21 | TRANSURETHRAL RESECTION INCISION OF THE PROSTATE AND TRANSURETHRAL RESECTION OF PROSTATE | UHLENHU TH | 52601/52450 | NO COMPLICATI ONS |
| 12/6/21 | TRANSURETHRAL RESECTION OF BLADDER TUMOR | UHLENHU TH | 52235 | NO COMPLICATI ONS |
| 12/7/21 | ROBOTIC-ASSISTED LAPAROSCOPIC RADICAL PROSTATECTOMY / BPLND | GAHAN | 55866/38571/S2900 | NO COMPLICATI ONS |
| 12/8/21 | RIGHT ROBOTIC-ASSISTED RADICAL NEPHRECTOMY | GAHAN | 50545/S2900 | |
| 12/8/21 | TRANSURETHRAL RESECTION OF BLADDER TUMOR | KIM | 52234 | NO COMPLICATI ONS |
| 12/13/21 | TRANSURETHRAL RESECTION OF PROSTATE | UHLENHU TH | 52601 | NO COMPLICATI ONS |

| | | | | |
|---|---|---|---|---|
| 12/13/21 | TRANSURETHRAL RESECTION OF PROSTATE | UHLENHUTH | 52601 | NO COMPLICATIONS |
| 12/13/21 | TRANSURETHRAL RESECTION OF PROSTATE & TRANSURETHRAL INCISION OF PROSTATE | UHLENHUTH | 52601 | NO COMPLICATIONS |
| 12/14/21 | RIGHT ROBOTIC PARTIAL NEPHRECTOMY | GAHAN | 50543/S2900 | NO COMPLICATIONS |
| 12/14/21 | ROBOTIC-ASSISTED LAPAROSCOPIC RADICAL PROSTATECTOMY / BPLND | GAHAN | 55866/38571/S2900 | NO COMPLICATIONS |
| 12/15/21 | RIGHT ROBOTIC RADICAL NEPHRECTOMY | GAHAN | 50545/S2900 | NO COMPLICATIONS |
| 12/15/21 | ROBOTIC-ASSISTED LAPAROSCOPIC RADICAL PROSTATECTOMY, BPLND | GAHAN | 55866/38571/S2900 | NO COMPLICATIONS |
| 12/16/21 | CYSTOSCOPY / TRANSURETHRAL RESECTION OF PROSTATE | CROTTY | 52601 | NO COMPLICATIONS |
| 12/17/21 | TRANSURETHRAL RESECTION OF BLADDER TUMOR | MANDALAPU | 52235 | 1/17/2022 PRESENTED TO ED-C/O OF DYSPNEA TESTED POSITIVE FOR COVID WAS D/C TO HOME |
| 12/17/21 | RIGHT HYDROCELECTOMY | MANDALAPU | 55040 | NO COMPLICATIONS |
| 12/20/21 | TRANSURETHRAL RESECTION OF PROSTATE | UHLENHUTH | 52601 | NO COMPLICATIONS |
| 12/20/21 | TRANSURETHRAL RESECTION OF BLADDER TUMOR | UHLENHUTH | 52601 | NO COMPLICATIONS |
| 12/22/21 | ROBOTIC-ASSISTED LAPAROSCOPIC | GAHAN | 55866/38571/S2900 | 1/6/2022 READMIT |

| | | | | |
|---|---|---|---|---|
| | RADICALPROSTATECTOMY / BPLND | | | C/C DIARRHEA C-DIFF NEGATIVE |
| 12/22/21 | ROBOTIC-ASSISTED SIMPLE PROSTATECTOMY | GAHAN | 55866/51050/S2900 | 12/27/2021 OUT-OF-OR UNPLANNED INTUBATION /ACLS DONE/ CODE CALLED |
| 12/27/21 | CYSTOSCOPY WITH FULGURATION | KIM | 52234 | NO COMPLICATIONS |
| | | | | |
| | CASES REVIEWED 2/7/2022 - 2/21/2022 | | | |
| 12/27/21 | TRANSURETHRAL RESECTION OF BLADDER TUMOR | KIM | 52234 | NO COMPLICATIONS |
| 12/28/21 | LEFT ROBOTIC-ASSISTED RADICAL NEPHROURETERECTOMY | GAHAN | 50548/S2900 | NO COMPLICATIONS |
| 12/29/21 | ROBOTIC-ASSISTED LAPAROSCOPIC RADICAL PROSTATECTOMY / BPLND | GAHAN | 55866 (ROBOT USED)/38571 | NO COMPLICATIONS |
| 1/11/22 | TRANSURETHRAL RESECTION OF PROSTATE | GAHAN | 52601 | NO COMPLICATIONS |
| 1/12/22 | ROBOTIC-ASSISTED PARTIAL NEPHRECTOMY | GAHAN | 50543/S2900 | NO COMPLICATIONS |
| 1/12/22 | CYSTOSCOPY /DIRECT VISION INTERNAL URETHROTOMY / TRANSURETHRAL INCISION OF BLADDER NECK CONTRACTURE | KIM | 52640 | NO COMPLICATIONS |
| 1/12/22 | MEATOPLASTY / CYSTO / TURBT | KIM | 53450/52234 | NO COMPLICATIONS |

| | | | | |
|---|---|---|---|---|
| | CASES REVIEWED 2/21/2022 - 3/6/2022 | | | |
| 1/18/22 | ROBOTIC-ASSISTED-ASSISTED RADICAL CYSTECTOMY / PELVIC LYMPH NODE DISSECTION / ILIEAL CONDUIT FORMATION | GAHAN | 50820/38571/51999/S2900 | NO COMPLICATIONS |
| 1/19/22 | LEFT ROBOTIC RADICAL NEHPROURETERECTOMY | GAHAN | 50548/S2900 | NO COMPLICATIONS |
| 1/21/22 | TRANSURETHRAL RESECTION OF BLADDER TUMOR | MANDALA PU | 52240 | NO COMPLICATIONS |
| 1/24/22 | SCROTAL EXPLORATION& EVACUATION OF HEMATOMA | UHLENHUTH | 55110 | NO COMPLICATIONS |
| 1/25/22 | LEFT ROBOTIC RADICAL NEHPROURETERECTOMY | GAHAN | 50545/S2900 | NO COMPLICATIONS |
| 1/27/22 | CYSTOSCOPY / TURBT / CYSTOGRAM / RIGHT RETROGRADE PYELOGRAM / RIGHT URETERAL STENT REMOVAL / RIGHT DIAGNOSTIC URETEROSCOPY / RIGHT URETERAL STENT INSERTION | CROTTY | 52332/52234/51600/74455/   52351 | NO COMPLICATIONS |
| 1/26/22 | ROBOTIC-ASSISTED-ASSISTED RADICAL CYSTECTOMY / PELVIC LYMPH NODE DISSECTION / ILIEAL CONDUIT FORMATION | GAHAN | 50820/38571/51999/S2900 | NO COMPLICATIONS |
| | | | | |
| | CASES REVIEWED 3/7/2022 - 3/20/2022 | | | |
| 1/28/22 | TRANSURETHRAL RESECTION OF BLADDER TUMOR / RIGHT | MANDALA PU | 52332/52234/74420 | NO COMPLICATIONS |

95

| | RETROGRADE PYELOGRAM / RIGHT URETERAL STENT PLACEMENT | | | |
|---|---|---|---|---|
| 1/28/22 | LEFT HYDROCELECTOMY | MANDALA PU | 55040 | NO COMPLICATIONS |
| 1/31/22 | TURBT | UHLENHUTH | 52234 | NO COMPLICATIONS |
| 2/1/22 | LEFT ROBOTIC-ASSISTED PARTIAL NEPHRECTOMY / INTRA-OPERATIVE ULTRASOUND | GAHAN | 50543/76998/S2900 | NO COMPLICATIONS |
| 2/2/22 | ROBOTIC-ASSISTED RIGHT NEPHROURETERECTOMY | GAHAN | 50548/S2900 | NO COMPLICATIONS |
| 2/7/22 | CYSTOSCOPY / TRANSURETHRAL RESECTION OF BLADDER TUMOR | UHLENHUTH | 52234 | NO COMPLICATIONS |
| 2/7/22 | LEFT HYDROCELECTOMY | UHLENHUTH | 55040 | NO COMPLICATIONS |
| 2/8/22 | ROBOTIC-ASSISTED RADICAL PROSTATECTOMY / BILATERAL PELVIC LYMPH NODE DISSECTION | GAHAN | 55866/38571/S2900 | NO COMPLICATIONS |
| 2/9/22 | RETZIUS-SPARING / ROBOTIC-ASSISTED RADICAL PROSTATECTOMY / BILATERALPELVIC LYMPH NODE DISSECTION | GAHAN | 55866/38751/S2900 | NO COMPLICATIONS |
| 2/9/22 | CYSTOSCOPY / MONOPOLAR TRANSURETHRAL RESECTION OF PROSTATE | KIM | 52601 | NO COMPLICATIONS |
| | | | | |
| | CASES REVIEWED 3/21/2022 - 4/3/2022 | | | |
| 2/15/22 | ROBOTIC-ASSISTED RADICAL PROSTATECTOMY, BPLND | MANDALA PU | 55866/38571/S2900 | NO COMPLICATIONS |

| 2/16/22 | CYSTOSCOPY / TRANSURETHRAL RESECTION OF BLADDER LESION | KIM | 52235 | NO COMPLICATIONS |
|---|---|---|---|---|
| 2/17/22 | CYSTOSCOPY / TRANSURETHRAL RESECTION OF BLADDER NECK CONTRACTURE | CROTTY | 52500 | NO COMPLICATIONS |
| 2/18/22 | CYSTOSCOPY / TRANSURETHRAL RESECTION OF BLADDER TUMOR | MANDALA PU | 52235 | NO COMPLICATIONS |
| 2/18/22 | CYSTOSCOPY / TRANSURETHRAL RESECTION OF BLADDER TUMOR | MANDALA PU | 52235 | NO COMPLICATIONS |
| | CASES REVIEWED 4/4/2022 - 4/17/2022 | | | |
| 2/22/22 | ROBOTIC-ASSISTED RIGHT NEPHRECTOMY | GAHAN | 50545/S2900 | 3/22/2022 READMISSION WITHIN 30 DAYS OF OR FOR POSSIBLE PE-NO PE FOUND |
| 2/23/22 | ROBOTIC -ASSISTED RADICAL CYSTECTOMY & BILATERAL PELVIC LYMPH NODE DISSECTION &ILEAL CONDUIT URINARY DIVERSION | GAHAN | 50820/38571/51999/S2900 | PT STATED WAS ADMITTED TO OSH FOR FAILURE TO THRIVE & AKI / NO DOCUMENTS FOUND IN CPRS TO VERIFY.  NO COMPLICATIONS |
| 2/25/22 | CYSTOSCOPY / TRANSURETHRAL | MANDALA PU | 52235 | NO COMPICATIONS |

| | RESECTION OF BLADDER TUMOR | | | |
|---|---|---|---|---|
| 2/25/22 | CYSTOSCOPY / TRANSURETHRAL RESECTION OF BLADDER TUMOR | MANDALA PU | 52234 | NO COMPICATI ONS |
| 2/25/22 | CYSTOSCOPY / TRANSURETHRAL RESECTION OF BLADDER TUMOR/MINI TRANSURETHRAL SECTION OF PROSTATE | MANDALA PU | 52235 | NO COMPICATI ONS |
| 2/25/22 | CYSTOSCOPY / TRANSURETHRAL RESECTION OF BLADDER TUMOR LARGE | MANDALA PU | 52235 | NO COMPICATI ONS |
| 2/28/22 | CYSTOSCOPY /TRANSURETHRAL RESECTION OF LARGE BLADDER TUMOR /CYSTOLITHOLOPAXY | UHLENHU TH | 52240 | NO COMPICATI ONS |
| 3/1/22 | ROBOTIC-ASSISTED SIMPLE PROSTATECTOMY | MANDALA PU | 55866/S2900 | NO COMPICATI ONS |
| 3/1/22 | HOLMIUM LASER ENUCLEATION OFPROSTTE | GAHAN | 52649 | 3/18/2022 UTI - URINE CULTURE >100,000 CFU/ML KLEBSIELLA AEROGENES |
| 3/2/22 | ROBOTIC ASSISTED LEFT URETERAL REIMPLANT | GAHAN | 50948/S2900 | NO COMPICATI ONS |
| 3/2/22 | BILATERAL RADICAL NEPHRECTOMY | GAHAN | 50220 | NO COMPICATI ONS |
| 3/3/22 | RE-TRANSURETHRALL RESECTION OF BLADDER TUMOR | CROTTY | 52234 | NO COMPICATI ONS |
| 3/3/22 | EXPLANT OF ARTIFICIAL URINARY SPHINCTER | MANDALA PU | 53446 | NO COMPICATI ONS |

| 3/4/22 | CYSTOSCOPY / TRANSURETHRAL RESECTION OF BLADDER TUMOR MEDIUM | MANDALA PU | 52235 | NO COMPICATI ONS |
|---|---|---|---|---|
| 3/4/22 | CYSTOSCOPY WITH URETERAL STENT REMOVAL / TURBT SMALL / URETEROSCOPY DIAGNOSTIC | MANDALA PU | 52310/52234/52351 | NO COMPICATI ONS |
| 3/4/22 | CYSTOSCOPY / TRANSURETHRAL RESECTION OF BLADDER TUMOR LARGE | MANDALA PU | 52240 | NO COMPICATI ONS |
| 3/7/22 | CYSTOSCOPY / TRANSURETHRAL RESECTION OF BLADDER LESION | UHLENHU TH | 52235 | NO COMPICATI ONS |
| | CASES REVIEWED 4/18/2022 - 5/1/2022 | | | |
| 3/8/22 | CYSTOSCOPY /  ROBOT-ASSISTED SIMPLE PROSTATECTOMY | GAHAN | 55821/S2900 | NO COMPLICATI ONS |
| 3/9/22 | RIGHT ROBOT-ASSISTED PARTIAL NEPHRECTOMY | GAHAN | 50543/S2900 | NO COMPLICATI ONS |
| 3/9/22 | ROBOT-ASSISTED SIMPLE PROSTATECTOMY | GAHAN | 55866/S2900 | NO COMPLICATI ONS |
| 3/10/22 | CYSTOSCOPY /  COLD BUP BLADDER BIOPSY / FULGURATION OF BIOPSY SITE | CROTTY | 52235 | NO COMPLICATI ONS |
| 3/10/22 | CYSTOSCOPY / TRANSURETHRAL RESECTION OF A BLADDER TUMOR / BLADDER BIOPSY | CROTTY | 52234 | NO COMPLICATI ONS |
| 3/11/22 | CYSTOSCOPY/TRANSURET HRAL BIOPSY OF BLADDER TUMOR | MANDALA PU | 52240 | NO COMPLICATI ONS |

| 3/11/22 | CYSTOSCOPY, TRANSURETHRAL RESECTION OF BLADDER TUMOR / MEDIUM | MANDALA PU | 52235 | NO COMPLICATIONS |
|---------|---|---|---|---|
| 3/11/22 | CYSTOSCOPY / MONOPOLAR TRANSURETHRAL RESECTION OF PROSTATE | MANDALA PU | 52601 | NO COMPLICATIONS |
| 3/14/22 | CYSTOSCOPY / MONOPOLAR TRANSURETHRAL RESECTION OF PROSTATE | UHLEHUTH | 52601 | NO COMPLICATIONS |
| 3/15/22 | ROBOTIC-ASSISTED RADICAL PROSTATECTOMY WITH BILATERAL PELVIC LYMPH NODE DISSECTION | MANDALA PU | 55866/38571/S2900 | NO COMPLICATIONS |
| 3/15/22 | HOLMIUMLASER ENUCLEATION OF THE PROSTATE AND TRANSURETHRAL RESECTION OF THE PROSTATE | GAHAN | 52649 | 4/3/2022 SYMPTOMATIC UTI - ESCHERICHIA COLI >100,000 FOUND IN URINE CULTURE |
| 3/16/22 | ROBOTIC ASSISTED RADICAL PROSTATECTOMY& BILATERAL PELVIC LYMPH NODE DISSECTION | GAHAN | 55866/38571/S2900 | NO COMPLICATIONS |
| 3/16/22 | BIPOLAR TRANSURETHRAL RESECTION OF PROSTATE AND HOLMIUM LASER ENUCLEATION OF PROSTATE | GAHAN | 52649 | NO COMPLICATIONS |
| 3/17/22 | BLUE LIGHT CYSTOSCOPY/ BLADDER BIOPSY-FULGURATION | CROTTY | 52234 | NO COMPLICATIONS |
| 3/17/22 | BLUE LIGHT CYSTOSCOPY/ BLADDER BIOPSY-FULGURATION | CROTTY | 52234 | NO COMPLICATIONS |
|  |  |  |  |  |

| | CASES REVIEWED 5/2/2022 - 5/15/2022 | | | |
|---|---|---|---|---|
| 3/18/22 | CYSTOSCOPY / TRANSURETHRAL RESECTION OF BLADDER TUMOR, MEDIUM | MANDALA PU | 52235 | NO COMPLICATIONS |
| 3/18/22 | CYSTOSCOPY / TRANSURETHRAL RESECTION OF BLADDER TUMOR, MEDIUM | MANDALA PU | 52235 | NO COMPLICATIONS |
| 3/21/22 | CYSTOSCOPY / MONOPOLAR TRANSURETHRAL RESECTION OF PROSTATE | UHLENHUTH | 52601 | NO COMPLICATIONS |
| 3/22/22 | ROBOTIC-ASSISTED RADICAL PROSTATECTOMY / BPLND | GAHAN | 55866/38571/S2900 | NO COMPLICATIONS |
| 3/22/22 | ROBOTIC-ASSISTED SIMPLE PROSTATECTOMY /LYSIS OF ADHESIONS | GAHAN | 55866/S2900 | NO COMPLICATIONS |
| 3/23/22 | RIGHT ROBOT-ASSISTED PARTIAL NEPHRECTOMY | GAHAN | 50543/76998/S2900 | NO COMPLICATIONS |
| 3/23/22 | LEFT SIMPLE ORCHIECTOMY / RIGHT ORCHIDOPEXY | KIM | 54640/54520 | NO COMPLICATIONS |
| 3/24/22 | BLUE LIGHT CYSTOSCOPY / BLADDER BIOPSY / FULGURATION | CROTTY | 52234 | NO COMPLICATIONS |
| 3/25/22 | CYSTOSCOPY / TRANSURETHRAL RESECTION OF BLADDER TUMOR, MEDIUM | MANDALA PU | 52235 | NO COMPLICATIONS |
| 3/25/22 | EXPLANATION OF ARTIFICIAL URINARY SPHINCTER CUFF, RESERVOIR, PUMP | MANDALA PU | 53446 | NO COMPLICATIONS |
| 3/28/22 | CYSTOSCOPY / TRANSURETHRAL RESECTION OF BLADDER TUMOR, MEDIUM | UHLENHUTH | 52235 | NO COMPLICATIONS |

| 3/28/22 | CYSTOSCOPY/MONOPOLAR TRANSURETHRAL RESECTION OF PROSTATE | UHLENHUTH | 52601 | NO COMPLICATIONS |
|---|---|---|---|---|
| 3/29/22 | ROBOTIC-ASSISTED LAPAROSCOPIC RADICAL PROSTATECTOMY, BILATERAL PELVIC LYMPH NODE DISSECTION | MANDALAPU | 55866/38571/S2900 | NO COMPLICATIONS |
| 3/29/22 | CYSTOSCOPY / HOLMIUM LASER ENUCLEATION OF PROSTATE | GAHAN | 52649 | NO COMPLICATIONS |
| 3/30/22 | LEFT ROBOTIC-ASSISTED PARTIAL NEPHRECTOMY THRU RETROPERITONEAL APPROACH | GAHAN | 50543/S2900 | NO COMPLICATIONS |
|  | CASES REVIEWED 5/16/2022 - 5/29/2022 |  |  |  |
| 4/1/22 | CYSTOSCOPY / BLADDER BIOPSY / FULGRATION | MANDALAPU | 52234 | NO COMPLICATIONS |
| 4/1/22 | CYSTOSCOPY / TRANSURETHRAL RESECTION OF BLADDER TUMOR | MANDALAPU | 52234 | NO COMPLICATIONS |
| 4/1/22 | CYSTOSCOPY / TRANSURETHRAL RESECTION OF BLADDER TUMOR / BIOPSY PROSTATIC URETHRA | MANDALAPU | 52214/52235 | NO COMPLICATIONS |
| 4/4/22 | RIGHT SPERMATOCELECTOMY | UHLENHUTH | 54840 | NO COMPLICATIONS |
| 4/5/22 | ROBOTIC-ASSISTED RADICAL PROSTATECTOMY & BILATERAL PELVIC LYMPH NODE DISSECTION / BILATERAL NERVE SPARING | MANDALAPU | 55866/38571/S2900 | NO COMPLICATIONS |
| 4/5/22 | ROBOTIC-ASSISTED SIMPLE PROSTATECTOMY / VASECTOMY | MANDALAPU | 55821/55250/S2900 | NO COMPLICATIONS |
| 4/6/22 | ROBOTIC-ASSISTED RADICAL PROSTATECTOMY | GAHAN | 55866/38751/S2900 |  |

| | & BILATERAL PELVIC LYMPH NODE DISSECTION / NERVE SPARING ON RIGHT / NON-NERVE SPARING ON LEFT | | | |
|---|---|---|---|---|
| | | | | |
| | CASES REVIEWED 5/30/2022 - 6/12/2022 | | | |
| 4/8/22 | TRANSURETHERAL RESECTION OF PROSTATE | MANDALA PU | 52601 | NO COMPLICATIONS |
| 4/8/22 | TRANSURETHERAL RESECTION OF PROSTATE | MANDALA PU | 52235 | NO COMPLICATIONS |
| 4/11/22 | TRANSURETHERAL RESECTION OF PROSTATE | UHLENHUTH | 52234 | NO COMPLICATIONS |
| 4/11/22 | TRANSURETHERAL RESECTION OF PROSTATE | UHLENHUTH | 52601 | NO COMPLICATIONS |
| 4/12/22 | RETZIUS-SPARING, ROBOTIC-ASSISTED RADICAL PROSTATECTOMY | GAHAN | 55866 / S2900 | NO COMPLICATIONS |
| 4/12/22 | ROBOTIC-ASSISTED RADICAL PROSTATECTOMY / BPLND | GAHAN | 55866/38571/S2900 | NO COMPLICATIONS |
| 4/13/22 | ROBOTIC-ASSISTED LEFT PARTIAL NEPHRECTOMY | GAHAN | 50543/76998/S2900 | NO COMPLICATIONS |
| 4/15/22 | CYSTOSCOPY / TRANSURETHERAL RESECTION OFBLADDER TUMOR | MANDALA PU | 52235 | NO COMPLICATIONS |
| 4/19/22 | ROBOTIC-ASSISTED RIGHT NEPHROURETERECTOMY / INTRAVESICAL INSTILLATION OF CHEMOTHERAPY AGENT | MANDALA PU | 50548 | NO COMPLICATIONS |
| 4/20/22 | ROBOTIC-ASSISTED RADICAL CYSTECTOMY / ILEAL CONDUIT / BPLND | GAHAN | 50820/55821/38571 /51999    S2900 | NO COMPLICATIONS |

| 4/20/22 | CYSTOSCOPY / BLADDER BIOPSY & FULGRATION | KIM | 52235 | NO COMPLICATIONS |
|---|---|---|---|---|
| 4/21/22 | BLUE LIGHT CYSTOSCOPY WITH FIOPSY & FULGURATION | CROTTY | 52234 | NO COMPLICATIONS |
| 4/22/22 | TRANSURETHERAL RESECTION OF BLADDER TUMOR | MANDALA PU | 52235 | NO COMPLICATIONS |
| 4/22/22 | TRANSURETHREAL RESECTION OF BLADDER TUMOR | MANDALA PU | 52235 | NO COMPLICATIONS |
| 4/22/22 | TRANSURETHRAL RESECTION OF BLADDER TUMOR | MANDALA PU | 52235 | NO COMPLICATIONS |
| 4/26/22 | HOLMIUM LASER ENUCLEATION OF PROSTATE / SUPRAPUBIC TUBE PLACEMENT | GAHAN | 52649/51102 | NO COMPLICATIONS |
|  |  |  |  |  |
|  | CASES REVIEWED 6/13/2022 - 6/26/2022 |  |  |  |
| 4/26/22 | HOLMIUM LASER ENUCLEATION OF PROSTATE | GAHAN | 52649 |  |
| 4/27/22 | ROBOTIC-ASSISTED RIGHT NEPHOURETERECTOMY / INTRAVESICAL INSTILLATION OF MYTOMYCIN | GAHAN | 50548/51720/S2900 | NO COMPLICATIONS |
| 4/27/22 | TRANSURETHERAL RESECTION OF BLADDER TUMOR | GAHAN | 52235 | NO COMPLICATIONS |
| 4/29/22 | REPEAT TRANSURETHRAL RESECTION OF BLADDER TUMOR | MANDALA PU | 52235 | NO COMPLICATIONS |
| 4/29/22 | TRANSURETHRAL RESECTION OF PROSTATE | MANDALA PU | 52601 | NO COMPLICATIONS |
| 4/29/22 | LEFT HYDROCELECTOMY | MANDALA PU | 55040 | NO COMPLICATIONS |

| 4/29/22 | PENILE EXPLORATION | MANDALA PU | 54437/53505/52000 | NO COMPLICATIONS |
|---------|--------------------|-----------|-------------------|------------------|
| 5/3/22 | ROBOTIC-ASSISTED RADICAL PROSTATECTOMY / BPLND | MANDALA PU | 55866/38571/S2900 | NO COMPLICATIONS |
| 5/4/22 | RETROPERITONEAL ROBOTIC ASSISTED LEFT PARTIAL NEPHRECTOMY | GAHAN | 50543/76998/S2900 | NO COMPLICATIONS |
| 5/4/22 | ROBOTIC-ASSISTED BILATERAL PELVIC LYMPH NODE DISSECTION | GAHAN | 38571/S2900 | NO COMPLICATIONS |
| 5/5/22 | TRANSURETHRAL RESECTION OF BLADDER TUMOR | MANDALA PU | 52235 | NO COMPLICATIONS, 5/26/2022 CVA |
| 5/6/22 | CYSTOURETHROSCOPY / TRANSURETHRAL RESECTION OF BLADDER TUMOR 2 TO 5 CM | MANDALA PU | 52235 | NO COMPLICATIONS |
| 5/6/22 | BLUELIGHT CYSTOURETHROSCOPY /TRANSURETHRAL RESECTION OF BLADDER TUMOR LESS THAN 2 CM | MANDALA PU | 52234 | NO COMPLICATIONS |
| 5/6/22 | BLUELIGHT CYSTOSCOPY / BILATERAL RETROGRADE PYELOGRAMS / RIGHT DIAGNOSTIC URETEROSCOPY / PROSTATIC  URETHRAL BIOPSY / TRANSURETHRAL RESECTION OF BLADDER LESION OVERALL AREA 2 TO 5 CM | MANDALA PU | 52214/74420/52235 | NO COMPLICATIONS |
| 5/6/22 | CYSTOSCOPY / TRANSURETHERALRESECTION OF BLADDER TUMOR | MANDALA PU | 52234 | NO COMPLICATIONS |
| 5/10/22 | RETZIUS-SPARING, ROBOTIC-ASSISTED RADICAL PROSTATECTOMY / BPLND | GAHAN | 55866/38571/S2900 | NO COMPLICATIONS |

| 5/11/22 | ROBOTIC-ASSISTED RIGHT PARTIAL NEPHRECTOMY | GAHAN | 50543/S2900 | NO COMPLICATIONS |
|---------|---------|---------|---------|---------|
| 5/11/22 | ROBOTIC-ASSISTED SIMPLE PROSTATECTOMY | GAHAN | 55866/S2900 | |
| | CASES REVIEWED 6/27/2022 - 7/10/2022 | | | |
| 5/13/22 | TRANSURETHRAL RESECTION OF PROSTATE | MANDALA PU | 52601 | NOT REPORTED NOR TRACKED BY NSO INTRA-OP - POSTERIOR URETHRAL INJURY |
| 5/13/22 | TRANSURETHRAL RESECTION OF PROSTATE | MANDALA PU | 52601 | NO COMPLICATIONS |
| 5/13/22 | TRANSURETHRAL RESECTION OF BLADDER TUMOR | MANDALA PU | 52234 | NO COMPLICATIONS |
| 5/16/22 | TRANSURETHERAL RESECTION OF BLADDER TUMOR | CROTTY | 52240 | NO COMPLICATIONS |
| 5/17/22 | ROBOTIC-ASSISTED RIGHT PARTIAL NEPHRECTOMY - RETROPERITONEAL APPROACH | GAHAN | 50543/S2900 | NO COMPLICATIONS |
| 5/13/22 | TRANSURETHRAL RESECTION OF PROSTATE / TRANSURETHRAL SECTION OF BLADDER | MANDALA PU | 52601/52234 | NO COMPLICATIONS |
| 5/17/22 | ROBOTIC-ASSISTED SIMPLE PROSTATATECTOMY | GAHAN | 55821/S2900 | NO COMPLICATIONS |
| 5/18/22 | REETZIUS SPARING ROBOTIC-ASSISTED LAPAROSCOPIC PROSTATECTOMY /BPLND | GAHAN | 55866/38571/S2900 | 5/20/2022 DVT-LEFT LOWER EXTREMITY WITHIN LEFT |

| | | | | |
|---|---|---|---|---|
| | | | | SUPERFICIAL FEMORAL VEIN FROM PROXIMAL PORTION EXTENDING THRU MID AND INTO DISTAL PORTION |
| 5/18/22 | RETZIUS SPARING ROBOTIC-ASSISTED LAPAROSCOPIC PROSTATECTOMY / BPLND | GAHAN | 55866/38571/S2900 | NO COMPLICATIONS |
| | | | | |

# <u>Exhibit-H</u>

<u>Contents:</u>

1. Chief of Surgery, Dr. Modrall, under oath, testified that a summary suspension decision was made before any complaint was made.

1      A.   It is not a common occurrence in Surgical

2   Service.  I have no idea in the rest of the VA, in this

3   facility or elsewhere.

4      Q.   Got it.  So in the Surgical Service here,

5   what kinds of situations are required for a summary

6   suspension of privileges to be issued?

7      A.   So my understanding and memory from reading

8   through the regulations at that point is it's really

9   for potential imminent danger to patients.

10          I suppose there could be physical danger from

11   a sexual predator, something else that could fit in

12   that category, but I have no idea.  So as I read it, I

13   was thinking purely of a surgeon and what would have

14   their privileges suspended temporarily.

15      Q.   And when you were reviewing the policy there,

16   do you recall if there was any definition for what

17   constitutes potential imminent danger?

18      A.   I do not recall a definition.

19      Q.   Okay.  I guess -- would this have to be

20   subjective determination by the individual based on

21   your understanding, interpreting the policy?

22      A.   Yes.

23      Q.   Okay.

24      A.   That would be my understanding.

25      Q.   Okay.

1      A.    Keep in mind, this was not a unilateral

2  decision by me, because I can't even issue a summary

3  suspension.  I escalated to my supervisor, the chief of

4  staff.  Dr. Hastings was off at the time; so the acting

5  Chief of Staff, Dr. Rivera, is the person that I

6  contacted.  Ultimately, he can't issue it either.  It

7  has to be issued by the director.  So he, thereafter,

8  contacted the director independent of me.

9      Q.    And actually, that was my next question here.

10  So you're on the same track as me here.  So in terms of

11  the overall process of issuing the summary suspension,

12  based on your understanding there, the complaint goes

13  to you, you speak to your supervisor, who then has to

14  go to the director of the hospital to then issue the

15  summary suspension?  Is that a correct summary?

16      A.    Yeah, that's my understanding.  Correct.  And

17  that's what was done in this case.

18      Q.    Okay.  In this case here, this whole process

19  started because you received an e-mail from Dr. Karen

20  Crotty; is that correct?

21      A.    No, that's not how it initially started.  The

22  e-mail came after a verbal discussion in my office.

23      Q.    Would --

24      A.    So --

25      Q.    With Dr. Crotty?

```
 1       A.    Correct.

 2       Q.    Okay.  Did you conduct your own investigation

 3  into her allegations?

 4       A.    So I queried her and challenged her, and then

 5  we had a discussion, the three of us, via phone, with

 6  Dr. Rivera, and it was thereafter that this was done.

 7             Again, the summary suspension of privileges

 8  buys time for an investigation by people that are

 9  subject matter experts.  I'm not a urologist; I'm a

10  vascular surgeon.  I do know surgeons.  I do know the

11  terminology.  I do know what I would find alarming, and

12  that was what got me concerned enough to call my

13  supervisors, when I heard enough that I was very

14  concerned.

15       Q.    So I have the timeline of events here -- if I

16  understood correctly -- you mentioned that you had a

17  conversation with the three of you -- Dr. Crotty, you,

18  and Dr. Rivera.  Was that before or after the e-mail

19  Dr. Crotty sent?

20       A.    That was before.

21       Q.    Okay.

22       A.    And the reason why the conversation happened

23  over the phone at first is because we never experienced

24  it.  I didn't know what to do.  I was not aware of the

25  process of a summary suspension of privileges at all.
```

1            So I queried Dr. Rivera and said, "This is

2    the concern.  What are our options?  We need to talk

3    through those options."

4            He literally opened the regulation manual and

5    projected it on Teams where we could look at it

6    together.  He showed it to us and said, "It sounds like

7    it fits this level of concern."

8            Dr. Crotty and I agreed and said, "So we have

9    to follow this pathway."

10       Q.   So when did you have this conversation, then,

11    if you can recall the date?

12       A.   I don't recall the date, but it was -- if the

13    summary suspension was issued the following week on a

14    Monday or Tuesday, it would have been the Friday before

15    at four o'clock.  Literally, it was right at four

16    o'clock.  Dr. Crotty walked into my office and told me

17    that she had a concern.

18       Q.   So if Dr. Crotty sent the e-mail on the

19    Saturday here, it would have been -- you would have had

20    the conversation the day before?

21       A.   Correct.

22       Q.   Okay.  Do you recall whether or not

23    Dr. Mandalapu was still at the facility when you had

24    this conversation?

25       A.   I would not know.

1      Q.    Okay.  Was it ever suggested that you should

2  talk to Dr. Mandalapu about what happened?

3      A.    The whole idea of the investigation was to

4  get his side of the story as well, and outside

5  reviewers, unbiased, outside reviewers.

6      Q.    So just for clarity, you didn't think it was

7  necessary to get his opinion before you went through

8  the process of suggesting that there was a need for a

9  summary suspension?

10      A.    No, I do not think that was necessary.  In

11  fact, it was predictable what any surgeon would say in

12  that circumstance.

13      Q.    Okay.  Did you have another -- I guess, after

14  -- I know you had this meeting on Friday here, and then

15  Dr. Crotty sent that e-mail on Saturday.  Did you have

16  another meeting with Dr. Crotty regarding this

17  situation the following Monday here before reaching out

18  to Dr. Rivera or sending a formal inquiry to him?

19      A.    No.  The inquiry happened on Friday.  If

20  anything happened on Monday, I don't recall.  It was --

21  really, the ball got rolling Friday.

22          Dr. Rivera asked Dr. Crotty to send an e-mail

23  summarizing the concern and that he would take that on

24  Monday and start working through the process.  So if

25  any conversations happened Monday between me and

1    Dr. Rivera or me and Dr. Crotty, they were sort of

2    incidental, and I don't recall.

3         Q.   Okay.  So Dr. Crotty, then, was told exactly

4    what to put in that e-mail that you just referenced

5    here?

6         A.   No.  He said, "You just need to summarize" --

7    so the statement "told exactly what to put in the

8    e-mail" would be a misrepresentation.  What she was

9    told was, "I need you to summarize your concern."

10        Q.   Okay.  Perfect.  So in your affidavit here,

11   you mentioned that Dr. Mandalapu had the right to

12   appeal the summary suspension.  Is that a correct

13   understanding?

14        A.   Yes.

15        Q.   When exactly does he get this right?

16        A.   When it's presented -- when the -- when the

17   review is complete, written up, taken to the executive

18   committee, the Medical Center's Credentialing

19   Subcommittee, and they would hear both the outcome of

20   the review and the rebuttal.

21             And I don't know if -- I'm not an expert in

22   this process, but I don't know if he had the

23   opportunity for oral rebuttal or written rebuttal, but

24   I do know that he provided a written rebuttal.

25        Q.   And do you recall when that would have

# Exhibit-I

Contents:

1. On May 14, 2022, Dr. Crotty filed a complaint against Plaintiff, alleging that Plaintiff caused significant complications and recommending suspension of operative previleges. (p. 2)

   a. The first case in the complaint was scheduled as Forbidden concurrent surgery. Dr. Crotty and Dr. Gahan participated in the surgery while the Plaintiff was engaged in the concurrent Robotic surgery. However, on April 28, 2022, Dr. Crotty confirmed 'no complications.' (p. 3-5) Later, she complained of significant complications due to the plaintiff's surgical competency errors.

   b. The second case in the complaint is not a reportable complication according to the VASQIP report, and did not exist at the time of adverse decision. However, medical records, including surgical operative reports, do not reflect Dr. Crotty's allegations. (p. 6-14)

   c. The alleged complications in the complaint are assumed to have occurred in the Plaintiff's absence, and he was never notified of them. RMOs refused to disclose her complaint to the plaintiff.

| | |
|---|---|
| **From:** | Crotty, Karen L. |
| **To:** | Modrall, John G.; Hastings, Jeffrey |
| **Subject:** | Staff issue |
| **Date:** | Saturday, May 14, 2022 1:48:00 PM |
| **Importance:** | High |

Jeff and Greg

I have significant concerns regarding the surgical skills of Dr Rao Mandalapu.  He recently had an unusual complication in a relatively simple procedure.  While concerning, it wasn't such a blatant or egregious error that it required more than a closer monitoring his practice.  However yesterday, there was another complication during a common procedure that was unrecognized at the time.  If recognized at the time, it would have been addressed and had minimal impact on the patient's hospital course and minimal to no effect on long term outcome.  Since it was not recognized at the time of surgery , the patient required midnight CT scans,  manipulations of the foley by another attending, and a transfer to the SICU for closer observation.  Most providers would have recognized the problem in the OR and addressed it at the time.

Both patients are doing fine.

However because of this pattern of errors in surgical technique, I no longer have confidence in his ability to perform surgery either independently or supervising residents.   I want to remove him from the OR schedule and covering call.  (While he is unenthusiastic about seeing clinic patients other than cancer patients, I do not have concerns with the quality of his clinical care).

He is scheduled for call this upcoming week:  I will take that.

He is scheduled for the OR every other Tuesday (including the 17th)  and every Friday.  My plan was to have him cover the clinics of other providers so that Jeff and I can cover those OR days for the next few weeks so as to not inconvenience the patients who have already been pre-op'd.

What options and actions do I need to take in this situation ?
Thank you for your help and guidance.


Karen Crotty, MD FACS
Chief, Urology Section
Dallas VAMC

```
                                                                    Page:  1
--------------------------------------------------------------------------------
MEDICAL RECORD                                               OPERATION REPORT
--------------------------------------------------------------------------------
NOTE DATED: 04/28/2022 13:06  OPERATION REPORT
VISIT: 04/28/2022 13:06 CYSTO
SUBJECT: Case #: 285238

VANTHCS OPERATION NOTE

PREOPERATIVE DIAGNOSIS
History of Left ureteral injury

POSTOPERATIVE DIAGNOSIS

Same
PROCEDURES

Cystoscopy, left retrograde pyelogram, left ureteral stent exchange
SURGEON
CALEB ASHBROOK, MD

1ST ASSISTANT
NONE.

2ND ASSISTANT
NONE.

ATTENDING SURGEON.
Karen Crotty

STATEMENT OF STAFF SUPERVISION
DR. Crotty was present and scrubbed for the entire case.

ANESTHESIA
SEE DOCUMENTATION

ANESTHETIST
SEE DOCUMENTATION

ATTENDING ANESTHESIOLOGY
SEE DOCUMENTATION

ESTIMATED BLOOD LOSS
0 cc

IV FLUIDS
SEE DOCUMENTATION

COUNTS
REPORTED BY RN TO BE CORRECT AT CASE TERMINATION.

COMPLICATIONS
None

FINDINGS
There was no evidence of persistent left ureteral injury.  The distal left
                  ** THIS NOTE CONTINUED ON NEXT PAGE **
--------------------------------------------------------------------------------
                        DALLAS VA MEDICAL CENTER    Printed:09/28/2022 15:35
          DOB:                Pt Loc: OUTPATIENT                Vice SF 516
--------------------------------------------------------------------------------
```

```
                                                                    Page:  2
--------------------------------------------------------------------------------
MEDICAL RECORD                                             OPERATION REPORT
--------------------------------------------------------------------------------
04/28/2022 13:06    ** CONTINUED FROM PREVIOUS PAGE **
```

ureter was patent and contrast drained readily.  There was note of slightly
purulent appearing urine after removal of his stent.  Given this we elected
to replace a ureteral stent on a string to facilitate drainage until removal
next week

SPECIMENS
None

DRAINS
6 French X JJ stent

STATEMENT OF MEDICAL NECESSITY
Mr. ██████████ is a 59-year-old male who underwent a colorectal surgery with
bilateral finder stent placement.  This was complicated by left ureteral
perforation during placement of the left stent.  A retrograde stent was not
able to be placed, therefore the patient underwent a left percutaneous
nephrostomy tube with an antegrade stent placement.  The left nephrostomy
tube was eventually dislodged and removed, but the stent remained in place.
He presents to the operating room today to evaluate whether there is
persistent injury.

DESCRIPTION OF PROCEDURE
The patient was taken to the operating room after informed consent was
obtained and preoperative antibiotics were administered.  The patient was
placed in the dorsal lithotomy position and all pressure points were padded.
We first began the case by introducing a 21 French rigid cystoscope at which
point we identified the left ureteral stent.  The bladder was drained, and a
sensor wire was placed alongside the stent.  We confirmed appropriate
position fluoroscopically in the kidney.  At this point we then introduced a
cystoscopic stent grasper, and carefully removed the stent while ensuring the
wire remained in place.  We then placed a second wire into the kidney and
advanced a 5 French open-ended catheter into the mid ureter.  We then
performed a retrograde pyelogram, which revealed a normal collecting system.
We then pulled the 5 French open-ended catheter into the distal ureter and
shot another retrograde pyelogram, which again showed a normal ureter.  We
then removed the 5 French open-ended catheter and took persistent
fluoroscopic images of the ureter draining.  There was no evidence of a
persistent ureteral injury or tapering of the distal ureter.  We performed 15
degree oblique shots of fluoroscopy in both directions which revealed good
patency of the ureter.  After confirming appropriate ureteral patency, the
decision was made to place a 6 French X 26 cm JJ stent on a string due to
findings of slightly purulent urine on removal of the stent.  It was felt
that the larger stent that was placed may have been causing some degree of
obstruction.  We then placed the stent under fluoroscopic guidance.  We
reintroduced the rigid cystoscope into the bladder to pull the stent further
into the bladder to allow for appropriate positioning in the renal pelvis.
The case was then terminated, the strings for the ureteral stent were secured
to the patient's penis using Mastisol and Tegaderm and lidocaine jelly was
introduced into the urethra
                  ** THIS NOTE CONTINUED ON NEXT PAGE **
--------------------------------------------------------------------------------
█████,████████         DALLAS VA MEDICAL CENTER    Printed:09/28/2022 15:35
████████ DOB:████████         Pt Loc: OUTPATIENT              Vice SF 516
--------------------------------------------------------------------------------

```
                                                                    Page:  3
--------------------------------------------------------------------------------
MEDICAL RECORD                                                  OPERATION REPORT
--------------------------------------------------------------------------------
04/28/2022 13:06     ** CONTINUED FROM PREVIOUS PAGE **


DISPOSITION
PACU then home

POSTOPERATIVE PLAN
The patient will present for a postoperative visit with the urology resident
clinic on Monday or Tuesday for stent removal on a string.  The patient will
then see Dr. Crotty in 6 weeks with a renal ultrasound prior to ensure no
residual hydronephrosis is present

                    Signed by: /es/ CALEB Q ASHBROOK, MD
                                     SURGICAL RESIDENT 04/28/2022 19:24
                  Cosigned by: /es/ KAREN L CROTTY, MD
                                     PHYSICIAN 04/29/2022 10:05
```

Quick Notes Page 4

Printout

Tuesday, September 27, 2022    3:10 PM

Second cystoscopy surgical procedure in Dr.
Crotty's complaint:

Operative report: H_TURP.pdf

Anesthesia records
Post operative coarse
Post operative urinary retention
Management of post operative urinary
retention hospital staff records

```
                                                                  Page:  1
----------------------------------------------------------------------------
MEDICAL RECORD                                              OPERATION REPORT
----------------------------------------------------------------------------
NOTE DATED: 05/13/2022 09:14  OPERATION REPORT
VISIT: 05/13/2022 09:14 CYSTO
SUBJECT: Case #: 285159

VANTHCS OPERATION NOTE

PREOPERATIVE DIAGNOSIS
 Lower urinary tract symptoms, benign prostatic hyperplasia

POSTOPERATIVE DIAGNOSIS
 Same

PROCEDURES

 Transurethral Resection of the Prostate

SURGEON
CALEB ASHBROOK, MD

1ST ASSISTANT
NONE.

2ND ASSISTANT
NONE.

ATTENDING SURGEON.
Dr. Mandalapu

STATEMENT OF STAFF SUPERVISION
DR. Mandalapu  was present and scrubbed for the entire case.

ANESTHESIA
SEE DOCUMENTATION

ANESTHETIST
SEE DOCUMENTATION

ATTENDING ANESTHESIOLOGY
SEE DOCUMENTATION

ESTIMATED BLOOD LOSS
 50 cc

IV FLUIDS
SEE DOCUMENTATION

COUNTS
REPORTED BY RN TO BE CORRECT AT CASE TERMINATION.

COMPLICATIONS
 None

FINDINGS
                     ** THIS NOTE CONTINUED ON NEXT PAGE **
----------------------------------------------------------------------------
                      DALLAS VA MEDICAL CENTER   Printed:09/27/2022 15:09
                         Pt Loc: OUTPATIENT                  Vice SF 516
----------------------------------------------------------------------------
```

```
--------------------------------------------------------------------------------
MEDICAL RECORD                                                  OPERATION REPORT
--------------------------------------------------------------------------------
```

05/13/2022 09:14    ** CONTINUED FROM PREVIOUS PAGE **

 Obstructing median lobe and kissing lateral lobes s/p TURP with findings of
scattered trabeculae in the bladder.

SPECIMENS
 Prostate Chips

DRAINS
 22 Fr 3-Way Foley

STATEMENT OF MEDICAL NECESSITY

 This is a 61 year old male with BPH and LUTS refractory to DMT who was
counseled on surgical options. He elected for TURP after discussion of risks and
benefits.

DESCRIPTION OF PROCEDURE
The patient was taken to the operating room after preprocedure antibiotics had
been administered.  A surgical timeout was performed, and the patient was
intubated.  The patient was put in a dorsal lithotomy position and all pressure
points were padded.  Patient was prepped and draped in a sterile fashion.  The
procedure was begun with attempted insertion of a 27 French resectoscope.  This
was noted to meet resistance at the meatus.  Additionally the 27 French scope
was noted to have incomplete locking of the inner sheath to the outer sheath.
Therefore, we performed sequential dilation with Heymans to 30 French.  A 28
French resectoscope was then advanced into the bladder.  The bladder was
drained, and the bilateral ureteral orifices were identified and an area 1 cm
distal to the UOs bilaterally was marked with cautery.  We then turned our
attention to the bladder neck and began the resection.  Once the bladder neck
was taken down, the left lateral lobe was resected starting from the 5 o'clock
position up to the 1 o'clock position.  The resection occurred until the bladder
neck was noted to be open and the lateral lobe hypertrophy was taken down on the
side.  We then turned our attention to the right lateral lobe and performed the
same procedure beginning at 7:00 and moving to 11.  We then performed our
initial hemostasis with cautery, and evacuated the prostate chips with an Elik.
We then ensured no residual prostate chips were remaining in the bladder,
prostatic urethra, or bulbar urethra.  Careful hemostasis was obtained under low
pressure environment.  The bladder was then filled, and a 22 French three-way
catheter was placed.  Initial attempt was unsuccessful meeting resistance near
the prostatic urethra.  Reattempted insertion was not successful.  We then used
a catheter guide to attempt to advance catheter into the bladder.  This did not
seem to be draining appropriately, therefore this balloon was taken down and
readvancement was reattempted.  This was not successful so we then remove the
catheter and reattempted with a catheter guide.  This was felt to be in
appropriate position, with return of fluid with inflation of balloon.  CBI was
initiated, but was running slower than expected.  The catheter was repositioned
and we were able to flush and aspirate through the catheter.  The bladder
irrigation increased to a fast drip rate.  At this point, a belladonna and opium
suppository was placed and the procedure was terminated.  The patient was
extubated and taken to the PACU in stable condition
                     ** THIS NOTE CONTINUED ON NEXT PAGE **
```
--------------------------------------------------------------------------------
                         DALLAS VA MEDICAL CENTER    Printed:09/27/2022 15:09
                         Pt Loc: OUTPATIENT                     Vice SF 516
--------------------------------------------------------------------------------
```

```
                                                              Page:  3
--------------------------------------------------------------------------------
MEDICAL RECORD                                               OPERATION REPORT
--------------------------------------------------------------------------------
05/13/2022 09:14    ** CONTINUED FROM PREVIOUS PAGE **


DISPOSITION
PACU then floor for postoperative management

POSTOPERATIVE PLAN
This is a delayed entry.  Please note the updated findings of a posterior
urethral injury that occurred with catheter placement with undermining of the
bladder.  This will be managed as a posterior urethral injury with catheter
drainage until CT cystogram is performed that confirms no evidence of leak.  We
will arrange for follow-up in 3 to 4 weeks with a CT cystogram and the patient
will be discharged with a catheter once medically stable

                  Signed by: /es/ CALEB Q ASHBROOK, MD
                                  SURGICAL RESIDENT 05/14/2022 10:15
                Cosigned by: /es/ RAO S MANDALAPU, MD
                                  UROLOGY PHYSICIAN 05/16/2022 07:42


05/14/2022 10:44    ADDENDUM          STATUS: COMPLETED
Please note the addition to description of procedure detail.

"Throughout the resection, care was made to ensure that the resection did not
extend distally to the verumontanum. At procedure termination, there was no
evidence of a mroe distal resection and no concern for sphincter injury."
                  Signed by: /es/ CALEB Q ASHBROOK, MD
                                  SURGICAL RESIDENT 05/14/2022 10:45
                Cosigned by: /es/ RAO S MANDALAPU, MD
                                  UROLOGY PHYSICIAN 05/16/2022 07:41
```



```
--------------------------------------------------------------------------------
                        DALLAS VA MEDICAL CENTER    Printed:09/27/2022 15:09
                        Pt Loc: OUTPATIENT                      Vice SF 516
--------------------------------------------------------------------------------
```

```
--------------------------------------------------------------------------------
MEDICAL RECORD                                                    Progress Notes
--------------------------------------------------------------------------------
NOTE DATED: 05/13/2022 11:29
LOCAL TITLE: ANES INTRA-OP NOTE
STANDARD TITLE: ANESTHESIOLOGY OPERATIVE NOTE
VISIT: 05/13/2022 11:29 PACU-POST ANESTHE. CARE UNIT
Patient: ██████, ██████ ████
Date of Operation:  5/13/2022

Diagnosis:
---------------
Benign prostatic hyperplasia.
Benign prostatic hyperplasia with lower

Procedure:
---------------
Transurethral resection of prostate.

Anesthesia Method:
---------------------------
General  5/13/2022 9:21  Airway: Supraglottic, Technique: LMA, Patient Position:
Supine, Preoxygenated, Induction Type: Intravenous, Breathing Circuit: Circle Adult,
Intubating Device: Standard Disposable, LMA Size: 4, 1 Number Of Attempts, Ease:
Easy, Br
eath Sounds: Equal And Bilateral, Performed By: Anesthesiologist
Rationale For Selected Technique: Elective
Airway Preparation: Lubricant
Insertion Complication: No Complications Noted
Verification: Ventilation Without Difficulty
Securement: Taped
Eye Protection: Both Eyes, Tape
Positioning: Head Neutral, Head And Neck In Alignment With Spine, Pressure Points
Padded & Checked, Eyes, Ears And Nose Free Of Pressure


Surgery Start Time:  5/13/2022 9:44
Surgery End Time:   5/13/2022 11:20

Anesthesia Care Start:  5/13/2022 9:05
Anesthesia Care End:   5/13/2022 11:34


ASA Number:  3


                     Signed by: /es/ Ginn J. Samuel, CRNA
                                Nurse Anesthetist
                                05/13/2022 11:29
```

```
--------------------------------------------------------------------------------
MEDICAL RECORD                                                     Progress Notes
--------------------------------------------------------------------------------
NOTE DATED: 05/13/2022 16:02
LOCAL TITLE: NUR INPT NOTE
STANDARD TITLE: NURSING INPATIENT NOTE
ADMITTED: 05/13/2022 12:39 4C100SURG
This note is for ████████, ████████ ████ ██ ████
```

1300-pt arrived on unit, pt is AOX4, on room air, vss, pt has murphy drip with
clear urine, draining, LR infusing on right FA PIV at 50ml/hr. No skin issues
noted, pt states that pain is tolerable at this time. all safety measures in
place. call light within reach, bed locked in the lowest position.

1430-pt ambulated to bathroom to attempt to have a bowel movement but states he
is unable to, pt states he has pressure in his abdomen that is not pain like but
states it makes him uncomfortable. Pt was given scheduled tylenol.

1530-pt states discomfort in his abdomen continue, belladona given.

1607-pt currently sleeping.

```
                    Signed by: /es/ KAREN C. ZAMORA
                                Registered Nurse
                                05/13/2022 16:08
```

```
--------------------------------------------------------------------------------
████ ████ ████       VA North Texas Health Care SystemPrinted:04/11/2023 15:37
████ ████ DOB:████████   Pt Loc: OUTPATIENT              Vice SF 509
--------------------------------------------------------------------------------
```

```
--------------------------------------------------------------------------------
MEDICAL RECORD                                                    Progress Notes
--------------------------------------------------------------------------------
NOTE DATED: 05/13/2022 22:25
LOCAL TITLE: NURSING NOTE
STANDARD TITLE: NURSING NOTE
ADMITTED: 05/13/2022 12:39 4C100SURG
This note is for ██████ ██████ ██████  ██-█-███.
 patient is c/o low Abd discomfort. Bladder scan is done by Dr Ashbrook which
shows 600 ml. Stat CT pelvis done with assist of charge nurse. Patient is c/o
Abd pain 10/10/ Dr Ashbrook notified. patient v/s BP 128/61 HR 76 O2 SAT 97 AT
THIS TIME. Will continue close monitor.

                    Signed by: /es/ Funa Liu, BSN, RN, CMSRN
                              Registered Nurse
                              05/13/2022 22:39
```

```
--------------------------------------------------------------------------------
████ ████ ████        VA North Texas Health Care SystemPrinted:04/11/2023 15:23
████ ████ DOB:████████     Pt Loc: OUTPATIENT              Vice SF 509
--------------------------------------------------------------------------------
```

73

```
--------------------------------------------------------------------------------
MEDICAL RECORD                                                    Progress Notes
--------------------------------------------------------------------------------
NOTE DATED: 05/13/2022 23:49
LOCAL TITLE: NURSING NOTE
STANDARD TITLE: NURSING NOTE
ADMITTED: 05/13/2022 12:39 4C100SURG
This note is for ███████ ███████ ████, ██████ ████.
Patient went to CT abd 3rd time. Morphine 4 mg iv x 1  per MD's order.

                    Signed by: /es/ Funa Liu, BSN, RN, CMSRN
                               Registered Nurse
                               05/13/2022 23:50
```

```
--------------------------------------------------------------------------------
██████, █████ █ ████    VA North Texas Health Care SystemPrinted:04/11/2023 15:26
██ ██ ██ DOB: ████ ████      Pt Loc: OUTPATIENT                    Vice SF 509
--------------------------------------------------------------------------------
```

```
--------------------------------------------------------------------------------
MEDICAL RECORD                                                     Progress Notes
--------------------------------------------------------------------------------
NOTE DATED: 05/14/2022 00:19
LOCAL TITLE: NURSING NOTE
STANDARD TITLE: NURSING NOTE
ADMITTED: 05/13/2022 12:39 4C100SURG
This note is for ▬▬▬▬▬ ▬▬▬▬▬ ▬▬▬▬  ▬▬ ▬▬▬▬▬.
MD replaced regular foley Cath instead 3 way foley. Patient urine is amber pink
now. His v/ds are normal stable afebrile. He deni9es pain and no SOB. Will
continue close monitor.

                    Signed by: /es/ Funa Liu, BSN, RN, CMSRN
                              Registered Nurse
                              05/14/2022 00:23
```

```
--------------------------------------------------------------------------------
▬▬▬▬, ▬▬▬ ▬ ▬▬▬▬   VA North Texas Health Care SystemPrinted:04/11/2023 15:27
▬▬▬▬▬▬ DOB: ▬▬▬▬▬        Pt Loc: OUTPATIENT                   Vice SF 509
--------------------------------------------------------------------------------
```

75

# Exhibit-J

## Contents:

1. Chief of Urology, Dr. Karen Crotty, under oath, testified that a summary suspension decision was made based entirely on her information. (p. 391)
2. Dr. Crotty deliberately misrepresented surgical operative reports and medical records. (p. 380-381)
3. Dr. Crotty testified that she prepared the Morbidity and Mortality (M&M) report. (p. 401)
4. Dr. Crotty, under an affidavit, made unsupported complaints, which led to a summary suspension, an FCCR review, and an ECMS review to ensure the summary suspension remains permanent in the NPDB repository.

1  five-year residency.  So he would have already -- I

2  think he was a PG-3 at the time; so he would have done

3  at least three months, and somewhere in the midst of

4  his second three-month rotation.

5      Q.   And let me pull up Complainant's Prehearing

6  Submissions Part 2, Exhibit H, PDF page 2.

7                THE COURT:  My apologizes.  We're

8  going to have to take a comfort break.  In the

9  meantime, off the record.

10               (Whereupon, a break was taken from

11  12:51 p.m. - 12:58 p.m. Central Time.)

12               THE COURT:  Go ahead, Mr. Robertson.

13     Q.   (By Mr. Robertson)  Thank you.  You testified

14  before that you didn't review the operation report

15  before your e-mail, but did you at some point review

16  this operation report?

17     A.   At some point.  I don't remember when.

18     Q.   Okay.  This is the operation report for the

19  May 13th surgery that we were just talking about?

20     A.   It's a portion of it.

21     Q.   Okay.  This is the continuation of it?

22     A.   Yes.

23     Q.   All right.  This is the last page here.  This

24  shows that Dr. Ashbrook signed this on May 14th; is

25  that right?

```
 1      A.   Yeah.

 2      Q.   Okay.

 3      A.   Yes.

 4      Q.   So if he signed this, then he's the one that

 5 input the information; right?

 6      A.   Most likely.  He wrote it, and Dr. Mandalapu

 7 cosigned it.

 8      Q.   And it indicates down here that there were no

 9 complications?

10      A.   Identified at the time of the dictation,

11 correct.

12      Q.   Which was May 14th?

13      A.   What time was it dictated?

14      Q.   You testified it was signed on May 14th;

15 correct?  Dr. Crotty, this was signed on May 14th;

16 correct?

17      A.   Yes.

18      Q.   So it would have been dictated that -- as of

19 that date?

20            MR. WALKER:  Objection.  Object to the

21 question.  The question is unclear.  Dictated as of

22 that date, I don't know what that means.

23            THE WITNESS:  I don't know how the

24 timestamps appear.  I'm sorry.  Do you have the

25 immediate post-op note?
```

1  surgery on May -- March 15th?  Or the same one?

2              THE WITNESS:  A different surgery.

3      Q.   (By Mr. Robertson)  Okay.  And so after the

4  conversation with Dr. Modrall in your e-mail -- sending

5  that e-mail, you guys both had a conversation with

6  Dr. Rivera?

7      A.   Yes.

8      Q.   Okay.  And did you provide any additional

9  details that were not in the e-mail during that

10  conversation with Dr. Rivera?

11             MR. WALKER:  Objection.  Asked and

12  answered.

13             THE COURT:  Sustained.

14             MR. ROBERTSON:  Can I provide a

15  response for the record, your Honor?

16             THE COURT:  Please.  Go ahead.

17             MR. ROBERTSON:  I asked referring to

18  Dr. Modrall before when I asked that question, not

19  Dr. Rivera.

20             THE COURT:  I do see the difference,

21  although I do think that Dr. Crotty responded as to

22  both.  My recollection was that neither Dr. Rivera nor

23  Dr. Modrall were specialists in urology like she was;

24  so she would have explained, you know, some of the more

25  technical details to them because of that, their lack

1    of background.

2              That's what my understanding was of

3    her prior answer.  So let's assume that it was and go

4    ahead and continue the question.

5        Q.   (By Mr. Robertson)  So then -- so following

6    that conversation, I guess, as a result of that

7    conversation, Dr. Rivera decided to recommend that

8    Complainant be issued a summary suspension of

9    privileges?

10       A.   I think it was that he needed to speak to the

11   acting director about that, yes.

12       Q.   You testified about how you three reviewed

13   the VHA directives to determine that -- if that's the

14   next steps; right?

15       A.   Yes.

16       Q.   Okay.  And Dr. Rivera then, based on prior

17   testimony, had to rely entirely on the information that

18   you were providing and what you had witnessed?

19       A.   For the suspension?  Yes.

20       Q.   Okay.  And was there any discussion about

21   speaking with Dr. Mandalapu first?

22       A.   I don't remember.

23       Q.   Was there any discussion about whether

24   Dr. Mandalapu's perspective or explanation was relevant

25   to this decision?

```
 1        A.   I don't remember.

 2        Q.   And you reviewed VHA directives to determine

 3   the next steps.  Did you guys consider conducting an

 4   investigation without summarily spending his

 5   privileges?

 6        A.   Our concern was that he had -- so just so you

 7   know, all complications at the Dallas -- all

 8   complications in the Surgery Service Department of the

 9   VA have to go to morbidity and mortality conference.

10             His first case, the stents, had already been

11   presented at M & M.  And in that review, he had already

12   -- it had already been marked as a level 3, I believe.

13   It was definitely a 2, but I think it was a 3, which is

14   providers wouldn't have done it that way.  So he

15   already -- so another urologist who had not been

16   involved in the case had already reviewed the case and

17   said that that's not how a prudent urologist would do

18   the case.

19             So that had already -- that was background

20   material, and here's a second case.  So after

21   discussion with Dr. Modrall and Dr. Rivera, it was felt

22   that not letting him continue to operate until we had

23   an outside review with the panel of three urologists

24   was the safest thing to do for patients.

25        Q.   But were you aware -- the question was, did
```

1  you guys discuss just conducting an investigation

2  without suspending him first?

3      A.    In our discussion, what was felt to be right

4  for patient safety was to prevent him from going to the

5  OR again until the investigation was completed.

6      Q.    Were you --

7      A.    We actually went into the weeds.  It was --

8  because the question was summary suspension of clinical

9  privileges and surgical -- just all clinical

10 privileges, which would have meant that he couldn't

11 have done clinic either.

12          At the time, we actually didn't have concerns

13 about his clinical care, meaning seeing patients in the

14 clinic.  It turned out that was problematic also, but

15 at the time, we weren't aware of those concerns.

16          So we had the discussion about whether to

17 completely suspend him or just the operative

18 privileges.  And the decision was, for the safety of

19 the patients, he should not continue to operate until

20 the investigation was done.

21     Q.    Were you aware of the option to just have an

22 investigation?  Or were you guys of the understanding

23 that summary suspension was the only option during the

24 investigation?

25     A.    I'm not sure, but we all felt that we were

1  concerned about patient safety.

2      Q.   So, I guess, if you're not sure of what --

3  strike that.  Sorry.

4           I'm looking for -- you mentioned that a --

5  that you were determining between which privileges to

6  suspend and which ones not to suspend; right?

7      A.   Yes, all privileges or just operative

8  privileges.

9      Q.   Okay.  And those are the only two options?

10     A.   Those were his privileges.

11     Q.   So --

12     A.   He had privileges to see patients in clinic,

13 and he had privileges to operate.

14     Q.   Complainant's Prehearing Submissions Part 4,

15 Exhibit BBB.  Have you ever seen a document like this

16 before regarding applications for clinical privileges?

17     A.   Yes.

18     Q.   And would these be the privileges provided to

19 Dr. Mandalapu during -- prior to them being suspended?

20     A.   There's one caveat -- yes, except for one

21 caveat.  Robotic -- if you are -- if the Executive

22 Medical Committee approves you for credentials,

23 approves your credentials, the robotic credentials are

24 actually provisionary.

25           You -- you cannot do robotic -- you cannot be

1  an attending surgeon to do robotic surgery with --

2  unless the -- what was -- Dr. Gahan in Urology, and it

3  was Dr. Pham in General Surgery -- observed your

4  robotic surgeries and approved you for independent

5  robotic surgery.  But otherwise, yes, that's a

6  credentialing issue.

7       Q.   And of these nine privileges, how many of

8  them are surgical?

9       A.   Technically, eight.  Fluoroscopy is just

10  stepping on the radiology pedal.

11       Q.   So -- which one is not surgical?

12       A.   Fluoroscopy.  That's just being able to use

13  x-ray.

14       Q.   And --

15       A.   You only do it in the OR, though.

16       Q.   And are all these privileges relevant to the

17  two surgeries that had you concerned?

18       A.   They're urology core.

19       Q.   So the two concerns fell just under the

20  urology core?

21       A.   Yes.

22       Q.   So why didn't -- why didn't you guys just

23  suspend his urology core privileges?

24       A.   Well, electroejaculation, penile vibratory

25  stimulation, nerve stimulation -- well, he wasn't doing

1  the others, and he never was able to achieve

2  independent robotic surgery privileges.

3         But again, please remember, the two

4  procedures that he had complications on were procedures

5  that we would expect a post-graduate year -- a

6  second-year resident and a third-year resident to be

7  able to do safely.  It was not a complicated surgery

8  that had complications.

9     Q.   So just to confirm, then, at the time that

10  you had this discussion with Dr. Rivera, you did not

11  have any concerns stemming to -- relating to any of

12  these privileges besides urology core?

13     A.   I'm not -- well, he never achieved robotic --

14  Dr. Gahan never gave him independent robotic surgery

15  privileges; so, obviously, he didn't cross that

16  threshold.

17         But as far as electroejaculation, penile

18  vibratory stimulation, those were performed.  I don't

19  think he ever did a UroLift or a hydrogel; so I don't

20  think a lot of those were pertinent to what his

21  caseload was.

22     Q.   But you didn't sit down and -- with

23  Dr. Rivera, and walk through it like this, like we just

24  did?

25     A.   No.

```
 1      Q.   Okay.  Have you ever reported concerns about

 2  another doctor's standard of care which resulted in

 3  suspension of privileges?

 4      A.   Not that I recall.

 5      Q.   Have you ever been --

 6                THE COURT:  I'm going to interrupt.

 7  Can you remove the document?

 8                MR. ROBERTSON:  Apologies, your Honor.

 9                THE COURT:  Thank you.

10      Q.   (By Mr. Robertson)  Have you ever been the

11  surgeon in a case -- in a procedure that had

12  complications?

13      A.   Yeah.

14      Q.   How many of those times were you reported for

15  potentially not meeting the standard of care?

16                THE COURT:  I'm so sorry.  I don't

17  think this line of questioning is helpful to me as a

18  factfinder.

19                MR. ROBERTSON:  You know, I'm just

20  trying to ascertain whether she has previous knowledge

21  of the standard that reaches the point of imminent risk

22  to patient safety, since she was involved in that

23  conversation.  And so if it happened to her before,

24  that would give her personal knowledge of when that

25  level is reached.
```

```
 1                    MR. WALKER:  Your Honor, we would
 2  piggyback on the objection.
 3                    THE COURT:  I'm not going to listen to
 4  back and forth.  I don't think it's going to be a
 5  helpful line of questioning for me.  So.  You can ask
 6  it differently.
 7                    You can -- for instance, Dr. Crotty,
 8  what led you to think that there would be the risk of
 9  imminent danger to a patient if you all did not place
10  him into this summary suspension while an investigation
11  took place?
12                    THE WITNESS:  So as the Assistant
13  Chief of Surgery, one of my duties every Tuesday
14  morning was to have the morbidity and mortality
15  conference.  That was one of my assignments.  All
16  complications in the Surgery Department have to be
17  presented there.
18                    And I had been doing -- but I had been
19  doing surgery for a long time.  Everyone who operates
20  is going to have complications.  Being a surgeon is a
21  great job.  It is interesting.  It is -- you get to
22  help people, and, best of all, you get to do surgery.
23  But the price you pay to be a surgeon is that you have
24  to accept the responsibility.
25                    A patient who is going to the OR with
```

```
 1   you who is under anesthesia, they are surrendering
 2   their agency.  They -- they cannot advocate for
 3   themselves once they're asleep.  So it is your
 4   responsibility as a surgeon to give your best care for
 5   that patient because they can't take -- they cannot
 6   advocate for themselves in that moment.
 7                    Every surgeon, other than one, that
 8   I've ever worked with feels the weight of that
 9   responsibility.  I have had partners and peers all
10   through my career have an adverse outcome in the OR.
11   Sometimes it's just an adverse outcome; it was a bad
12   hand they had to play.  Sometimes there was an error in
13   technique in the OR.  But they come into your room, and
14   they sit down, and they just -- they feel that weight
15   on them.
16                    They feel the weight of the
17   responsibility of what just happened to that patient
18   when they were in their care.  And they -- and they
19   work through, "What could I have done better?  What
20   could I have done differently?  How could I have made
21   this a better outcome?"
22                    Every other surgeon I've worked with,
23   but one, has done that.  They ask themselves, "What did
24   I do wrong?  What could I have done better?"
25                    The fact that Dr. Mandalapu never,
```

1  ever accepted responsibility for the complications,

2  never accepted the fact that they even happened, tried

3  to blame residents, that is the part that scared

4  Dr. Modrall and I.  That is why we thought he was an

5  imminent threat to other patients because he adamantly

6  refused to ever learn from mistakes, since you asked.

7                    THE COURT:  Thank you.  Next question,

8  Mr. Robertson?

9       Q.   (By Mr. Robertson)  So if Dr. Mandalapu had

10  felt the weight of the responsibility or accepted what

11  occurred to more of your satisfaction, would you have

12  been concerned about him being an imminent threat to

13  patients?

14                    MR. WALKER:  Objection.  Calls for

15  speculation.

16                    THE COURT:  Overruled.  Answer if you

17  can, Dr. Crotty.

18                    THE WITNESS:  I think the course would

19  have been different.

20                    MR. ROBERTSON:  Okay.  You mentioned a

21  -- sorry.  Strike that.  Okay.  So you mentioned a --

22  an M & M that occurred for the March surgery.

23                    THE WITNESS:  Yes.

24       Q.   (By Mr. Robertson)  Can you remind me what

25  that stands for?

```
 1        A.    Morbidity and mortality conference.

 2        Q.    Okay.  And who -- and that's a, I guess,

 3   like, a peer review?

 4        A.    It's a conference.  If a complication is

 5   deemed to be a level 2 or a level 3, that would trigger

 6   a peer review.

 7        Q.    Okay.  And who fills out an M & M?

 8        A.    If I'm not involved in a case, it would have

 9   been me, but since I was involved in the case, I handed

10   it off to another surgeon, but I don't remember who.

11        Q.    Okay.  So --

12        A.    But it triggered a peer review that Dr. Nancy

13   Kim did.

14        Q.    Okay.  I would like to draw your attention to

15   Agency Supplemental Exhibit 13, then we're going to PDF

16   page 209.  Can you see my screen?

17        A.    Yes.

18        Q.    Does this look to be the start of the M & M

19   form for the March surgery?

20        A.    Yes.

21        Q.    Scrolling down --

22        A.    I'm sorry.  I did write it.  I'm sorry.  I

23   thought I handed it off.

24        Q.    So, generally, you're not supposed to fill

25   one of those out if you're involved in the surgery;
```

# Exhibit-K

<u>Contents:</u>

1. May 18, 2022, Summary suspension without specific reasons, notice, or due process. (p.2-3; p.10-19)

2. Summary suspension disproportionate to Dr. Crotty's unsupported allegation regarding two minor surgical procedures. (p.4; p.14-15)

3. Plaintiff's highly skilled operative privileges were abruptly suspended without disclosing the reasons, conflict-free expert review, or due process procedures. (p.5-6)

4. The Medical Center Director refused to disclose the reasons for the summary suspension and deliberately denied the plaintiff's fair hearing rights. (p.7-9; p.18-19)

5. The Medical Center Director violated the Plaintiff's Fifth Amendment due process rights, VHA bylaws, and HCQIA statutes. (p.10-19)

**VA** | **U.S. Department of Veterans Affairs**
_____
Veterans Health Administration
_VA North Texas Health Care System_

May 18, 2022

Rao Mandalapu, MD
Surgical Service (112)
VA North Texas Health Care System
4500 S. Lancaster Road
Dallas, TX 75216

SUBJ:  Summary Suspension of Operating Room Settings

Dear Dr. Mandalapu:

This letter is to notify you that your operating room settings are summarily suspended effective May 18, 2022.  This action is being taken upon the recommendation of the Chief of Staff since concerns have been raised to suggest that aspects of your clinical practice do not meet the accepted standards of practice and potentially constitute an imminent threat to patient welfare.  Specifically, there are concerns about your technical competence in performing urological operations, your aptitude to recognize technical and judgment errors during surgery, and your ability to provide appropriate instruction and direction to trainees in the operating room.  This suspension is in effect pending a comprehensive review of these allegations.

You have the opportunity to provide any information you desire to provide regarding these concerns.  Correspondence needs to be sent within 14 calendar days from your receipt of this notice, and be addressed to:

ATTN: Chief, Medical Staff Office (11G)
VA North Texas Health Care System
4500 S. Lancaster Road
Dallas, TX 75216

The comprehensive review of the reasons for the summary suspension must be accomplished within 30 calendar days of the suspension unless there are extenuating circumstances, with recommendations to proceed with formal procedures for reduction or revocation of clinical privileges forwarded to me for consideration and action.  Within 5 working days of receipt of the recommendations, I will make a decision either to restore your operating room settings to an active status or that the evidence warrants proceeding with a reduction or revocation process.  Since you cannot perform any operating room procedures during the review, you are hereby assigned to nonoperative duties only.

_Corporate Office_:  Dallas VA Medical Center, 4500 South Lancaster Road, Dallas, TX 75216
Sam Rayburn Memorial Veterans Center, 1201 East Ninth Street, Bonham, TX 75418
Fort Worth Outpatient Clinic, 2201 SE Loop 820, Fort Worth, TX 76119
Tyler VA Primary Care Clinic, 7916 S. Broadway Ave, Tyler, TX 75703
Polk Street Annex Primary Care Clinic, 4243 S. Polk Street, Dallas, TX 75224
Plano VA Outpatient Clinic, 3804 W, 15th Street, Plano, TX 75075
Grand Prairie VA Outpatient Clinic, 2737 Sherman Drive, Grand Prairie, TX  75051

21

Should the comprehensive review result in a tentative decision by me to restrict or revoke your privileges, and if appropriate, to take an adverse personnel action, you will be notified at that time of your rights as per VHA Handbook 1100.19 and VA Directive and Handbook 5021. You have a right to be represented by an attorney or other representative of your choice throughout the proceedings.

Summary suspension pending comprehensive review and due process is not reportable to the National Practitioner Data Bank (NPDB). However, if a final action against your clinical privileges is taken for professional incompetence or improper professional conduct, both the summary suspension and the final action, if greater than 30 days, will be reported to the NPDB, and a copy of the report must be sent to the state licensing boards in all states in which you hold a license, including the Wisconsin and North Dakota Medical Boards.

If you surrender or voluntarily accept a restriction of your clinical privileges, including by resignation or retirement, while your professional competence or professional conduct is under investigation during these proceedings or to avoid investigation, VA is required to file a report to the NPDB, with a copy to the appropriate state licensing boards, pursuant to VA regulations in title 38 Code of Federal Regulations (CFR) Part 46 and VHA Handbook 1100.17, National Practitioner Data Bank Reports.

It is the policy of VA to report to State Licensing Boards those licensed health care professionals, whether currently employed or separated (voluntarily or otherwise), whose clinical practice during VA employment so significantly failed to meet generally accepted standards of clinical practice as to raise reasonable concern for the safety of patients (see 38 CFR Part 47). In the event you are found to not meet standards of care, consideration will be given whether, under these criteria, you should be reported to the appropriate State Licensing Boards pursuant to the provisions of VHA Handbook 1100.18, Reporting and Responding to State Licensing Boards.

If you have any questions, please feel free to contact the Chief of Staff Office at (214) 857-1150.

Sincerely,

Kendrick D. Brown, CHFM
Acting Executive Medical Center Director

| | |
|---|---|
| **From:** | Crotty, Karen L. |
| **To:** | Modrall, John G.; Hastings, Jeffrey |
| **Subject:** | Staff issue |
| **Date:** | Saturday, May 14, 2022 1:48:00 PM |
| **Importance:** | High |

Jeff and Greg

I have significant concerns regarding the surgical skills of Dr Rao Mandalapu.  He recently had an unusual complication in a relatively simple procedure.  While concerning, it wasn't such a blatant or egregious error that it required more than a closer monitoring his practice.  However yesterday, there was another complication during a common procedure that was unrecognized at the time.  If recognized at the time, it would have been addressed and had minimal impact on the patient's hospital course and minimal to no effect on long term outcome.  Since it was not recognized at the time of surgery , the patient required midnight CT scans,  manipulations of the foley by another attending, and a transfer to the SICU for closer observation.  Most providers would have recognized the problem in the OR and addressed it at the time.

Both patients are doing fine.

However because of this pattern of errors in surgical technique, I no longer have confidence in his ability to perform surgery either independently or supervising residents.   I want to remove him from the OR schedule and covering call.  (While he is unenthusiastic about seeing clinic patients other than cancer patients, I do not have concerns with the quality of his clinical care).

He is scheduled for call this upcoming week:  I will take that.

He is scheduled for the OR every other Tuesday (including the 17th)  and every Friday.  My plan was to have him cover the clinics of other providers so that Jeff and I can cover those OR days for the next few weeks so as to not inconvenience the patients who have already been pre-op'd.

What options and actions do I need to take in this situation ?
Thank you for your help and guidance.


Karen Crotty, MD FACS
Chief, Urology Section
Dallas VAMC

PR1                                                                                                  06/17/22

Sort By:  **Department, Practitioner**

**Surgical Service (Cont'd)**

| | | | | | Inst. Action | |
|---|---|---|---|---|---|---|
| Procedure Listing for: | **Mandalapu, Rao, MD** | | | | | |
| Appointed to the Department of: | **Surgical Service** | **Standing** | **Scope** | **Status** | **Date** | **Review** |

Surgical Service - Urology

nephroureterectomy, orchiectomy inguinal (radical), orchiopexy bilateral, orchiopexy unilateral, orhiectomy - simple, unilateral or bilateral, partial cystectomy, partial cystectomy w/ ureteroneocystostomy, pelvic exenteration w/ (male) urinary diversion, penis amputation complete, penis amputation partial, penis amputation plus ileoinguinal (inguinofemoral), penis correction of chordee w/out hypospadias, penis lymphadenectomy, penis repair major injury, percutaneous endopyeloplasty (new procedure/limited at present), percutaneous nephroscopy, percutaneous nephrostomy, perigee apogee for pelvic floor descensus, posterior colporrhaphy w/wo mesh, prostate open biopsy, prostatectomy: perineal radical, prostatectomy: perineal simple, prostatectomy: retropubic radical, prostatectomy: retropubic simple, prostatectomy: suprapubic, pyelolithotomy, pyeloplasty, pyeloplasty plus symphysiotomy, radical cystectomy w/ continent diversion, radical cystectomy w/ileal conduit, radical cystectomy w/ureterosigmoidostmy, reduction plus fixation of torsion, renal biopsy open, renal cyst unroofing, renal needle biopsy, repair enterovesical fistula, repair of rupture bladder, repair of vesico-vaginal fistula abdominal, repair of vesico-vaginal fistula vaginal, repair testis (trauma), repair urethral injury, replacement of ureter w/ bowel, revascularization (microsurgery), scrotum excision complete, scrotum excision partial, scrotum hydrocelectomy, scrotum incise & drain abscess, scrotum repair (trauma), shunt cavernosum to saphenous vein, shunt cavernosum to spongiosum percutaneous, shunt cavernosum to spongiosum open, sigmoid conduit - separate procedure bilateral, simple cystectomy w/ cutaneous ureterostomy, simple cystectomy complete, simple cystectomy w/ ileal conduit, simple cystectomy w/ uretero-sigmoidostomy, TAH in association with female cystectomy, transobturator urethropexy w/wo mesh, transrenal US/bxy, transureteroureterostomy, ureterolithotomy, ureterolysis, ureteroneocystostomy bilateral, ureteroneocystostomy unilateral, ureteroneocystostomy w/ bladder flap, ureteroscopy (separate procedure), ureteroscopy w/ calculus removal biopsy or fulgeration, ureterosigmoidostomy, ureteroureterostomy, urethra diverticulectomy, urethra transpubic repair membranous stricture, urethra/perineal urethroplasty, urethrectomy, separate procedure, urethropexy (Marsall-Marchetti),  urethroplasty for anterior stricture - one stage, urethroplasty for anterior stricture - staged,  urethrostomy external, urethrostomy perineal, urethrostomy internal, urodynamics, vaginal urethropexy (Stamey-Raz), vasectomy, vasotomy for vasogram plus biopsy, vasovasostomy (unilateral), vesicostomy, ureteroscopy and fulgeration of upper tract tumors, cystolitholopaxy, percutaneous nephrostolithomy, transurethral resection/fulguration of prostate, and Transrectal US guided placement of fiducial markers. Laparoscopic surgical approach can be applied for the listed organ systems and procedures listed above.

Select All Records

# North Texas Health Care System
## Current Practitioner Privilege/Procedure Listing

PR1                                                                                    06/17/22

Sort By:   **Department, Practitioner**

**Surgical Service (Cont'd)**

| Procedure Listing for: | **Mandalapu, Rao, MD** | | | | Inst. Action | |
| Appointed to the Department of: | **Surgical Service** | Standing | Scope | Status | Date | Review |
|---|---|---|---|---|---|---|

**Surgical Service - Urology**
 *Other Privileges*

| | Standing | Scope | Status | Date | Review |
|---|---|---|---|---|---|
| Fluoroscopic imaging (for those procedures otherwise credentialed) | Active | Full | Approved | 09/27/2021 | 09/26/2023 |
| Robotic approach (for those procedures otherwise credentialed) | Active | Full | Approved | 09/27/2021 | 09/26/2023 |
| Transurethral Urolift Procedure | Active | Full | Approved | 09/27/2021 | 09/26/2023 |

Select All Records

**Mandalapu, Rao S.**

| | |
|---|---|
| **From:** | Mandalapu, Rao S. |
| **Sent:** | Wednesday, November 9, 2022 3:54 PM |
| **To:** | Brown, Kendrick D. |
| **Cc:** | Mandalapu, Rao S. |
| **Subject:** | RE: Summary suspension of privileges-175th day |
| **Attachments:** | Clinical Care Review committee report_Response.pdf |

Hi Mr. Kendrick Brown,

This is in continuation of previous mails requesting to restore my operative privileges.

Brief recap, you have summarily suspended all operative privileges without any notice or any documented evidence in support of the adverse action on 5/18/2022.

I made several requests to disclose those documented evidence that led to the adverse action. I have also brought up to your attention that any suspension of privileges for more than 6-weeks needs documented evidence to be submitted to the medical boards and to the credentialing authorities. This has been 175 days as of now.

Apparently, you aware of the fact that you are intended to kill my professional career.

I have received 'clinical care committee' report who reviewed all my surgeries and submitted a report stating issue on four-minor operative cases. Rest all are good.

I have received the report dated 9/23/2022. The report was not about surgical complications but strange comments on the surgical procedure without any supportive documented evidence.

I requested to disclose the committee members identity and their qualifications. The administration refused to disclose committee members identity rises suspicious validity of the report.

I have submitted response to the clinical care committee report with documented evidence on 9/30/2022 and copied to you as well. (attached-Clinical care committee report_response)

I am sure you are aware of the fact that all those surgeries assigned to me since 5/18/2022 were outsourced to the private hospitals.

I request you please let me know if there is any end point for this continued humiliation?

Hope to hear from you.

Thank you,

Sincerely,

Rao Mandalapu, MD

---

**From:** Mandalapu, Rao S.
**Sent:** Friday, September 23, 2022 3:08 PM
**To:** Brown, Kendrick D. <Kendrick.Brown@va.gov>

**Cc:** rao ms <msrao17@gmail.com>; Mandalapu, Rao S. <Rao.Mandalapu@va.gov>
**Subject:** RE: Summary suspension of privileges-129th day

Hi Mr. Kendrick Brown,

This is in continuation of my previous mails requesting you to restore all my privileges effective from 5/18/2022 immediately.

Since you are aware of the fact that You have summarily suspended all my operative privileges abruptly on 05/18/2022 without any notice or specific reasons that led to the adverse action. I made multiple repeated requests to provide me with specifics that lead to the summary suspension of privileges.

I have not heard back from you yet.

Please advise.

Thank you,

Rao Mandalapu, MD

---

**From:** Mandalapu, Rao S.
**Sent:** Friday, September 2, 2022 12:08 PM
**To:** Brown, Kendrick D. <Kendrick.Brown@va.gov>
**Cc:** Mandalapu, Rao S. <Rao.Mandalapu@va.gov>; rao ms <msrao17@gmail.com>
**Subject:** RE: Summary suspension of privileges-108th day

Hi Mr. Kendrick Brown,

This is in continuation of my previous mail requesting to restore all my privileges effective from 5/18/2022 immediately.

Just to re-cap, you have summarily suspended all my operative privileges abruptly on 05/18/2022 without any notice or cause. I made multiple repeated requests to provide me with specifics that lead to the summary suspension of privileges, and I did not receive any response so far for the past 108 days. This has been ongoing, rather, intentional humiliation and to ridicule my professional reputation.

Again, I do not have any surgical complications as reported in VASQIP quarterly report (VASQIP-VA Surgical Quality Improvement Program) (copy attached). I don't know why my privileges were summarily suspended?

Based on these facts, I should be granted restoration of all my privileges immediately without a condition.

As a head of the institution, your clear guidelines to appoint a third-party enquiry committee (those with no personal contacts with the Department of Surgery and urology) to investigate the facts that lead to the summary suspension of privileges and held those responsible for this mishap accountable. And measures to prevent future occurrences and as an assurance for the current and future physicians to function at their full capacity without discrimination/humiliation/harassment/intimidation/retaliation.

Thank you,

Rao Mandalapu, MD

Urology, staff physician

**From:** Mandalapu, Rao S.
**Sent:** Friday, August 26, 2022 8:16 AM
**To:** Brown, Kendrick D. <Kendrick.Brown@va.gov>
**Cc:** Mandalapu, Rao S. <Rao.Mandalapu@va.gov>
**Subject:** Privileges suspended

Hi Mr. Kendrick Brown,

I am Rao Mandalapu, staff physician at the Dallas VA Medical center.

I would like to bring to your attention that my operative privileges were abruptly suspended effective from 5/18/2022 without any reason. I have been requesting my supervisor, Dr. Karen Crotty to provide the specifics that lead to suspension of privileges on multiple occasions, and she refused. I was directed to reach out to you for those details.

I have staffed approx.738 patients in the last 6-months including surgeries (Jan to June 2022). I have no reportable surgical complications on my name as reported in "VASQIP" (VA surgical quality improvement program) quarterly report (copy attached for your review).

Evidently, my operative privileges were suspended without a reason. This has been ongoing for the past 101 days as of today. I believe this act is to ridicule my qualifications and professional reputation.

I request you to restore my operative privileges immediately and restrict administrative responsibilities on those who are responsible for this illegal activity to reassure current and future physicians to function at their capacity without discrimination/humiliation/harassment/intimidation/retaliation.

Thank you,

Rao Mandalapu, MD

## PART I.  DISCIPLINARY AND ADVERSE ACTIONS UNDER TITLE 5

## CHAPTER 1.  GENERAL

**1.  SCOPE.**  This chapter contains the policy for taking disciplinary and adverse actions in the Department of Veterans Affairs (VA).  Unless otherwise indicated, the chapter applies to all VA employees appointed under title 5 U.S.C., and under title 38 U.S.C., sections 7401(3).

**2.  REFERENCES.**  Title 5 U.S.C., chapters 73 and 75; VA Handbook 5005, Staffing, part IV; 5 CFR, part 752; VA Handbook 5019; [ ] 38 U.S.C. 7401(3) [; and 38 U.S.C. 7403(f)(3)].

**3.  POLICY**

a.  The public interest requires the maintenance of high standards of employee integrity, conduct, effectiveness, and service to the public.  When such standards are not met, it is essential that prompt and just corrective action be taken.  The policy of VA is to maintain standards of conduct and efficiency that will promote the best interests of the service.  Disciplinary and adverse actions shall be governed by these basic principles:

(1) An employee shall be informed in writing honestly and specifically why the action is being brought against him or her.

(2) An employee shall be given a reasonable opportunity to present his or her side of the case.

(3) The employee and representative shall have assurance of freedom from restraint, interference, coercion, discrimination, or reprisal in discussing, preparing, and presenting a defense.

b.  In taking actions covered by this part, like penalties will generally be imposed for like offenses (see appendix A of this part, for further discussion).  However, supervisors should give consideration to several factors when determining what action is appropriate, including the nature and-gravity of the offense, the existence of either mitigating or aggravating circumstances, the frequency of the offense, and the employee's position.  Adverse actions against employees (excluding employees in the Senior Executive Service (SES)) will be taken only for such cause as will promote the efficiency of the service. [Suspension of more than 14 calendar days] against SES employees will be based only on misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function.

c.  The adverse action procedures described in this part will be used for all actions defined as an adverse action in paragraph 4 [ ] and covered under 5 CFR, part 752.

d.  An action covered under this part must be in conformance with the merit system principles in 5 U.S.C. 2301 and must not be based on any of the prohibited personnel practices listed in 5 U.S.C. 2302.  Accordingly, actions covered under this chapter may not be based on prohibited discrimination because of race, color, religion, sex, national origin, age, or disability.  Except when required by statute, an action covered under this chapter must not be taken against an employee because

c.  Actions resulting from a Central Office investigation, with the exception of those conducted by the Office of Inspector General (OIG), will be proposed and decided by officials in Central Office [as appropriate.  Based on the circumstances of the case, actions may be proposed and decided by officials outside the employee's supervisory line in order to ensure no conflict of interest exists.  When adverse actions are proposed and decided by officials outside the employee's supervisory chain, the concepts described in paragraph 6b(5) will be followed to determine the correct officials to propose and decide the action].  Such authority may be delegated on a case by case basis to the field facility Director.  Actions based on OIG investigations may be taken at the field facility level in coordination with the appropriate organizational elements in Central Office.

d.  Consistent with the restrictions provided in subparagraphs b and c above, field facility directors are responsible for designating officials who may propose and/or decide disciplinary and adverse actions.

*cannot occur in this time frame is required.  Appropriate follow-up is required to close the Automatic Suspension once resolution is attained.  Examples of such circumstance could include a practitioner who is accused of a crime unrelated to clinical practice or is being investigated for fraudulent use of a Government Credit Card, both of which could take well over 20 days to resolution.*

(d)  <u>Procedures Applicable to Administrative Heads.</u>  Procedures to reduce and revoke clinical privileges identified within this Handbook are applicable to Directors, COSs, CMOs, and VISN Directors.  All responsibilities normally assumed by the COS during the clinical privileging reduction or revocation process must be assigned to an appropriate practitioner who serves as acting chair of the medical staff's Executive Committee.  The COS may appeal the Director's decision, or the Director may appeal the Associate Director's decision, regarding the reduction of privileges decision to the VISN Director, just as all practitioners may appeal such a decision.  A VISN Director whose clinical privileges to practice at a given facility are reduced or revoked may appeal to the Chief VISN Officer.  ***NOTE:  See Appendix F for Sample Advisement to Licensed Health Care Professional of Automatic Suspension of Clinical Privileges.***

(4)  **Reduction of Privileges,** The Process

(a)  Recommendations to reduce a practitioner's privileges must be made by the Executive Committee of the Medical Staff, based upon review and deliberation of clinical performance and professional conduct information.  Initially, the practitioner receives a written notice of the proposed changes in privileges from the COS.  The notice must include a discussion of the reason(s) for the change and the process that will be afforded the practitioner to respond to this recommendation.  The notice to a physician or dentist also needs to indicate that if a reduction is effected based on the outcome of the proceedings, and the reduction is for greater than 30 days, a report must be filed with the NPDB, with a copy to the appropriate SLBs in all states in which the practitioner holds a license, and in the State in which the facility is located.  The notice must include a statement of the practitioner's right to be represented by an attorney or other representative of the practitioner's choice throughout the proceedings.  The notice needs to advise that a physician or dentist who surrenders clinical privileges, resigns, retires, etc., during an investigation relating to possible professional incompetence or improper professional conduct must be reported to the NPDB in accordance with VA regulations 38 CFR Part 46 and VHA Handbook 1100.17.  This includes the failure of a practitioner to request renewal of privileges while under investigation for professional incompetence or improper professional conduct or to avoid such investigation.

(b)  The practitioner must be allowed to review all evidence not restricted by regulation or statute upon which proposed changes are based.  Following that review, the practitioner may respond in writing to the COS's written notice of intent.  The practitioner must submit a response within 10 business days of the COS's written notice and access to the available evidence.  If requested by the practitioner, the COS may grant an extension for a brief period, normally not to exceed 10 additional business days, except in extraordinary circumstances.

***NOTE:  Prior to releasing any information to the practitioner or any other individual associated with the review, consultation with the facility Privacy Officer or Regional Counsel is appropriate.***

(c) A complete package including the evidence, the recommendation of the Executive Committee of the Medical Staff, and any written statement submitted by the practitioner is forwarded to the facility Director. The facility Director must make, and document, a decision on the basis of the record. If the practitioner disagrees with the facility Director's decision, a hearing may be requested. The practitioner must submit the request for a hearing within 5 business days after receipt of decision.

(d) The facility Director must appoint a review panel of three professionals, within 5 business days after receipt of the practitioner's request for hearing. These three professionals will conduct a review and hearing. At least two members of the panel must be members of the same profession. If specialized knowledge is required, at least one member of the panel must be a member of the same specialty. This review panel hearing is the only hearing process conducted in connection with the reduction of privileges. Any other review processes must be conducted on the basis of the record. The hearing must proceed as follows:

<u>1</u>. The practitioner must be notified in writing of the date, time, and place of the hearing. The date of the hearing must not be less than 20 business days and not more than 30 business days from the date of notification letter.

<u>2</u>. During such hearing, the practitioner has the right to:

<u>a</u>. Be present throughout the evidentiary proceedings.

<u>b</u>. Be represented by an attorney or other representative of the practitioner's choice. *NOTE: If the practitioner is represented, this individual is allowed to act on behalf of the practitioner including questioning and cross-examination of witnesses.*

<u>c</u>. Cross-examine witnesses.

*NOTE: The practitioner has the right to purchase a copy of the transcript or tape of the hearing.*

<u>3</u>. In cases involving reduction of privileges, a determination must be made as to whether disciplinary action should be initiated.

<u>4</u>. The panel must complete the review and submit the report within 15 business days from the date of the close of the hearing. Additional time may be allowed by the facility Director for extraordinary circumstances or cause.

(e) The panel's report, including findings and recommendations, must be forwarded to the facility Director, who has authority to accept, reject, accept in part, or modify the review panel's recommendations.

(f) The facility Director must issue a written decision within 10 business days of the date of receipt of the panel's report. If the practitioner's privileges are reduced, the written decision must indicate the reason(s). The signature of the facility Director constitutes a final action and, if the practitioner is a physician or dentist, the reduction is reportable to the NPDB.

the NPDB, following appropriate due process procedures described in subparagraph 14l(5)(g). Where early termination of the contract or other appointment does not involve substandard care, professional incompetence, or professional misconduct, privileges must be terminated without regard to the due process requirements for privileging actions.  This termination is not reportable to the NPDB.

   (b)  Reduction and Revocation of Privileges.  A reduction of privileges may include restricting or prohibiting performance of selected specific procedures, including prescribing and/or dispensing controlled substances.  Reduction of privileges may be time limited and/or have restoration contingent upon some condition, such as demonstration of recovery from a medically-disabling condition or further training in a particular area.  Revocation of privileges refers to the permanent loss of clinical privileges.  If it becomes necessary to formally reduce or revoke clinical privileges based on deficiencies in professional performance, the procedures indicated in this Handbook must be followed.  Procedures for reduction and revocation of clinical privileges are identified in the following paragraphs, and apply to all practitioners included within the scope of this Handbook.

   1.  A physician or dentist who surrenders clinical privileges, resigns, retires, etc., during an investigation relating to possible professional incompetence or improper professional conduct or in return for not conducting such investigation must be reported to the NPDB in accordance with VA regulations 38 CFR Part 46 and VHA Handbook 1100.17.  This includes the failure of a practitioner to request renewal of privileges while under investigation for professional incompetence or improper professional conduct.

   2.  Due process under these circumstances is limited to a hearing to determine whether the physician or dentist's surrender of clinical privileges, resignation, retirement, etc. occurred during such an investigation.  If the practitioner does not request this limited hearing, the practitioner waives the right to further due process for the NPDB report and needs to be reported immediately.

   (c)  Adverse Professional Review Action.  Any final professional review action that adversely affects the clinical privileges of a practitioner for a period longer than 30 days, including the surrender of clinical privileges or any voluntary restriction of such privileges, while the physician or dentist is under investigation, is reportable to the NPDB pursuant to the provisions of the VHA policy regarding NPDB reporting.

   1.  **Summary Suspension.**  Clinical privileges may be summarily suspended when the failure to take such action may result in an imminent danger to the health of any individual. Summary suspension pending comprehensive review and due process, as outlined in subparagraphs 14i, on reduction and revocation, is not reportable to the NPDB.  However, the notice of summary suspension to the physician or dentist needs to include a notice that if a final action is taken, based on professional competence or professional conduct grounds, both the summary suspension, if greater than 30 days, and the final action will be reported to the NPDB. The notice of summary suspension needs to contain a notice to the individual of all due process rights.  ***NOTE:  See Appendix E for Sample Advisement to Licensed Health Care Professional of Summary Suspension of Clinical Privileges.***

a. When privileges are summarily suspended, the comprehensive review of the reason for summary suspension should be accomplished within 30 calendar days of the suspension with recommendations to proceed with formal procedures for reduction or revocation of clinical privileges forwarded to the facility Director for consideration and action.  In those instances where the comprehensive review cannot be accomplished in 30 days, the circumstances should be documented with an expectation of when the comprehensive review will be completed.  The facility Director must make a decision within 5 business days of receipt of the recommendations. This decision could be to exonerate the practitioner and return privileges to an active status or that there is sufficient evidence of improper professional conduct or incompetence to warrant proceeding with a reduction or revocation process.

*NOTE:  Proceeding to the reduction or revocation process requires appropriate due process. Guidance needs to be sought from Regional Counsel and Human Resources to ensure due process is afforded.  It is only after the due process is completed, a final action taken by the facility Director, and all appeals have been exhausted that the summary suspension and subsequent reduction or revocation of clinical privileges of a physician or dentist is reported to the NPDB.*

b. Administrative Denial of Privileges.  If the practitioner's clinical privileges are pending renewal and due to expire during a summary suspension or due process procedures for reduction or revocation, the clinical privileges must be denied pending outcome of the review and due process procedures.  This denial is considered administrative until such time as a final decision is made in the summary suspension or due process procedures.  This final decision determines whether an adverse action has occurred and the responsibility for reporting of the action.  If the final action results in what would have been a reportable event, it must be reported in accordance with VHA Handbook 1100.17.

2. **Automatic Suspension of Privileges.**  Any time a practitioner is removed from patient care, and the reason does not result in a Summary Suspension of clinical privileges (see subpar. 14 l(3)(e)1) consideration should be given to automatically suspending privileges for administrative reasons.  An example could include a practitioner who failed to maintain mandatory requirements for membership to the medical staff.  The process for automatic suspension of privileges must be defined in the Medical Staff Bylaws.

a. Such instances must be weighed against the potential for substandard care, professional misconduct, or professional incompetence.  A thorough review of the circumstances must be documented with a determination of whether the cause for the automatic suspension does or does not meet the test of substandard care, professional misconduct, or professional incompetence.

b. Under no circumstances should there be more than three automatic suspensions of privileges in 1 calendar year, and no more than 20 days per calendar year.  If there are more than three automatic suspensions of privileges in 1 calendar year, or more than 20 days of automatic suspension in a calendar year, a thorough assessment of the need for the practitioner's services needs to be performed and documented and appropriate action taken.  Any action is to be reviewed against all reporting requirements.  *NOTE:  There may be circumstances where an automatic suspension of clinical privileges is warranted but resolution cannot occur in 20 calendar days.  Under these special circumstances documentation of the reason resolution*

practitioner's choice throughout the proceedings. The notice should also advise that a physician or dentist who surrenders clinical privileges, resigns, retires, etc., during an investigation relating to possible professional incompetence or improper professional conduct or to avoid such investigation, must be reported to the NPDB in accordance with VA regulations 38 CFR Part 46 and VHA Handbook 1100.17. This includes the failure of a practitioner to request renewal of privileges while under investigation for professional incompetence or improper professional conduct.

**NOTE:** *Fair hearing and due process proceedings can and should occur even if the practitioner has been separated. A final action does not occur until after all due process proceedings have been completed unless otherwise noted.*

    1. The practitioner must be allowed to review all evidence not restricted by regulation or statute upon which proposed changes to privileges are based. Following that review, the practitioner may respond in writing to the COS's written notice of intent. The practitioner must submit a response within 10 business days of the COS's written notice and access to the evidence. If requested by the practitioner, the COS may grant an extension for a brief period, normally not to exceed 10 additional business days, except in extraordinary circumstances.

**NOTE:** *Prior to releasing any information to the practitioner or any other individual associated with the review, consultation with the facility Privacy Officer or Regional Counsel is appropriate.*

    2. A complete package including the evidence, the recommendation of the Executive Committee, and any written statement submitted by the practitioner is forwarded to the facility Director. The facility Director must make, and document, a decision on the basis of the record. If the practitioner disagrees with the facility Director's decision, a hearing may be requested. The practitioner must submit the request for a hearing within 5 business days after receipt of decision.

    3. The facility Director must appoint a review panel of three professionals, within 5 business days after receipt of the practitioner's request for hearing. These three professions will conduct a review and a hearing. At least two members of the panel must be members of the same profession. If specialized knowledge is required, at least one member of the panel must be a member of the same specialty. This review panel hearing is the only hearing process conducted in connection with the revocation of privileges. Any other review processes must be conducted on the basis of the record. The hearing will proceed as follows:

    a. The practitioner must be notified in writing of the date, time, and place of the hearing. The date of the hearing must not be less than 20 business days and not more than 30 business days from the date of notification letter.

    b. During such hearing, the practitioner has the right to:

    (1) Be present throughout the evidentiary proceedings.

(2)  Be represented by an attorney or other representative of the practitioner's choice.  ***NOTE:*** *If the practitioner is represented, this individual is allowed to act on behalf of the practitioner including questioning and cross-examination of witnesses.*

(3)  Cross-examine witnesses.

***NOTE:*** *The practitioner has the right to purchase a copy of the transcript or tape of the hearing.*

c.  The panel must complete the review and submit the report within 15 business days from the date of the close of the hearing.  Additional time may be allowed by the facility Director for extraordinary circumstances or cause.

d.  The panel's report, including findings and recommendations, must be forwarded to the facility Director, who has authority to accept, reject, accept in part, or modify the review panel's recommendations.  ***NOTE:*** *If the facility Director accepts in part or modifies the review panel's recommendations which results in a reduction of the practitioner's clinical privileges, reporting to the NPDB must be initiated in accordance with VHA policy on NPDB reporting.*

e.  The facility Director must issue a written decision within 10 business days of the date of receipt of the panel's report.  If the revocation of practitioner's privileges is sustained, the written decision must indicate the reason(s).  The signature of the facility Director constitutes a final action and the reduction is reportable to the NPDB only for physicians or dentists.

f.  If the practitioner wishes to appeal the Director's decision, the practitioner may appeal to the appropriate VISN Director within 5 business days of receipt of the facility Director's decision.  This appeal option will not delay the submission of the NPDB report.  If the Director's decision is overturned on appeal, the report to the NPDB must be withdrawn.

g.  The VISN Director must provide a written decision, based on the record, within 20 business days after receipt of the practitioner's appeal.  The decision of the VISN Director is not subject to further appeal.

(6)  **Management Authority.**  Nothing in these procedures restricts the authority of management to temporarily detail or reassign a practitioner to non-patient care areas or activities, thus in effect suspending privileges while the proposed reduction of privileges or discharge, separation, or termination is pending.

(a)  The facility Director, acting in the position of Governing Body as defined in the Medical Staff Bylaws, is the final authority for all privileging decisions.  This decision must be based on the recommendations of the appropriate Service Chief(s), COS, and/or Executive Committee of the Medical Staff.

(b)  Furthermore, the facility Director, on the recommendation of the COS, may summarily suspend privileges, on a temporary basis, when there is sufficient concern regarding patient safety or specific practice patterns.

October 15, 2012

VHA HANDBOOK 1100.19

APPENDIX G

**SAMPLE ADVISEMENT TO LICENSED HEALTH CARE PROFESSIONALS OF CLINICAL PRACTICE REVIEW**

Date

John Doe, MD
1234 East Main
Little Town, Big State 12345

Dear Dr. Doe:

This is to notify you that a review is being conducted of your clinical privileges.  Concerns have been raised regarding your professional conduct or competence that suggest such conduct affects or could affect adversely the health or welfare of a patient, or patients.  ___(Insert general statement on reason for review)___.

In accordance with VHA Handbook 1100.19, Credentialing and Privileging, and the ___(Insert Facility Name)___ Veterans Health Care System Medical Staff Bylaws, Fair Hearing and Appellate Review, you will be extended "due process" rights.

A review will be initiated to determine if your privileges could be adversely affected.  You will be allowed to review all evidence not restricted by regulation or statute, collected by the review process upon which any proposed adverse action is based.  Following that review, you may respond in writing to my written notice of intent.  You must submit a response within 10 working days of receipt of written notice.  If you request, I may grant an extension for a brief period, normally not to exceed 10 business days, except in extraordinary circumstances.

All information collected during the review will be forwarded to the facility Director for decision.  The facility Director will make, and document, a decision on the basis of the record.  Full and impartial consideration will be given to your reply if a reply is submitted.  If you disagree with the facility Director's decision, you may request a hearing.  You must submit the request for a hearing within 5 business days after receipt of the decision.

If you request a hearing, the facility Director will appoint a review panel of three professionals, within 5 business days after receipt of your request for hearing, to conduct a review and hearing.  At least two members of the panel will be members of your same profession.  If specialized knowledge is required, at least one member of the panel must be a member of your specialty.  This review panel hearing will be the only hearing process conducted in connection with the adverse privileging action; any other review processes will be conducted on the basis of the record.  You will be advised in writing of the date, time, and place of the hearing.

During such hearing, you have the right to be present throughout the evidentiary proceedings, represented by an attorney or other representative of your choice, and to question and cross-examine witnesses.  You have the right to purchase a copy of the transcript of the tape of the hearing.

**G-1**

The panel must complete the review and submit the report within 15 business days from the date of the close of the hearing. The facility Director may allow additional time for extraordinary circumstances or cause. The panel's report, including findings and recommendations regarding privileges, and whether disciplinary action should be initiated, will be forwarded to the facility Director, who has the authority to accept, reject, accept in part, or modify the review panel's recommendation.

The facility Director will issue a written decision within 10 business days of the date of the receipt of the panel's report. If your privileges are reduced, the written decision will indicate the reason(s). The facility Director's signature constitutes a final action, and if the reduction is for a period longer than 30 days on grounds related to professional incompetence or improper professional conduct, the reduction is reportable to the National Practitioner Data Bank (NPDB), with a copy to be sent to the appropriate State Licensing Boards in all states in which you hold a license(s) and in the State of ___(Insert State in which facility resides)___. This adverse action report to NPDB will be filed within 15 calendar days after the privileging action is made final by the facility Director. Prior to approving the report, the facility Director will notify you and provide you with an opportunity for discussion. The NPDB will send a copy of the computerized report to you with a limited comment period. You are not able to submit changes to the report; however, if you wish to appeal the decision, you may appeal to the Veterans Integrated Service Network (VISN) ___(Insert VISN #)___ Director within 5 business days of receipt of the facility Director's decision. This appeal option will not delay the submission of the NPDB report. If the facility Director's decision is overturned by the ___(Insert VISN #)___ Director, the report to the NPDB will be withdrawn.

The ___(Insert VISN #)___ Director will provide a written decision, based on the record, within 20 business days after receipt of your appeal. The decision of the VISN Director is not subject to further appeal.

Should you surrender or voluntarily accept a restriction of your clinical privileges, or resign or retire from your medical staff position with the Department of Veterans Affairs (VA) while your professional competence or professional conduct is under investigation during these proceedings or to avoid investigation, such action is required to be reported without further review or due process to the NPDB and the appropriate State Licensing Boards. ***NOTE: Delete this paragraph if practitioner is not a physician or dentist.***

It is the policy of VA to report to State Licensing Boards those licensed health care professionals, whether currently employed or separated (voluntarily or otherwise), whose clinical practice during VA employment so significantly failed to meet generally accepted standards of clinical practice as to raise reasonable concern for the safety of patients (see title 38 Code of Federal Regulations Part 47). In the event you are found to not meet standards of care, consideration will be given whether, under these criteria, you should be reported to the appropriate State Licensing Board(s) pursuant to the provisions of VHA Handbook 1100.18,

# Exhibit-L

## Contents:

1. The Chief of Staff stated, 'a team of impartial Urologists completed a Focused review of your clinical performance.'
2. The FCCR review was conducted by Dr. Crotty and Dr. Gahan, who have conflicts of interest.
3. Dr. Rivera, Dr. Hastings, and Dr. Crotty were under affidavit at the time of the FCCR.

**Mandalapu, Rao S.**

| | |
|---|---|
| **From:** | Hastings, Jeffrey |
| **Sent:** | Friday, September 23, 2022 5:15 PM |
| **To:** | Mandalapu, Rao S. |
| **Subject:** | Clinical Care Review Report |
| **Attachments:** | Clinical Care Review Report.pdf |

Dear Dr. Mandalapu:

On May 18, 2022, the operating room settings of your clinical privileges were summarily suspended upon my recommendation, since concerns were raised to suggest that aspects of your clinical practice do not meet accepted standards and potentially constitute an imminent threat to patient welfare.  The concerns were related to your technical competence in performing urological operations, your aptitude to recognize technical and judgment errors during surgery, and your ability to provide appropriate instruction and direction to trainees in the operating room.

Since then, a team of impartial urologists completed a focused review of your clinical performance.  The attached report includes their findings and conclusions, which our Executive Council of the Medical Staff (ECMS) will consider when formulating a recommendation for our Executive Medical Center Director regarding your clinical privileges.  **Please acknowledge receipt of the report by using your PIV card to complete and electronically sign page 2 of the attached document, and return the signed document to me via email.**

You have the opportunity to provide any information you desire, relating to the review team's findings and conclusions in the attached report, for consideration by ECMS.  Correspondence needs to be sent within 14 calendar days from your receipt of this notice, and be addressed to:

> VA North Texas Health Care System
> ATTN: Chief, Medical Staff Office (11G)
> 4500 S Lancaster Road
> Dallas, TX 75216

If you have any questions in this regard, please direct them to the Office of the Chief of Staff at (214) 857-1150.

Sincerely,


**Jeffrey L. Hastings, MD, MS**
Chief of Staff
VA North Texas Health Care System, Dallas, TX.
Associate Professor of Medicine
University of Texas Southwestern Medical Center at Dallas, TX
Office:(214) 857-1150    Fax:(214) 857-1171

| Patient & last 4 | Procedure | Date | Please answer the following | regarding the surgery and/or post- | operative care. |
|---|---|---|---|---|---|
| | | | Was the standard of care met? | Would a reasonably prudent urologist have recognized and addressed any complication before the end of the procedure? **Yes or No**? | Would a reasonably prudent urologist advise a trainee to perform the procedure in this manner? **Yes or No**? |
| | | | **Yes or No**? | | |
| Cases reviewed by all reviewers. | | | If "no", explain why | If "no", explain why | If "no", explain why |
| | TURP | 5/13/2022 | Reviewer #1: yes<br>Reviewer #2: No.     Reviewer #3: No, although prostate urethral injury/undermining can occur with TURP, this even and how it was managed was not the standard of care | Reviewer #1: yes     Reviewer #2: Posterior urethral injury unrecognized at time of catheter placement at conclusion of TURP. Catheter was placed outside of bladder only Reviewer #3 Yes, with a concern for difficult foley placement following TURP, and failed attempt with catheter guide, repeat cystoscopy and placement of foley over a wire should have been performed | Reviewer #1: no - I would have not left OR until catheter verified in correct position. Per operative it seems the catheter was rather forcefully placed. It is not clear that the catheter postion was verified (either by flushing catheter repeatedly or by cystogram).     Reviewer #2: No. After unsuccessful attempt at catheter placement and poor irrigation of the catheter, it is not safe to redo the attempt blindly with a catheter guide. At this point, catheter should be removed and cystoscopy performed to inspect the urethra and prostatic fossa to determine reason for unsuccessful catheter placement.     Reviewer #3: No, if there was a concern for poor foley placement, a trainee would be intructed to |
| | B ureteral catheters | 3/15/2022 | Reviewer #1: no - would not attempt placement of cone tip catheter, would not attempt placement without guide wire Reviewer #2: No. cone tip catheter should not be used to cannulate ureter, only to perform retrograde. Reviewer #3: No, cone tip catheter not tipically used for ureter identification, although what precisely caused perforation/injury is unclear, but cone tip catheter and repeated attempts to pass wire were possible causes | Reviewer #1: yes - complication was recognized by different urologist than one performing procedure however .     Reviewer #2: Yes, although a complication is not documented. Reviewer #3 Yes, with the degree of challenge to pass wire/catheter, urologist had option to forego catheter placement or obtain C-arm for intraoperative imaging | Reviewer #1: no - would not advise resident to use cone-tip catheter. This is not within standard of care. Again, concern that this catheter was forcefully placed without any sort of verification of position.     Reviewer #2: No. Cone tip should not be used as an indwelling ureteral stent. When difficulty advancing stent encountered, fluor should have been employed and a retrograde performed to ensure correct placement and to ensure no ureteral injury. Reviewer #3: No, most urologists would not use cone tip catheters for this procedure |
| | Cysto, R stent | 5/6/2022 | Reviewer #1: yes - after resident intervention. Resident seemed to force faculty to use fluoro which should not have been her role, although admirable for standing up for patient.     Reviewer #2: No complication mentioned.     Reviewer #3: Yes, but based on ROC report, because resident advocated for use of fluoroscopy | Reviewer #1: yes     Reviewer #2: No complication mentioned.     Reviewer #3: N/A | Reviewer #1: no - I would not proceed with stenting infected stone without fluoro if fluoro was availbale. This would be considered a deviation from standard of care.     Reviewer #2: Per ROC, fluoroscopy was not initially used by the surgeon , which is not SOC. However, this is not documented in OP note, so cannot comment     Reviewer #3: No, according to ROC urologist was recommending a stent placement without imaging (fluoroscopy). Image guided stent placement should be the way this is taught. |
| | R radical orchiectomy | 3/18/2022 | Reviewer #1: yes     Reviewer #2: Failure to identify spermatic cord led to performance of second incision     Reviewer #3: No, single incision is usually made for this procedure | Reviewer #1: yes     Reviewer #2: yes     Reviewer #3: N/A (complication noted intraoperatively). | Reviewer #1: yes     Reviewer #2: no     Reviewer #3: No, although patient was overweight, BMI 37, initial incision should have been made at appropriate location, or at a location where it could be extended in one direction or or both to allow for appropriate exposure |

| Patient & last 4 | Procedure | Date | Please answer the following | regarding the surgery and/or post- | operative care. |
|---|---|---|---|---|---|
| | | | Was the standard of care met? **Yes or No?** If "no", explain why | Would a reasonably prudent urologist have recognized and addressed any complication before the end of the procedure? **Yes or No?** If "no", explain why | Would a reasonably prudent urologist advise a trainee to perform the procedure in this manner? **Yes or No?** If "no", explain why |
| ▇▇▇▇▇ | TURP | 5/13/2022 | Reviewer #1: yes    Reviewer #2: Yes.    Reviewer #3: Yes. | Reviewer #1: yes    Reviewer #2: None recorded.    Reviewer #3: N/A (did not see complication noted in follow up notes, 6/24/22) | Reviewer #1: yes    Reviewer #2: yes.    Reviewer #3: yes |
| **Reviewer #1 cases** | | | | | |
| ▇▇▇▇▇ | TURBT | 4/1/2022 | yes | yes | yes |
| ▇▇▇▇▇ | TURBT | 4/8/2022 | yes | yes | yes |
| ▇▇▇▇▇ | B ureteral catheters | 4/15/2022 | yes | yes | yes |
| ▇▇▇▇▇ | restaging TURBT | 4/22/2022 | yes | yes | yes |
| ▇▇▇▇▇ | TURP | 3/11/2022 | yes (although I would argue a TRUP questionable in 79 yo after stroke on ASA 325 when not in urinary retention) | yes | yes - from a technical standpoint. My concern was more patient selection. |
| **Reviewer #2 cases.** | | | | | |
| ▇▇▇▇▇ | TURP | 5/13/2022 | Yes, not much detail in OR note. | Did not see a complication described | OP note mentions bladder tumor vs PROSTATE. No tumor in path. |
| ▇▇▇▇▇ | cysto B ureteral catheters | 3/25/2022 | Yes | No complication | Although most urologists would place stents w fluoro, this is not always practical or necessary prior to a general surgical procedure |
| ▇▇▇▇▇ | restaging TURBT | 4/22/2022 | Yes, although unclear if resection was intended to include muscle | None recorded | The operative note is not complete enough to fully describe what was done |
| ▇▇▇▇▇ | TURBT | 4/1/2022 | Yes | None recorded | Yes |
| ▇▇▇▇▇ | blue light cysto, TURBT | 4/1/2022 | No | No complication noted, although pt did visit the ED later that day for a leaking catheter. | |
| **Reviewer # 3 cases.** | | | | | |
| ▇▇▇▇▇ | cysto, urethral dilation | 4/15/2022 | Yes, however offering a patient appropriate evaluation with RUG/VCUG should be completed/documented | N/A (did not see complication noted in follow up visit on 5/31/22) | Yes, if after patient counseling he elected to proceed with one endoscopic procedure |

From: Modrall, John G.
To: Walker, Johnston B. (OGC)
Subject: FW: Reviewers for Clinical Care Reviews
Date: Monday, April 8, 2024 2:16:26 PM
Attachments: image001.png

---

**From:** Crotty, Karen L. <Karen.Crotty@va.gov>
**Sent:** Monday, July 11, 2022 2:19 PM
**To:** Modrall, John G. <John.Modrall2@va.gov>
**Subject:** FW: Reviewers for Clinical Care Reviews

You know.
When we are done, we need to write up all we learned doing this and keep it as a guide for the future (just in case).

I'm glad I was so circumspect about what I told him, because I wasn't aware I had to do the intro to the reviewers or anything.

**From:** Rivera, Raul A. <Raul.Rivera2@va.gov>
**Sent:** Monday, July 11, 2022 2:09 PM
**To:** Crotty, Karen L. <Karen.Crotty@va.gov>
**Cc:** Modrall, John G. <John.Modrall2@va.gov>
**Subject:** RE: Reviewers for Clinical Care Reviews

1. To grant CPRS access to the reviewers, your ADPAC would have to submit a VISN 17: Remote Access Request – North Texas ePas. All the required fields are the exact same as any other ePas (i.e., full name, birthdate, SSN). If your ADPAC needs help, Darin MacCatherine in our office has done this for others in the recent past.
2. You send the list to the panel and explain your expectations when you meet with them to discuss the review purpose, scope and methodology, and establish a reasonable timeline.

**From:** Crotty, Karen L. <Karen.Crotty@va.gov>
**Sent:** Sunday, July 10, 2022 1:02 PM
**To:** Rivera, Raul A. <Raul.Rivera2@va.gov>
**Cc:** Modrall, John G. <John.Modrall2@va.gov>
**Subject:** RE: Reviewers for Clinical Care Reviews

Raul
Sent an email to Dr Jordan to see if he's got 3rd person yet and when we can have teams meeting.

A few logistical questions.
1. I just got asked to do an OPPE for a urologist in El Paso. But I can't get into the CPRS of El Paso to review the notes. (Oddly enough, I had to do a FPPE on the same provider with Dr Uhlenhuth about 6 months back: they ended up scanning clinic notes and sending them to us in Email attachments)
I'm going assume the Long beach docs will have the same issue accessing DVAMC/VSN 17 charts. Who can help me with what to tell them?

2. Now, I made the packets of 10 cases with the 3 problem cases embedded in the list (but not highlighted). I sent them to you (but I obviously still have them on my computer). Do I send those to the members of the panel or is that someone in the email addresses below??

Finally, the letter suspending his privileges has an anniversary date of the 16th, so I'll reach out this week to get another letter.

Thanks.

**From:** Rivera, Raul A. <Raul.Rivera2@va.gov>
**Sent:** Wednesday, July 6, 2022 5:41 PM
**To:** Crotty, Karen L. <Karen.Crotty@va.gov>; Jozwiak, Karolina J <Karolina.Jozwiak@va.gov>; Modrall, John G. <John.Modrall2@va.gov>
**Cc:** Filer, Christopher P. <Christopher.Filer@va.gov>; Hastings, Jeffrey <Jeffrey.Hastings@va.gov>; Holt, Stephen R. <Stephen.Holt@va.gov>; Nokai, April K. <April.Nokai@va.gov>; Potu, Rajani <Rajani.Potu2@va.gov>
**Subject:** RE: Reviewers for Clinical Care Reviews

**Karolina** – Thank you!

**Drs. Crotty/ Modrall** – In the absence of available reviewers from V17, Ms. Jozwiak contacted Dr. Mark L. Jordan (562-826-8000 ext. 5562), Chief of Urology at Long Beach VAMC, who agreed to assist with our Clinical Care Review and make another urologist available to complete the panel. At this juncture, I suggest you schedule a Teams meeting with Dr. Jordan and his colleague, along with Dr. Jeffrey Gahan (local panel lead), to go over the review purpose, scope and methodology, and to establish a reasonable timeline for the review.

The results of the review must be submitted in writing to the Service Chief and Chief of Staff, for subsequent presentation and discussion at ECMS. The report should contain Purpose or Charge, Scope, Information/Data Source, Findings/Results, and Conclusions. Included in the report package should be all supporting information, such as the specific results of the individual medical record reviews, summaries of interviews, supporting literature, etc.

I recommend against asking the panel to make recommendations. Instead, after evaluating the panel's findings/conclusions and in consultation with the Chief of Staff, the Service Chief should make one of the following three recommendations when the review is presented to ECMS:

- Concern for provider's clinical performance is unsubstantiated and no further action is needed,
- Concern for provider's clinical performance is substantiated, but provider should be placed on a "FPPE for Cause" with clearly defined expectations and outcomes that afford the provider the opportunity to demonstrate improvement and requisite skill, or
- Concern for provider's clinical performance is substantiated, and concern for patient safety is so great that provider should not retain privilege(s) and action is to be taken to move toward privilege reduction/revocation/removal.

**From:**     Modrall, John G.
**To:**         Walker, Johnston B. (OGC)
**Subject:**   FW: focused clinical review
**Date:**      Monday, April 8, 2024 2:19:40 PM

---

**From:** Crotty, Karen L. <Karen.Crotty@va.gov>
**Sent:** Monday, July 25, 2022 1:35 PM
**To:** Jordan, Mark Louis <Mark.Jordan2@va.gov>; Gahan, Jeffrey C. <Jeffrey.Gahan@va.gov>; Moskowitz, Ross M (University of California Irvine) <Ross.Moskowitz@va.gov>
**Cc:** Modrall, John G. <John.Modrall2@va.gov>; Loughlin, John F. <John.Loughlin2@va.gov>
**Subject:** RE: focused clinical review

John
Can you please help.
I need to set up a teams meeting with Drs Jordan, Moskowitz, Gahan and myself for this Wednesday at 1700 CDT.  I sent out an invite but theirs no Teams link to it.

Could you please send out an invite for me?

---

**From:** Crotty, Karen L.
**Sent:** Monday, July 25, 2022 12:34 PM
**To:** Jordan, Mark Louis <Mark.Jordan2@va.gov>; Gahan, Jeffrey C. <Jeffrey.Gahan@va.gov>; Moskowitz, Ross M (University of California Irvine) <Ross.Moskowitz@va.gov>
**Cc:** Modrall, John G. <John.Modrall2@va.gov>
**Subject:** RE: focused clinical review

Thank you.    I have sent out an invite for Wednesday, 7/25 at 1700 CDT for a teams meeting to Dr Jordan, Dr Moskowtiz, and Dr Gahan.

Jeff    Please let me know if the invite makes it clear that it's on Teams.

---

**From:** Jordan, Mark Louis <Mark.Jordan2@va.gov>
**Sent:** Monday, July 25, 2022 11:52 AM
**To:** Gahan, Jeffrey C. <Jeffrey.Gahan@va.gov>; Crotty, Karen L. <Karen.Crotty@va.gov>; Moskowitz, Ross M (University of California Irvine) <Ross.Moskowitz@va.gov>
**Cc:** Modrall, John G. <John.Modrall2@va.gov>
**Subject:** RE: focused clinical review

# Could do Wed at 1700 CDT (1600 PDT)



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**William Moorhead Federal Building**
**1000 Liberty Avenue, Suite 1801**
**Pittsburgh, PA 15222**

**This equal employment opportunity investigative document contains identifiable personal data that is subject to the Privacy Act of 1974, 5 U.S.C. Sec. 552a. Release of such data must be in accordance with the provisions of the Act, as amended. The unauthorized release of this information could subject the releaser to formal disciplinary action and/or criminal penalties, including a fine of up to $5,000.00.**

**Investigative Report`**
**In the Matter of the EEO Complaint of Discrimination of Rao Mandalapu**

| | | |
|---|---|---|
| Rao Mandalapu | ) | |
| Complainant | ) | |
| | ) | |
| | ) | |
| v. | ) | ORM No. 2003-549A4-2022-147508 |
| | ) | |
| Secretary | ) | |
| Department of Veterans Affairs | ) | |
| 810 Vermont Avenue NW | ) | |
| Washington, DC 20420 | ) | |
| Respondent | ) | |

Facility:
Veterans Affairs Medical Center, Dallas TX

Theresa D. Brunson, JD
EEO Investigator
David Jones CPA PC
827 Fairways Court, Suite 304
Stockbridge, GA 30281



**DEPARTMENT OF VETERANS AFFAIRS**
**Office of Resolution Management, Diversity & Inclusion**
**William S. Moorhead Federal Building**
**1000 Liberty Avenue, Suite 1801**
**Pittsburgh, PA 15222**

Table of Contents
Case No. 2003-549A4-2022-147508

**1. Formal Complaint**
Formal Complaint                                    1-1
Investigator Assignment Letters                     1-2

**2. EEO Counselor's Report**
Counselor's Report                                  2-1
Notice of Right to File                             2-2
Notice of Rights and Responsibilities              2-3

**3. Procedural Review**
Notice of Acceptance                                3-1

**4. Settlement Agreements**                        4-1
Reserved

**5. Prior Appellate Activity**                     5-1
Reserved

**6. Report of Investigation Summary**              6-1

**7. Exhibits, Evidence**
Affidavit & Supp Docs of Complainant               7-1
Affidavit & Supp Docs of Karen Crotty (RMO)        7-2
Affidavit & Supp Docs of John Modrall (RMO)        7-3
Affidavit of Kathy Rodgers (Witness)               7-4
Affidavit & Supp Docs of Kendrick Brown (Witness)  7-5
Affidavit & Supp Docs of Raul Rivera (RMO)         7-6
Dept VA HR Memo 8.10.2022                           7-7
Dept of VA Request for Info. HWE Questionnaire     7-8
RMO EEO Training Report                             7-9
Current Practitioner Privilege Procedure Listing   7-10
Text Messages re Use of Annual Leave Time          7-11
Leave Use Summary 9.26.2021 – 8.3.2022             7-12
CP Request for Use of Annual Leave                 7-13
Pretext Document by Complainant - Karen Crotty     7-14
Pretext Document by Complainant - John Modrall     7-15
Pretext Document by Complainant – Raul Rivera      7-16

1

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**Continental District**
**Houston, TX  77030**

**Rao Mandalapu**
**Table of Contents**
**2003-549A4-2024-157842**

**1. Formal Complaint**
Formal Complaint                                          1-1
Investigator Assignment Letters                          1-2

**2. EEO Counselor's Report**
Counselor's Report                                       2-1
Notice of Right to File                                  2-2
Notice of Rights and Responsibilities                    2-3

**3. Procedural Review**
Notice of Acceptance                                     3-1
Notice of Receipt                                        3-2

**4. Settlement Agreements**
 Reserved Sheet                                          4-1

**5. Prior Appellate Activity**
Reserved Sheet                                            5-1

**6. Report of Investigation Summary**
ROI                                                      6-1

**7. Exhibits, Evidence**
Affidavit of Complainant, Rao Mandalapu                  7-1
Affidavit of RMO Raul Rivera                             7-2
Affidavit of RMO Jason Cave                              7-3
Affidavit of RMO John Modrall                            7-4
Affidavit of RMO Kendrick Brown                          7-5
Affidavit of RMO Karen Crotty                            7-6
SF50 RMO Karen Crotty                                    7-7
Medical Release Form                                     7-8
Agency EEO Office Email Regarding RMO Hastings           7-9

1    them to -- you don't want them to -- to teach them how

2    to stick the wrong catheters in ureters or to put a

3    Foley catheter in the space behind the bladder and not

4    do an x-ray to confirm the location of the catheter

5    before you leave the OR.

6        Q.   (By Mr. Robertson)  So going back to where

7    these boxes, then, with direction to trainees --

8        A.   It's not there.

9        Q.   But you didn't indicate these concerns --

10       A.   It's not there.

11       Q.   Dr. Crotty, you did not indicate these

12   concerns in your narrative; correct?

13       A.   The concern was that he stuck the wrong

14   catheter in a ureter.

15       Q.   All right.  And following the issuance -- the

16   issuance -- the suspension, a comprehensive review is

17   supposed to be conducted; right?

18       A.   Yes.

19       Q.   And you were ultimately responsible for

20   coordinating the panel members?

21       A.   No.  That's not true.

22       Q.   No?

23       A.   Huh-uh.  That was Dr. Rivera.

24       Q.   Okay.  I'm going to pull up -- this is Agency

25   Prehearing Report, Exhibit 5.  Apologies, your Honor.

 1  It's the Prehearing Report for case 1, Exhibit 5.  Is

 2  that -- is this your e-mail right here?

 3      A.   Yes.

 4      Q.   And it's an e-mail to Dr. Jordan indicating

 5  that it's an invite for three doctors?

 6      A.   Yes, but I didn't create the panel.

 7  Dr. Rivera did.

 8      Q.   Okay.  But you coordinated the panel members

 9  meeting?

10      A.   The first meeting.

11      Q.   Is that a "yes"?  You did?

12      A.   Yes.  I did not make the panel.  So precision

13  is important.  I did not create or pick the members of

14  the panel.  I did coordinate the first meeting of them.

15      Q.   And you previously mentioned that Dr. --

16  Dr. Gahan, he was involved in that March surgery in the

17  same capacity as you; correct?

18      A.   Yes.

19      Q.   So he was personally involved in one of the

20  surgeries that they were reviewing?

21      A.   Not the surgery, but trying to undo it.

22      Q.   So he was -- he was basing his opinion on

23  different information, though, than the other two panel

24  members?

25      A.   He had more, but the other panel members had

1    access to all the op notes and progress notes that were

2    done after that problem.

3        Q.    But you mentioned the op reports indicate

4    that -- the May 2022 op report stated no complications;

5    correct?

6                      MR. WALKER:  Objection.

7    Mischaracterization, your Honor.

8                      THE COURT:  She also stated just now

9    that they also had access to progress notes, which I

10   don't think were part of the operative reports by the

11   resident.  So I'm sustaining the objection.

12       Q.    (By Mr. Robertson)  So in your experience,

13   it's not abnormal that Dr. Gahan was part of this

14   panel?

15       A.    I've never been involved in a panel before;

16   so I don't know what's regular or not.

17       Q.    Did the other panel members know that

18   Dr. Gahan was involved in some capacity in one of the

19   surgeries that they were reviewing?

20                     MR. WALKER:  Objection.  Calls for

21   speculation.

22                     MR. ROBERTSON:  Your Honor, I asked if

23   -- if she knew --

24                     THE COURT:  If she knows, she can

25   answer it.  Go ahead if you know the answer,

1  Dr. Crotty.

2              THE WITNESS:  I don't know.  I was on

3  the phone to introduce the topic, and then I got off so

4  they could talk among themselves without me influencing

5  them.  I don't know what they talked about.

6      Q.   (By Mr. Robertson)  Why were you concerned

7  about influencing them?

8      A.   I didn't want there to be any impropriety or

9  appearance of impropriety.

10     Q.   And having one of the -- a doctor with

11  personal involvement in one of the reviews wouldn't

12  give the appearance of impropriety?

13              MR. WALKER:  Objection.  Calls for

14  speculation.

15              THE COURT:  I'm going to overrule it.

16  Answer if you are able, Dr. Crotty.

17              THE WITNESS:  As I recall, the panel

18  required one of the urologists on the panel to be from

19  the facility.  That would mean Dr. Gahan or Dr. Kim, in

20  which case, one of the persons on the panel had to be

21  involved in one of his complications.

22              THE COURT:  Let me interrupt.  I do

23  have a question right now.  Why would it have been only

24  Dr. Gahan or Dr. Kim?  Weren't there other urology

25  surgeons available at that time?

```
 1                    THE WITNESS:  Not at that time.  It
 2  was Rao, me, Kim, and -- me, Dr. Mandalapu, Kim, and
 3  Gahan.  I think Dr. Uhlenhuth had retired by then.
 4                    THE COURT:  Thank you.
 5                    MR. ROBERTSON:  I didn't catch the
 6  start of your response.  Why would it have to have been
 7  Dr. Gahan on there?  Why couldn't all three have been
 8  from a different hospital?
 9                    THE WITNESS:  You'll have to ask
10  Dr. Rivera that.  I was told that one of the members of
11  the panel is usually from the facility.  I did not have
12  anything to do with the construction of the panel.
13      Q.   (By Mr. Robertson)  Okay.  During the
14  comprehensive review period, Dr. Mandalapu was supposed
15  to be provided certain due process rights; is that
16  correct?
17      A.   Yes.
18      Q.   And you -- shortly after the issuing of the
19  suspension letter, did Dr. Mandalapu reach out to you
20  and ask for specifics about why he was suspended?
21      A.   Yes.
22      Q.   And you didn't bring up the two concerns that
23  were mentioned in your e-mail when he asked, did you?
24      A.   I don't remember our conversation exactly,
25  but it would have been, "There have been some
```

1  complications that would be unexpected for somebody who

2  has finished residency.  They were complications in

3  basic cases that were concerning."

4      Q.   So you did not tell him the two surgeries

5  that resulted in the suspension letter?

6      A.   Yes, I did.

7      Q.   You told him when he asked you -- when did

8  you provide that information to him?

9      A.   I do not know.  I don't remember the exact

10 date.

11     Q.   Still on the Prehearing Report, Case 1, going

12 to PDF page 12.  Do you recall sending this e-mail on

13 May 29th to Dr. Modrall and Dr. Rivera?

14     A.   Can you go to the one above?  Okay.  You're

15 going too fast.  Go back.  Okay.

16     Q.   So this is your e-mail; correct?

17     A.   It appears.

18     Q.   Do you not recall sending this e-mail?

19     A.   Specifically, no.

20     Q.   In this e-mail, this is where you're sending

21 information to Dr. Mandalapu about his FPPE and focused

22 clinical reviews; is that correct?

23     A.   Well, it appears to me that it's an e-mail

24 asking Greg and Rao if it was okay to send it by e-mail

25 since he had been -- he was sick, not in office, and I

1  wanted to make sure that he got his information.

2      Q.   And did you end up sending this e-mail or

3  this information?

4      A.   I do not remember.

5              THE COURT:  Just to make sure that I

6  have not misheard, did you -- Mr. Robertson, did you

7  use the acronym FPPE?

8              MR. ROBERTSON:  Yes.

9              THE COURT:  Where is that in this?

10  I'm sorry.  Okay.  Thank you very much.  Okay.

11      Q.   (By Mr. Robertson)  What was your

12  understanding of the amount of information that an

13  employee's entitled to following a summary suspension?

14      A.   It appears to me, based on that, I was

15  sending him the part of the handbook regarding the

16  process that gave him all of his rights and privileges.

17              THE COURT:  Let me interrupt.  I want

18  to ask -- this line of questioning -- are you going to

19  continue this?  I'm sorry, Mr. Robertson, but I'm going

20  to have to ask you --

21              MR. ROBERTSON:  It's -- it's my -- I'm

22  done with -- I'm leading into my next line right now.

23              THE COURT:  Okay.

24      Q.   (By Mr. Robertson)  Do you recall sending an

25  e-mail in July of 2022 discussing your conversations

1    with Dr. Mandalapu about the reasons for his summary

2    suspension?

3         A.   Do I -- no, I don't recall.  There were a lot

4    of e-mails sent during this process.  If you have one

5    you would like me to look at, I would be happy to.

6         Q.   Yes.  I'm going to pull up Agency -- still in

7    the same prehearing report -- Agency Exhibit 10.  This

8    is an e-mail from you to Dr. Modrall on July 11th; is

9    that right?

10        A.   Say it again?

11        Q.   This is an e-mail that -- from you --

12        A.   Okay.  Yeah.

13        Q.   And you state in there, "I'm glad I was so

14   circumspect about what I told him because I wasn't

15   aware I had to do the intro to the reviewers or

16   anything."  Can you please explain what you meant by

17   that?

18        A.   I don't remember.

19        Q.   In what context -- when you say you were

20   being circumspect, what do you mean by that?

21        A.   I don't remember.

22        Q.   Circumspect -- and correct me if you have a

23   different understanding -- is that unwillingness to

24   take a risk?  When would you use that word?

25        A.   When you're being careful about word choice.

```
 1      Q.   So you --

 2      A.   But it was made clear to him that --

 3      Q.   I'm -- excuse me.

 4      A.   Sorry.  Go ahead.

 5      Q.   So you tailored the information that you

 6  provided him in order to, I guess, avoid risk of some

 7  kind?

 8      A.   No.

 9                THE COURT:  I'm going to ask the

10  attorney -- can you explain to me the relevance of --

11  of this line of questioning?

12                MR. ROBERTSON:  Sure.  It seems -- it

13  appears, on the face of this e-mail, that Dr. Crotty

14  was aware that Dr. Mandalapu was requesting specifics

15  about the reason all this was going on, and that she

16  was actively withholding information, and she was glad

17  that she did it because she was afraid, it seems, to

18  provide inconsistent information or there was a risk

19  with regards to what she could have told him versus

20  what she was going to tell the reviewers.

21                It didn't seem like there would be a

22  reason to tell Dr. Mandalapu something different than

23  the reviewers.

24                MR. WALKER:  Your Honor, the Agency

25  would object.  That testimony is not being consistent
```

1  at all with what the e-mail says.  The e-mail speaks

2  for itself.

3              THE COURT:  So this is what I'm trying

4  to figure out.  If the process involves Dr. Mandalapu

5  responding to a report generated by the focused

6  clinical care review panel, then I don't understand the

7  relevancy of what he did or did not know before that

8  time through someone who was not part of that panel.

9              MR. ROBERTSON:  More so, your Honor,

10  it goes toward why -- why the information would be

11  different when provided to Dr. Mandalapu than when

12  presented to the reviewers.

13              THE COURT:  Okay.  Where are you

14  reading that?  Where are you coming up with the

15  information being different?

16              MR. ROBERTSON:  I understand -- she

17  said she was circumspect, cautious with what she told

18  Dr. Mandalapu because she didn't know that she was

19  going to have to talk to the reviewers.

20              And I was just trying to ascertain

21  whether there was inconsistencies that she was worried

22  about, and that's why -- like, why would she not tell

23  Dr. Mandalapu all the same things that she was going to

24  tell the reviewers if they're all reviewing the same

25  information, the same allegations?

1          Why be cautious about the information
2  that you provide to the person being investigated?
3                THE COURT:  So let me ask you this.
4  Dr. Crotty, if you can recall, what do you mean here
5  when you said "do the intro to the reviewers"?  Do you
6  recall?  It's been a long time.
7                THE WITNESS:  It's been a long time,
8  and I don't remember.
9                THE COURT:  Okay.
10                THE WITNESS:  I told him that we were
11  doing it because of concerns, adverse outcomes on
12  relatively basic cases.  That was told to him
13  frequently.  I told him the process, that we'll be
14  sending cases to outside reviewers.
15                He would ask me, frequently, questions
16  that either I couldn't answer, I didn't know the answer
17  to, and that's why I kept saying, you know, "Look.
18  Here.  Here.  Here's the handbook.  Here's your rights.
19  Go."
20                When it came to the intro, I got on.
21  I said, "We have concerns regarding a urologist and his
22  ability to do basic procedures," and then, as I said, I
23  excused myself and got off so they could do their work
24  without me there.
25                THE COURT:  Next question,

1  Mr. Robertson.

2      Q.    (By Mr. Robertson)  What questions did he ask

3  you that you didn't know the answer to?

4      A.    I don't remember.  He asked the same ones

5  frequently, though.

6      Q.    But you don't remember those, but they were

7  asked frequently?

8      A.    Those -- I don't remember what I didn't know

9  the answers to, but he asked, "Why is this happening?"

10          "Because there were complications in basic

11  surgeries that we were concerned about."

12      Q.    And you also -- did you also issue the

13  summary suspension extension letters following --

14      A.    I didn't issue any letters.

15      Q.    You handed them to Dr. Mandalapu?

16      A.    That was -- it was assigned to me, tasked to

17  me to do that, so, yes.

18      Q.    And you were tasked with handing

19  Dr. Mandalapu the extension letters as well?

20      A.    Yes, and having him sign them.

21      Q.    Okay.  And you provided those, all of the

22  extension letters that you handed to Dr. Mandalapu,

23  with your affidavit?

24      A.    Sorry.  Sorry.  I didn't hear the start of

25  your question.

```
 1        Q.   No problem.  So did you provide a copy of all

 2   the extension letters that you were tasked with handing

 3   to Dr. Mandalapu with your affidavit for the

 4   investigation in this case?

 5        A.   I didn't turn over anything.  Are you asking

 6   did I -- are you asking did I give copies to him?  Or

 7   did I give copies to y'all?  Or what?  I don't

 8   understand the question.

 9        Q.   I'll rephrase.  Do you recall providing an

10   affidavit of testimony during the investigation into

11   this matter?

12        A.   It's been a while.  So if you say I did, I

13   did.

14        Q.   So you don't know if you filled out an

15   affidavit?

16        A.   I filled out -- he -- we -- I received

17   numerous things from EEO over my time there, and once

18   since I left, regarding questions regarding

19   discrimination based on age, and something else, and

20   then finally on -- no.  The last one was disability.

21   So I received a lot of -- is that -- was that an

22   affidavit?

23        Q.   I --

24        A.   Is that the affidavit you're talking about?

25        Q.   Strike that.  I'm going to move on.  You
```

```
 1  retired in July 2023; correct?

 2       A.   Yes.

 3       Q.   And that was one month after Dr. Mandalapu

 4  resigned?

 5       A.   Yes.

 6       Q.   All right.  And -- but the panel that you

 7  conducted, that occurred back in --

 8       A.   I didn't conduct the panel.

 9       Q.   The panel members met --

10       A.   Yes.

11       Q.   -- in July/September 2022?

12       A.   I -- I -- I was on there first.  After that,

13  they did their work.

14       Q.   And after you were done with that, did you

15  have any involvement in any aspect of the summary

16  suspension going forward?

17       A.   When they finished their review, the only

18  thing that I had to do with the panel after that was to

19  put their responses on an Excel spreadsheet that would

20  go to the executive medical staff committee meeting.

21            I summarized -- I took their three Excel

22  sheets and put them into one, and then I sent it to the

23  executive medical committee.

24       Q.   At that point, the executive medical

25  committee was -- they reviewed that and then provided
```

1  recommendations to the medical director; is that

2  correct?

3       A.   I wasn't in the meeting.  The only

4  information -- I didn't hear about it, so -- except

5  that -- about the unanimous vote to continue the

6  suspension of his OR privileges.  I wasn't in the

7  meeting.

8       Q.   When was that?  Do you recall when the

9  unanimous decision was made?

10      A.   I think it was September 2023.  But, like I

11  said, I wasn't in on it.

12      Q.   And -- so -- and you said the decision was to

13 remain suspended indefinitely?

14      A.   The only reason I know what happened there

15 was because I had to do the packet for -- that was for

16 his termination.  So I read the minutes.  And I think

17 the end of the minutes said that it was because they're

18 moving for a termination.

19      Q.   Okay.

20      A.   From -- so continued suspension while doing

21 the termination work.  That's my paraphrasing.

22      Q.   Your Honor, Ms. Velasquez -- it's time for a

23 comfort break.  And I'm pretty sure I'm done, but I'll

24 look through my notes, and I figure now might be a good

25 time for that.

```
 1                      THE COURT:  Off the record, please.
 2                      (Whereupon, a break was taken from
 3   2:10 p.m. - 2:45 p.m. Central Time.)
 4                      THE COURT:  I think the way we left it
 5   was Mr. Robertson was going to look over his notes and
 6   finish with his direct of Dr. Crotty.  Go ahead,
 7   please.
 8                      MR. ROBERTSON:  Just a few more
 9   questions.  Dr. Crotty, you testified that you learned
10   about the decision made by ECMS after the panel review
11   at some point; is that correct?
12                      THE WITNESS:  I learned about the
13   decision to continue the suspension of OR privileges
14   almost immediately because that affects scheduling.
15   But the discussion and all that, I did not know
16   anything about that until the -- until I had to start
17   preparing the packet.
18       Q.  (By Mr. Robertson)  Who informed you of that?
19       A.  I don't remember, but it was probably
20   Dr. Modrall, who was in the meeting.
21       Q.  Okay.  And after they notified you of that,
22   when was the next update that you received about
23   Dr. Mandalapu's privileges?
24       A.  Well, there wasn't an update.  It was an
25   ongoing suspension.
```

1      Q.   So then, I guess, after you received that

2   information, did they come every month and tell you

3   that it was still suspended?

4      A.   I would -- I would phrase it as it was never

5   lifted.

6      Q.   Do you recall, after learning of that

7   decision, did you hand Dr. Mandalapu any more extension

8   letters?

9      A.   I don't remember.  If I'm -- if I had a

10   letter, I presented it.

11      Q.   But you don't specifically recall handing him

12   --

13      A.   After September, no, I don't remember if I

14   did or if I didn't.

15      Q.   Do you recall if Dr. Mandalapu was made aware

16   of the outcome of the ECMS in the same way that you

17   were?

18      A.   I don't recall if I'm the one who told him or

19   not.  I don't recall.

20      Q.   Did you ever receive any phone calls from any

21   potential employers regarding Dr. Mandalapu?

22      A.   Yes.

23      Q.   And when was that?

24      A.   Sometime after he left.

25      Q.   And --

```
 1       A.    I think -- before I -- after he left and
 2  before I left.
 3       Q.    And what did you tell them?
 4                    MR. WALKER:   Objection.  Relevance,
 5  your Honor.
 6                    MR. ROBERTSON:   Your Honor, it goes
 7  toward damages.
 8                    MR. WALKER:   How would her phone call
 9  be a damage from something else?
10                    MR. ROBERTSON:   Your Honor, would you
11  like me to address his question?
12                    THE COURT:   Yes.  Go ahead.
13                    MR. ROBERTSON:   There's been a lot of
14  testimony, specifically yesterday, about the subsequent
15  effect of the retaliation and harassment and
16  discrimination that occurred prior to Dr. Mandalapu
17  seeking employment elsewhere; and so the information
18  provided by Dr. Crotty would be relevant to that.
19                    THE COURT:   Your Honor, our position
20  would be that's a new claim.
21                    THE COURT:   You know, I think it
22  probably would be a separate claim, but, however, I
23  also think that it would have to do with evidence
24  toward whether or not Dr. Mandalapu sought to mitigate
25  his damages.
```

```
 1                    So I wouldn't consider it as --
 2   obviously, I'm not going to add it as a brand-new
 3   claim, but I will consider it with respect to
 4   mitigation of damages.  Dr. Crotty, you can answer.
 5                    THE WITNESS:  I said that I wouldn't
 6   be comfortable discussing Dr. Mandalapu.
 7        Q.   (By Mr. Robertson)  And that was the extent
 8   of the conversation?
 9        A.   Yep.
10        Q.   Okay.  Did you -- what did they ask you
11   initially?
12        A.   "This is Somebody Somebody from Somebody
13   Hospital.  We're calling you about Dr. Mandalapu, who's
14   joining.  Could we put you down for a reference?"  And
15   I said that I wasn't comfortable discussing
16   Dr. Mandalapu.
17        Q.   Did they ask to confirm that he was employed
18   under you at some point?
19        A.   I don't remember.
20        Q.   No further questions.  Thank you.
21        Q.   (By Mr. Walker)  Thank you.  Dr. Crotty, I'm
22   Johnston Walker with the Agency.  Good to see you.
23   We've spoken before, but I don't know if we've ever
24   spoken where I had my camera on.
25                    I wanted to ask you about the -- the May
```

# <u>Exhibit-M</u>

<u>Contents:</u>

1. On September 30, 2022, Plaintiff submitted a response to the FCCR review, accompanied by documented evidence contradicting the factual inaccuracies.
2. No response from the Chief of Staff and the Director of the Medical Center to the contradiction.
3. Refused to disclose conflicts of interest of the reviewers.

Dear Dr. Hastings/Mr. Brown,

I have received Clinical Review Committee report on 9/27/2022.

I would like to submit response to the committee's reported highlighted cases with documented evidence in support of my claim.

**Brief background:**

I have staffed 728 patients/procedures in about 6-months (attached Case list Jan-June 2022_Total pts). and I have staffed about 130 surgical procedures over 6-months (attached Case list Jan-June 2022_surgeries). As you can see from the ICD10 codes and CPT codes, more than 90 percent of my patients are urologic cancer patients. Most of my surgeries are complex urologic cancer surgical procedures.

The VASQIP (VA Surgical Quality Improvement Program) reviews all the surgeries on quarterly basis and reports surgical complications (attached UROLOGY MORBIDITY FY 2022_RM).

As per the VASQIP report, I have NO surgical complications reported on my name (UROLOGY MORBIDITY FY 2022_RM).

To the best of my knowledge, the complications rate is calculated as:  To calculate a surgeon's rate of complications, number of the surgeon's patients who suffered a complication by the total number of surgeries he or she performed.

I believe the clinical care review report is NOT based on the facts but based on the perceptions. I have enclosed detailed documented evidence in support of my claim.


1. ███████████████████ :

Procedure: cystoscopy and bilateral ureteral stent placement 3/15/2022 @7.53AM ██████
████████████████

Surgeon(s): Rao Mandalapu, MD, Karen Crotty, MD and Jeffrey Gahan, MD

Indications: A 59-year-old male with recurrent diverticulitis proceeding to OR with general surgery for Robotic sigmoidectomy

Complication: Unable to cannulate and place a stent into left ureter. Possible injury to the distal left ureter.

Intra-operative complication noted, and urology team (Dr. Karen Crotty and Dr. Jeffrey Gahan) attempted to place left ureteral stent without success (████████████████ .
██████████ )

Surgical outcome: Follow up retrograde pyelogram documented normal caliber left ureter. No perforation or stricture noted. (██████████████████████ )

This case was reviewed by three reviewers (2 from outside VA) independently reviewed charts in CPRS.

Was standard of care met?
Reviewer #1: no - would not attempt placement of cone tip catheter, would not attempt placement without guide wire
Reviewer #2: No. cone tip catheter should not be used to cannulate ureter, only to perform retrograde.
Reviewer#3: No, cone tip catheter not typically used for ureter identification, although what precisely caused
perforation/injury is unclear, but cone tip catheter and repeated attempts to pass wire were possible causes

Answer to the reviewers' comments:

1. I had a scheduled Robotic radical prostatectomy and pelvic lymph node dissection on 3/15/2022 @7.45 AM (Op report ███████████████████ )
2. This procedure was started by myself (operative report attached for your review ████████████ ) and Dr. Karen Crotty took over the case because I was doing Robotic surgery in another room and Dr. Jeffrey Gahan joined Dr. Crotty to assist the procedure as well (Op report ████████████ ).
3. Finally, none of the three urologists (Rao Mandalapu, Karen Crotty and Jeffrey Gahan) could not successfully canulate the left ureter and place a stent into left ureter despite using Fluoroscopy guidance and ureteroscopy guidance due to underlying disease process.
4. The reviewers committee members did not review/acknowledge any of these details as documented in the operative report.
5. All the three reviewers committee of physicians echoed the same pointing out 'cone tip catheter'.
6. The real time operative report dictated by the resident documented (copy attached- ████████tents-page 3)
   *"The cone tip catheter was advanced 1 to 2 mm into the ureteral orifice, but it was felt that it would be unlikely to advance more proximally, so this was withdrawn. This was exchanged through the working channel for a 5- French Pollock catheter."*
   *'Guidewires used-straight sensor, Bentson wire and a hydrophilic Glide wire.'*
   **It was felt that it would be unlikely to advance more proximally, so the cone tip catheter was withdrawn. This was a conscious decision made by me not to get the cone tip catheter into the ureter. So, the cone tip catheter was never inserted into the ureter and was never intended to do so. I believe operating surgeon has freedom of selecting his operative instruments to his comfort based on his experience with those instruments.**
7. I gave detailed explanation of rationale of using 'cone tip catheter' to the chief of surgery, Dr. John Modrall (copy attached-RE ██████████████ )

8. Again, the cone tip catheter was never inserted into the ureter, but only 1 mm to 2 mm into the ureteral orifice within the bladder wall. The ureter was presumably injured at least 40 mm to 60 mm away from the ureteral orifice (intravesical portion of the ureter approx. 15 mm to 25 mm and the distal ureter proper was about 20 mm to 40 mm where the suspected ureteral injury might have occurred).

9. The reviewers did not acknowledge operative reports properly. There was no mention of operative team including Drs. Rao Mandalapu, Karen Crotty and Jeffrey Gahan. The reviewers did not acknowledge left distal ureter might have entangled in the inflammatory mass secondary to the recurrent diverticulitis. So, the reviewers did not consider all factors such as patient factors, underlying disease process and surgical/technical difficulties.

Addendum:
I would like to bring to your attention that ███████████████████ was scheduled on the same day and at the same time when I had a robotic radical prostatectomy and pelvic lymph node dissection was scheduled on 3/15/2022.

So, I was assigned two surgeries on the same day at the same time in two different operative rooms. (Op note attached-████████████)

I did at least 9 similar cases since December 2021 till my operative privileges were summarily suspended by you on 5/18/2022. The specific intra operative ureteral stent placement procedures dates including 12/10/2021, 02/25/2022, 03/15/2022, 03/25/2022, 03/29/2022, 04/05/2022, 04/15/2022, 04/22/2022, and 05/10/2022.

To be fair, please review all similar cases and report the complication rate and if that complication was expected as reported in the literature or never been reported elsewhere?


2. ████████████████

Procedure: Transurethral resection of the prostate 05/13/2022 @09:14 (op ███████████████
Surgeon: Caleb Ashbrook, MD, Attending: Dr. Mandalapu
Procedure was uneventful.

Indications: A 61-year-old male with BPH w/ LUTS with failed medical therapy.

Complication: Post op urinary retention, malposition of the Foley catheter, possible injury to the prostatic urethra.

Complication management: Foley catheter placement

Surgical outcome: Foley catheter was removed pre-maturely by the ED and the patient was able to void without any difficulty that was documented by measuring post void residuals. No sequel documented.

This case was reviewed by three reviewers (2 from outside VA) independently reviewed charts in CPRS.

Was standard of care met?

Reviewer #1: yes
Reviewer #2: No. (Reviewer did not provide his reasons)
Reviewer #3: No, although prostate urethral injury/undermining can occur with TURP, this even and how it was managed was not the standard of care.

Answer to the reviewers' comments:

The Foley catheter was flushed and aspirated and confirmed to be in the bladder and CBI was started in the operating room which was running at fast drip rate. (op report_____TURP)

Op notes:
*This was not successful so we then remove the catheter and reattempted with a catheter guide. This was felt to be in appropriate position, with return of fluid with inflation of balloon. CBI was initiated, but was running slower than expected. The catheter was repositioned and we were able to flush and aspirate through the catheter. The bladder irrigation increased to a fast drip rate. At this point, a belladonna and opium suppository was placed and the procedure was terminated. The patient was extubated and taken to the PACU in stable condition*

DISPOSITION
PACU then floor for postoperative management

The patient was awakened and left the operative room on 5/13/2022 at 11.24 AM with 2L saline bag CBI (Continuous Bladder Irrigation) to the PACU then to the surgical floor.
I did see him on Post op rounds- patient was sleeping comfortably at about 4.30 PM on 5/13/2022. CBI was noted running well, and Foley catheter was noted draining well. (Note documented in the chart by RN)

I think, if the Foley catheter was not in the bladder, CBI can't run continuously because the bladder only accommodates the continuous flow and drains out through the Foley catheter.

At this point in time, post op care was handed over to Dr. Nancy Kim who was on call/covering physician on that day.

5/13/2022 happened to be a Friday and I did not get a chance to see the patient due to weekend.

Evidently, I was not involved in the post operative management.

Post op management by Dr. Nancy Kim who should explain why she has ordered CT-urogram on simple post op urinary retention patient? what has happened to the Foley catheter and why the

Foley catheter was migrated to the dome of the bladder approx. 8-10 cm away from the bladder neck into the posterior urethra?

3. ███████████ :

Procedure: Right radical inguinal orchiectomy 03/18/2022 @12:10 (████████████)

Indications: A 30-year-old male presented with abdominal pain. CT scan showed bulky retroperitoneal lymphadenopathy. Scrotal ultrasound demonstrated 1 cm intratesticular mass suspicious for testicular cancer.

Complications:  None

Surgical outcome: He did well, and he was discharged home on the same day of surgery.

This case was reviewed by three reviewers (2 from outside VA) independently reviewed charts in CPRS.

Was standard of care met?

Reviewer #1: yes
Reviewer #2: Failure to identify spermatic cord led to performance of second incision
Reviewer #3: No, single incision is usually made for this procedure

Answer to the reviewers' comments:

This patient was obese and has variable anatomy that is usually seen in newborn kids or in early childhood. Anatomic variations are fairly common in some of the cancer patients due to underlying disease process or congenital malposition.

The reviewers dropped the ball again, not reading the operative notes or understanding the operative steps.
I request the reviewers to note that there was NO second incision for this surgery. I did clearly document that incision was made on the external oblique facia, to accommodate anatomic variation. Please review the operative note one more time if you can change your review.

To the best of my knowledge, the operating surgeon makes appropriate decisions while operating based on the surgical challenges.
The three reviewers did not review the op note properly and confused on extending facial incision for a second incision.
Let me clarify that this surgery was done with a single incision only.

Op note: (████████)

*We again identified the external inguinal ring, and made a fascial knick with the Bovie and extended this lateral with Metzenbaum scissors.  With extensive*

*retraction, we attempted to identify the spermatic cord, but we were eventually unable to.  We reevaluated attempted to identify the position of the external inguinal ring once more.  A slightly superior and medial incision was made on the external oblique fascia in similar fashion to as above.  Again we attempted to identify the spermatic cord, but likely due to excessive inguinal fat, we are unable to successfully identify this.*

*We then traced the spermatic cord back up to the external ring.  This appeared to be immediately overlying the internal ring, so no fascial incisions were extended or new ones made.*

4: ███████████████████ :

    Procedure: Cystoscopy, right ureteral stent placement 05/06/2022 @16:33 ████████ )

    Indications: A 73-year-old male with right ureteral stone.

    Complications:  None

    Surgical outcome: He did well.

This case was reviewed by three reviewers (2 from outside VA) independently reviewed charts in CPRS.

Was standard of care met?

Reviewer #1: yes - after resident intervention. Resident seemed to force faculty to use fluoro which should not have been her role, although admirable for standing up for patient.
Reviewer #2: No complication mentioned.
Reviewer #3: Yes, but based on ROC report, because resident advocated for use of fluoroscopy

Answer to the reviewers' comments:

I don't know what to answer to these reviewers. The review was totally baseless.

Please see the attached operative report for your review (████████). Is there anything in the operative report in support of reviewer's comments?

Evidently, the reviewers committee members made allegations based on the perceptions, not based on the facts.

Please disclose the identity of the reviewers if they can testify their reviews under the Oath.

Thank you,
Sincerely,
Rao Mandalapu, MD

# Exhibit-N

## Contents:

1. On November 16, 2022, ECMS convened to discuss FCCR review under Dr. Hastings, Chief of Staff.

2. Dr. Gahan, as a reviewer, has participated in surgeries reviewed with direct conflicts of interest and is implicated in the protected activity.

3. The Medical Center Director should decide within five days after the ECMS, which triggers fair hearing procedures.

**ECMS minutes:** (Reproduced from the ECMS minutes note) **(p48)**

**Dr. Hastings, Chief of staff:**
*Dr. Mandalapu's comments to the reviewers - he doesn't know what to answer to the reviewers because the review is totally baseless. Please see the attached OP report. Is there anything in the OP report to support the reviewers' comments? Evidently, the reviewers' committee members made allegations based upon the perceptions, not based upon facts. Please disclose the identity of the reviewers if they can testify to the reviews under the Oath.*
**Dr. Gahan**: *This one goes back to, there is a ROC by one of our residents, so it is a bit of a he said, she said kind of situation, and there was no harm done to the patient, so this is just kind of taking her word. Why else would you write something like this unless you felt there was something going wrong? I think it just goes back, the dictation and the operative reports don't necessarily or ever discuss what we were talking about before surgery unless it's directly related to the patient. I would certainly never expect to see the resident put in an operative report for me. We talked about using this device or that device, and then we decided to use this device instead. That's not so to say that this wouldn't show up in OP report, I don't think that's where we would expect to see any of this kind of dialogue.*

This was the explanation/justification by Dr. Gahan, who would not be participating in this committee due to conflicts of interest per VHA policies. I have not seen any ROC, and that's totally irrelevant to the surgery, and the CRC review report never submitted any documented evidence supporting their review.

**Evidently,** the ECMS discussion had **'no content'**; the discussion was not about the surgical complications or surgical technique but some strange, non-existent, imaginary, intentional, baseless, and irrelevant content. However, **the ECMS decision was not to reinstate operative privileges.**

The ECMS reviewers were under the EEOC and OIG investigations and should not be participating in the administrative review process due to **legal conflicts of interest**.

**The Complainant has been stating the same since August 2022 and has not received a response.**

**This self-explanatory documented evidence demonstrates the integrity and credibility of the Ethical leadership at the VA North Texas Health Care System.**

*I am a urologic oncology fellowship-trained urologist who has done over 5,200 urologic surgical procedures. I am obligated to keep up the reputation of my training Institutes, and I believe operative privileges are certified by the training Institutes.*

*I did request the leadership in writing that if you don't like me working with you for unknown reasons, I would be happy to leave the service without question. However, the administration chose to humiliate/torture/ridicule my professional qualifications and threatened to report to the National Practice Data Base (NPDB) and medical boards if I left the service while under investigation. The investigation process has lasted for about a year now. Since my operative*

# Exhibit-O

Contents:

1. On August 3, 2022, the Chief of Staff reported the NPDB report
2. The Chief of Staff under affidavit at the time of the NPDB report.
3. The NPDB report was disputed for factual inaccuracies, for failing to meet reporting requirements, and for failing to follow the process to conduct due process.

National Practitioner Data Bank
Health Resources and Services Administration
U.S. Department of Health and Human Services
P.O. Box 10832
Chantilly, VA 20153-0832
https://www.npdb.hrsa.gov

DCN: 5500000214857488
Process Date: 08/03/2023
Page: 1 of 3
MANDALAPU, RAO S
For authorized use by:
MANDALAPU, RAO S

# MANDALAPU, RAO S

## VA NORTH TEXAS HEALTH CARE SYSTEM

| TITLE IV CLINICAL PRIVILEGES ACTION | Date of Action: 05/18/2022 |
|---|---|
| **Initial Action** | **Basis for Initial Action** |
| - SUSPENSION OF CLINICAL PRIVILEGES<br>- VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE (S), WHILE UNDER, OR TO AVOID, INVESTIGATION RELATING TO PROFESSIONAL COMPETENCE OR CONDUCT | - SUBSTANDARD CARE OR INADEQUATE SKILL LEVEL |

| A. REPORTING ENTITY | | |
|---|---|---|
| | Entity Name: | VA NORTH TEXAS HEALTH CARE SYSTEM |
| | Address: | 4500 S LANCASTER RD OFC 11G |
| | | CHIEF OF STAFF |
| | City, State, Zip: | DALLAS, TX 75216-7167 |
| | Country: | |
| | Name or Office: | MEDICAL STAFF OFFICE |
| | Title or Department: | CHIEF OF STAFF OFFICE |
| | Telephone: | (214) 857-4195 |
| | Entity Internal Report Reference: | |
| | Type of Report: | INITIAL |

| B. SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL) | | |
|---|---|---|
| | Subject Name: | MANDALAPU, RAO S |
| | Other Name(s) Used: | |
| | Gender: | MALE |
| | Date of Birth: | 04▮▮▮▮▮ |
| | Organization Name: | |
| | Work Address: | |
| | City, State, ZIP: | |
| | Home Address: | 3710 N BRAESWOOD BLVD |
| | City, State, ZIP: | HOUSTON, TX 77025-3104 |
| | Deceased: | NO |
| | Social Security Numbers (SSN): | ***-**-3▮ |
| | National Provider Identifiers (NPI): | |
| | Professional School(s) & Year(s) of Graduation: | ▮▮▮▮▮▮▮ |
| | Occupation/Field of Licensure: | PHYSICIAN (MD) |
| | State License Number, State of Licensure: | ▮▮▮▮▮ |
| | Specialty: | UROLOGICAL SURGERY |
| | Drug Enforcement Administration (DEA) Numbers: | ▮▮▮▮▮ |
| | Name(s) of Health Care Entity (Entities) With Which Subject Is Affiliated or Associated (Inclusion Does Not Imply Complicity in the Reported Action): | |
| | Business Address of Affiliate: | |
| | City, State, ZIP: | |
| | Nature of Relationship(s): | |

AI

National Practitioner Data Bank
Health Resources and Services Administration
U.S. Department of Health and Human Services
P.O. Box 10832
Chantilly, VA 20153-0832
https://www.npdb.hrsa.gov

DCN: 5500000214857488
Process Date: 08/03/2023
Page: 2    of    3
MANDALAPU, RAO S
For authorized use by:
MANDALAPU, RAO S

| **C. INFORMATION REPORTED** | | |
|---|---|---|
| Type of Adverse Action: | TITLE IV CLINICAL PRIVILEGES | |
| Basis for Action: | SUBSTANDARD CARE OR INADEQUATE SKILL LEVEL (F6) | |
| Adverse Action Classification Code(s): | SUSPENSION OF CLINICAL PRIVILEGES (1630) VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE(S), WHILE UNDER, OR TO AVOID, INVESTIGATION RELATING TO PROFESSIONAL COMPETENCE OR CONDUCT (1635) | |
| Date Action Was Taken: | 05/18/2022 | |
| Date Action Became Effective: | 05/18/2022 | |
| Length of Action: | PERMANENT | |
| Description of Subject's Act(s) or Omission(s) or Other Reasons for Action(s) Taken and Description of Action(s) Taken by Reporting Entity: | Physician voluntarily resigned on June 2, 2023, while under investigation for professional incompetence and misconduct, prior to the Medical Center Director taking a final privileging action or closing the investigation based on the findings and recommendation of the Professional Standards Board. | |

| **D. SUBJECT STATEMENT** | |
|---|---|
| | If the subject identified in Section B of this report has submitted a statement, it appears in this section. |

Date Submitted:  08/16/2023

The notice of summary suspension of operative privileges dated 05/18/2022 violated VHA policy (VHA Handbook 1100.19).  The following rights of the candidate were missing in the summary suspension of operative privileges notice: 1. The summary suspension of operative privileges notice was missing "No statement on the reason for the summary suspension of privileges. 2. The summary suspension of privileges notices must include the candidate's opportunity to respond within 14 calendar days  3. Right to be represented by an attorney throughout the proceedings. 4. The comprehensive review of the reasons(s) for the summary suspension must be accomplished within 30 calendar days of the suspension 5. The comprehensive review of the reasons for the summary suspension was never disclosed to the candidate. 6. In sum, summary suspension of operative privileges 'without cause' and the candidate was not allowed to respond violating VHA 1100.19. The service chief expressed concerns about two minor surgeries that led to the summary suspension of all operative privileges: 1. The complainant reported that both patients are doing fine and have no concerns about the quality of patient care  2. The service chief's complaint was a 'false allegation.' The complainant expressed concerns about managing post-operative urinary retention requiring a Foley catheter placement in an ambulatory surgical procedure (TURP). I did not handle the post-operative care. This was falsely attributed to me. 3. I have submitted documented evidence showing I had no reportable surgical complications and no patient care issues throughout my stay at the VA service I have submitted a written request that the review process should be conducted by a third party blinded to the facility and people or the OIG or academic center The comprehensive review of the reasons(s) for the summary suspension must be accomplished within 30 calendar days of the suspension. I have never received any review reports summary suspension of privileges for over a year (384 days) In May 2023, I notified the medical center director, requesting to relieve me from the VA service after a year of summary suspension of operative privileges (May 2022 to May 2023) without disclosing the reasons for the summary suspension violating multiple VHA policies. This workplace harassment had a tremendous impact on my professional and personal life/family life. I resigned from the VA service on 06/05/2023 Reporting to NPDB:1. VA North Texas Health Care System Title IV clinical privileges action report dated 08/03/2023. The report was not submitted in accordance with NPDB reporting requirements VHA policy VHA Handbook 1100.17  The Director of the

National Practitioner Data Bank
Health Resources and Services Administration
U.S. Department of Health and Human Services
P.O. Box 10832
Chantilly, VA 20153-0832
https://www.npdb.hrsa.gov

DCN: 5500000214857488
Process Date: 08/03/2023
Page: 3 of 3
MANDALAPU, RAO S
For authorized use by:
MANDALAPU, RAO S

VA medical center must file an adverse action report within 15 calendar days. The physician must be offered due process  Response: Not filed within 15 calendar days of leaving the VA service and No due process was offered to the practitioner per the VHA Handbook 1100.19  Summary suspension of clinical privileges pending review by the executive committee of the medical staff or other review panel is not reportable per VHA 1100.17 p.14. The NPDB report was not submitted in accordance with NPDB reporting requirements  U.S. Equal Employment Opportunity Commission (EEOC):1. In August 2022, The EEOC/OAWP initiated an investigation against the section chief, chief of surgery, chief of staff, and the Director of the medical center on charges of Racial discrimination, Retaliation after the fact, workplace harassment, VHA policy violations, and abuse of power of authority. They should not be involved in any review process or reporting process due to conflicts of interest and Retaliation.  Despite written requests and documented conflicts of interest testified under the Oath continued filing false allegations, and suspended privileges without cause for 384 days in retaliation violating VHA policy and civil rights.

| **E. REPORT STATUS** | Unless a box below is checked, the subject of this report identified in Section B has not contested this report. |
|---|---|
| | [X] This report has been disputed by the subject identified in Section B. |
| | [ ] At the request of the subject identified in Section B, this report is being reviewed by the Secretary of the U.S. Department of Health and Human Services to determine its accuracy and/or whether it complies with reporting requirements.  No decision has been reached. |
| | [ ] At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services and a decision was reached. The subject has requested that the Secretary reconsider the original decision. |
| | [ ] At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services. The Secretary's decision is shown below: |
| | Date of Original Submission:     08/03/2023 |
| | Date of Most Recent Change:     08/03/2023 |

| **F. SUPPLEMENTAL SUBJECT INFORMATION ON FILE WITH DATA BANK** | The following information was not provided by the reporting entity identified in Section A of this report. The information was submitted to the Data Bank from other sources and is intended to supplement the information contained in this report. |
|---|---|
| | Occupation/Field of Licensure:  Physician (MD) |
| | State License Number, State of Licensure:  ███████ |
| | Occupation/Field of Licensure:  Physician (MD) |
| | State License Number, State of Licensure:  ████████ |

**This report is maintained under the provisions of:** Title IV

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the provisions of Title IV of Public Law 99-660, as amended, and 45 CFR Part 60. All information is confidential and may be used only for the purpose for which it was disclosed. Disclosure or use of confidential information for other purposes is a violation of federal law. For additional information or clarification, contact the reporting entity identified in Section A.

─────────── **END OF REPORT** ───────────

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**                **AI**

 Gmail

**rao ms <msrao17@gmail.com>**

---

## Request to withdraw NPDB/SLB report

---

**rao ms** <msrao17@gmail.com>                                    Fri, Aug 25, 2023 at 8:41 AM
To: Wendell.Jones@va.gov, xavier.becerra@hhs.gov, Roma.Nelson@va.gov, Mark.Wilson5@va.gov
Cc: rao ms <msrao17@gmail.com>

Hi Mr. Jones Wendell,
I would like to bring to your attention that the director of the VA North Texas Health Care System (under VISN 17) submitted a clinical privileges action report to the NPDB/SLB on 08/03/2023.
The NPDB/SLB report disputed the factual accuracy of the report and the NPDB report was not submitted in accordance with the NPDB reporting requirements.
I have submitted 'prima facie' supporting my request to withdraw the NPDB/SLB report immediately as this report violates VHA policies, violates Bylaws, and violates civil rights.
Therefore, my humble request is to withdraw the NPDB/SLB report immediately.
I have submitted documented evidence showing I have never had any reportable surgical complications (Clavien II/III or more) as per the VASQIP (VA Surgical Quality Improvement Program) and I have never had any patient care issues or any patient complaints and I have never had any malpractice or Tort claims against me.
This mail is copied to the Honorable United States Secretary of Health and Human Services, Mr. Xavier Becerra, Assistant Under Secretary for Health for Operations, Veterans Health Administration, Department of Veterans Affairs, Ms. RimaAnn O. Nelson and VHA Executive Director, National Surgery Office, Dr. Mark Wilson as well.
Again, I humbly request you to investigate the summary suspension of operative privileges according to the VHA policies by independent third-party board-certified surgeons or by the OIG as I had previously requested on multiple occasions if found reportable to the NPDB/SLB as in accordance with the NPDB reporting requirements, you may submit the NPDB/SLB report until then, current NPDB/SLB report should be withdrawn immediately as the NPDB/SLB report violates VHA policies and NOT in accordance with the NPDB reporting requirements (Prima facie evidence attached-NPDB reporting).
I have submitted the same request to the director of the VA North Texas Health Care System as shown below. (forwarded)

Thank you,

Respectfully,

Rao Mandalapu, MD

---------- Forwarded message ---------
From: **rao ms** <msrao17@gmail.com>
Date: Wed, Aug 23, 2023 at 8:08 AM
Subject: Request to withdraw NPDB/SLB report
To: <Jason.Cave2@va.gov>, <xavier.becerra@hhs.gov>
Cc: rao ms <msrao17@gmail.com>

Hi Mr. Jason Cave,
I am Rao Mandalapu, a staff physician at the VA North Texas Health Care System from 10/12/2021 to 06/05/2023.
I request you to withdraw the NPDB report DCN: 5500000214857488 (The VA North Texas Health Care System Title IV clinical privileges action report dated 08/03/2023) immediately.
The NPDB report disputed the factual accuracy of the report and the report was not submitted in accordance with the NPDB reporting requirement.
Please find the attached documented report explaining the disputed reasons. I will be happy to provide you with documented evidence supporting my request.
I request you to withdraw the NPDB/SLB report immediately as it affects my professional career and I lost my job due to the NPDB report.

**AI**

Case 3:25-cv-01320-L     Document 17-2     Filed 11/26/25     Page 217 of 295     PageID 345

Please investigate the disputed facts if the findings with documented evidence qualified to support reportable to the NPDB, you may submit the report to the NPDB after the investigation on non-disputable issues.

I strongly believe this is illegal to violate civil rights to ridicule my professional qualifications without documented evidence and the NPDB report was not submitted in accordance with the NPDB reporting requirements.

This mail is copied to the Honorable United States Secretary of Health and Human Services, Mr. Xavier Becerra as well.

I request you withdraw the NPDB report immediately. You may investigate the disputed issues by the OIG or a third-party academic institute for the factual documented evidence supporting reportable to the NPDB as a new NPDB report.

I would appreciate your response.

Thank you,
Respectfully,
Rao Mandalapu, MD

 **NPDB reporting.pdf**
255K

August 27, 2023

Dr. Shereef Elnahal,
Honorable U.S. Under Secretary for Health.

I am Rao Mandalapu, MD, a staff physician at the VA North Texas Health Care System (VISN 17) **from 10/12/2021 to 06/05/2023**.

The director of the VA North Texas Health Care System (VANTHCS) summarily suspended operative privileges on 05/18/2022 in response to a 'false allegation.' (Summary suspension of privileges notice)

I have submitted documented evidence to the director of the VANTHCS showing that summary suspension of operative privileges was based on a 'false allegation' (Complaint to suspend operative privileges, forwarded mail have complete documented evidence)

The summary suspension of privileges without a 'reason' and 'without due process' violates VHA policy and civil rights. (Comm_JC_042023, Summary suspension of privileges notice)

   a. *The notice of summary suspension needs to contain a notice to the individual of all due process rights. NOTE: See Appendix E for Sample Advisement to Licensed Health Care Professional of Summary Suspension of Clinical Privileges. (VHA Handbook 1100-19, p51)*
   b. *The notice must include a statement of the practitioner's right to be represented by an attorney or other representative of the practitioner's choice throughout the proceedings. (VHA 1100.19, p53)*
   c. *The practitioner must be allowed to review all evidence not restricted by regulation or The statute upon which proposed changes are based. Following that review, the practitioner may respond in writing to the COS's written notice of intent. The practitioner must submit a response within 10 business days of the COS's written notice and access to the available evidence. If requested by the practitioner, the COS may grant an extension for a brief period, normally not to exceed 10 additional business days, except in extraordinary circumstances. (VHA 1100.19, p53)*
   d. *VA reports only final actions sustained for physicians and dentists to the NPDB, but due process procedures are required for all privileged practitioners for whom revocation occurs. (VHA 1100.19, p56)*

A focused clinical review (FCR) or Clinical Review Committee (CRC) report was not based on the documented evidence violating VHA policy and was 'illegal' due to conflicts of interest. (Comm_JC_042023)

   1. *The Reviewer is responsible for withdrawing from participation in a case review if they had direct involvement with the patient care. (VHA Directive 1190, p14)*
   2. *The Reviewer is responsible for withdrawing from the Review where there is a conflict of interest. (VHA Directive 1190, p14)*

**AI**

Due to legal conflicts of interest, I made written objections to the director of VANTHCS ECMS review having to be an independent, impartial team of experts. (FW_JC_Request to reinstate privileges, Email communication with leadership, Email response to the adverse evaluation)

The director of the VANTHCS submitted the NPDB/SLB report Title IV clinical privileges action on 08/03/2023.

The comprehensive review of the reasons(s) for the summary suspension must be accomplished within 30 calendar days of the suspension (05/18/2022) per VHA Handbook 1100.19. The director of the VANTHCS submitted the NPDB/SLB report Title IV clinical privileges action on 08/03/2023, i.e., 443 days after summary suspension of privileges violating VHA Handbook 1100.19/violation Bylaws/violating civil rights/abusing power of authority/legal conflicts of interest.

The NPDB report was NOT submitted in accordance with the NPDB reporting requirements. (Copy attached-NPDB report)

1. NPDB/SLB report timeline:
    1. 05/18/2022: Summary suspension of operative privileges without disclosing the reasons despite innumerable requests (Summary suspension of privileges)
    2. 05/29/2023: re-credentialing privileges application submitted and confirmed receipt of the same on 05/30/2023 (FW_Recredentialing Packet)
    3. 06/05/2023: Resigned from the VA service as the summary suspension of operative privileges for 384 days of intentional humiliation/harassment/ridicule of professional qualifications and intentional violation of VHA policies/civil rights. (Comm_JC_042023)
    4. 08/03/2023: The director of the VANTHCS submitted an NPDB/SLB report pending investigation for 443 days, violating VHA policies and legal conflicts of interest. (NPDB report)
    5. 08/23/2023: Requested the director of the VANTHCS to withdraw the NPDB/SLB report as the report was disputed with factual accuracy, and the NPDB report was NOT submitted in accordance with the NPDB reporting requirements. (Request to withdraw NPDB/SLB report)
    6. 08/25/2023: Request submitted to the director of VISN 17 to withdraw the NPDB/SLB report as the NPDB report was NOT submitted per the NPDB reporting requirements. (Request to withdraw NPDB/SLB report)

I made innumerable requests to assign to the Office of Inspector General (OIG) or a third-party academic institute to review all my surgeries in accordance with the VHA policy.
I have submitted a list of all surgeries, VASQIP reports, operative reports, post-operative care reports, and VHA policy violations to the chief of staff and the director of the VANTHCS in response to the 'false allegations' without documented evidence in the name of 'Clinical Review Committee report (CRC) or Focused Clinical Review (FCR) on 09/30/2022. (CRC-Response report).

**AI**

**In sum**, the VANTHCS leadership summarily suspended operative privileges for 443 days without a reason and submitted the NPDB/SLB report Title IV privileges action violating multiple VHA policies/violating civil rights/abusing power of authority/legal conflicts of interest.

I request to withdraw the NPDB/SLB report submitted illegally and not in accordance with the NPDB reporting requirements.

I sincerely hope the leadership will take firm action against those who violates VHA policies/violates civil rights/and abuse power of authority to protect current and future physicians willing to serve our veterans.

This email with supportive documents was copied to other dignitaries, as mentioned below, for their input.

Thank you,

Respectfully

Rao Mandalapu, MD

PS: Copy to:
1. The U.S. Secretary of Health and Human Services
2. VHA Executive director, National Surgery Office
3. Assistant Deputy Under Secretary for Health

**AI**

Ref: **DCN:** 5500000214857488
 MANDALAPU, RAO S

1. SUSPENSION OF CLINICAL PRIVILEGES
2. VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE (S), WHILE UNDER, OR TO AVOID, INVESTIGATION RELATING TO PROFESSIONAL COMPETENCE OR CONDUCT

**Dispute the factual accuracy of the report/or the report was not submitted in accordance with NPDB reporting requirements.**

1. **SUSPENSION OF CLINICAL PRIVILEGES:**

   1. The VA North Texas Health care System Title IV clinical privileges action report dated 08/03/2023

   2. The Director of VA North Texas Health Care System (Director of the medical center) notice of summary suspension of operative privileges dated 05/18/2022 violated VHA policy (VHA Handbook 1100.19). The following rights of the candidate were **missing** in the notice:

      1. The summary suspension of operative privileges notice was missing "No statement on the reason for the summary suspension of privileges."(VHA 1100.19)
      2. The summary suspension of privileges notices must include the candidate's opportunity to respond within 14 calendar days:
         1. *You have the opportunity to provide any information you desire to provide regarding these concerns. The correspondence needs to be sent within 14 calendar days from your receipt of this notice and be addressed to: (VHA Handbook 1100.19 Appendix E).*
      3. You have a right to be represented by an attorney or other representative of your choice throughout the proceedings.
      4. The comprehensive review of the reasons(s) for the summary suspension must be accomplished within 30 calendar days of the suspension, with recommendations to proceed with formal procedures for reduction or revocation of clinical privileges forwarded to me for consideration and action. Within 5 working days of receipt of the recommendations, I will make a decision either to restore your privileges to an active status or that the evidence warrants proceeding with a reduction or revocation process.
      5. The comprehensive review of the reasons for the summary suspension was never disclosed to the candidate.

1

**AI**

      **6.  In sum, summary suspension of operative privileges 'without reason' and the candidate was not allowed to respond violating VHA 1100.19**

2.  I made innumerable written requests to the director of medical center and other higher officials in the VA system to disclose the reasons for the summary suspension of operative privileges and never received a response.

3.  In April 2023, I received a copy of a complaint from the service chief dated 05/14/2022, expressing concerns about two minor surgeries that led to the summary suspension of all operative privileges. (C- complaint attached)

    1.  The complainant reported that **both patients are doing fine** and **have no concerns about the quality of patient care**. I do not know why the medical center director summarily suspended all operative privileges without any evidence of life-threatening complications or imminent danger to the health and safety of patients. Moreover, the complaint was on two minor procedures with **non-reportable surgical complications**, but the Director issued a summary suspension of all operative privileges without disclosing reasons for the summary suspension of operative privileges violating VHA policy.

    2.  The service chief's complaint dated 05/14/2022 was a **'false allegation.'** The leadership intentionally refused to disclose to the candidate until April 2023 despite innumerable requests to disclose the reasons for the summary suspension violating VHA 1100.19. The complainant expressed concerns about managing post-operative urinary retention requiring a Foley catheter placement in an ambulatory surgical procedure (TURP). I did not handle the post-operative care but the current service chief of urology. This was falsely attributed to me.

    3.  I have submitted detailed documented evidence dated 09/30/2022 to the chief of staff and the director of the medical center showing the '**focused clinical review (FCR)**' was based on a '**perception**' NOT based on a '**fact**'. The facts are the documented evidence that I have submitted contrary to the FCR report. I have the copy of the documents for review on demand.

    4.  The chief of staff and the director of the center's legal neglect' of documented evidence was a prejudice and intentional.

    5.  I have submitted detailed documented evidence dated 04/12/2023 to the Professional Standard Board (PSB) and the director of the medical center showing the complaint was prejudiced, intentional, violating VHA policies, violating civil rights, abusing the power of authority, and was a **false allegation**. (Copy attached-summary suspension of operative room setting)

    6.  I have submitted documented evidence showing I had **no reportable surgical complications** and **no patient care issues** throughout my stay at the VA service. The copy of the VASQIP submitted to the chief of staff and the director of the medical center on 9/30/2022.

**AI**

7. All the documented evidence that I have submitted on multiple occasions, including operative reports, post-operative care reports, and supportive documentation, were ignored and never acknowledged continued filing false allegations.

8. I could have submitted the explanation dated 04/12/2023 to the medical center director, the chief of surgery, and the chief of staff on 05/14/2022 if they had asked me to respond to the service chief's concerns on those two surgeries per the VHA policy. (VHA 1100.19).

9. The director of the medical center, service chief, chief of surgery and chief of staff violated VHA policies and civil rights, abusing the power of authority intentionally created 'false allegations' and issued summary suspension of operative privileges notice without disclosing the reasons and not allowing to respond to the reasons of suspension. (VHA Handbook 1100.19)

10. The director of the medical center, service chief, chief of surgery and chief of staff were under EEOC investigation since August 2022 for violating civil rights. I have submitted written objection to the director of the medical center against involving service chief of urology, chief of surgery, chief of staff and the director of the medical center in the investigation/administrative process due to '**conflicts of interest'** and the investigation process should be assigned to **the OIG or a third party outside the VA facilities blinded to the facility and people to be fair and independent impartial investigation.**

11. The director of the medical center ignored all my written requests and documented evidence is prejudiced.

## 2. VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE (S):

1. The Director of VA North Texas Health Care System (VANTHCS) notice of summary suspension of operative privileges dated 05/18/2022.

2. The summary suspension of operative privileges violating VHA policy as mentioned in page:1.

3. The summary suspension notice as per the VHA 1100.19 Appendix E should include:

   A. *The comprehensive review of the reasons(s) for the summary suspension must be accomplished within 30 calendar days of the suspension, with recommendations to proceed with formal procedures for reduction or revocation of clinical privileges forwarded to me for consideration and action. Within 5 working days of receipt of the recommendations, I will make a decision either to restore your privileges to an active status or that the evidence warrants proceeding with a reduction or revocation process.*

4. I never have had received the comprehensive review of reasons for the summary suspension within 30 calendar days.

3

**AI**

5. The summary suspension of privileges continued without disclosing reasons and review of reasons for more than a year (443 days) violating VHA policy/civil rights.
6. The VANTHCS notified me in May 2023 to re-apply for the operative privileges.
7. I did complete VetPro update and submitted re-credentialing application in May 2023 and also confirmed from the service chief that they have received the same.
8. I did not surrender clinical privileges voluntarily but the VA administration falsely reported to the NPDB is predetermined and prejudiced.

3. I have had experienced terrible **workplace harassment/intentional humiliation** and **racial discrimination/retaliation** for 384 days while awaiting to complete the investigation from the date of summary suspension (05/18/2022) to the date of resignation (06/05/2023).

   1. The EEOC initiated an investigation against the service chief, chief of surgery, chief of staff, and the medical center director for violating civil rights since August 2022.
   2. The medical center director, chief of staff, chief of surgery, and the service chief should not be participating in any review process of summary suspension of privileges due to conflicts of interest as they are testified under the Oath by the EEOC investigating agency.
   3. I have submitted a written objection participating those under EEOC investigation to the Director of the medical center and the chief of staff due to legal conflicts of interest.
   4. I made written request to the medical center director and the chief of staff that the review process of summary suspension of operative privileges should be conducted by a third party blinded to the facility and people or the OIG (Office of the Inspector General) or an academic institute outside Texas.
   5. I have submitted a written request to the Director of the medical center and the chief of staff requesting that the review process of summary suspension of operative privileges should be conducted by a third party blinded to the facility and people or the OIG (Office of the Inspector General).
   6. Apparently, the medical center director ignored all my written objections and requests to refrain those under investigation by the EEOC from the summary suspension review process due to conflicts of interest.
   7. The medical center director never acknowledged all the documented evidence that I have submitted against the **'false allegations".** (Copy Attached-Summary probationary review)
   8. I brought to the attention of the medical center director multiple VHA policies violations (written documentation) in the review process of summary suspension of operative privileges, but he never responded to the VHA policy violations and written requests objecting involving those under EEOC investigation.

4. The comprehensive review of the reasons(s) for the summary suspension must be accomplished within 30 calendar days of the suspension as per the notice/VHA policy (VHA 1100.19). I have never received any such comprehensive review reports or

**AI**

extenuating reasons for extending summary suspension of privileges for over a year (443 days).

5. In May 2023, I notified the medical center director, requesting to relieve me from the VA service after a year of summary suspension of operative privileges (May 2022 to May 2023) without disclosing the reasons for the summary suspension violating multiple VHA policies, work place harassment and violating civil rights. This workplace harassment had a tremendous impact on my professional and personal life/family life.

6. After serving the notice in May 2023, I resigned from the VA service on 06/05/2023 to move on with my life. NPDB report dated 08/03/2023.


**Reporting to NPDB:**

1. **VA North Texas Health care System Title IV clinical privileges action report dated 08/03/2023 (DCN: 5500000214857488)**
2. The report was **not** submitted in accordance with NPDB reporting requirements VHA policy VHA Handbook 1100.17.

    i. The Director of the VA medical center must file an adverse action report, on behalf of the VA medical facility and on behalf of any satellite clinics operated by them, within 15 calendar days of the date the action is made final by the signature of the Medical Center Director, with the: (a) NPDB (VHA 1100.17)

      **Response:**

      A. The VA North Texas Health Care System Title IV, clinical privileges action report, dated 08/03/2023. This report was **not submitted within 15 calendar days** according to the VHA 1100.17

    ii. The summary suspension of the privileges review process was non-compliant according to the VHA policy.

      A. Prior to approving the NPDB report, the Medical Center Director must notify the practitioner to be reported and provide the practitioner an opportunity for discussion with appropriate facility officials, including the Medical Center Director, before the report is submitted. (VHA 1100.17)

      **Response:**
      1. The medical center director **did not notify** the practitioner prior to approving the report violating VHA policy (VHA 1100.17).
      2. **Never** provide the practitioner an opportunity for discussion before the report is submitted. (VHA 1100.17 policy violation)

**AI**

4. The physician must be offered due process (as outlined in VHA Handbook 1100.19) regarding the reduction and revocation of privileges.

**Response:**

**a. No due process** was offered to the practitioner per the VHA Handbook 1100.19.

**b.** Therefore, **the NPDB report was not submitted in accordance with NPDB reporting requirements** VHA Handbook 1100.17 and VHA 1100.19.

7. It is intended that the report be filed within 15 calendar days of the date the action is made final by the signature of the VA Medical Center Director.

1. After serving the notice to the medical center director in May 2023, I resigned from the VA services effective 06/05/2023.
2. After leaving the VA service (06/05/2023), the medical center director should not be processing my file when I was not in the service.
3. The report was not submitted in accordance with NPDB reporting requirements VHA Handbook 1100.17.

**2. <u>Summary suspension of clinical privileges pending review by the executive committee of the medical staff or other review panel is not reportable</u>** per VHA 1100.17 p.14.

a. The medical center director summarily suspended operative privileges on 05/18/2022. The summary suspension of privileges violated VHA Handbook 1100.19 policies as explained on page.1.
b. No **reasons** for the summary suspension were mentioned in the notice, and the candidate was not given the opportunity to respond to the reasons for the summary suspension violating VHA policy.
c. The comprehensive review of the reasons(s) for the summary suspension must be accomplished within 30 calendar days of the suspension as per the notice/VHA policy. **Non-complaint with the VHA policy**.
d. I have never received any comprehensive review reports within 30 calendar days of summery suspension of operative privileges.
e. I have never received extenuating reasons for extending the summary suspension of privileges for over a year (384 days) violating VHA policy.
f. After serving the notice to the medical center director in May 2023, I resigned from the VA services effective 06/05/2023.
g. After leaving the VA service (06/05/2023), the medical center director or the chief of staff should not be processing my file when I was not in the service effective from 06/05/2023.
h. The NPDB report was not submitted in accordance with NPDB reporting requirements VHA Handbook 1100.17.

**U.S. Equal Employment Opportunity Commission (EEOC):**

1. In August 2022, The EEOC/OAWP initiated an investigation against the section chief, chief of surgery, chief of staff, and the Director of the medical center on charges of Racial discrimination,

**AI**

Retaliation after the fact, workplace harassment, VHA policy violations, and abuse of power of authority.

2. I made numerous written requests to the Director of the medical center and the chief of staff to refrain from the review process of summary suspension of operative privileges and any involvement of those involved in the EEOC investigation testimony under the Oath to avoid legal conflicts of interest.

3. I made a written request to the Director of the medical center and the chief of staff to assign the review process of summary suspension of privileges to a third party blinded to the facility and people or to the OIG (Office of the Inspector General) or an academic institute outside the TX state to be fair and independent impartial academic institute to avoid conflicts of interest while EEOC investigation continues.

4. My written objections were ignored and continued to make false allegations is prejudiced and in Retaliation to the EEOC investigation.

**AI**



MS <urodoc7@gmail.com>

---

## FW: Recredentialing Packet for VA North Texas Health Care System
1 message

---

**Mandalapu, Rao S.** <Rao.Mandalapu@va.gov>                    Wed, May 31, 2023 at 11:06 AM
To: "urodoc7@gmail.com" <urodoc7@gmail.com>

---

**From:** Mandalapu, Rao S.
**Sent:** Tuesday, May 30, 2023 1:51 PM
**To:** Crotty, Karen L. <Karen.Crotty@va.gov>
**Cc:** Luna-McGimsey, Michelle E. <Michelle.Luna-McGimsey@va.gov>
**Subject:** RE: Recredentialing Packet for VA North Texas Health Care System


Hi Dr. Crotty,

Please find the attached recredentialing packet for your approval.

Thank you,

Rao

---

**From:** Luna-McGimsey, Michelle E. <Michelle.Luna-McGimsey@va.gov>
**Sent:** Monday, May 29, 2023 6:35 PM
**To:** Mandalapu, Rao S. <Rao.Mandalapu@va.gov>
**Cc:** Malone, Martin T. <Martin.Malone@va.gov>
**Subject:** Recredentialing Packet for VA North Texas Health Care System
**Importance:** High


Good Afternoon Mandalapu Rao


It is time to renew your credentials here at VA North Texas Health Care System.  In order to process your credentials timely, please complete all steps below.

### This must be completed no later than <u>06/09/2023</u>

**<u>Step 1: VetPro</u>**


VetPro Internet Address:                    http://fcp.vetpro.org

---

**AI**

Log-on ID:                         MANDALAPUR1307

Temporary Password:             **@04181965**

Update the following information (Do not skip any of these – You are required to put a new entry for these each recredentialing cycle, EVEN IF THE LICENSE/ CERTIFICATION IS NOT EXPIRED. NEW ENTRY IS NEEDED EACH TIME VETPRO IS OPEN FOR RECREDENTIALING

o **Personal Profile** - Update any personal information as needed, Save.

o **Supp/Attest** – Click "Add new record", answer all questions, any affirmative answers require an explanation, Save. (VetPro takes several seconds to save your entries.)

o **License** - Highlight your last entry for your current license(s), change expiration date as needed; Save as New Record.

o **Federal DEA -** Highlight your last DEA entry; change expiration date as needed; Save as New Record.

o **State CDS (non-Texas only) -** Highlight your last state CDS entry; change expiration date as needed; Save as New Record.

o **Certification (BLS) -** NO ENTRY NEEDED.  PLEASE INCLUDE COPY OF BLS WITH SIGNED PACKET

o **Certification (Board Certification) -** Highlight your last entry for your board certification(s), indicate if MOC participating, enter Agency and Certifying Board (choose "Other" if not applicable); Save as New Record.

o **Certification (ACLS, if applicable) -** NO ENTRY NEEDED.  PLEASE INCLUDE COPY OF BLS WITH SIGNED PACKET

o **References/Peer Review** - Enter 2 peer references (same occupation as you), include phone numbers and email addresses, save after each entry (VetPro takes a few seconds to save each entry).

o **Personal History** – Add a new entry for all <u>current</u> work histories, including here at VA North Texas; click the current box before the to and from dates; Save as New Record.

o **Sign & Submit** - Check the box to attest to the Bylaws for VA North Texas Health Care System (copy attached for your reference), then sign using the VetPro password you created for this session.

**Step 2:**  **Send the digitally signed and completed copy of your completed packet <u>AND</u> requested privileges to the appropriate section and service chief for their signature, <u>and copy me</u>.**

When completing your new privilege form, it may be helpful to review your current privilege listing found on the VA intranet (by service):

https://dvagov.sharepoint.com/sites/NTX/services/mso/privileges/default.aspx

Case 3:25-cv-01320-L    Document 17-2    Filed 11/26/25    Page 230 of 295    PageID 358

**Step 6:** If you are not able to able to digitally sign the packet and privilege form, email us a copy of both so we can get started while you are getting signatures. You must then return the original hand-signed privilege form to me **after obtaining all service-level signatures.** Only original hand-written initials/signatures or digitally signatures are acceptable. Faxed copies <u>will not</u> be accepted.


Please feel free to contact me at if you have any questions about the credentialing process. We know this can be a complicated process and we are here to assist you.


Thank you!



Respectfully,

## Michelle Luna-McGimsey

Credentialing Specialist / Medical Staff Office

📞 Phone: (214) 857-0497

📠 Fax: (214) 462-4843

✉️ Michelle.Luna-McGimsey@va.gov | www.va.gov


*"Changing lives. One Veteran at a time*



---

**4 attachments**

📄 **Urology Privileges - Approved 4.16.20.pdf**
445K


**ACLS_eCard.pdf**
87K


**BLS_eCard.pdf**
88K


**Recredentialing Packet.pdf**
762K

# NPDB NATIONAL PRACTITIONER DATA BANK

1. The NPDB Guidebook: Chapter E: Reports, Reporting Adverse Clinical Privileges Actions
2. NPDB Guide to Reporting Clinical Privilege Actions

# NPDB GUIDE TO REPORTING CLINICAL PRIVILEGES ACTIONS

## BEFORE SUBMITTING:

Are you a hospital or health care entity that took a
professional review action against a physician or dentist? *
**Report the professional review action if both A <u>and</u> B are met:**


**A**

Adversely affects clinical privileges (including privileges, medical staff or panel membership, network participation, affiliation, and other circumstances) for a period of more than 30 days, <u>including</u>:

- Reduction, restriction, suspension or revocation of privileges
- Denial of privileges based on professional review (excluding denials based on failure to meet specific threshold criteria or an initial application withdrawal before a final professional review decision)
- A practitioner's surrender of, or failure to renew, privileges while under or to avoid investigation
- Summary suspensions that are the result of a professional review (in effect for more than 30 days), regardless of whether the action is final

**AND**

**B**

Is based on the practitioner's professional competence or professional conduct that adversely affects, or could adversely affect, the health or welfare of a patient.


Initial

Submit within 30 days of when the action was taken

You must forward a copy of the report to your state licensing board in the NPDB system (or by mail)

## SUBMIT AN INITIAL ADVERSE ACTION REPORT

## REPORT MODIFICATIONS (when needed):

*The NPDB notifies the subject of the report when the report is submitted, and when any of these modifications are made.*


Did your organization take an action that modifies or relates to a previously reported action (including reinstatements)?

### SUBMIT A REVISION-TO-ACTION REPORT
 
Initial    Revision


Did your organization determine there is an error or omission in a previously submitted report?

### SUBMIT A CORRECTION REPORT
 
Initial    Corrected Report

Did your organization determine that an action should not have been reported because:
1. The report was erroneously submitted?
2. The action is not reportable?
3. The action was reversed or overturned?
These are the only reasons for which a report may be voided.

### VOID THE REPORT
Initial

*Reporting of physicians and dentists is mandatory. Other health care practitioners may be reported.

www.npdb.hrsa.gov

# Exhibit-P

## Contents:

1. On April 27, 2023, Plaintiff submitted a conditioned notice of resignation after privileges were reinstated

**From:** Mandalapu, Rao S.
**Sent:** Thursday, April 27, 2023 7:50 AM
**To:** Cave, Jason (NTX) <Jason.Cave2@va.gov>
**Cc:** Mandalapu, Rao S. <Rao.Mandalapu@va.gov>
**Subject:** RE: Summary suspension of operative room setting

Hi Mr. Cave,

Good morning.

I have submitted operative room real time documents showing what has happened.

No veteran ever suffered harm due to my surgeries or in the clinic. The review process has been prejudiced because the defendants are the judges.

I would be grateful to you if you can reinstate my operative privileges immediately.

Unfortunately, suspension of operative privileges caused irreparable damage to my surgical career and reputation of my training institutes and, hundreds of veterans' surgeries were outsourced to community care urology.

I suffered deep humiliation, torture and insults and I cannot bear this humiliation anymore. I am DONE.

Given the situation, I am afraid that I may not be able to function at my full capacity as a fellowship trained urologist. I request you to relieve me as soon as you reinstate operative privileges without a condition.

I would appreciate your help and support.

Thank you,
With regards

Rao Mandalapu, MD

---

**From:** Mandalapu, Rao S. <Rao.Mandalapu@va.gov>
**Sent:** Friday, April 14, 2023 7:48 AM
**To:** Cave, Jason (NTX) <Jason.Cave2@va.gov>
**Cc:** Mandalapu, Rao S. <Rao.Mandalapu@va.gov>
**Subject:** FW: Summary Probationary Review and Convening of Professio0nal Standard Board

Good morning, Mr. Cave

# Exhibit-Q

## Contents:

1. On September 27, 2023, a letter to the EEOC AJ stated that reporting to NPDB while EEOC proceedings are pending is retaliatory.

September 27, 2023

**The Honorable Veronica Cuadra, Administrative Judge**
U.S. Equal Employment Opportunity Commission
207 South Houston Street, 3rd Floor
Hearings Unit
Dallas, TX 75202-4703.

**Re:  EEOC Case No. 450-2023-00222X**
Agency Case No. 2003-549A4-2022-1475

Respected Honorable Judge Veronica Cuadra,

I, Rao Mandalapu (Plaintiff), request you to consider a new claim because the agency (Defendants) filed a report to the National Practitioner Data Bank (NPDB) and the Texas Medical Board (TMB) and other State Medical Licensing Boards (SLB) on 08/31/2023 in retaliation to the EEOC proceedings. (Copy attached)

I requested the director of the VA North Texas Health Care System (VANTHCS) to withdraw the NPDB report as the report was not submitted in accordance with the NPDB reporting requirements and factual inaccuracies without success. (Copy attached)

The agency (Defendants) submitted the NPDB report and the State Medical Licensing Board reports in retaliation to the EEOC proceedings.

I humbly request you to consider a new retaliation claim.

Thank you,

Respectfully submitted,

Rao Mandalapu, Plaintiff (Pro Se)


CC:
Johnston Walker, ESQ
Agency's representative
1500 Woodrow Wilson Dr.,
Jackson, Mississippi 39216,
(Johnston.walker@va.gov)

# Exhibit-R

Contents:

1. On February 20, 2024, the Chief of Staff reported the same voided erroneous report to the NPDB.

   NPDB guidebook, p.10-11, renewal of privileges is not reportable.

**NPDB Request for dispute resolution**:
*Report summary for DCN: 5500000228160003*
*Federal governing statute(s):*
*• Title IV*
***Reported Action(s):***
*• Voluntary Surrender of Clinical Privilege(s), While Under, or to Avoid, Investigation Relating to Professional Competence or Conduct*

*Dispute Points: (p391)*
   The reporting agency submitted three similar NPDB Title IV privileges action reports.
   1. **The NPDB report DCN**: 5500000214857488 dated 08/03/2023. This report was disputed for factual inaccuracy and voided.
   2. **The NPDB report DCN:** 5500000216574829, dated 08/31/2023, was disputed for factual inaccuracy and false reporting. The NPDB dispute resolution review committee has already reviewed the timeline events and the rebuttal response to the reporting agency timeline events with documented evidence dated 12/21/2023. The report was voided on 01/22/2024, stating that there was an error reporting.
   3. **The NPDB report DCN:** 5500000228160003 dated 02/20/2024.  The reporting agency resubmitted the voided report on 02/20/2024.
   **NPDB guidebook**: Table 1 Actions reportable to the NPDB under Legislation Title IV: Voluntary surrender or restriction of clinical privileges while under or to avoid an investigation. (1635)
   The reporting agency suspended operative privileges only, but not clinical privileges. I continued to have clinical privileges and have been staffing patients until the last minute of my employment.
   The suspension of operative privileges was based on a false allegation subject to review.
   I submitted all the timeline events with documented evidence, including operative reports, operating room records, anesthesia records, hospital records, and surgical floor nurses' reports from the suspension of operative privileges to the re-credentialing of operative privileges dated 05/29/2023, with the confirmed receipt.
   The reporting agency never contradicted the documented evidence submitted.
   I did apply for **re-credentialing of operative privileges in May 2023** and resigned from the VA service in June 2023.  The reporting agency did not notify me of any pending investigation regarding clinical privileges during the resignation notice period.
   NPDB guidebook: Nonrenewal: Nonrenewal of medical staff appointments or clinical privileges generally should not be reported to the NPDB. However, if the practitioner does not apply for renewal of medical staff appointment or clinical privileges while under investigation by the healthcare entity for possible professional incompetence or improper professional conduct, or in return for not conducting such an investigation or not taking a professional review action, the event is considered a surrender while under investigation and must be reported to the NPDB.  I did apply for re-credentialing in May 2023 and resigned from the VA service in June 2023. Therefore, I did not voluntarily surrender clinical privileges while under or to avoid an investigation per the NPDB guidebook.  Therefore, I request that the NPDB report be void.

**Documentation attached**: (p396-538)

National Practitioner Data Bank
Health Resources and Services Administration
U.S. Department of Health and Human Services
P.O. Box 10832
Chantilly, VA 20153-0832
https://www.npdb.hrsa.gov

DCN: 5500000228160003
Process Date: 02/20/2024
Page: 1    of    3
MANDALAPU, RAO S
For authorized use by:
MANDALAPU, RAO S

# MANDALAPU, RAO S

## VA NORTH TEXAS HEALTH CARE SYSTEM

| TITLE IV CLINICAL PRIVILEGES ACTION | Date of Action: 06/05/2023 |
|---|---|
| Initial Action | Basis for Initial Action |
| - VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE (S), WHILE UNDER, OR TO AVOID, INVESTIGATION RELATING TO PROFESSIONAL COMPETENCE OR CONDUCT | - SUBSTANDARD CARE OR INADEQUATE SKILL LEVEL |

**A. REPORTING ENTITY**

| | |
|---|---|
| Entity Name: | VA NORTH TEXAS HEALTH CARE SYSTEM |
| Address: | 4500 S LANCASTER RD OFC 11G |
| | CHIEF OF STAFF |
| City, State, Zip: | DALLAS, TX 75216-7167 |
| Country: | |
| Name or Office: | MEDICAL STAFF OFFICE |
| Title or Department: | CHIEF OF STAFF OFFICE |
| Telephone: | (214) 857-4195 |
| Entity Internal Report Reference: | |
| Type of Report: | INITIAL |

**B. SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL)**

| | |
|---|---|
| Subject Name: | MANDALAPU, RAO S |
| Other Name(s) Used: | |
| Gender: | MALE |
| Date of Birth: | 0█ |
| Organization Name: | |
| Work Address: | |
| City, State, ZIP: | |
| Home Address: | █ |
| City, State, ZIP: | H█, TX 77025-3104 |
| Deceased: | NO |
| Social Security Numbers (SSN): | ***-**-█ |
| National Provider Identifiers (NPI): | 1█ |
| Professional School(s) & Year(s) of Graduation: | █ |
| Occupation/Field of Licensure: | PHYSICIAN (MD) |
| State License Number, State of Licensure: | █, TX |
| Specialty: | UROLOGICAL SURGERY |
| Drug Enforcement Administration (DEA) Numbers: | █ |
| Name(s) of Health Care Entity (Entities) With Which Subject Is Affiliated or Associated (Inclusion Does Not Imply Complicity in the Reported Action): | |
| Business Address of Affiliate: | |
| City, State, ZIP: | |
| Nature of Relationship(s): | |

**C. INFORMATION REPORTED**

| | |
|---|---|
| Type of Adverse Action: | TITLE IV CLINICAL PRIVILEGES |
| Basis for Action: | SUBSTANDARD CARE OR INADEQUATE SKILL LEVEL (F6) |
| Adverse Action Classification Code(s): | VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE(S), WHILE UNDER, OR TO AVOID, INVESTIGATION RELATING TO PROFESSIONAL COMPETENCE OR CONDUCT (1635) |

CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY   AK

National Practitioner Data Bank
Health Resources and Services Administration
U.S. Department of Health and Human Services
P.O. Box 10832
Chantilly, VA 20153-0832
https://www.npdb.hrsa.gov

DCN: 5500000228160003
Process Date: 02/20/2024
Page: 2 of 3
MANDALAPU, RAO S
For authorized use by:
MANDALAPU, RAO S

| | |
|---|---|
| Date Action Was Taken: | 06/05/2023 |
| Date Action Became Effective: | 06/05/2023 |
| Length of Action: | PERMANENT |
| Description of Subject's Act(s) or Omission(s) or Other Reasons for Action(s) Taken and Description of Action(s) Taken by Reporting Entity: | Physician voluntarily resigned on June 5, 2023, while under investigation for professional incompetence and misconduct, prior to the Medical Center Director taking a final privileging action or closing the investigation based on the findings and recommendation of the Professional Standards Board. |

**D. SUBJECT STATEMENT**

If the subject identified in Section B of this report has submitted a statement, it appears in this section.

Date Submitted: 03/01/2024

The reporting agency submitted three similar NPDB Title IV privileges action reports.  1. The NPDB report DCN: 5500000214857488 dated 08/03/2023. This report was disputed for factual inaccuracy and voided.  2. The NPDB report DCN: 5500000216574829 dated 08/31/2023. This report was disputed for factual inaccuracy and false reporting. The NPDB dispute resolution review committee has already reviewed the timeline events and the rebuttal response to the reporting agency timeline events with documented evidence dated 12/21/2023. This report was voided on 01/22/2024.  The NPDB report was voided on 01/22/2024, and the reporting agency resubmitted the same report on 02/20/2024.  3. The NPDB report DCN: 5500000228160003 dated 02/20/2024.  NPDB guidebook: Table 1 Actions reportable to the NPDB under Legislation Title IV: Voluntary surrender or restriction of clinical privileges while under or to avoid an investigation. (1635)  The reporting agency suspended operative privileges only, but not the clinical privileges. I continued to have clinical privileges and have been staffing patients until the last minute of my employment.  The suspension of operative privileges was based on a false allegation subject to review.   I submitted all the timeline events with documented evidence, including operative reports, operating room records, anesthesia records, hospital records, and surgical floor nurses' reports from the suspension of operative privileges to the re-credentialing of operative privileges dated 05/29/2023, with the confirmed receipt.   The reporting agency never contradicted the documented evidence submitted.   I did apply for re-credentialing of operative privileges in May 2023 and resigned from the VA service in June 2023.  The reporting agency did not notify me of any pending investigation regarding clinical privileges during the resignation notice period.  NPDB guidebook: Nonrenewal: Nonrenewal of medical staff appointments or clinical privileges generally should not be reported to the NPDB. However, if the practitioner does not apply for renewal of medical staff appointment or clinical privileges while under investigation by the healthcare entity for possible professional incompetence or improper professional conduct, or in return for not conducting such an investigation or not taking a professional review action, the event is considered a surrender while under investigation and must be reported to the NPDB.  I did apply for re-credentialing in May 2023 and resigned from the VA service in June 2023. Therefore, I did not voluntarily surrender clinical privileges while under or to avoid an investigation per the NPDB guidebook.  Therefore, I request that the NPDB report be void.

**E. REPORT STATUS**

Unless a box below is checked, the subject of this report identified in Section B has not contested this report.

[X] This report has been disputed by the subject identified in Section B.

National Practitioner Data Bank
Health Resources and Services Administration
U.S. Department of Health and Human Services
P.O. Box 10832
Chantilly, VA 20153-0832
https://www.npdb.hrsa.gov

DCN: 5500000228160003
Process Date: 02/20/2024
Page: 3    of    3
MANDALAPU, RAO S
For authorized use by:
MANDALAPU, RAO S

☐    At the request of the subject identified in Section B, this report is being reviewed by the Secretary of the U.S. Department of Health and Human Services to determine its accuracy and/or whether it complies with reporting requirements.  No decision has been reached.

☐    At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services and a decision was reached. The subject has requested that the Secretary reconsider the original decision.

☐    At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services. The Secretary's decision is shown below:

Date of Original Submission:         02/20/2024

Date of Most Recent Change:         02/20/2024

**This report is maintained under the provisions of:** Title IV

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the provisions of Title IV of Public Law 99-660, as amended, and 45 CFR Part 60. All information is confidential and may be used only for the purpose for which it was disclosed. Disclosure or use of confidential information for other purposes is a violation of federal law. For additional information or clarification, contact the reporting entity identified in Section A.

═══════════════════  **END OF REPORT**  ═══════════════════

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**            **AK**

 Gmail

**Rao MS <raomsmd@gmail.com>**

---

## Request to withdraw the NPDB report DCN: 5500000228160003

2 messages

---

**Rao MS** <raomsmd@gmail.com>                      Tue, Feb 27, 2024 at 6:54 PM
To: Tanya.Bradsher@va.gov, "Jackson, Kimberly M." <kimberly.M.Jackson@va.gov>, "Holt, Stephen R."
<Stephen.Holt@va.gov>, "Jones, Wendell E. (V17)" <Wendell.Jones@va.gov>, jason.cave@va.gov
Cc: Rao MS <raomsmd@gmail.com>

Hi Mr. Jason Cave,

I am Rao Mandalapu, a staff physician at the VA North Texas Health Care System from
10/12/2021 to 06/05/2023.

It was brought to my attention that there is another (third) NPDB report dated 02/20/2024 from
the reporting entity VA North Texas Health care System, VISN-17.

Unfortunately, these extreme actions damaged my medical career permanently.

I would like to remind you of one of my communications with you dated 04/27/2023 stating:

***No veteran ever suffered harm due to my surgeries or in the clinic. Unfortunately, the
suspension of operative privileges without a valid reason caused irreparable damage to my
surgical career and the reputation of my training institutes. I suffered deep humiliation,
torture, and insults, and I cannot bear this humiliation anymore. I am DONE. Given the
situation, I am afraid that I may not be able to function at my full capacity as a fellowship-
trained urologist.***

I never had any complaints against me from the staff physicians, nursing staff, residents,
students, operative room staff, anesthesia staff physicians, patient care issues, malpractice, or tort
claims.

I did submit to your kind attention all my surgical case logs and all timeline events with the
documented evidence on multiple occasions requesting an investigation by an independent
academic institute or by the OIG as per the VHA directive.

I request you to investigate all the timeline events under the supervision of the Honorable
Stephen R. Holt, MD, Chief Medical Officer (VISN-17), or the Honorable Kimberly M. Jackson,
VA Chief of Staff by three independent board-certified urologists per the VHA directive before
submitting the NPDB report.

If the investigation found a genuine reason to be reportable to the NPDB, you may report to the
NPDB with a collective decision of the investigation team per the VHA directive.

Three NPDB reports were already submitted previously.

*AK*

1. The NPDB report was submitted DCN: 5500000214857488 dated 08/03/2023. This report was disputed for factual inaccuracy and voided.

2. The NPDB report was submitted DCN: 5500000216574829 dated 08/31/2023. This report was disputed for factual inaccuracy and voided on 01/22/2024.

3. The NPDB report DCN: 5500000228160003 dated 02/20/2024.

Therefore, I request you to withdraw the NPDB report DCN: 5500000228 160003 dated 02/20/2024 immediately.

I will be happy to provide you with any other information that helps you in making the decision.

This mail is copied to the Honorable Tanya Bradsher, Deputy Secretary of Veterans Affairs, VA Chief of Staff, and the Honorable Dr. Stephen R. Holt, Chief Medical Officer (VISN-17)

I would appreciate your response.

Thank you,

Respectfully,

Rao Mandalapu, MD

PS:
Copies of the NPDB reports are attached.

---

**3 attachments**

📄 **NPDB report 02202024.pdf**
40K

📄 **NPDB report_08312023.pdf**
88K

📄 **NPDB report 08032023.pdf**
87K

---

**Rao MS** <raomsmd@gmail.com>                                    Tue, Feb 27, 2024 at 6:57 PM
To: "Bridges, Kristy K. (OAWP)" <Kristy.Bridges@va.gov>

FYI
[Quoted text hidden]

---

**3 attachments**

📄 **NPDB report 02202024.pdf**
40K

📄 **NPDB report_08312023.pdf**
88K

**AK**

**NPDB report 08032023.pdf**
87K

**AK**

Case 3:25-cv-01320-L     Document 17-2     Filed 11/26/25     Page 246 of 295     PageID 374

**NPDB** NATIONAL PRACTITIONER DATA BANK

# Reporting Adverse Clinical Privileges Actions

Hospitals and other health care entities must report adverse clinical privileges actions to the NPDB that meet NPDB reporting criteria - that is, any professional review action that adversely affects the clinical privileges of a physician or dentist for a period of more than 30 days *or* the acceptance of the surrender of clinical privileges, or any restriction of such privileges by a physician or dentist, (1) while the physician or dentist is under investigation by a health care entity relating to possible incompetence or improper professional conduct, or (2) in return for not conducting such an investigation or proceeding. Clinical privileges include privileges, medical staff membership, and other circumstances (e.g., network participation and panel membership) in which a physician, dentist, or other health care practitioner is permitted to furnish medical care by a health care entity.

Adverse clinical privileges actions that *must* be reported to the NPDB are professional review actions - that is, they are based on a physician's or dentist's professional competence or professional conduct that adversely affects, or could adversely affect, the health or welfare of a patient. Generally, the entity that takes the clinical privileges action determines whether the physician's or dentist's professional competence or professional conduct adversely affects, or could adversely affect, the health or welfare of a patient. Hospitals and other health care entities *must* report clinical privileges actions taken against physicians and dentists when those actions meet the criteria for reportability.

In addition, hospitals and other health care entities *may* report - and are encouraged to report - clinical privileges actions taken against health care practitioners *other than* physicians and dentists when those clinical privileges actions are based on the practitioner's professional competence or professional conduct that adversely affects, or could adversely affect, the health or welfare of a patient.

Definitions and examples of these terms are provided in Chapter C: Subjects of Reports.

Table E-5 outlines reporting obligations for adverse clinical privileges actions.

#### ⊞ **Table E-5: Authority for Reporting Adverse Clinical Privileges Actions ▾**

| Law | Who Reports? | What is Reported? | Who is Reported? |
|-----|--------------|-------------------|------------------|
| Title IV | Hospitals<br>Other health care entities with formal peer review | Certain clinical privileges actions related to professional competence or conduct | Physicians and dentists<br>Other practitioners (optional) |

Hospitals and other eligible health care entities must report:

- Professional review actions that adversely affect a physician's or dentist's clinical privileges for a period of more than 30 days
- Acceptance of a physician's or dentist's surrender or restriction of clinical privileges while under investigation for possible professional incompetence or improper professional conduct, or in return for not conducting such an investigation or not taking a professional review action that otherwise would be required to be reported to the NPDB

Actions taken against a physician's or dentist's clinical privileges include reducing, restricting, suspending, revoking, or denying privileges, and also include a health care entity's decision not to renew a physician's or dentist's privileges if that decision was based on the practitioner's professional competence or professional conduct. Clinical privileges actions are reportable once they are made final by the health care entity. However, summary suspensions lasting more than 30 days are reportable *even if* they are not final.

*Adverse clinical privileges actions should not be reported to the NPDB unless they adversely affect the practitioner's clinical privileges for a period longer than 30 days.*
Adverse clinical privileges actions should not be reported to the NPDB unless they adversely affect the practitioner's clinical privileges for a period longer than 30 days. Matters not related to the professional competence or professional conduct of a practitioner should not be reported to the NPDB. For example, adverse actions based primarily on a practitioner's advertising practices, fee structure, salary arrangement, affiliation with other associations or health care professionals, or other competitive acts intended to solicit or retain business are excluded from NPDB reporting requirements.

Hospitals and other health care entities must report revisions to previously reported adverse clinical privileges actions. For more information, see Types of Reports.

## Administrative Actions

**Exhibit WW**

651

Case 3:25-cv-01320-L   Document 17-2   Filed 11/26/25   Page 247 of 295   PageID 375

Administrative actions that do not involve a professional review action should not be reported to the NPDB. For example, a hospital's bylaws require physicians to be board certified in their specialty. A physician's board certification expires and, as a result, the hospital automatically revokes the physician's clinical privileges through an administrative action. The revocation of clinical privileges was not a result of a professional review action and should not be reported to the NPDB.

## Multiple Adverse Actions

If a single professional review action produces multiple clinical privileges actions (for example, a 12-month suspension followed by a 5-month mandatory consultation period requiring approval of a department chair before the exercise of clinical privileges), only one report, reflecting the multiple actions taken, should be submitted to the NPDB. The reporting entity may select up to five Adverse Action Classification Codes on the reporting format to describe the actions taken. Reporting entities should use the narrative description to explain any additional adverse actions imposed.

A Revision-to-Action Report must be submitted when each of the multiple actions is lifted or otherwise changed. For the example in the previous paragraph:

- If the Initial Report clearly states that the suspension is to end after 12 months, and the mandatory consultation period is to end after 5 months, and if these penalties are not changed and are fully met by the practitioner, no additional reports should be submitted
- If, after the Initial Report is submitted, the suspension period is extended to 14 months or the mandatory consultation period is shortened to 4 months, a Revision-to-Action Report must be submitted when either change is imposed

If an adverse action against the clinical privileges of a practitioner is based on multiple grounds, only a single report should be submitted to the NPDB. However, all reasons for the action should be reported and explained in the narrative description. The reporting entity may select up to four Basis for Action Codes to indicate these multiple reasons. Additional reasons should be summarized in the narrative description.

## Denials or Restrictions

Denials or restrictions of clinical privileges for more than 30 days that result from professional review actions relating to the practitioner's professional competence or professional conduct that adversely affects, or could adversely affect, the health or welfare of a patient must be reported to the NPDB. This includes denials of initial applications for clinical privileges. When used by the NPDB in the context of clinical privileges actions, a "restriction" is the result of a professional review action based on clinical competence or professional conduct that leads to the inability of a practitioner to exercise his or her own independent judgment in a professional setting.

Note that a denial of clinical privileges at appointment or reappointment that occurs solely because a practitioner does not meet a health care institution's established threshold criteria for that particular privilege should not be reported to the NPDB. Such denials are not deemed the result of a professional review action relating to the practitioner's professional competence or professional conduct but are considered decisions based on eligibility. In addition, if a hospital or other health care entity retroactively changes the threshold criteria for a particular clinical privilege, a physician who does not meet the new criteria will lose previously granted clinical privileges. This loss of privileges should not be reported to the NPDB.

Examples of eligibility threshold criteria may include: (1) minimum professional liability coverage, (2) board certification, (3) geographic proximity to the hospital, and (4) performance of a minimum number of procedures prescribed for a particular clinical privilege.

## Withdrawal of Applications

*A practitioner's awareness that an investigation is being conducted is not a requirement for filing a report with the NPDB.* Voluntary withdrawal of an initial application for medical staff appointment or clinical privileges prior to a final professional review action generally should not be reported to the NPDB. However, if a practitioner applies for renewal of a medical staff appointment or clinical privileges and voluntarily withdraws that application while under investigation by the health care entity for possible professional incompetence or improper professional conduct, or in return for not conducting such an investigation or not taking a professional review action, then the withdrawal of application for renewal of clinical privileges must be reported to the NPDB. These actions must be reported regardless of whether the practitioner knew he or she was under investigation when the renewal application for medical staff appointment or clinical privileges was withdrawn. A practitioner's awareness that an investigation is being conducted is not a requirement for filing a report with the NPDB.

## Nonrenewals

Nonrenewals of medical staff appointment or clinical privileges generally should not be reported to the NPDB. However, if the practitioner does not apply for renewal of medical staff appointment or clinical privileges while under investigation by the health care entity for

652

Case 3:25-cv-01320-L   Document 17-2   Filed 11/26/25   Page 248 of 295   PageID 376

possible professional incompetence or improper professional conduct or in return for not conducting such an investigation or not taking a professional review action, the event is considered a surrender while under investigation and must be reported to the NPDB. These actions must be reported regardless of whether the practitioner was aware of the investigation at the time he or she failed to renew the staff appointment or clinical privileges. A practitioner's awareness that an investigation is being conducted is not a requirement for filing a report with the NPDB.

## Investigations

Investigations should not be reported to the NPDB. However, a surrender of clinical privileges or failure to renew clinical privileges while under investigation or to avoid investigation must be reported.

NPDB interprets the word "investigation" expansively. It may look at a health care entity's bylaws and other documents for assistance in determining whether an investigation has started or is ongoing, but it retains the ultimate authority to determine whether an investigation exists. The NPDB considers an investigation to run from the start of an inquiry until a final decision on a clinical privileges action is reached. In other words, an investigation is not limited to a health care entity's gathering of facts or limited to the manner in which the term "investigation" is defined in a hospital's by-laws. An investigation begins as soon as the health care entity begins an inquiry and does not end until the health care entity's decision-making authority takes a final action or makes a decision to not further pursue the matter.

A *routine*, formal peer review process under which a health care entity evaluates, against clearly defined measures, the privilege-specific competence of *all* practitioners is *not* considered an investigation for the purposes of reporting to the NPDB. However, if a formal, targeted process is used when issues related to a *specific practitioner's* professional competence or conduct are identified, this *is* considered an investigation for the purposes of reporting to the NPDB.

A health care entity that submits a clinical privileges action based on surrender, restriction of, or failure to renew a physician's or dentist's privileges while under investigation should have evidence of an ongoing investigation at the time of surrender, or evidence of a plea bargain. The reporting entity should be able to produce evidence that an investigation was initiated prior to the surrender of clinical privileges by a practitioner. Examples of acceptable evidence may include minutes or excerpts from committee meetings, orders from hospital officials directing an investigation, or notices to practitioners of an investigation (although there is no requirement that the health care practitioner be notified or be aware of the investigation).

### Guidelines for Investigations

- For NPDB reporting purposes, the term "investigation" is not controlled by how that term may be defined in a health care entity's bylaws or policies and procedures.
- The investigation must be focused on the practitioner in question.
- The investigation must concern the professional competence and/or professional conduct of the practitioner in question.
- To be considered an investigation for purposes of determining whether an activity is reportable, the activity generally should be the precursor to a professional review action.
- An investigation is considered ongoing until the health care entity's decision-making authority takes a final action or formally closes the investigation.
- A routine or general review of cases is *not* an investigation.
- A routine review of a particular practitioner is *not* an investigation.

## Temporary Clinical Privileges

For the purpose of reporting to the NPDB, no distinction is made between temporary clinical privileges (including but not limited to emergency and disaster clinical privileges) and clinical privileges. If, however, temporary privileges are awarded to a physician or dentist for a specific amount of time, with no opportunity for renewal - and both the physician or dentist and the privileging party agree that the privileges are temporary - and the temporary privileges expire while the practitioner is under investigation, a report should *not* be submitted to the NPDB. In this scenario, there is no opportunity to renew the temporary clinical privileges, so the expiration of the temporary privileges while under investigation cannot be considered a nonrenewal or surrender of clinical privileges while under investigation.

## Summary Suspensions

A summary suspension must be reported if it is:

- In effect or imposed for more than 30 days
- Based on the professional competence or professional conduct of the physician, dentist, or other health care practitioner that adversely affects, or could adversely affect, the health or welfare of a patient, and
- The result of a professional review action taken by a hospital or other health care entity

In addition, summary suspensions imposed for an indefinite length that have not lasted more than 30 days but are expected to last more than 30 days, and that are otherwise reportable, may be reported to the NPDB. If the summary suspension ultimately does not last more than 30 days, the report must be voided.

*If a summary suspension is confirmed by a review body, the action is considered to have taken effect when it was first imposed by a hospital official.* The NPDB treats summary suspensions differently from other professional review actions because the procedural rights of the practitioner are provided *following* the imposition of a suspension, rather than *preceding* it. A summary suspension is often imposed by an official (for instance, the chairman of a department) on behalf of the hospital or health care entity for the purpose of protecting patients from imminent danger. Commonly, this action is then reviewed and confirmed by a hospital committee, such as a medical executive committee (MEC), as authorized by the medical staff bylaws or other official documents (e.g., rules and procedures, standard operating procedures). Summary suspensions are considered to be effective when they go into effect, even though they may be subject to review by some committee or body of the health care entity according to the entity's bylaws or other official documents.

For purposes of reporting a summary suspension to the NPDB, if the summary suspension is confirmed by the review body, the action is considered to have taken effect when it was first imposed by the hospital official. If a summary suspension is in effect for more than 30 days before an action is taken by the authorized hospital committee or body, it must be reported to the NPDB. If the authorized hospital committee or body does not confirm the initial action or takes a different professional review action, a Revision-to-Action Report must be submitted. If the authorized hospital committee or body vacates the summary suspension, the entity must void the previous report submitted to the NPDB.

If the summary suspension subsequently is modified or revised as part of a final decision by the governing board or similar body, the health care entity must then submit a Revision-to-Action Report to supplement the Initial Report submitted to the NPDB.

If the physician, dentist, or other health care practitioner surrenders his or her clinical privileges during a summary suspension, regardless of whether the suspension has been confirmed by a hospital review body, that action must be reported to the NPDB. The action must be reported because the practitioner is surrendering the privileges either while under investigation concerning professional conduct or professional competence that did or could affect the health or welfare of a patient, or in return for not conducting an investigation concerning the same.

This reporting policy for summary suspensions is in keeping with the purpose of the NPDB, which is to protect the public from the threat of incompetent practitioners continuing to practice without disclosure or discovery of previous damaging or incompetent performance.

*An action must be reported to the NPDB based on whether it satisfies NPDB reporting requirements and not based on the name affixed to the action.*
An action must be reported to the NPDB based on whether it satisfies NPDB reporting requirements and not based on the name affixed to the action. A suspension or restriction, whether called immediate, summary, emergency, or precautionary, typically means that a serious question has been raised and must be addressed quickly. Therefore, if a hospital or other health care entity suspects but has not confirmed a risk to an individual or individuals and imposes a suspension or restriction as immediate or precautionary, and the suspension remains in effect for more than 30 days, it must be reported to the NPDB.

## Proctors

If, as a result of a professional *If a proctor is not required to be present for or approve procedures, the action should not be reported to the NPDB.* review action related to professional competence or conduct, a proctor is required in order for a physician or dentist to proceed freely exercising clinical privileges, and the period lasts longer than 30 days, the action must be reported to the NPDB. In other words, if, for a period lasting more than 30 days, the physician or dentist cannot perform certain procedures without proctor approval or without the proctor being present and watching the physician or dentist, the action constitutes a restriction of clinical privileges and must be reported.

However, if the proctor is not required to be present for or approve the procedures (for example, if the proctoring consists of the proctor reviewing the physician's or dentist's records or procedures after they occur), the action is not considered a restriction of clinical privileges and should not be reported to the NPDB.

## Residents and Interns

Residents and interns generally should not be subjects of adverse clinical privileges actions because they are trainees in graduate health professions education programs and are not granted clinical privileges within the meaning of NPDB regulations, but they are authorized by the sponsoring institution to perform clinical duties and responsibilities within the context of their graduate educational program. However, adverse clinical privileges actions based on events occurring outside the scope of a formal graduate educational program - for example moonlighting in the intensive care unit or emergency room - must be reported to the NPDB.

## Length of Restriction

654

Case 3:25-cv-01320-L    Document 12    Filed 11/26/25    Page 250 of 295    PageID 378

Entities report clinical privileges actions only if they result from a professional review action and last longer than 30 days. Title IV underline{requires} "a professional review action that *adversely affects* the clinical privileges of a physician or dentist for longer than 30 days" to be reported (emphasis added). The NPDB has consistently interpreted "adversely affects" to mean the impact of the restriction, not the manner in which the restriction is written.

If a physician's or dentist's privileges are adversely affected for longer than 30 days, the restriction must be reported, regardless of how the health care entity writes the restriction. For example, summary suspensions must be reported if imposed or in effect for longer than 30 days. However, summary suspension reports must be voided if the reported suspension did not ultimately last longer than 30 days. As is the case with any restriction, the reportability of the action is determined by the number of days privileges are restricted.

A health care entity may choose to structure a restriction based on when a health care practitioner demonstrates clinical competence, rather than attaching a specific timeframe to the action. A significant percentage of clinical privileging actions are reported to the NPDB as "indefinite" in length, placing the responsibility on the practitioner to demonstrate to the entity that he or she no longer needs the restriction. If such an adverse action is in effect for more than 30 days, it must be reported.

With the exception of summary suspensions, which may be reported whenever a summary suspension is expected to last more than 30 days, a restriction begins at the time a physician cannot practice the full scope of his or her privileges and is reportable to the NPDB once that restriction has been in place for 31 days. For example, proctoring may or may not be reportable depending on the type of proctoring and the length of time it is in effect. If a physician or dentist cannot perform certain procedures without proctor approval or presence, this is considered a restriction on privileges. The inability to practice the full scope of privileges without a proctor's presence or approval is a restriction. Once the physician or dentist is prohibited from performing the procedure without a proctor, his or her privileges are adversely affected. The number of cases required to be proctored at the time of imposition, or the expectation that a restriction conclude in fewer than 31 days, is irrelevant for reporting purposes. The reportability of a proctoring restriction hinges on whether the restriction, in fact, is in effect for a period longer than 30 days.

## Confidentiality Laws Related to Drug and Alcohol Treatment

If a clinical privileges action is taken and the practitioner enters a drug or alcohol treatment or rehabilitation program as a result, the adverse action must be reported. This is true even if the treatment is a condition of probation. However, the fact that the practitioner entered a drug or alcohol treatment facility should not be reported.

## Submitting a Copy of the Report to a State Licensing Board

A copy of the report that health care entities receive after a clinical privileges action report is processed successfully by the NPDB must be provided to the appropriate state licensing board in the state in which the health care entity is located. Alternatively, NPDB reporters may elect to send an electronic version of the report to the appropriate state licensing board through the NPDB's Electronic Report Forwarding service, provided the state board has agreed to accept electronic notices of an action.

## Sanctions for Failing to Report to the NPDB

A hospital or other health care entity that has substantially failed to report adverse clinical privileges reports can lose, for 3 years, the immunity protections provided under Title IV for professional review actions it takes against physicians and dentists based on their professional competence and professional conduct.

The secretary of HHS will conduct an investigation if there is reason to believe that a health care entity has substantially failed to report required adverse actions. If the investigation reveals that the health care entity has not complied with NPDB regulations, the secretary will provide the entity with written notice describing the noncompliance. This written notice provides the entity with the opportunity to correct the noncompliance and notifies it of its right to request a hearing.

A request for a hearing must contain a statement of the material factual issues in dispute to demonstrate cause for a hearing and must be submitted to HHS within 30 days of receipt of the notice of noncompliance. These issues must be both substantive and relevant. An example of a material factual issue in dispute is a health care entity refuting HHS's claim that the health care entity failed to meet reporting requirements.

A request for a hearing will be denied if it is untimely or lacks a statement of material factual issues in dispute, or if the statement is frivolous or inconsequential. Hearings are held in the Washington, DC, metropolitan area.

If a request for a hearing is denied or if HHS determines that a health care entity has substantially failed to report information in accordance with NPDB requirements, the name of the entity will be published in the *Federal Register*, and the entity will lose the immunity provisions of Title IV with respect to professional review activities for a period of 3 years, commencing 30 days from the date of publication in the *Federal Register*.

Table E-6 provides examples of activities that should and should not be reported as clinical privileges actions.

655

Case 3:25-cv-01320-L    Document 17-2    Filed 11/26/25    Page 251 of 295    PageID 379

**⊞ Table E-6: Determining if Clinical Privileges Actions Must be Reported ❯**

| Action | Reportable? |
|---|---|
| Based on assessment of professional competence, a proctor is assigned to a physician or dentist for a period of more than 30 days. The proctor must grant approval before the practitioner can perform procedures. | Yes |
| Based on assessment of professional competence, a proctor is assigned to supervise a physician or dentist for a period of more than 30 days, but the proctor need not be present or grant approval before medical care is provided by the practitioner. | No |
| Based on assessment of professional competence, a proctor is assigned to watch a physician's or dentist's procedures for a period of more than 30 days, and the proctor needs to be present or grant approval before medical care is provided by the practitioner. | Yes |
| Practitioners who have recently been granted clinical privileges are routinely assigned a proctor for 60 days as required by hospital policy | No |
| A physician or dentist restricts or surrenders clinical privileges; the physician or dentist is under investigation related to professional competence or professional conduct. | Yes |
| A physician or dentist restricts or surrenders clinical privileges for personal reasons; the physician or dentist is not under investigation related to professional competence or professional conduct. | No |
| A physician or dentist restricts or surrenders clinical privileges in return for not conducting an investigation related to professional competence or professional conduct. | Yes |
| A physician or dentist surrenders clinical privileges for personal reasons but is under investigation for professional competence or conduct. | Yes |
| A physician or dentist is denied medical staff appointment or clinical privileges because the health care entity has too many specialists in the practitioner's discipline | No |
| A physician's or dentist's application for medical staff appointment is denied based on a professional review action related to professional competence or professional conduct | Yes |
| A physician's or dentist's request for clinical privileges is denied or restricted for more than 30 days based upon an assessment of clinical competence as defined by the hospital. | Yes |
| A physician's or dentist's clinical privileges are suspended for reasons not related to professional competence or professional conduct. | No |

Case 3:25-cv-01320-L    Document 17-2    Filed 11/26/25    Page 252 of 295    PageID 380

# NPDB Guide to Reporting Clinical Privileges Actions

**BEFORE SUBMITTING:**

Are you a hospital or health care entity that took a professional review action against a physician or dentist? *
Report the professional review action if both A **and** B are met:

**A** — Adversely affects clinical privileges (including privileges, medical staff or panel membership, network participation, affiliation, and other circumstances) for a period of more than 30 days, including:

- Reduction, restriction, suspension or revocation of privileges
- Denial of privileges based on professional review (excluding denials based on failure to meet specific threshold criteria or an initial application withdrawal before a final professional review decision)
- A practitioner's surrender of, or failure to renew, privileges while under or to avoid investigation
- Summary suspensions that are the result of a professional review (in effect for more than 30 days), regardless of whether the action is final

**AND**

**B** — Is based on the practitioner's professional competence or professional conduct that adversely affects, or could adversely affect, the health or welfare of a patient.

**SUBMIT AN INITIAL ADVERSE ACTION REPORT**

Initial

Submit within 30 days of when the action was taken

You must forward a copy of the report to your state licensing board in the NPDB system (or by mail)

**REPORT MODIFICATIONS (when needed):**

The NPDB notifies the subject of the report when the report is submitted, and when any of these modifications are made.

Did your organization take an action that modifies or relates to a previously reported action (including reinstatements)?

**SUBMIT A REVISION-TO-ACTION REPORT**

Initial    Revision

Did your organization determine there is an error or omission in a previously submitted report?

**SUBMIT A CORRECTION REPORT**

Initial    Corrected Report

Did your organization determine that an action should not have been reported because:
1. The report was erroneously submitted?
2. The action is not reportable?
3. The action was reversed or overturned?

These are the only reasons for which a report may be voided.

**VOID THE REPORT**

Initial

*Reporting of physicians and dentists is mandatory. Other health care practitioners may be reported.

www.npdb.hrsa.gov

## Update                                                                October 2018

The following table describes changes made to the NPDB Guidebook. Style and formatting changes made throughout the Guidebook that do not affect the substance of the text are not indicated below. References to new figures added to this edition can be found in the Table of Figures.

- Modified the section entitled "Proctors."
- Added a new section, "Length of Restriction," following the section entitled "Residents and Interns."
- Rewrote the answer to Q&A no. 9.
- Added four new Q&As following the previous Q&A no. 21 and renumbered the succeeding Q&As.
- Added a new Q&A following the previous Q&A no. 26 and renumbered the succeeding Q&As.
- Added a new Q&A following the previous Q&A no. 40 and renumbered the succeeding Q&As.
- Added a new Q&A following the previous Q&A no. 42.

## Sections Updated

- Chapter E: Reports, Reporting Adverse Clinical Privileges Actions
- Chapter E: Reports, Q&A: Reporting Adverse Clinical Privileges Actions

# Exhibit-S

## Contents:

1. Potential employers declined credentialing and job contracts

Docusign Envelope ID: E51794FB-A609-4B55-BFDB-396081C0D1EA



CANDIDATE
LETTER OF COMMITMENT

**Name**:                Rao S. Mandalapu, MD

**Position**:    Physician Services – Urology

**Location:**    Columbia Va Healthcare System/ VAMC; 6439 Garners Ferry Rd, Columbia, SC 29209

**Solicitation**:    36C24724Q0910

This letter affirms my intent to agree to employment as a Urology Physician with AMN Healthcare, part of Team PFS, in support of the U.S. Department of Veterans Affairs, should this contract be awarded for services in support of Columbia VAMC.

This letter also affirms my commitment to be available to start work _____01/03/2026_____, and available for onboarding before that upon award of this contract.

Signature:            Signed by:

Rao S. Mandalapu, MD

7FCD192D44BE413...

Date:            11/7/2025

 **Gmail**

**Rao M <mvlaxm@gmail.com>**

# FW: Aspirus Stevens Point Hospital declined Bid #B-ASSPH-251024-23271

1 message

**Terrance Cotton** <Terrance.Cotton@amnhealthcare.com>

Fri, Nov 7, 2025 at 11:59 AM

To: Rao M <mvlaxm@gmail.com>

---

**From:** Locumsmart Notifier <notification@locumsmart.net>
**Sent:** Thursday, November 6, 2025 9:32 AM
**To:** Terrance Cotton <Terrance.Cotton@amnhealthcare.com>
**Subject:** Aspirus Stevens Point Hospital declined Bid #B-ASSPH-251024-23271

**WARNING:** This email came from outside of our trusted email system. **DO NOT CLICK** links or attachments if you find the email suspicious.

Aspirus Stevens Point Hospital declined bid #B-ASSPH-251024-23271

Assignment: A-ASSPH-251014-32204
HCO: Aspirus Health
Facilities: Aspirus Stevens Point Hospital (WI)
Specialty: Urology
Provider: Rao Mandalapu
Reason for Declining: Provider does not meet credentialing/licensing requirements.

You may wish to use this feedback to re-bid the same provider at a different rate or dates, or incorporate it into your recruiting efforts to find a provider that more closely matches the needs of the facility.

To view the bid details, click here

You are receiving this message because you are subscribed for email notifications at app.locumsmart.net. Navigate to the notifications tab of your user profile to review your notification settings.

**LETTER OF INTENT**

**Name**:              Rao Mandalapu, MD

**Position**:          Urologist

**Solicitation**:      36C24526Q0041

This letter affirms my commitment to Titan-Auxo in support of **Urology Services** within the **Martinsburg VA Medical Center** should Titan-Auxo receive a contract award in response to solicitation 36C24526Q0041.

Signature:      *Rao Mandalapu*

Date:              10 / 30 / 2025

# CERTIFICATE *of* SIGNATURE

REF. NUMBER
JMIWY-M39DQ-SNPZU-EXWEG

DOCUMENT COMPLETED BY ALL PARTIES ON
30 OCT 2025 22:56:28
UTC

| SIGNER | TIMESTAMP | SIGNATURE |
|---|---|---|
| **RAO MANDALAPU** | SENT<br>30 OCT 2025 16:51:16 | *Rao Mandalapu* |
| EMAIL<br>MSRAO17@GMAIL.COM | VIEWED<br>30 OCT 2025 17:11:30 | |
| PHONE<br>+12144221113 | SIGNED<br>30 OCT 2025 22:56:28 | IP ADDRESS<br>174.170.114.95 |
| | | LOCATION<br>HOUSTON, UNITED STATES |

**RECIPIENT VERIFICATION**

EMAIL VERIFIED
30 OCT 2025 17:11:30

PHONE NUMBER VERIFIED
30 OCT 2025 22:56:06



**CANDIDATE
LETTER OF INTENT**

**Name**:          Rao S. Mandalapu, M.D.

**Position**:       Urology Physician

**Location:**      VA Central California Health Care System

2615 E. Clinton Ave

Fresno, CA. 93703

**Solicitation**:    36C24525Q0854


This letter affirms my intent to agree to employment as a Board-Certified Urology Physician with JR Enterprise, part of Team PFS in support of the U.S. Department of Veterans Affairs should this contract be awarded for services in support of the VA Central California Health Care System in Fresno, CA.

This letter affirms my commitment to being available to start work  and available for onboarding before that upon award of this contract.


Signature:          *Rao Mandalapu*


Date:               10 / 09 / 2025

# CERTIFICATE *of* SIGNATURE

REF. NUMBER
XWR5Q-ETJQB-C9JU2-SAX4W

DOCUMENT COMPLETED BY ALL PARTIES ON
09 OCT 2025 16:24:18
UTC

| SIGNER | TIMESTAMP | SIGNATURE |
|---|---|---|
| **RAO MANDALAPU** | SENT<br>09 OCT 2025 16:22:03 | Rao Mandalapu |
| EMAIL<br>MSRAO17@GMAIL.COM | VIEWED<br>09 OCT 2025 16:22:36 | |
| PHONE<br>+12144221113 | SIGNED<br>09 OCT 2025 16:24:18 | IP ADDRESS<br>174.170.114.95 |
| | | LOCATION<br>HOUSTON, UNITED STATES |

**RECIPIENT VERIFICATION**

PHONE NUMBER VERIFIED
09 OCT 2025 16:22:36



**mch**

**Medical Center Health System**

Your One Source for Health

September 17, 2025

Dear Dr. Rao Mandalapu,

Thank you for your interest in applying for membership at Medical Center Hospital.
After careful review of your submitted information and in accordance with the bylaws, we
regret to inform you that you do not currently meet the eligibility criteria required to apply for
membership.

Pursuant to the credentialing policy 2.A.1 (o) Threshold Eligibility Criteria- To be eligible to
apply for initial appointment, reappointment, or clinical privileges, an applicant must, as
applicable: Demonstrate recent clinical activity in their primary area of practice during the last
two years.  With the documentation provided we are not able to verify urology case logs for
you for the past two years.

As such, we are unable to proceed with your application at this time.
All appropriate parties involved in the medical staff application and review process have been
notified.

Sincerely,

Michelle Mendoza

Michelle Mendoza, CPCS
Medical Staff Services Manager



June 3, 2025
Dr. Rao S. Mandalapu
3710 N. Braeswood Blvd.
Houston, Texas 77025

Dear Dr. Mandalapu,

I would like to thank you for considering Medical Center Hospital and MCH ProCare. It was a pleasure meeting you and discussing an opportunity in association with our hospital and MCH ProCare. I believe you would make an excellent addition to our Urology Division. To that end, this letter reflects our offer for employment to join the group. Our hope is that you will consider joining us, and, that we can begin drafting a final employment agreement.

The salary and benefits that would be set forth in our employment agreement would include the following:

**Terms:** Three-years, full-time employment, starting upon obtaining a Texas license, privileges at Medical Center Hospital, and relocation to Odessa, Texas, To be mutually determined. (Call requirement to be determined.)

**Salary:** Base salary year up to $750,000 ($730,000 plus up to $20,000 for Annual Performance Measure bonuses for Documentation/Coding, Quality, & Patient Satisfaction).

**Call:** Calls in excess of 7 to be paid at $1,500 per day

**Production Incentive:** Production incentive pay based on $67.00 per wRVU's over 12,500 annually.

**Sign-on/Retention Bonus:** $100,000

**Relocation:**  up to $10,000

**Benefits:** CME allowance $5,000, Malpractice Insurance, Life Insurance, AD&D, and eligible to participate in Health, Dental, and 401K Plans.

The terms are subject to your and MCH ProCare's approval of the final drafted agreements.  You will have the opportunity to review the final language prior to execution, and an offer of employment is conditional on verifying licensure in Texas, obtaining privileges with Medical Center Hospital, background and reference checks, and MCHS and ProCare Board approvals. Your signature on this document signifies that you are agreeable to the principal terms listed above, and that you are sincere in securing the discussed position with MCH ProCare.

Sincerely,

Adiel Alvarado, DHA, FACMPE, FACHE
President/ MCH ProCare

Dr. Rao S. Mandalapu

# Mi**brook

Date 6/5/2024

Name Dr. Rau Mandalapu
Street Address 13204 Laguna Shores Dr
City, State zip Pearland, TX 77584

**Re: Candidate Commitment Letter (the "Letter")**

Dear Dr. Mandalapu ,

Millbrook is pleased to provide you this Letter[1] which is your commitment to work for us in the position of Urologist w/robotics
assigned to our client, Fargo VAMC (the "Client") for the following terms:

- Pay Rate(s):          $375.00          All Inclusive 1099 Contract Rate
  All inclusive means that reimbursement for lodging, travel and incidentals are already contemplated within the listed hourly rate.

- Estimated Start:     To Be Determined

- Position:            Urologist

- Schedule:            To Be Determined

- Client Name:         Fargo VAMC

- Client Location:     2101 Elm St NE, Fargo, ND 58102

- Additional Notes:

By signing this Letter, you hereby instruct Millbrook to submit your documentation to the Client.  Upon the Client accepting you for this assignment, you hereby agree to the terms of this confidential[3] Letter and will work with us to meet all Client onboarding deadlines.

**Accepted & Agreed:**

*Rao Mandalapu*                   2024-06-21

Signature                         Date

---

[1] This Letter is conditional upon you being accepted by the Client, and successfully passing the appropriate background checks, credentialing, and executing the applicable onboarding documentation, and is not a guarantee of employment until the foregoing have been meet.

[3] This Letter is strictly confidential and will not be shared, shown, or given to clients, or competitors without Millbrook's written consent.

# Signature Certificate

Reference number: YBKGU-ULMJH-2YL62-RHVEZ

| Signer | Timestamp | Signature |
|---|---|---|
| **Rao Mandalapu**<br>Email: msrao17@gmail.com | | |

| | | |
|---|---|---|
| Sent: | 06 Jun 2024 14:38:03 UTC | |
| Viewed: | 18 Jun 2024 19:02:34 UTC | |
| Signed: | 21 Jun 2024 15:32:04 UTC | |

*Rao Mandalapu*

**Recipient Verification:**

✔ Email verified    18 Jun 2024 19:02:34 UTC

IP address: 161.178.0.140
Location: Chicago, United States

Document completed by all parties on:
21 Jun 2024 15:32:04 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 50,000+ companies worldwide.



Department of Veterans Affairs – Central Texas Veteran Healthcare System Temple, TX

**EMERGE** solutions group

Emerge C-24-01

## CONSULTANT AGREEMENT

**THIS AGREEMENT,** made as of  TBD by and between, Rao S. Mandalapu, MD,  3710 North Braeswood Blvd, Houston, TX 77025 hereinafter referred to, as the "Consultant", and Emerge Solutions Group, LLC, 5410 Edson Lane, Suite 310, North Bethesda, Maryland 20852 hereinafter referred to as "Emerge".

### WITNESSETH:

WHEREAS Emerge and Consultant desire to enter into an agreement for the performance by Consultant of professional services in connection with contract number XXXXX (TBD), Department of Veteran Affairs, Central Texas Veterans Healthcare System, where Emerge Solutions Group, LLC is the Prime Contractor, which set forth the terms and conditions governing the relationship between the parties in providing services to the Government.

NOW, THEREFORE, in consideration of the premises and of the mutual promises herein, the parties hereto agree as follows:

**1.  CONSULTANCY PERIOD:**  This Agreement is made with the Consultant, who will furnish services at the Olin E, Teague Medical Center, 1901 Veterans Memorial Drive, Temple, Texas, 76504, as an independent contractor and not as an employee of Emerge.  Emerge hereby retains Consultant, and Consultant agrees to perform professional services for Emerge through the contract period of March 1, 2024, through February 28, 2027. This is a fixed-price contract for a base year plus two option years.  This agreement will be amended annually as the government provides funding.  (These dates are TBD)

**2.  STATEMENT OF WORK:**  The Consultant shall provide one Board Certified, Robotics Trained, Full Scope Operative Urology Physician Services on site in accordance with the specifications contained herein to beneficiaries of the Department of Veterans Affairs (VA) and the Olin E. Teague Medical Station.  See Annex A for the position description.

**3.  DIRECTION:** The Consultant will perform these consulting services at the direction of Emerge's leadership, Zohra Ghilzai and Jazelle Gilbert. The consultant shall provide board-certified operative urological physician services.  The on-call physician must always be available for phone consultations with VA residents and physicians.   The on-call provider must be available within 15 minutes by phone and on-site within 60 minutes.

**4.  TOTAL VALUE:** Consultant incurs obligation based on anticipation of 2080 regular hours worked for the base year performance. The Unanet time and attendance recording will validate all expenditures.  Emerge is not obligated to reimburse the Consultant for costs incurred in excess of the above amount unless and until Emerge notifies the Consultant in writing that such amount has been increased, which shall be the new maximum amount for which Emerge shall be liable.

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW

Department of Veterans Affairs – Central Texas Veteran Healthcare System Temple, TX



Emerge C-24-01

| Labor Category | Unit Price | Hours | Price | Charge Number |
|---|---|---|---|---|
| Board Certified, Robotics trained, Full Scope Operative Urology Physician Services | $375.00 | 2,080 | $780,000.00 | 6002 |
| OFF-HOURS COVERAGE/ON CALL<br><br>Board Certified, Robotics trained, Full Scope Operative Urology Physician Services | $50.00 | 1,236.00 | $61,800.00 | 6002 |

**5. PAYMENT:** Emerge shall pay the consultant at the rates described above for work pertaining to services addressed above in Paragraph 1. Regarding On-Call, should the consultant be called back to the facility, the on-call rate will revert to the hourly wage. It should be recorded at the time the consultant is notified that they need to return to the facility, any time accrued from traveling to the facility is included. Should Emerge require Consultant to travel in conjunction with efforts performed hereunder, Emerge shall pay or reimburse Consultant for such travel. Payments or reimbursement for travel shall be in accordance with the Emerge Travel Policy. In order to verify expenditures, all invoices for travel expenses shall be supported by copies of receipts. Any travel performed hereunder by the Consultant requires prior approval by Emerge's senior leadership. Travel will be provided on a reimbursable basis.

**6. PATENT RIGHTS:** Consultant will disclose promptly to Emerge all ideas, inventions, discoveries, and improvements, hereafter referred to as "Subject Inventions", whether or not patentable relating to the work hereunder which are conceived or first reduced to practice by Consultant in the performance of the work under, or related to, this Agreement. Consultant agrees to keep a written record of his/her technical activities and that all such records and such Subject Inventions shall become the sole property of Emerge. During or subsequent to the period of this Agreement, Consultant will execute and deliver to Emerge all such documents and take such other action as may be reasonably required by Emerge to assist it in obtaining patents and vesting in the company or its designee title to said Subject Inventions; except, however, that as to Subject Inventions not conceived but first reduced to practice hereunder, Consultant's obligations shall be only to the extent that Consultant may make such actions without incurring liability to other solely because of such actions.

**7. COPYRIGHTS:** Consultant agrees that all writings produced by Consultant under this Agreement shall be the sole property of Emerge, and Emerge shall have exclusive rights to copyright such writings in any country or countries; however, Emerge will make its best efforts to

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW                                                                    Page 2 of 26

**✦ EMERGE**
solutions group

**Emerge C-24-01**

grant a nonexclusive right to Consultant to publish such writings when circumstances, including security regulations, will permit.

**8.  PROFESSIONAL STANDARDS:**  Consultant agrees that the work performed hereunder will represent his/her best efforts and will be of the highest professional standards and quality.

**9.  ETHICS:**  Consultant agrees to the following:

-  Represent to Emerge that entering into the agreement and performing the duties and services will not create a conflict of interest for such consultant or Emerge;
-  Represent to Emerge that all laws will be complied with and, if they impose a higher standard of conduct, local customs will be observed; and
-  Acknowledge that it may be necessary for Emerge to disclose the fact of Consultant's retention, the duties performed and the compensation paid should there be proper inquiry from such source as an authorized U.S. Government agency or should Emerge believe it has a legal obligation to disclose such information.

**10.  RELATIONSHIP OF THE PARTIES:** The parties are and shall be independent contractors to one another, and nothing herein shall be deemed to cause this Agreement to create an agency, partnership, or joint venture between the parties.  Except as provided in this Agreement, Emerge shall not be liable for any debts, account obligations, or other liabilities whatsoever with the consultant, including (without limitation) the consultant's obligations to withhold Social Security and income taxes for itself or any of its employees.  Further, the parties hereby acknowledge and agree that Emerge shall not have the right to control the manner, means, or method by which the consultant performs the services called for by this Agreement.  Rather, Emerge shall be entitled only to direct the consultant with respect to the elements of services to be performed by the consultant and the results to be derived by Emerge, to inform the consultant as to where and when such services shall be performed, and to review and assess the performance of such services by the consultant for the limited purposes of assuring that such services have been performed satisfactorily.

**11.  PRIVILEGED AND PROPRIETARY INFORMATION:**

-  Except as specifically authorized by this Agreement, or as otherwise approved by Emerge in writing, records or other information, documents and material furnished by Emerge to the Consultant will be used only in connection with the work performed under this Agreement. The Consultant will, upon the completion or termination of this Agreement, transit to Emerge all records or other information, documents and materials, and copies thereof, furnished by Emerge to the Consultant or developed by the Consultant in the performance of this Agreement.
-  The Consultant will be held responsible for safeguarding from unauthorized disclosure any information or other documents and materials deemed proprietary by Emerge and made available to other Consultant in connection with the performance of work under this Agreement.  The Consultant agrees to conform to all regulation, requirements, and directions of Emerge with respect to such materials and documentation.  The Consultant's duties under this clause will not be construed to limit or affect in any way the Consultant's

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW



obligations to conform to all security regulations and requirements of Emerge pertaining to classified information material.

☐  Except as may be required in the performance of the work, Consultant shall not divulge any information acquired from Emerge or its Clients without the prior written consent of Emerge.

☐

**12.  TERMINATION:** Either party may terminate this Agreement in whole or in part at any time by giving 30 day written notice to the other.

**13.  PAYMENT FREQUENCY:** Emerge will pay the consultant on the 10th and 25th of each month in accordance with the Company's routine payroll procedures.  The consultant will be set up to record hours worked on a daily basis into Emerge's (Unanet) time and attendance system.

**14.  MONTHLY STATUS REPORTS:** Monthly status reports will be submitted with content and in the format required by Emerge.

**15.  AMENDMENTS**: This Agreement may be amended, in whole or in part, at any time upon mutual written agreement between Consultant and Emerge.

**16.  LIABILITIES:**
a)  Consultant shall not solicit nor accept employment from Emerge's prime contractor on this program for a period of one (1) year after termination of this agreement without written authorization from Emerge.  Such authorization shall not be unreasonably withheld. The parties hereto, recognizing that irreparable injury will result to Emerge in the event of a breach of the terms of this paragraph on the part of the Consultant, agree that in such event, Emerge shall be entitled, in addition to any other remedies and damages available, to an injunction to restrain the violation thereof by the Consultant, and all persons acting for or with him/her.

b)  In the event that any legal action is instituted by Emerge or the Consultant to enforce the terms, considerations, and covenants of the Agreement, the prevailing party, in either a court of law or in an arbitration proceeding, shall be entitled to reimbursement for all court costs and reasonable attorney's fees.  In the event the parties do not agree to reasonable attorney's fees, they may stipulate and agree to have said fees set by the court or arbitrator, and the determination of the fees shall not be subject to appeal by either party.

**17.  VALIDATION**:  In the event that any part of this agreement shall be adjudged or decreed invalid, such invalidation shall not invalidate that whole agreement but shall pertain only to the special covenant in question, and the remaining covenants of this agreement shall continue to be valid, binding and in full force and effect.

**18.  GOVERNING LAWS:**  This agreement shall be construed and interpreted in accordance with the laws of the State of Maryland.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

Department of Veterans Affairs – Central Texas Veteran Healthcare System Temple, TX

**EMERGE** solutions group

Emerge C-24-01

**RAO S. MANADALAPU, MD**          **EMERGE SOLUTIONS GROUP, LLC**

*Rao Mandalapu*
_____          _____
Signature                                                    Signature

Rao S. Manadalapu, MD                        Frederick L. Woods
_____          _____
Printed Name                                            Printed Name

Urologist              2024-02-16               Chief Operating Officer
_____          _____
Title                                Date                    Title                                Date

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW

✦ EMERGE
  solutions group

Emerge C-24-01

ANNEX A

PERFORMANCE WORK STATEMENT

**B.3 PERFORMANCE WORK STATEMENT**

**GENERAL:**

1.1. Services Provided: The Contractor shall provide one Board Certified, Robotics Trained, Full Scope Operative Urology Physician Services on site in accordance with the specifications contained herein to beneficiaries of the Department of Veterans Affairs (VA) and the Olin E. Teague Medical Station.  Contractor shall provide one (1) FTE.

1.2. Place of Performance: Contractor shall furnish services at the Olin E. Teague Medical Center; 1901 Veterans Memorial Drive; Temple, Texas; 76504.

1.3. Authority: Under the authority of Public Law 104-262 and 38 USC 8153, Health Care Resources (HCR) sharing Authority.  FAR 12 in combination with FAR 13.

1.4. Policy/Directives/Handbooks. The contractor shall be subject to the following policies, including any subsequent updates during the period of performance.  The policies listed below can be accessed electronically at the following:

1.4.1. VA Directive 1663: Health Care Resources (HCR) Contracting – Buying Title 38 U.S.C. 8153

1.4.2. VHA Directive 1003.04: VHA Patient Advocacy

1.4.3. VHA Directive 1065: Productivity and Staffing Guidance for Specialty Provider Group Practice

1.4.4. VHA Directive 1088(1): Communicating Test Results to Providers and Patients

1.4.5. VHA Directive 1100.18: Reporting and Responding to State Licensing Boards

1.4.6. VHA Directive 1100.20 Credentialing of Health Care Providers

1.4.7. VHA Directive 1100.21 Privileging

1.4.8. VHA Directive 1192.01: Seasonal Influenza Vaccination Program for VHA Health Care Personnel

1.4.9. VHA Directive 1220(1): Facility Procedure Complexity Designation Requirements to Perform Invasive Procedures in Any Clinical Setting

1.4.10. VHA Directive 1400.01: Supervision of Physician, Dental, Optometry, Chiropractic, and Podiatry Residents:

1.4.11. VHA Directive 1605.01: Privacy and Release of Information

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW

Department of Veterans Affairs – Central Texas Veteran Healthcare System Temple, TX

**EMERGE** solutions group

Emerge C-24-01

1.4.12. VHA Directive 1907.01: VHA Health Information Management and Health Records

1.4.13. VHA Handbook 1100.17: National Practitioner Data Bank (NPDB) Reports

1.4.14. VHA Handbook 1400.04: Supervision of Associated Health Trainees:

1.4.15. Privacy Act of 1974 (5 U.S.C. 552a) as amended: http://www.justice.gov/oip/foia_updates/Vol_XVII_4/page2.htm

1.5. Acronyms/Definitions: Terms used in this contract shall be interpreted as follows unless the context expressly requires a different construction and/or interpretation. In case of a conflict in language between the Definitions and other sections of this contract, the language in this section shall govern.

1.5.1. ABU: American Board of Urology

1.5.2. ACGME: Accreditation Council for Graduate Medical Education

1.5.3. ACLS: Advanced Cardiac Life Support

1.5.4. BLS: Basic Life Support

1.5.5. CDC: Centers for Disease Control and Prevention

1.5.6. CEU: Certified Education Unit

1.5.7. Clinical Privileging: Clinical privileging is the process by which a practitioner, licensed for independent practice; e.g., without supervision, direction, required sponsor, preceptor, mandatory collaboration, etc.; is permitted by law and the facility to practice independently, to provide specific medical or other patient care services within the scope of the individual's license, based upon the individual's clinical competence as determined by peer references, professional experience, health status, education, training and licensure. Clinical privileges must be facility-specific and provider-specific, and within available resources.

1.5.8. CME: Continuing Medical Education

1.5.9. CMS: Centers for Medicare and Medicaid Services

1.5.10. Contracting Officer (CO): The person executing this contract on behalf of the Government with the authority to enter and administer contracts and make related determinations and findings.

1.5.11. Contracting Officer's Representative (COR): A person appointed by the CO to take necessary action to ensure the Contractor performs in accordance with and adheres to the specifications contained in the contract and to protect the interest of the Government. The COR shall report to the CO promptly any indication of non-compliance in order that appropriate action can be taken.

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW

Department of Veterans Affairs – Central Texas Veteran Healthcare System Temple, TX



Emerge C-24-01

1.5.12.  COS: Chief of Staff

1.5.13.  CPARS: Contractor Performance Assessment Reporting System

1.5.14.  DEA: Drug Enforcement Agency

1.5.15.  ED: Emergency Department

1.5.16.  EHR: Electronic Health Record - electronic health record system used by the VA

1.5.17.  FSMB: Federation of State Medical Boards

1.5.18.  FTE: Full Time Equivalent. VA's definition for full time-working the equivalent of 80 hours every two weeks, 2080 hours per year. In calculating FTE, any hours not worked on national holidays shall not be included.

1.5.19.  HHS: Department of Health and Human Services

1.5.20.  HIPAA: Health Insurance Portability and Accountability Act

1.5.21.  HR: Human Resources

1.5.22.  ISO: Information Security Officer

1.5.23.  Key Personnel: The individuals specified in this contract who are essential to work performance.

1.5.24.  Medical Emergency: a sudden onset of a medical condition manifesting itself by acute symptoms of sufficient severity that the absence of immediate medical attention could reasonably result in: Permanently placing a patient's health in jeopardy, causing other serious medical consequences, causing impairments to body functions, or causing serious or permanent dysfunction of any body-organ or part.

1.5.25.  NPI: National Provider Identifier. NPI is a standard, unique 10-digit numeric identifier required by HIPAA. The Veterans Health Administration must use NPIs in all HIPAA-standard electronic transactions for individual (health care practitioners) and organizational entities (medical centers).

1.5.26.  POP: Period of Performance

1.5.27.  PPD: Purified Protein Derivative

1.5.28.  PWS: Performance Work Statement

1.5.29.  QA/QI: Quality Assurance/Quality Improvement

1.5.30.  QM/PI: Quality Management/Performance Improvement QASP: Quality Assurance Surveillance Plan

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW



1.5.31.  VETPro: VHA's mandatory credentialing software platform to document the credentialing of VHA health care providers.  This system facilitates completion of a uniform, accurate, and complete credentials file.

1.5.32.  VHA: Veterans Health Administration

1.5.33.  VISN: Veterans Integrated Services Network

1.5.34.  VistA: Veterans Information Systems Technology Architecture

## 2. QUALIFICATIONS:

2.1.  Staff/Facility

2.1.1.  License: The Contractor's physician assigned by the Contractor to perform the services covered by this contract shall have a current license to practice medicine in any State, Territory, or Commonwealth of the United States or the District of Columbia when services are performed onsite on VA property.  To avoid delays in getting performance started as soon as possible, our office advises that ALL required licensing/certifications are required to be submitted at the time of offers due.  Proposals that do not contain the required licensing/certification at the time of offers due shall automatically be rendered technically unacceptable and will not be eligible for award.

All licenses held by the key personnel working on this contract shall be full and unrestricted licenses. Contractor's physician who has current, full and unrestricted licenses in one or more states, but who have, or ever had, a license restricted, suspended, revoked, voluntarily revoked, voluntarily surrendered pending action, or denied upon application will not be considered for the purposes of this contract.

2.1.2.  Board Certification: All contractor's physician(s) shall be Board Certified by the American Board of Urology (ABU) and be currently certified in Basic Life Support (BLS) Advanced Cardiac Life Support (ACLS) or equivalency, preferably from the American Heart Association. All continuing education courses required for maintaining certification must be always kept up to date. Documentation verifying current certification shall be provided by the Contractor to the VA COR on an annual basis for each year of contract performance.

2.1.3.  Credentialing and Privileging: Credentialing and privileging is to be done in accordance with the provisions of VHA Directive 1100.20 and VHA Directive 1100.21 referenced above. The Contractor is responsible to ensure that proposed physician(s) possesses the requisite credentials enabling the granting of privileges. No services shall be provided by any Contractor's physician prior to obtaining approval by the Facility Medical Executive Board and Medical Center Director.

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW

Department of Veterans Affairs – Central Texas Veteran Healthcare System Temple, TX

**EMERGE**
solutions group

Emerge C-24-01

2.1.3.1.  If a Contractor's physician and/or other contract provider(s) are not credentialed and privileged or has credentials/privileges suspended or revoked, the Contractor shall furnish an acceptable substitute without any additional cost to the government.

2.1.4.  Technical Proficiency: Contractor's physician shall be technically proficient in the skills necessary to fulfill the government's requirements, including the ability to speak, understand, read, and write English fluently. Contractor shall provide documents upon request of the CO/COR to verify current and ongoing competency, skills, certification and/or licensure related to the provision of care, treatment and/or services performed. Contractor shall provide verifiable evidence of all educational and training experiences including any gaps in educational history for all contractor's physician and contractor's physician shall be responsible for abiding by the Facility's Medical Staff By-Laws, rules, and regulations (referenced herein) that govern medical staff behavior.

2.1.5.  Continuing Medical Education (CME)/ Certified Education Unit (CEU) Requirements: Contractor shall provide the COR copies of current CMEs as required or requested by the facility. Contractor's physician registered or certified by national/medical associations shall continue to meet the minimum standards for CME to remain current. Contractor shall report CME hours to the credential's office for tracking. These documents are required for both privileging and re-privileging. Failure to provide shall result in loss of privileges for contractor's physician.

2.1.6.  Training (ACLS, BLS, EHR and VA MANDATORY): Contractor shall meet all VA educational requirements and mandatory course requirements defined herein; all training must be completed by the contractor's physician(s) as required by the VA. Other training may become required. VA will communicate any changes to the training requirement to the contractor.

| Training The following training is mandatory per VHACO for Contracted Urologist | Frequency (once a year, etc.) | Annual Hours |
|---|---|---|
| ACLS/BLS | Annual | 1 |
| Active Threat Training | Annual | 1 |
| Blood Administration: Complications | Annual | 0.5 |
| EHR | Annual | 1 |
| Government Ethics | Annual | 1 |
| Hospice and Palliative Care for VA Clinicians | Annual | 1 |
| Military Sexual Trauma (MST) for Medical Providers | Annual | 1 |

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW



Department of Veterans Affairs – Central Texas Veteran Healthcare System Temple, TX

**Emerge C-24-01**

| | | |
|---|---|---|
| Moderate Sedation In-Service Training | Annual | 1 |
| PACT Act 2022 Toxic Exposure Screening (TES) | Annual | 1 |
| Patient Abuse | Annual | 1 |
| Patient Rights | Annual | 1 |
| Patient Safety | Annual | 1 |
| Prevention/Management of Disruptive Behavior/Violence Prevention Level I | Every two years | 2.5 |
| Prevention of Workplace Harassment/No Fear Act | Annual | 1 |
| Suicide Prevention: Suicide Risk Management Training for Clinicians | Annual | 1 |
| SUX Infection Control and Blood Borne Pathogens | Annual | 1 |
| VA Core Values Training (ICARE Recommitment) | Annual | 1 |
| VA Privacy and Information Security Awareness and Rules of Behavior | Annual | 2 |
| VHA MRI Safety Training Level 1 Training (all who enter MRI suites) | Annual | 0.5 |
| VHA Privacy and HIPAA Focused Training | Annual | 2 |
| VISTA Imaging | Annual | 1 |

2.1.7. **STANDARD INFECTION CONTROL MEASURES (PPD, IMMUNIZATIONS, ETC.):** Contractor shall provide proof of the following for physicians within five (5) calendar days after contract award and prior to the first duty shift to the COR and Contracting Officer. **Tests shall be current within the past year**.

2.1.7.1. TUBERCULOSIS TESTING: Contractor shall provide proof of a negative Tuberculosis Skin Test (TST) or interferon-gamma release assays (IGRA) for all Contractor's physician(s) upon hire in accordance with CDC guidance. (This is applicable to all health care workers). A negative chest radiographic report for active tuberculosis shall be provided in cases of positive TST or IGRA results.

2.1.7.2. MEASLES, MUMPS, & RUBELLA TESTING: Contractors shall provide proof of immunity for all Contractor physicians {This is applicable to all health care workers}.

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW

2.1.7.3.   VARICELLA: Contractors shall provide proof of immunity for all Contractor physicians {This is applicable to all health care workers}.

2.1.7.4.   ACELLULAR PERTUSSIS: Contractors shall provide proof of 1 dose of Tdap vaccination for all Contractor physicians {This is applicable to all health care workers}.

2.1.7.5.   INFLUENZA: Contractors shall provide proof that all Contractor physicians have received the annual Influenza vaccine unless it is contraindicated. If the Contractor physician has a medical contraindication to the vaccine, they shall be required to wear a mask during the Influenza season. {This is applicable to all health care workers}.

2.1.7.6.   COVID-19: Contractors shall comply with VHA Supplemental Contract Requirements for Combatting COVID-19 {This is applicable to all health care workers}.

2.1.7.7.   OSHA REGULATION CONCERNING OCCUPATIONAL EXPOSURE TO BLOODBORNE PATHOGENS: Contractor shall provide evidence of completing and passing generic self-study blood-borne pathogen training for all Contractor's physician(s) {This is applicable to all health care workers}; provide their own Hepatitis B vaccination series and hepatitis B surface antigen test results following the hepatitis B vaccination series; maintain an exposure determination and control plan; maintain required records; and ensure that proper follow-up evaluation is provided following an exposure incident.

2.1.7.8.   The facility shall notify the Contractor of any significant communicable disease exposures as appropriate. Contractor shall adhere to current CDC/HICPAC Guideline for Infection Control in health care personnel (as published in American Journal for Infection Control- AJIC 1998; 26:289-354 http://www.cdc.gov/hicpac/pdf/InfectControl98.pdf) for disease control. Contractor shall provide follow up documentation of clearance to return to the workplace prior to their return.

2.1.8.   National Provider Identifier (NPI): NPI is a standard, unique 10-digit numeric identifier required by HIPAA. The Veterans Health Administration must use NPIs in all HIPAA-standard electronic transactions for individual (health care practitioners) and organizational entities (medical centers). The Contractor shall have or obtain appropriate NPI and if pertinent the Taxonomy Code confirmation notice issued by the Centers for Medicare and Medicaid Services (CMS) National Plan and Provider Enumeration System (NPPES) be provided to the Contracting Officer with the proposal.

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW

✦ EMERGE™
s o l u t i o n s   g r o u p

Emerge C-24-01

2.1.9.  DEA: Contractor shall provide copy of current DEA certificate.

2.1.10.  Conflict of Interest: The Contractor and all contractor's physician(s) are responsible for identifying and communicating to the CO and COR conflicts of interest at the time of proposal and during the entirety of contract performance. At the time of proposal, the Contractor shall provide a statement which describes, in a concise manner, all relevant facts concerning any past, present, or currently planned interest (financial, contractual, organizational, or otherwise) or actual or potential organizational conflicts of interest relating to the services to be provided. The Contractor shall also provide statements containing the same information for any identified consultants or subcontractors who shall provide services. The Contractor must also provide relevant facts that show how it's organizational and/or management system or other actions would avoid or mitigate any actual or potential organizational conflicts of interest. These statements shall be in response to the VAAR provision 852.209-70 Organizational Conflicts of Interest and fully outlined in response to the subject attachment in Section D of the solicitation document.

2.1.11.  Citizenship related Requirements:

2.1.11.1.  The Contractor certifies that the Contractor shall comply with all legal provisions contained in the Immigration and Nationality Act of 1952, As Amended; its related laws and regulations that are enforced by Homeland Security, Immigration and Customs Enforcement and the U.S Department of Labor as these may relate to non-immigrant foreign nationals working under contract or subcontract for the Contractor while providing services to Department of Veterans Affairs patient referrals.

2.1.11.2.  While performing services for the Department of Veterans Affairs, the Contractor shall not knowingly employ, contract, or subcontract with an illegal alien; foreign national non-immigrant who is in violation their status, because of their failure to maintain or comply with the terms and conditions of their admission into the United States. Additionally, the Contractor is required to comply with all "E-Verify" requirements consistent with "Executive Order 12989" and any related pertinent Amendments, as well as applicable Federal Acquisition Regulations.

2.1.11.3.  If the Contractor fails to comply with any requirements outlined in the preceding paragraphs or its Agency regulations, the Department of Veterans Affairs may, at its discretion, require that the foreign national who failed to maintain their legal status in the United States or otherwise failed to comply with the requirements of the laws administered by Homeland Security, Immigration and Customs Enforcement and the U.S Department of Labor, shall be prohibited from working at the Contractor's place of business that services Department of Veterans Affairs

**✛ EMERGE**
solutions group

patient referrals; or other place where the Contractor provides services to veterans who have been referred by the Department of Veterans Affairs; and shall form the basis for termination of this contract for breach.

2.1.11.4.  This certification concerns a matter within the jurisdiction of an agency of the United States and the making of a false, fictitious, or fraudulent certification may render the maker subject to prosecution under 18 U.S.C. 1001.

2.1.11.5.  The Contractor agrees to obtain a similar certification from its subcontractors. The certification shall be made as part of the offerors response to the RFP using the subject attachment in Section D of the solicitation document.

2.1.12.  Annual Office of Inspector General (OIG) Statement: In accordance with HIPAA and the Balanced Budget Act (BBA) of 1977, the Department of Health and Human Services (HHS) Office of Inspector General (OIG) has established a list of parties and entities excluded from Federal health care programs. Specifically, the listed parties and entities may not receive Federal Health Care program payments due to fraud and/or abuse of the Medicare and Medicaid programs.

2.1.12.1.  Therefore, Contractor shall review the HHS OIG List of Excluded Individuals/Entities on the HHS OIG web site at http://oig.hhs.gov/exclusions/index.asp to ensure that the proposed contractor's physician(s) are not listed. Contractor should note that any excluded individual or entity that submits a claim for reimbursement to a Federal health care program, or causes such a claim to be submitted, may be subject to a Civil Monetary Penalty (CMP) for each item or service furnished during a period that the person was excluded and may also be subject to treble damages for the amount claimed for each item or service. CMP's may also be imposed against the Contractor that employ or enter contracts with excluded individuals to provide items or services to Federal program beneficiaries.

2.1.12.2.  By submitting their proposal, the Contractor certifies that the HHS OIG List of Excluded Individuals/Entities has been reviewed and that the Contractors are and/or firm is not listed as of the date the offer/bid was signed.

2.2.  Clinical/Professional Performance: The qualifications of Contractor personnel are subject to review by VA Medical Center COS or his/her clinical designee and approval by the Medical Center Director as provided in VHA Directive 1100.20 and VHA Directive 1100.21. Clinical/Professional performance monitoring and review of all clinical personnel covered by this contract for quality purposes will be provided by the facility COS and/or the Chief of the Service or his designee. A clinical COR may be appointed, however, only the CO is authorized to consider any contract modification request and/or make changes to the contract during the administration of the resultant contract.

**EMERGE**
solutions group

2.3.  Non-Personal Healthcare Services: The parties agree that the Contractor and all contractor's physician(s) shall not be considered VA employees for any purpose.

2.4.  Indemnification: The Contractor shall be liable for, and shall indemnify and hold harmless the Government against, all actions or claims for loss of or damage to property or the injury or death of persons, arising out of or resulting from the fault, negligence, or act or omission of the Contractor, its agents, or employees.

2.5.  Prohibition Against Self-Referral: Contractor's physicians are prohibited from referring VA patients to contractor's or their own practice(s).

2.6.  Inherent Government Functions: Contractor and Contractor's physician(s) shall not perform inherently governmental functions. This includes, but is not limited to, determination of agency policy, determination of Federal program priorities for budget requests, direction and control of government employees (outside a clinical context), selection or non-selection of individuals for Federal Government employment including the interviewing of individuals for employment, approval of position descriptions and performance standards for Federal employees, approving any contractual documents, approval of Federal licensing actions and inspections, and/or determination of budget policy, guidance, and strategy.

2.7.  No Employee status: The Contractor shall be responsible for protecting Contractor's physician(s) furnishing services. To carry out this responsibility, the Contractor shall provide or certify that the following is provided for all their staff providing services under the resultant contract:

2.7.1. Workers' compensation

2.7.2. Professional liability insurance

2.7.3. Health examinations

2.7.4. Income tax withholding, and

2.7.5. Social security payments.

2.8.  Tort Liability: The Federal Tort Claims Act does not cover Contractor or contractor's physician(s). When a Contractor or contractor's physician(s) has been identified as a provider in a tort claim, the Contractor shall be responsible for notifying their legal counsel and/or insurance carrier. Any settlement or judgment arising from a Contractor's (or contractor's physician(s)) action or non-action shall be the responsibility of the Contractor and/or insurance carrier.

2.9.  Key Personnel:

2.9.1.  The VA Full Time Equivalency (FTE) for the services required is 2,080 hours = 1.0 VA FTE

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW

**EMERGE**
solutions group

2.9.2.  The minimum number of Board-Certified Operative Urology physicians required to be on site daily is one (1), required to be on site at the same time as defined in paragraph Hours of Operation in this section.

2.9.3.  The Contractor shall be responsible for providing coverage to the VA during periods of vacancies of the Contractor's personnel due to sick leave, personal leave, vacations, and additional coverage as required. In the event a scheduled physician is unable to complete an assigned shift, the contractor shall provide replacement physician coverage within 2 hours and notify the Contracting Office Representative (COR) immediately of the schedule change.

2.9.4.  Personnel Substitutions: During the first ninety (90) calendar days of performance, the Contractor shall make NO substitutions of key personnel unless the substitution is necessitated by illness, death, or termination of employment. The Contractor shall notify the CO, in writing, within 30 calendar day (s) after the occurrence of any of these events and provide the information required below. After 90 days, the Contractor shall submit the information required below to the CO at least 30 calendar days prior to making any permanent substitutions.

2.9.4.1.  The Contractor shall provide a detailed explanation of the circumstances necessitating the proposed substitutions, complete resumes for the proposed substitutes, and any additional information requested by the CO. Proposed substitutes shall have comparable qualifications to those of the persons being replaced. The CO will notify the Contractor within 10 calendar days after receipt of all required information of the decision on the proposed substitutes. The contract will be modified to reflect any approved changes of key personnel.

2.9.4.2.  For temporary substitutions where the key person shall not be reporting to work for three consecutive workdays or more, the Contractor shall provide a qualified replacement for the key person. The substitute shall have comparable qualifications to the key person. Any period exceeding two weeks will require the procedure as stated above.

2.9.4.3.  The Government reserves the right to refuse acceptance of any Contractor personnel at any time after performance begins, if personal or professional conduct jeopardizes patient care or interferes with the regular and ordinary operation of the facility. Breaches of conduct include intoxication or debilitation resulting from drug use, theft, patient abuse, dereliction, or negligence in performing directed tasks, or other conduct resulting in formal complaints by patient or other staff members to designated Government representatives. Standards for conduct shall mirror those prescribed by current federal personnel regulations. Should the VA COS or designee show documented clinical problems

Department of Veterans Affairs – Central Texas Veteran Healthcare System Temple, TX

**EMERGE**
solutions group

Emerge C-24-01

or continual unprofessional behavior/actions with any Contractor's physician(s), s/he may request, without cause, immediate replacement of said Contractor's physician(s). The CO and COR shall deal with issues raised concerning Contractor's physician(s) conduct. The final arbiter on questions of acceptability is the CO.

2.9.4.4.  Contingency Plan: Because continuity of care is an essential part of the facility's medical services, The Contractor shall have a contingency plan in place to be utilized if the Contractor's physician(s) leaves Contractor's employment or is unable to continue performance in accordance with the terms and conditions of the resulting contract.

3. **VA HOURS OF OPERATION/SCHEDULING:**

3.1. VA Business Hours: The Olin E. Teague VAMC is a twenty-four (24) hour medical facility, with designated GU clinic. Clinic hours are Monday – Friday, 7:00 AM – 5:00 PM Central Time, as applicable.  Clinic or Operating Room (OR) schedule varies, and on-call hours will be required at a minimum of 1,236 hours per year.

3.1.1.  Patients must be seen by a contractor's physician(s) on-site at the facility in a timely manner in accordance with VA Rules and Regulations on clinic wait times and consult completion. Contractor shall notify the COR at least monthly about any obstacles to meeting this performance measure.

3.1.2.  Contractor's physician(s) shall be available and present in clinic during normal facility clinic hours, which will be established, and may be revised, as deemed appropriate for patient care by the Chief of Staff. Currently, normal clinic hours are Monday – Friday, 7:00 AM – 5:00 PM Central Time.

3.1.3.  Off-hours Coverage: Contractor must make the contractor's physician(s) available during all hours when the facility clinic is closed, including evenings, weekends, and holidays.

3.1.3.1.  On-call contractor's physician(s) must be always available for phone consultations with VA residents and physicians.

3.1.3.2.  On-call providers must be available within 15 minutes by phone and on-site, within 60 minutes.

3.2. Federal Holidays: The following holidays are observed by the Department of Veterans Affairs:

- New Year's Day
- President's Day
- Martin Luther King's Birthday
- Memorial Day

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW

Department of Veterans Affairs – Central Texas Veteran Healthcare System Temple, TX



Emerge C-24-01

- Juneteenth
- Independence Day
- Labor Day
- Columbus Day
- Veterans Day
- Thanksgiving
- Christmas
- Any day specifically declared to be a national holiday.

3.3. Cancellations:  Clinic cancellations are to be requested by the contractor's physician 45 days in advance and in accordance with national directives and local policies.

4. **CONTRACTOR RESPONSIBILITIES**

4.1. Clinical Personnel Required: The Contractor shall provide contractor's physician(s) who are competent, qualified per this performance work statement and adequately trained to perform assigned duties.

4.1.1. Contractor's physician(s) shall be responsible for signing in and out when in attendance. These sign in/sign out sheets will be used by the COR to confirm hours/days provided against the contractor's invoices.

4.2. Standards of Care: The contractor's physician(s) care shall cover the range of Urology services as would be provided in a state-of-the-art civilian medical treatment facility and the standard of care shall be of a quality, meeting or exceeding currently recognized national standards as established by:

4.2.1. American Urological Association Guidelines:
https://www.auanet.org/education/aua-guidelines.cfm

4.2.2. The professional standards of the The Joint Commission (TJC):
http://www.jointcommission.org/standards_information/standards.aspx

4.2.3. The standards of the American Hospital Association (AHA):
http://www.hpoe.org/resources?show=100&type=8

4.2.4. The requirements contained in this PWS.

4.3. EDUCATION AND SUPERVISION OF HEALTH PROFESSIONS TRAINEES (HPTS): Education and Supervision of HPTs: Per the guidelines dictated by the VA Office of Academic Affiliations (OAA) Directives and health professions education (HPE) accrediting agencies, the contractor performing the services of the contract will be responsible for the education and supervision of health professions trainees. Contract Provider shall be responsible for:

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW

4.3.1. Education of HPTs: Contractor shall provide an academic environment conducive to the training and professional development of HPTs rotating through the Urology Service in accordance with current VA, accrediting agency, and JC equivalent compliance guidelines. Contractor shall meet the educational objectives of the training program as outlined in the program letter of agreement. Contractor may provide practice-based learning opportunities and/or didactic teaching to HPTs.

4.3.2. Supervision of HPTs: Contractor shall provide supervision of HPTs in accordance with current VA, accrediting agency, and JC equivalent compliance guidelines. Contractor shall ensure HPT supervision in accordance with VHA Directive 1400.01, Supervision of Physician, Dental, Optometry, Chiropractic, and Podiatry Residents, and VHA Handbook 1400.04, Supervision of Associated Health Trainees. Contractor shall be responsible for overseeing HPTs' acquisition and demonstration of knowledge, skills, attitudes, and professionalism while the HPT participates in patient care. Contractor shall be responsible for periodic evaluation of HPTs and the training program as required by accrediting agencies and program letters of agreement. Contractor shall be responsible for ensuring that all notes and encounters are completed, clearly demonstrate the involvement of the supervising practitioner, and comply with VA standards, equivalent to JC compliance guidelines, standard commercial practice and guidelines established by VHA Directive 1400.01 and VHA Handbook 1400.04. The Contractor shall also perform any administrative duties relative to documentation of HPT training, as required and directed by the VA COS or designated representative.

4.4. **MEDICAL RECORDS**

4.4.1. Authorities: Contractor's physician(s) providing healthcare services to VA patients shall be considered as part of the Department Healthcare Activity and shall comply with the 5 U.S.C.552a (Privacy Act), 38 U.S.C. 5701 (Confidentiality of claimants records), 5 U.S.C. 552 (FOIA), 38 U.S.C. 5705 (Confidentiality of Medical Quality Assurance Records) 38 U.S.C. 7332 (Confidentiality of certain medical records), Title 5 U.S.C. § 522a (Records Maintained on Individuals) as well as 45 C.F.R. Parts 160, 162, and 164 (HIPAA).

4.4.2. HIPAA: This contract and its requirements meet exception in 45 CFR 164.502(e), and do not require a BAA in order for Covered Entity to disclose Protected Health Information to: a health care provider for treatment of VA patients. Based on this exception, a BAA is not required for this contract. Health records generated by this contract or provided to the Contractors by the VA are covered by the VA Privacy Act system of records entitled 'Patient Medical Records-VA' (24VA10A7). Contractor

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW                                    Page 19 of 26

generated VA Patient records are the property of the VA and shall not be accessed, released, transferred, or destroyed except in accordance with applicable laws and regulations. Contractor shall ensure that all records pertaining to medical care and services provided to VA patients are captured in the VA electronic health record system as required by VA policy as discussed in 4.4.4.

4.4.3. Disclosure: Contractor's physician(s) may have access to patient medical records for the purpose of providing medical care and services to VA patients and performing services under the contract; however, Contractor shall obtain permission from the VA before disclosing any patient information outside VA. VA authorizes the Contractor to discuss patient health information for coordination of care with community health care providers in compliance with VA regulations, HIPAA and VHA Directive 1605.01, Privacy and Release of Information. The VA will provide the Contractor with a copy of VHA Directive 1907.01, Health Information Management and Health Records and VHA Directive 1605.1, Privacy and Release of Information. The penalties and liabilities for the unauthorized disclosure of VA patient information mandated by the statutes and regulations mentioned above, apply to the Contractor.

4.4.4. Professional Standards for Documenting Care: Care shall be appropriately documented in medical records in accordance with standard commercial practice and guidelines established by VHA Directive 1907.01 Health Information Management and Health Records: https://www.va.gov/vhapublications/ViewPublication.asp?pub_ID=9235  and all guidelines provided by the facility.

4.4.5. Release of Information: The VA shall maintain control of releasing any copies of patient health information or health records and will follow policies and standards as defined, but not limited to Privacy Act requirements. Contractor will not release or disclose copies of records and will refer all such requests to the Release of Information Department at the VA facility were assigned.

4.4.6. Management for Medical Records: National Archives and Records Administration record disposition requirements are found in RCS 10-1 Chapter 6, 6000 series.

4.5. Direct Patient Care: estimated 80% of the time involved in direct patient care. Contractor shall be responsible for one Board Certified, robotics trained, full scope operative urologist.

4.5.1. Scope of Care: Contractor's physician(s) as appropriate and within scope of practice/privileging shall be responsible for providing Urology care, including, but not limited to:

4.5.1.1. Clinic and Surgical Care: Contractor's physician(s) shall provide clinical urology services including surgeries, consultations cystoscopies and other related urology

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW

**EMERGE**
solutions group

procedures. Contractor's physician(s) shall be present on time for any scheduled clinics/surgeries as documented by physical presence in the clinic or operating room at the scheduled start time.

4.5.1.2.   Specialty Exams: The contractor shall provide direct patient care including specialty exams such as compensation and pension, agent orange, etc., as it pertains to urological conditions only.

4.5.1.3.   COMMUNICATING TEST RESULTS TO PROVIDERS AND PATIENTS: In accordance with VHA Directive 1088, Communicating Test Results to Providers and Patients, all test results requiring action must be communicated by the ordering provider, or designee, to patients no later than seven (7) calendar days from the date on which the results are available. For test results that require no action, results must be communicated by the ordering provider, or designee, to patients no later than 14 calendar days from the date on which the results are available. The Contractor shall provide the VA with the name, pager, and telephone numbers of a LIP (physician, nurse practitioner, or physician assistant) at the Outpatient Site of Care to accept critical test results discovered on tests done by the VA. For critical results, the LIP must respond back to the VA within forty-five (45) minutes of the initial page or telephone call. The receiving LIP will document the results in the record and conduct a "read back" procedure to ensure accuracy of transmission and translation of all verbal results. The contractor shall determine a plan to fulfill critical test result procedures, per VA policy. VA will not be responsible for the failure of the Contractor to receive critically abnormal test results. Critical results must be reported to the clinician by the radiologist by telephone. Documentation of this notification, "who, when" must appear in the radiology report. For critical results that represent an imminent danger to the patient, the Contractor shall notify the patient immediately. See policy VHA Directive 1088 for additional requirements regarding communication of test results. Mechanisms must be in-place to provide notification of test results for patients receiving care in accordance with VHA Directive 1088, Communicating Test Results to Providers and Patients.

4.5.1.4.   Medications: Contractor's physician(s) shall follow all established medication policies and procedures. No sample medications shall be provided to patients.

4.5.1.5.   Discharge education: Contractor's physician(s) shall provide discharge education and follow up instructions that are coordinated with the next care setting for all urology clinical or surgical patients.

4.5.2.   Administrative: estimated 20% of time not involved in direct patient care.

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW

**Department of Veterans Affairs – Central Texas Veteran Healthcare System Temple, TX**

✦ **EMERGE**
solutions group

**Emerge C-24-01**

4.5.2.1.  Quality Improvement Meetings: The contractor's physician(s) shall participate in continuous quality improvement activities and meetings with committee participation as required by the facility Chief of Service, Chief of Staff, or designee.

List all meetings, associated time, and frequency.

| Meeting | Frequency (once a year, etc.) | Annual Hours |
|---|---|---|
| DMS Quality Assurance | ANNUAL | 10 |

4.5.2.2.  Staff Meetings: The contractor's physician(s) shall attend staff meetings as required by the facility Chief of Service, Chief of Staff, or designee. Contractor to communicate with COR on this requirement and report any conflicts that may interfere with compliance with this requirement.

*List all meetings, associated time, and frequency.*

| Meeting | Frequency (once a year, etc.) | Annual Hours |
|---|---|---|
| ALL STAFF | QUARTERLY | 4 |

4.5.2.3.  QA/QI documentation: The contractor's physician(s) shall complete the appropriate QM/PI documentation pertaining to all procedures, complications, and outcome of examinations.

4.5.2.4.  Patient Safety Compliance and Reporting: Contractor's physician(s) shall follow all established patient safety and infection control standards of care. Contractor's physician(s) shall make every effort to prevent medication errors, falls, and patient injury caused by acts of commission or omission in the delivery of care. All events related to patient injury, medication errors, and other breeches of patient safety shall be documented in the medical record of those impacted and disclosed to the patient or surrogate. As soon as practicable (but within 24 hours) Contractors shall notify COR of incident and submit an entry in the Patient Safety Reporting System, following up with COR as required or requested.

4.5.2.5.  Patient Safety Compliance and Reporting: Contractor's physician(s) shall follow all established patient safety and infection control standards of care. Contractor's physician(s) shall make every effort to prevent medication errors, falls, and patient injury caused by acts of commission or omission in the delivery of care. All events related to patient injury, medication errors, and other breeches of patient safety shall be documented in the medical record of those impacted and disclosed to the patient or surrogate. As soon as practicable (but within 24 hours) Contractors shall notify COR of incident and submit an entry in the VA Patient Safety Reporting System, following up with COR as required or requested.

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW

4.6. **PERFORMANCE STANDARDS, QUALITY ASSURANCE (QA) AND QUALITY IMPROVEMENT(QI)**

4.6.1.  Quality Management/Quality Assurance Surveillance: Contract personnel shall be subject to Quality Management measures, such as patient satisfaction surveys, timely completion of medical records, and Peer Reviews. Methods of Surveillance: Focused Provider Practice Evaluation (FPPE) and Ongoing Provider Practice Evaluation (OPPE). Contractor performance will be monitored by the government using the standards as outlined in this Performance Work Statement (PWS) and methods of surveillance detailed in the Quality Assurance Surveillance Plan (QASP). The QASP shall be attached to the resultant contract and shall define the methods and frequency of surveillance conducted.

4.6.2.  Patient Complaints: The CO will resolve complaints concerning Contractor relations with the Government employees or patients. The CO is final authority on validating complaints. If The Contractor is involved and named in a validated patient complaint, the Government reserves the right to refuse acceptance of the services of such personnel. This does not preclude refusal in the event of incidents involving physical or verbal abuse.

4.6.3.  The Government reserves the right to refuse acceptance of any Contractor personnel at any time after performance begins, if personal or professional conduct jeopardizes patient care or interferes with the regular and ordinary operation of the facility. Breaches of conduct include intoxication or debilitation resulting from drug use, theft, patient abuse, dereliction, or negligence in performing directed tasks, or other conduct resulting in formal complaints by patient or other staff members to designated Government representatives. Standards for conduct shall mirror those prescribed by current federal personnel regulations. The CO and COR shall deal with issues raised concerning Contractor's conduct. The final arbiter on questions of acceptability is the CO.

4.6.4.  Performance Standards:

4.6.4.1.  Measure: Provider Quality Performance

Performance Requirement: All Contractor's physician(s) shall perform in accordance with clinical standards.

Standard: OPPE documentation for all (100%) staff providing services under the contract. All staff (100%) meet Standards.

Acceptable Quality Level: 100% meet Standards

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW

Department of Veterans Affairs – Central Texas Veteran Healthcare System Temple, TX

**✦ EMERGE**
solutions group

**Emerge C-24-01**

Surveillance Method: Ongoing Provider Performance Evaluation (OPPE) data pertinent to care performed for each provider working under this contract. OPPE data will review the following elements:

A. Patient Care Performance
B. Medical/Clinical knowledge
C. Practiced Based Learning and Improvement
D. Interpersonal and Communication Skills
E. Professionalism
F. System Based Practice

Frequency: Quarterly

4.6.4.2. Measure: Qualifications of Key Personnel

Performance Requirement: All contractor's physician(s) shall be Board Certified/Board Eligible in accordance with American Board of Urology (ABU)Standards.

Standard: All (100%) contract physicians are board certified/board eligible.

Acceptable Quality Level: 100% No deviations accepted.

Surveillance Method: Random Inspection of qualification documents

Frequency: Quarterly

4.6.4.3. Measure: Scope of Practice/Privileging

Performance Requirement: Contractor's physician(s) perform within their individual scopes of practice/privileging.

Standard: All (100%) contractor's physician(s) perform within their scope of practice/privileges 100% of the time.

Acceptable Quality Level: 100% contractor's physician(s) perform within their scope of practice/privileges 100% of the time.

Surveillance Method: Random Sampling of records.

Frequency: Annual

4.6.4.4. Measure: Patient Access

Performance Requirement: The Contractor shall provide contractor's physician(s) in accordance with the operating hours and VA clinical schedule outlined in this PWS.

Standard: All (100%) contractor's physician(s) are on time and available to perform services.

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW

**◆ EMERGE**
solutions group

**Emerge C-24-01**

Acceptable Quality Level: Contractor's physician(s) is on-time and available to perform services 100% of the time.

Surveillance Method: Periodic Inspection of Time and Attendance Sheets

Frequency: Annual

4.6.4.5.   Measure: Patient Safety

Performance Requirement: Patient safety incidents shall be reported using Patient Safety Reporting System. All incidents reported immediately (within 24 hours.)

Standard: All (100%) of patient safety incidents are reported using Patient Safety Reporting System within 24 hours of incident.

Acceptable Quality Level: 100% of patient safety incidents are reported using Patient Safety Reporting System within 24 hours of incident.

Surveillance Method: Random Sampling or Periodic Inspection

Frequency: Quarterly

4.6.4.6.   Measure: Maintains licensing, registration, and certification

Performance Requirement: Updated Licensing, registration and certification shall be provided as they are renewed. Licensing and registration information kept current.

Standard: All (100%) licensing, registration(s) and certification(s) for contractor's physician(s) shall be provided as they are renewed. Licensing and registration information kept current.

Acceptable Quality Level: 100% licensing, registration(s) and certification(s) for contractor's physician(s) shall be provided as they are renewed. Licensing and registration information kept current. No acceptable deviation.

Surveillance Method: Periodic Inspection and Random Sampling

Frequency: Annual

4.6.4.7.   Measure: Mandatory Training

Performance Requirement: Contractor shall complete all required training on time per facility policy.

Standard: All (100%) of required training is complete on time by contract physician(s).

Acceptable Quality Level 100% completions.

Surveillance Method: Periodic Inspection or Random Sampling

Frequency: Periodic Sampling

4.6.4.8.   Measure: Privacy, Confidentiality and HIPAA

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW

EMERGE
solutions group

**Emerge C-24-01**

Performance Requirement: Contractor is aware of all laws, regulations, policies, and procedures relating to Privacy, Confidentiality and HIPAA and complies with all standards Zero breaches of privacy or confidentiality.

Standard: All (100%) contractor physician(s) comply with all laws, regulations, policies, and procedures relating to Privacy, Confidentiality and HIPAA

Acceptable Quality Level: 100% compliance.

Surveillance Method: Periodic Inspection; Contractor shall provide evidence of annual training required by the facility, reports violations per VA Handbook 6500.6.

Frequency: Annual

Document Ref: Q6Q83-KCGRG-J9ONJ-MAPFW

# Signature Certificate

Reference number: Q6Q83-KCGRG-J9ONJ-MAPFW

| Signer | Timestamp | Signature |
|--------|-----------|-----------|
| **Rao Mandalapu**<br>Email: msrao17@gmail.com | | |

| | | |
|---|---|---|
| Sent: | 16 Feb 2024 20:14:50 UTC | |
| Viewed: | 16 Feb 2024 20:18:46 UTC | |
| Signed: | 16 Feb 2024 20:19:38 UTC | |

*Rao Mandalapu*

**Recipient Verification:**

✔ Email verified          16 Feb 2024 20:18:46 UTC

IP address: 73.183.168.242
Location: Houston, United States

Document completed by all parties on:
16 Feb 2024 20:19:38 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 50,000+ companies worldwide.



 **Gmail**

**rao ms <msrao17@gmail.com>**

---

## Incomplete application

---

**rao ms** <msrao17@gmail.com>                                    Mon, Oct 30, 2023 at 6:13 AM
To: Wendell.Jones@va.gov, Shereef.elnahal@va.gov
Cc: "Pastrano, John R." <jrpastrano@houstonmethodist.org>, rao ms <msrao17@gmail.com>, "Coleman, Kim"
<kcoleman2@houstonmethodist.org>


Dr. Wendell Jones,
Network Director,  VISN 17,
Arlington, TX.

Reg: Potential employer attempts to obtain employment verification were unsuccessful (02/2023 to 10/2023)

I am Rao Mandalapu, MD, a staff physician at the VA North Texas Health Care System (VISN 17) from 10/12/2021 to
06/05/2023.

My last patient contact was at 4 p.m. on the last day of the VA service. I do not have any reportable surgical
complications as documented in the VASQIP (VA Surgical Quality Improvement Program), no patient care issues, and
no current or pending malpractice cases against me. I will be happy to provide you with the documented evidence on
demand.

I applied for clinical privileges at the Houston Methodist Hospital (HMH), Houston, TX in February 2023.  I received an
email from the HMH credentialing/medical staff office on 10/27/2023 stating that their attempts to obtain employment
verification were unsuccessful (see the attached communication).

I humbly request you assign the concerned department in the VHA to complete the employment verification process in
a timely manner. (past VA employee)

This mail is copied to the office of Dr. Shereef Elnahal, MD, Honorable U.S. Under Secretary for Health for his staff to
review continued VHA policy violations.

This mail is copied to the medical staff specialists at the Houston Methodist Hospital for the follow-up.

Thank you,

Respectfully,

Rao Mandalapu, MD


---------- Forwarded message ---------
From: **Coleman, Kim** <0>
Date: Fri, Oct 27, 2023 at 3:51 PM
Subject: Incomplete application
To: msrao17@gmail.com <msrao17@gmail.com>
Cc: Pastrano, John R. <jrpastrano@houstonmethodist.org>


Hello, Dr. Rao.


After a thorough review and processing of your application and file, I regret to inform you that we are unable to

Case 3:25-cv-01320-L     Document 17-2     Filed 11/26/25     Page 292 of 295     PageID 420

proceed with your application. Your file will be marked as incomplete. Unfortunately, our attempts to obtain employment verification were unsuccessful, which has contributed to this decision.

If you have any questions, please feel free to reach out.

Thank you.

Have a great weekend.

*Kim Coleman*

*Medical Staff Specialist*

*Houston Methodist Hospital- Texas Medical Center*

*Scurlock 5th floor*

*346-238-4810*

*Main: 713-441-2194*

*Direct: 346-238-4810*

*Fax: 713-441-1459*

*Email:*KColeman2@houstonmethodist.org

Houston Methodist. Leading Medicine.

*U.S. News & World Report* has named Houston Methodist Hospital the Best Hospital in Texas* for 12 years in a row and recognized us on the Honor Roll seven times. For more than 100 years, we have provided patients with the best — and safest — clinical care, advanced technology and patient experience. That is our promise of leading medicine.

houstonmethodist.org
twitter.com/MethodistHosp
facebook.com/HoustonMethodist

*In a two-way tie

***CONFIDENTIALITY NOTICE*** This e-mail is the property of Houston Methodist and/or its relevant affiliates and may contain restricted and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender and delete all copies of the message. Thank you.

# Exhibit-T

## Contents:

1. VHA Directive 1100.19- Sample Letter - Hearing for Resignation of Physician or Dentist While Under Investigation.
2. The Medical Center Director should offer a fair hearing if the practitioner is under investigation at the time of resignation.

## Sample Letter - Hearing for Resignation of Physician or Dentist While Under Investigation

John Doe, MD
1234 East Main
Little Town, Big State 12345

Dear Dr. Doe:

I am in receipt of your letter of resignation dated March 19, 20XX, with an effective date of April 1, 20XX.

This letter is to notify you that you are entitled to a hearing to determine if you are resigning while under investigation relating to possible professional incompetence or improper professional conduct. Resignation while under such an investigation is reportable to the National Practitioner Data Bank.

If you want to request a hearing, your request must be submitted within 5 calendar days from the date of receipt of this letter. This hearing will be limited to whether you were under investigation for issues related to professional competence or conduct when you submitted your letter of resignation, and whether you were informed of the consequences of resigning while under investigation. Your request for the hearing must be submitted to the Office of the Chief of Staff in accordance with this letter.

Please sign and date the acknowledgement on the next page and return it to the Office of the Chief of Staff in the enclosed envelope.

Should you have any questions or wish to discuss this issue, please feel free to contact <insert name> , MD, Chief of Staff at <insert telephone number>.

Sincerely,


Medical Center Director

Enclosure

37

Advisement that resignation while under investigation is reportable to the National Practitioner Databank.

I, _____, acknowledge
                    (Printed Name)

receipt of this notification.


_____  _____
(Signature)                                                                              (Date)


***NOTE:***  *This letter is only used if practitioner is a physician or dentist who is reportable to the NPDB for resignation while under investigation.*

38

**000223**