UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| RAO MANDALAPU, M.D. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:25-cv-1320-D |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF VETERANS AFFAIRS; | ) | Jury Trial Demanded |
| U.S. SECRETARY OF | ) | |
| VETERANS AFFAIRS, | ) | |
| DOUGLAS A. COLLINS | ) | |
| in his official capacity; | ) | |
| DR. KAREN CROTTY, | ) | |
| in her individual capacity; | ) | |
| DR. JEFFREY GAHAN, | ) | |
| in his individual capacity; | ) | |
| DR. JOHN MODRALL, | ) | |
| in his individual capacity; | ) | |
| DR. RAUL RIVERA, | ) | |
| in his individual capacity; | ) | |
| DR. JEFFREY HASTINGS, | ) | |
| in his individual capacity; | ) | |
| MR. KENRICK BROWN, | ) | |
| in his individual capacity; | ) | |
| and MR. JASON CAVE, | ) | |
| in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff, Rao Mandalapu, M.D. ("Plaintiff" or "Dr. Mandalapu"), by and through

undersigned counsel, for his First Amended Complaint against Defendants, alleges as follows:

**INTRODUCTION**

1

1. Plaintiff is a board-certified Urologist and surgeon formerly employed by the Department of Veterans Affairs ("VA") who lost his clinical privileges, his VA employment, and the ability to practice his profession following unlawful actions by Defendants.

2. The Defendants' actions began after Dr. Mandalapu complained about workplace decisions apparently based on his race, age, or national origin. Their actions were taken for an unlawful, retaliatory purpose. These actions initially followed procedures set by regulation, but they extended the timing of these procedures past all reason until Dr. Mandalapu resigned his position. After he resigned, the Defendants filed invalid reports against Dr. Mandalapu in the National Practitioner Data Bank and the State Medical Board. The final report claims that Dr. Mandalapu voluntarily failed to renew his clinical privileges while under investigation, but this claim is false.

3. These reports have prevented Dr. Mandalapu from being hired as a physician ever since.

4. They have also damaged his professional reputation in connection with adverse employment actions and a constructive discharge.

5. Dr. Mandalapu brought the Title VII portion of this case before the Equal Employment Opportunity Commission ("EEOC"), which made a final decision denying relief on February 25, 2025. A related case is on appeal to the EEOC's Office of Federal Operations; however, for this case, Dr. Mandalapu has elected to bring an action in federal court under 42 U.S.C. § 2000e-5(f)(3).

6. After Plaintiff complained about workplace decisions apparently based on his race, age, or national origin, Defendants undertook retaliatory actions, extended credentialing procedures far beyond permissible timelines, constructively forced his resignation, and

2

filed false reports in the National Practitioner Data Bank ("NPDB") and with the State Medical Board stating that he failed to renew his privileges while under investigation.

7. The NPDB reports have prevented Plaintiff from being hired as a physician and damaged his professional reputation in connection with adverse employment actions and a constructive discharge.

8. Plaintiff timely exhausted Title VII administrative remedies, received a final decision on February 25, 2025, and elected to file this action under 42 U.S.C. § 2000e-5(f)(3).

## JURISDICTION AND VENUE

9. This action arises under the Fifth Amendment to the United States Constitution, the Administrative Procedure Act, and Title VII of the Civil Rights Act of 1964.  This Court has subject matter jurisdiction and personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1343.

10. The events noted below took place in and near Dallas, Texas.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

11. This Court has supplemental jurisdiction over the state-law tort claims pursuant to 28 U.S.C. § 1367.

12. Sovereign immunity is waived under 5 U.S.C. § 702

## PARTIES

13. Plaintiff, Rao Mandalapu, M.D., is an Asian man of East Indian origin and a former staff physician at the VA North Texas Health Care System ("VANTHCS").

14. Defendant United States Department of Veterans Affairs is a federal agency within the meaning of the Administrative Procedure Act.

15. Defendant Secretary of Veterans Affairs is sued in his official capacity for the APA, Fifth Amendment, and Title VII claims.

16. Defendants Dr. Karen Crotty, Dr. Jeffrey Gahan, Dr. John Modrall, Dr. Raul Rivera, Dr. Jeffrey Hastings, Mr. Kenrick Brown, and Mr. Jason Cave are sued in their individual capacities for Texas common-law torts based on their personal participation in the conduct alleged herein.

## Background and Supervision

15. Plaintiff's immediate supervisor was Dr. Karen Crotty, Chief of Urology and Assistant Chief of Surgical Services for the VA North Texas Health Care System (VANTHCS).

16. Dr. Crotty's immediate supervisor was Dr. John Modrall, Chief of Surgical Services at VANTHCS.

17. Dr. Modrall's immediate supervisor was Dr. Jeffrey Hastings, Chief of Staff at VANTHCS. However, during some of the events described below, Dr. Raul Rivera, who normally serves as deputy chief of staff, was acting chief of staff.

18. Mr. Kendrick Brown, Certified Healthcare Facility Manager, served as Medical Center Director for VANTHCS in 2022-23.

19. In March 2023, Mr. Brown was replaced by Mr. Jason Cave.

## Clinical Privileges and Adverse Clinical Actions

20. In order to practice as a surgeon in a VA hospital (or any other hospital), a doctor must have "privileges" to perform various specific functions, such as fluoroscopic imaging or robotic-assisted surgery. Plaintiff received these privileges for the VANTHCS in 2021.

21. Within the VA system, a physician's privileges may be suspended or reduced under the procedures set out in VHA Directive 1100.21(1) (2023). However, this directive did not go into effect until March 2, 2023.

22. Before March 2, 2023, privileging procedures were still governed by VHA Handbook 1100.19 (2012). In particular, before a physician's privileges could actually be reduced, he had to be allowed to review "all evidence not restricted by regulation or statute" upon which the proposed changes were based. He also had to be notified of his right to a Review Panel, at which he had the right to be present, to examine the evidence against him, to be represented, and to cross-examine witnesses.

23. Plaintiff joined the VA in 2021 and practiced without noteworthy incident until 2022 as a urological surgeon at the Dallas VA Medical Center.

24. Plaintiff reported to Dr. Karen Crotty, Chief of Urology and Assistant Chief of Surgical Services; Dr. John Modrall, Chief of Surgical Services; and Dr. Jeffrey Hastings, Chief of Staff; during some events, Dr. Raul Rivera served as Acting Chief of Staff.

25. Mr. Kenrick Brown served as Medical Center Director in 2022–23 and was replaced by Mr. Jason Cave in March 2023.

26. The Medical Center Director may also impose a Summary Suspension of Privileges under VA Privileging Directive 1100.21—Standard Operating Procedure P9 ("SOP P9"). A summary suspension is designed to temporarily stop the physician's practice in areas where the Director has some concern about patient safety, while an appropriate investigation is conducted. Per SOP P9, "it is critical that the investigation be completed, and appropriate action be taken as expeditiously as possible." As will be shown below, this did not occur in Dr. Mandalapu's case.

27. Also as noted by the SOP P9, the "appropriate investigation" is generally a Focused Clinical Care Review (FCCR) conducted under the authority of the Executive Committee of Medical Staff (ECMS) in accordance with VHA Directive 1100.21. VHA Handbook 1100.19, which governed privileges in 2022, required the FCCR to be completed within 30 days of the summary suspension, with the circumstances surrounding any deviations to be documented.

28. According to the VHA Office of Quality, Safety, and Value, Focused Clinical Care Review and FPPE For Cause Guidance (January 2018), "if it is determined that action should be taken on a provider's privileges, detailed evidence of substandard care must be gathered." As will be shown below, after the summary suspension of Dr. Mandalapu's privileges, he requested but did not receive such evidence; yet the language of this publication suggests that the evidence should already have been gathered before the summary suspension.

29. Once the FCCR is conducted, its results are sent to the ECMS, which makes a recommendation to the Medical Facility Director, who chooses between the following options: (1) no further action, (2) Focused Professional Practice Evaluation measures (a kind of probation for the physician), or (3) further steps to reduce the physician's privileges (which ultimately include the physician's right to a Review Panel). VHA Directive 1100.21, para. 7g. Under VHA Handbook 1100.19, the director had five business days from receipt of the recommendations to make this decision.

30. Thus, the procedures for reducing a physician's privileges in the VA move from collecting evidence (1) summary suspension (2) FCCR investigation (3) ECMS

recommendation (4) Action by the Director (5) Physician's right to a hearing before a Review Panel.

31. Of all the steps noted above, only the hearing before a Review Panel guarantees the physician procedural due process, in the sense of notice and a right to be heard; and the constructive denial of these rights by means of interminable delay lies at the heart of this lawsuit.

32. Adverse employment actions within the VA are governed by VA Handbook 5021/22, Employee/Management Relations. For adverse actions, the manual requires: "*An employee shall be informed in writing honestly and specifically why the action is being brought against him or her. An employee shall be given a reasonable opportunity to present his or her side of the case. The employee and representative shall have assurance of freedom from restraint, interference, coercion, discrimination, or reprisal in discussing, preparing, and presenting a defense*".

### Reports to the National Practitioner Data Bank

33. Under the Health Care Quality Improvement Act of 1986, the Department of Health and Human Services maintains the National Practitioner Data Bank (NPDB), to which reporting authorities (such as hospitals and the VANTHCS) must report certain significant actions in the career of a physician who receives his privileges from them.

34. Reportable actions include healthcare related criminal convictions, malpractice payments based on a physician's conduct, final actions reducing a physician's privileges, and (of interest to this case) a failure to renew clinical privileges by a physician who is under investigation.

35. As noted in Chapter E of the NPDB Guidebook, whether a given action is reportable often depends on whether the practitioner was afforded due process rights, or at least whether such rights were made available to him.

36. Also as noted in Chapter E of the NPDB Guidebook, a reporting entity may "void" its report at any time, if the report was submitted in error, the action did not meet NPDB reporting requirements, or the action was overturned on appeal.

**VA Privileging and Adverse Clinical Actions Framework**

37. Physicians require delineated surgical privileges; Plaintiff received such privileges in 2021 for VANTHCS.

38. In 2022, privileging was governed by VHA Handbook 1100.19 (2012), which required evidence review and notice of Review Panel rights, including presence, representation, and cross-examination, before a privilege reduction.

39. SOP P9 allowed summary suspension for patient-safety concerns during investigation, required expeditious investigation (typically via Focused Clinical Care Review ("FCCR")), and recognized FCCR timelines under VHA Handbook 1100.19 (30 days) with documentation of deviations.

40. Guidance required that detailed evidence of substandard care be gathered if action on privileges is contemplated.

41. Following FCCR, ECMS makes recommendations to the Medical Facility Director, who must act within five business days under VHA Handbook 1100.19.

42. Of these steps, only a Review Panel guarantees full procedural due process; constructive denial of such rights by delay is central to this case.

8

43. VA Handbook 5021/22 requires honest, specific written notice of adverse actions, a reasonable opportunity to respond, and freedom from reprisal in presenting a defense.

## NPDB Reporting Framework

44. The NPDB is maintained by HHS; reportable actions include final actions reducing privileges and failures to renew privileges while under investigation, and due-process availability bears on reportability; erroneous reports may be voided.

## EEOC and Initial Complaints

45. Dr. Mandalapu Makes His Original EEO Complaints

46. Dr. Mandalapu is an Asian man of East Indian origin.

47. Plaintiff engaged in EEOC-protected activity by complaining to his supervisors that he felt discriminated against based on age, race, accent, and national origin in February and April 2022.

48. VHA Directive 1039(3), Ensuring Correct Surgery and Invasive Procedures In and Out of the Operating Room (2018), forbids "concurrent" or "simultaneous' surgeries, in which a surgeon leaves uncredentialed providers to perform a critical part of a scheduled surgery while he attends to a different surgery at the same time.

49. Dr. Mandalapu's complaint was that his supervisors were assigning such surgeries to him, but were not doing so to Caucasian staff physicians in the same supervisory line.

50. Plaintiff complained to supervisors in February and April 2022 that he was discriminated against based on age, race, accent, and national origin, including objections to being assigned concurrent or simultaneous surgeries contrary to VHA Directive 1039(3) while similarly situated Caucasian surgeons were not.

9

51. This case challenges retaliation for protected activity rather than adjudicating the underlying discrimination allegations themselves.

52. This action is not based on whether the original actions were in fact discriminatory; but it is partly based on whether the VA took its subsequent actions in retaliation for Dr. Mandalapu's complaints of discrimination.

**Summary Suspension and Investigatory Process**

53. On May 14, 2022, Dr. Crotty recommended summary suspension of Plaintiff's operative privileges.

54. For further details as to Dr. Crotty's accusations, and why the bases given for the summary suspension were invalid, see Exhibit A to this complaint.

55. On May 18, 2022, Mr. Brown issued a summary suspension of clinical privileges against Dr. Mandalapu. This summary suspension prevented him from practicing surgery, and Dr. Mandalapu was reassigned to non-surgical duties.

56. Dr. Mandalapu asked Dr. Crotty for documented evidence, to explain why he was being summarily suspended. Dr. Crotty responded that she did not have to give him such evidence.

57. The appropriate investigation did not take place within 30 days, as required by VHA Handbook 1100.19 and SOP P9.

58. The required investigation was not completed within 30 days as required by governing guidance.

59. On September 23, 2022, Plaintiff received the FCCR with a 14-day response window; he responded on September 30, 2022.

60. On November 16, 2022, ECMS recommended against reinstatement; Plaintiff was not allowed to see this report until April 3, 2023, and the Director did not act within five business days as required.

61. By March–April 2023, Plaintiff informed Director Cave that he had been humiliated and intimidated without adequate reasons as the summary suspension persisted for over 10 months—well beyond contemplated timelines—and no decision had issued.

62. The prolonged suspension threatened atrophy of Plaintiff's highly specialized robotic and oncologic surgical skills.

### The Focused Clinical Care Review (FCCR)

63. On September 23, 2022, Dr. Mandalapu finally received a report from the FCCR. The cover letter noted that this report, together with any response from him, would be considered by the Executive Council of the Medical Staff (ECMS) in recommending a final action by the Executive Medical Center Director. It gave him 14 days to submit his response.

64. On September 30, 2022, Dr. Mandalapu did his best to answer the accusations against him, and provided some helpful detail. For details of why this FCCR report was invalid see **Exhibit A** to this complaint.

### Privilege Renewal and Resignation

65. On April 27, 2023, Plaintiff asked Director Cave to restore privileges, noting no veteran had suffered harm, and expressed intent to resign after reinstatement without conditions.

66. He asked Mr. Cave to restore his privileges, pointing out that the lengthy suspension had done irreparable damage to his career, not to mention imposing deep humiliation on him. He asked Mr. Cave to relieve him of further duties "as soon as [Mr. Cave] reinstate[d]

operative privileges without a condition"; in other words, Dr. Mandalapu wanted to first have his privileges restored, and then resign from the VA.

67. On May 29, 2023, the Medical Staff Office at VANTHCS wrote to Dr. Mandalapu, telling him it was time for him to renew his privileges.

68. On May 30, 2023, Dr. Mandalapu applied for renewal of his privileges. Applying for renewal is not an action reportable to the NPDB.

69. When Dr. Mandalapu resigned, he was not under investigation; the "investigation," the FCCR, had taken place the prior year.

70. On June 5, 2023, Plaintiff felt no choice but to resign, and he submitted his resignation; at that time, no bona fide investigation remained open—the FCCR had occurred the prior year.

### NPDB Reports

71. VANTHCS issued three successive NPDB reports.

72. August 3, 2023: report stating suspension and "voluntary surrender of clinical privileges while under, or to avoid, investigation"; both claims were untrue.

73. August 31, 2023: "corrected" report still claiming voluntary surrender while under investigation; still untrue.

74. February 20, 2024: final report continued the false claim of surrender while under or to avoid investigation.

### The Executive Committee of Medical Staff (ECMS) Takes Action

75. On November 16, 2022, the Executive Committee of Medical Staff (EMCS), the body that authorized the FCCS, issued a report, recommending that Dr. Mandalapu's privileges not be reinstated. However, Dr. Mandalapu was not allowed to see this report until April

12

3, 2023, and the Medical Center Director did not take action within 5 business days as required by VHA Handbook 1100.19. For further details of why the ECMS report was invalid, see Exhibit A to this complaint.

76. The Plaintiff wrote to Mr. Jason Cave, the new Medical Center Director, in March-April 2023, stating that he was humiliated, tortured, and intimidated without being informed of the reasons for the suspension of his privileges. At this point, the "summary suspension" had remained in place for over 10 months, far more the 30 days contemplated by VHA Handbook 1100.19 and SOP P9, and the Director still had not issued his decision.

77. The Plaintiff's skills, particularly his robotic assisted surgical skills and cancer surgical skills, are highly specialized skills. They require regular practice for the provider to maintain his proficiency. The protracted "summary suspension" led Dr. Mandalapu to fear that his skills would atrophy, and that he would never be able to practice these skills at all as long as he worked at the VA.

**VANTHCS Issues Its NPDB Reports**

78. In the aftermath of Dr. Mandalapu's resignation, VANTHCS has issued three successive reports against him to the NPDB.

79. The first report, issued on August 3, 2023, states that Plaintiff suffered a "suspension of clinical privileges" and undertook a "voluntary surrender of clinical privilege(s) while under, or to avoid, investigation relating to professional competence or conduct."

80. Both halves of this claim were untrue. Dr. Mandalapu had suffered only a non-reportable "summary suspension" of privileges. He had not voluntarily surrendered his clinical privileges by resigning after asking to renew them, and he was not under, or pending, any investigation when he resigned.

81. The second report, issued on August 31, 2023, supersedes the first, but it still states that Dr. Mandalapu voluntary surrendered his clinical privileges "while under, or to avoid, investigation relating to professional competence or conduct." This claim was still untrue.

82. The final report, issued on February 20, 2024, still contains the false claim that he surrendered his privileges "while under, or to avoid, investigation."

**Administrative Exhaustion and Continuing Harm**

78. Plaintiff disputed the NPDB reports through NPDB dispute resolution, but the false claim remains.

79. Plaintiff filed his formal EEO complaint on April 2, 2024; the EEOC Administrative Judge denied relief on February 21, 2025; the agency issued its final order on February 25, 2025; Plaintiff elected to bring this action.

80. Over Plaintiff's objection, two EEO cases were consolidated; one is on appeal to OFO; the other—based on the final NPDB report—is brought here with Plaintiff's other federal claims.

81. Since leaving the VA and since the NPDB reports, Plaintiff has repeatedly sought physician employment but has been unable to obtain it because of Defendants' actions.

82. Plaintiff exhausted Title VII administrative remedies received a final action order on February 25, 2025, and filed this action in a timely manner; Plaintiff also pursued NPDB dispute procedures.

**WESTFALL / FTCA**

83. The conduct alleged—knowingly false NPDB certification, retaliatory manipulation of privileging, and procedural sabotage during ongoing EEO proceedings—falls outside any

14

lawful discretionary authority and beyond the scope of employment, and violates mandatory legal requirements.

84. These acts constitute ultra vires and retaliatory misconduct not within the scope of legitimate federal employment.

85. Individual Defendants acted ultra vires, in bad faith, and beyond lawful authority, including conduct motivated by retaliation and knowingly false reporting. Texas torts are asserted only against individuals, not the U.S. federal agency.

86. Scope of employment for Westfall Act purposes is governed by state law and is subject to judicial, not unilateral executive, determination. Any certification by the Attorney General that federal employees acted within the scope of employment is subject to challenge and judicial review.

87. Plaintiff expressly contests any Westfall certification.

## CLAIMS FOR RELIEF

## COUNT I

**Administrative Procedure Act, 5 U.S.C. § 702 (Against VA and the Secretary in Official Capacity)**

88. The VA is an agency subject to the APA.

89. The VA's credentialing actions were unreasonably delayed and violated VA regulatory guidance governing summary suspensions, investigation timelines, ECMS consideration, and timely Director decisions.

90. The NPDB report asserting Plaintiff surrendered privileges while under investigation was arbitrary, capricious, and unsupported by substantial evidence.

15

91. VA Handbook 1100.17 requires due process under VHA Handbook 1100.19 before reporting a surrender of privileges while under investigation; that requirement was not satisfied.

92. The VA's filing also violated VA Handbook 1100.17, National Practitioner Data Bank Reports, para. 9a(2) (2009), which requires that "[t]he physician must be offered due process (as outlined in VHA Handbook 1100.19)" before an NPDB report may be filed based on a surrender of privileges while under investigation.

93. Dr. Mandalapu has suffered harm from the defendants' actions, to include damage to his skills, being pressured into resigning from his job, and being unable to obtain a new one as a urological surgeon.

## COUNT II

**Fifth Amendment Due Process (Against VA and the Secretary in Official Capacity)**

94. Defendants' actions inflicted stigma and reputational harm in connection with serious adverse actions—the prolonged, de facto suspension of privileges, constructive discharge, and industry-wide barriers to practice—implicating recognized liberty interests.

95. Plaintiff was denied procedural due process because he lacked full notice of the evidence and a meaningful hearing at which to rebut and cross-examine before the effective deprivation.

96. Defendants thereby deprived Plaintiff of liberty without due process of law.

## COUNT III

**Title VII Retaliation, 42 U.S.C. § 2000e-3 (Against VA and the Secretary in Official Capacity)**

97. Plaintiff engaged in protected activity in February–April 2022 by opposing perceived discrimination based on age, race, accent, and national origin.

98. Shortly thereafter, Defendants imposed a summary suspension based in part on surgical issues for which similarly situated Caucasian surgeons were not suspended.

99. Defendants prolonged proceedings, preventing Plaintiff from practicing his specialty, degrading his skills, and precipitating his constructive discharge and false NPDB reports; he continues to suffer harm.

100. Defendants disregarded Plaintiff's repeated requests for evidence and updates, evidencing intentionality.

101. Defendants intentionally subjected Plaintiff to adverse actions because of his protected activity.

## COUNT IV

### Defamation (Against Individual Defendants)

102. Defendants published false statements through NPDB submissions, asserting that Plaintiff voluntarily surrendered clinical privileges while under, or to avoid, investigation relating to professional competence or conduct, and that he provided substandard care or had inadequate skills. These statements foreseeably deterred employers and credentialing entities nationwide.

103. These statements are defamatory per se under Texas law because they impute professional incompetence and misconduct injurious to Plaintiff's profession and were communicated to third parties through the NPDB national repository, which is queried by hospitals, medical boards, and healthcare insurers nationwide.

104. Defendants acted at least negligently, and in many instances with actual malice, including republication after voiding an earlier NPDB report as erroneous.

105. Plaintiff suffered presumed and actual damages, including loss of employment opportunities and reputational harm.

106. Defendants, including Drs. Crotty, Gahan, Modrall, Rivera, Hastings, and Directors Brown and Cave, published false statements to the NPDB that Plaintiff voluntarily surrendered clinical privileges while under, or to avoid, investigation relating to professional competence or conduct, and that he provided substandard care or had inadequate skills.

107. These statements are defamatory per se because they impute professional incompetence and misconduct injurious to Plaintiff's profession and were communicated to third parties through the NPDB, which is queried by hospitals, boards, and insurers.

108. Defendants acted at least negligently, and on information and belief, knowingly or recklessly, despite voiding or correcting iterations and then re-publishing substantively similar content.

109. Plaintiff suffered presumed and actual damages, including loss of employment opportunities and reputational harm.

110. Each publication to the NPDB constitutes a separate publication; the August 3, 2023, August 31, 2023, and February 20, 2024, reports constitute distinct acts, with the latter remaining active and disseminated upon query.

111. The NPDB's restricted-access, query-based nature and Defendants' voiding and resubmission practices materially affected discovery, accrual, and republication of the alleged defamation and fraudulent statements.

18

## COUNT V

**Fraud and Fraudulent Misrepresentation (Against Individual Defendants)**

112. Defendants knowingly made materially false representations in NPDB reports and related communications, intending that hospitals, credentialing bodies, and licensing authorities rely upon them.

113. Third parties did in fact rely on these misrepresentations, causing Plaintiff concrete professional and economic harm. As a direct consequence, Plaintiff suffered loss of earning capacity.

114. Plaintiff surrendered privileges while under investigation and was incompetent or provided substandard care; Defendants knew these statements were false or acted with reckless disregard and intended third-party reliance.

115. The NPDB and credentialing recipients justifiably relied on these statements in evaluating Plaintiff's applications, causing injury including loss of employment and professional opportunities.

## COUNT VI

**Tortious Interference with Prospective Business Relations (Against Individual Defendants)**

116. Plaintiff had reasonable probability of prospective employment and credentialing opportunities post-VA; Defendants knew of such prospective relations and intentionally interfered through independently tortious and unlawful conduct, including defamation and fraudulent NPDB reporting, proximately causing the loss of those opportunities and damages.

19

117. Each publication to the NPDB constitutes a separate publication; the August 3, 2023, August 31, 2023, and February 20, 2024, reports constitute distinct acts, with the latter remaining active and disseminated upon query.

118. The NPDB's restricted-access, query-based nature and Defendants' voiding and resubmission practices materially affected discovery, accrual, and republication of the alleged defamation and fraudulent statements.

## COUNT VII

### Civil Conspiracy (Against Individual Defendants)

119. Defendants agreed and acted in concert to achieve unlawful objectives, including retaliatory prolongation of summary suspension, a conflicted peer-review process, and false NPDB reporting to injure Plaintiff's profession; one or more overt acts were committed in furtherance, proximately causing damages.

## COUNT VIII

### Abuse of Process (Against Individual Defendants)

120. Defendants used internal privileging and peer-review processes (summary suspension, FCCR, ECMS) for an ulterior purpose: retaliation for Plaintiff's protected activity and to engineer adverse NPDB reporting, employing the process in a manner not proper in the regular conduct of proceedings, causing damages.

## COUNT IX

### Negligent Supervision and Retention (Against Individual Defendants with Supervisory Authority)

121. Defendants with supervisory authority negligently supervised or retained personnel who conducted the FCCR/ECMS process and prepared NPDB submissions despite notice of procedural defects and inaccuracies, resulting in foreseeable harm to Plaintiff.

## COUNT X

### Intentional Infliction of Emotional Distress (Against Individual Defendants)

122. Defendants engaged in extreme and outrageous conduct by knowingly prolonging a *"summary"* suspension far beyond policy timelines, withholding evidence, and falsely branding Plaintiff as incompetent under investigation in a national repository, intentionally or recklessly causing severe emotional distress and damage to his career.

123. Each publication to the NPDB constitutes a separate publication; the August 3, 2023, August 31, 2023, and February 20, 2024, reports constitute distinct acts, with the latter remaining active and disseminated upon query.

124. The NPDB's restricted-access, query-based nature, and Defendants' voiding and re-submission practices, materially affected discovery, accrual, and republication of the alleged defamation and fraudulent statements.

124. Plaintiff exhausted Title VII administrative remedies, received a final order on February 25, 2025, and timely filed this action; Plaintiff also pursued NPDB dispute procedures.

## JURY DEMAND

125. Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court:

a)   Declare that the February 20, 2024, NPDB report is arbitrary and capricious, retaliatory, and violative of Plaintiff's Fifth Amendment due process rights;

b) Issue injunctive relief requiring VANTHCS to void the February 20, 2024 NPDB report within a specified period;

c) Award Plaintiff damages under Texas law against the individual defendants, including economic damages, reputational harm, loss of employment/privileges, and any other damages supported by the evidence and as permitted by law.

d) Award compensatory damages, emotional distress damages, and punitive damages as permitted by law;

e) Award reasonable attorneys' fees;

f) Tax costs of suit; and

g) Award such other and further relief as this Honorable Court deems just and proper.

Respectfully Submitted,

*/s/ Sean C. Timmons*

Sean C. Timmons, Esq., LL.M.
Managing Partner, Tully Rinckey PLLC
Texas Bar No.: 24067908
New York State Bar No.: 5470190
Admitted to Practice in all
Texas Federal Courts
18722 University Blvd., Ste. 235
Sugar Land, TX 77479
(832) 240-3273 Phone
(281) 387-3411 Cell
(832) 241-5998 FAX
Stimmons@tullylegal.com
*Attorney for Plaintiff, Dr. Rao Mandalapu*

*/s/ Michelle A. Salermo*
Michelle Alvarado Salermo, Esq.
Associate, Tully Rinckey PLLC
5488 Sheridan Drive Suite 500

Buffalo NY 14221
Tel: (716) 272-3015
Fax: (716) 462-4455
msalermo@tullylegal.com